IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| The Private Suite IAD, LLC, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | |
| | ) | Civil Case No. 1:26-cv-349 |
| Metropolitan Washington | ) | |
| Airports Authority, | ) | |
| | ) | |
| *Defendant.* | ) | |
| | ) | |

---

**MEMORANDUM IN SUPPORT OF THE PRIVATE SUITE IAD, LLC'S
EMERGENCY MOTION FOR TEMPORARY INJUNCTIVE RELIEF**

---

The Private Suite IAD, LLC ("PS") moves the Court for temporary injunctive relief against the Metropolitan Washington Airports Authority ("MWAA"). Because MWAA's inevitable award of a nine-figure contract ("the Contract") to PS's competitor was predicated on arbitrary and irrational decisions that violate the statutory scheme governing MWAA and will irreparably damage PS, the Court should enjoin MWAA's issuance of an award during the pendency of this dispute.

**THE STATUTORY SCHEME**

This is a pre-award bid protest action against MWAA. MWAA is "a regional entity created by the Virginia General Assembly and the District of Columbia City Council for the purpose of operating the federally owned Washington-Dulles International Airport [("Dulles")] and Ronald Reagan Washington National Airport [("Reagan National")]." *Washington-Dulles Transp., Ltd. v. MWAA*, 263 F.3d 371,

373 (4th Cir. 2001) ("*WDT I*"). Thus, MWAA leases the land on which Dulles and

Reagan National are situated from the Secretary of Transportation, *i.e.*, from the

federal government. However, given its status as an independent entity, MWAA is

not itself a federal agency subject to the Administrative Procedure Act or the Little

Tucker Act. *Corr v. MWAA*, 702 F.3d 1334, 1335 (Fed. Cir. 2012). Because MWAA is

not a federal agency, Congress passed the so-called "Enabling Act" to delimit

MWAA's actions and provide for certain contractual minimums to be included in the

lease ("the Lease") between MWAA and the Secretary of Transportation. 49 U.S.C.

§§ 49101–12; Ex. 1, Lease. The Enabling Act specifically imbues this Court with

"jurisdiction to compel [MWAA] and its officers and employees to comply with the

terms of the [L]ease." *Id.* § 49104(c).

The Enabling Act expresses an overwhelming congressional intent to ensure

that MWAA adheres to the traditional rules of the road for government contracting

and procurement. To accomplish this aim, the Enabling Act identifies certain terms

that the Lease "must provide during its 50-year term." 49 U.S.C. § 49104(a). Among

other things, "[i]n acquiring by contract supplies or services for an amount

estimated to be more than $200,000, or awarding concession contracts, [MWAA] to

the maximum extent practicable shall obtain complete and open competition

through the use of published competitive procedures." *Id.* § (a)(4). True to the

Enabling Act's requirements, the Lease contains a substantively identical provision.

*See* Ex. 1, Lease, at § 11.D. As this Court has put it: "[T]he Enabling Act specifically

requires MWAA to follow open and competitive contracting procedures."

*LTMC/Dragonfly, Inc. v. MWAA*, 699 F. Supp. 2d 281, 291 (D.D.C. 2010). This requirement resulted in MWAA's adoption of a Contracting Manual ("the Manual").

The Enabling Act features several other pertinent provisions relating to MWAA's contracting authority. This Court has noted that the statute "also requires that MWAA's contracts be 'awarded by procedures that follow sound Government contracting principles.'" *LTMC/Dragonfly, Inc.*, 699 F. Supp. 2d at 284 (quoting 49 U.S.C. § 49106(g)). Given the capitalization of "Government" in Section 49106(g) and other references within the Enabling Act to the 'United States Government," there can be little doubt as to Congress's intent: MWAA is required to follow sound *federal* government contracting principles in its procurements. *Compare, e.g.*, 49 U.S.C. § 49106(g), *with id.* § (a)(2).

On top of that, MWAA must "develop a code of ethics and financial disclosure to ensure the integrity of decisions made by the board of directors and employees." *LTMC/Dragonfly, Inc.*, 699 F. Supp. 2d at 284 (citing 49 U.S.C. § 49104(a)(8)). And the Enabling Act "prohibits members of the MWAA board and their families from having financial conflicts of interests with any enterprise that does business with MWAA." *Id.* (citing 49 U.S.C. § 49106(d)). When its provisions are taken together, "the Enabling Act provides jurisdiction for a disappointed bidder to challenge the MWAA's application of competitive bidding procedures that are required by the Lease." *Id.* (citing *WDT I*, 263 F.3d at 377).

4926-1406-4524.1

## FACTUAL AND PROCEDURAL BACKGROUND

**A.    MWAA solicits proposals for a luxury private terminal at Dulles.**

As the operator of Dulles, MWAA decided it wanted a luxury private terminal at Dulles, presumably to take advantage of the burgeoning market for luxury travel. MWAA's desire for such a terminal piqued PS's interest. PS is a California-based company that pioneered the idea of a luxury private terminal at commercial airports. PS offers its customers a first-class, white-glove experience: private luxury suites in separate terminals with tarmac car service to commercial planes. Perhaps most importantly of all, PS's terminals feature separate customs and security, allowing PS's customers to "skip the line" and go through security discretely and comfortably. PS presently offers this exclusive experience at Los Angeles International Airport and Hartsfield-Jackson Atlanta International Airport, and it's developing new terminals in airports in Paris, Dallas-Fort Worth, and Miami. Simply put: PS stands alone in the niche luxury terminal industry.

Given the tens of millions of dollars required for such an undertaking, MWAA had to publicly bid the project under the Enabling Act. On June 26, 2023, MWAA issued RFP-23-21311, entitled "Remote VIP Passenger Processing Service Concession, IAD" ("the Original RFP"). Ex. 2, Original RFP. The Original RFP featured two phases, one technical and one financial. Under the first, MWAA would evaluate offerors' proposals to determine whether an offeror could provide MWAA the level of service and technical expertise to develop, lease, and operate a luxury private terminal at Dulles. Under the second phase, MWAA would determine whether an offeror could provide MWAA the optimal return on its investment.

-4-

The Original RFP called for a "negotiated Best-Value procurement method" as that term was defined in MWAA's Contracting Manual ("the Manual"). *See* Ex. 3, Manual, at 33. Under this method, MWAA evaluates technical factors and price separately, then considers them together to determine which proposal offers the best value to the airport. If the proposals are technically equivalent, price becomes the controlling factor. But if a proposal offers additional technical benefit, MWAA is not obligated to accept the lowest price proposal. Similarly, in proposals that request that an offeror provide a percentage of revenue or rent to the airport—like this one—MWAA is not obligated to accept the highest price proposal if there is additional technical benefit in a lower price proposal.

PS submitted a proposal responsive to this Original RFP, highlighting its extensive—if not exclusive—expertise in the realm of private terminals. Because of its real-world experience, PS provided MWAA with exhaustive, data-driven estimates for what MWAA could expect (both technically and financially) from PS's operation of a private terminal at Dulles. No other company could provide MWAA with the level of detail that PS provided—because no one else has done it.

Only one other offeror sent MWAA a proposal: daa International ("DAAI"). DAAI is wholly owned by the Irish State and does not operate any luxury terminals in the United States, which meant DAAI had to present its proposal alongside an American affiliate, Potomac Holdings, LLC (more on that later). In reality, DAAI only operates one terminal worldwide that even approaches the private terminal experience. Critically, though, DAAI's experience does not offer the private security

experience integral to PS's private terminals, *i.e.*, DAAI's customers go through security and customs in traditional terminals before entering a suite attached to a commercial terminal. This experience is decidedly less valuable to customers in the marketplace for luxury travel—which means that it has a direct and inevitable impact on what DAAI could charge its customers, and ultimately what it could feasibly remit to MWAA under the Original RFP's financial requirements.

**B.    MWAA cancels the Original RFP without explanation after PS files a bid protest highlighting the weaknesses in its competitor's proposal.**

Despite DAAI's inferior qualifications, it quickly became apparent that MWAA was bound and determined to award the Contract to DAAI. On February 7, 2025, MWAA informed PS that it intended to award DAAI the Contract based on DAAI's "highest price" of some $104,716,074.17 in total Ground Rent and Minimum Annual Guarantee.

That pie-in-the-sky number was unmoored from reality. PS knew that because of the extensive data it collected during its operation of private terminals across the country. So, on February 14, 2025, PS filed a protest with MWAA, pointing out that MWAA had grossly overvalued DAAI's technically weaker proposal and credited its unrealistic financial projections, which could not be supported by data because DAAI lacked a record of operating similar facilities in the United States (or anywhere, for that matter). Ex. 4, February 2025 Protest. Boiled down: DAAI was writing checks in its proposal that it couldn't cash when the time came to perform.

4926-1406-4524.1

On April 4, 2025, PS filed a supplemental protest reiterating these concerns following a debriefing session with MWAA about the dispute. Ex. 5, April 2025 Protest. PS escalated its protest to MWAA's CEO and, eventually, to MWAA's Board of Directors. Ex. 6, April Board Protest. At each stage of the dispute, PS explained anew that MWAA had selected a technically inferior proposal based on an unrealistic and unsupported price, thus transgressing the stated purposes of a best-value procurement under the Manual.

PS's bid-protest efforts were initially successful. On June 13, 2025, MWAA issued Amendment 5 to the Original RFP, cancelling the solicitation altogether. Ex. 7, Amendment 5. But MWAA did not explain in Amendment 5—or anywhere—why it was cancelling the solicitation, despite the Manual's requirement that MWAA document the reason for its cancellation. Ex. 3 Manual, at § 4.2.3. Still, the silence spoke volumes: MWAA clearly did not believe that it could award the contract to DAAI under the Original RFP's parameters after PS pointed out the flaws in DAAI's proposal and MWAA's evaluation thereof.

## C.    MWAA issues a functionally identical RFP with a different evaluation method designed to award the Contract to DAAI.

Not to be deterred, on September 25, 2025, MWAA issued a functionally identical procurement RFP-25-24520, entitled "Remote VIP Passenger Services at IAD" ("the New RFP"). Ex. 8, New RFP. Tellingly, though, the New RFP contains a different method for MWAA's evaluation of the proposals. Rather than evaluate the proposals for the best value to MWAA, MWAA arbitrarily switched evaluation methodologies to pursue a "Highest Price Technically Acceptable" ("HTPA") method

-7-

of evaluating the proposals. Rather than select the contractor that offers the best value to the airport, this methodology means that MWAA must accept the proposal that offers MWAA the highest projected revenue, so long as the proposal is minimally acceptable as it relates to the New RFP's technical requirements.

MWAA never offered a rationale for changing procurement methodologies, but it was patently obvious that the new methodology favored DAAI. Still, the New RFP (originally) maintained a failsafe: While the proposals only had to meet minimal technical requirements (which, standing alone, is a staggering choice by MWAA given security concerns at an international airport), MWAA said it would nonetheless evaluate the proposals for "reasonableness, completeness, and realism as appropriate." Ex. 9, Attachment 01, § 02. Despite its misgivings about the change in RFP evaluation methodology, this "reality failsafe" convinced PS that it still had a chance at winning the Contract.

But as the solicitation progressed, it became clear that MWAA (and others) were intent on awarding the Contract to DAAI. On November 3, 2025, a group of Democratic congresspeople wrote a letter to MWAA about DAAI's and "Potomac Holdings, LLC's bid for the new VIP Terminal at Washington Dulles International Airport." Ex. 10, Congress Letter. Though its stated purpose was to "urge the Board [of MWAA] to conduct a thorough and impartial evaluation of all proposals," the letter read like a billboard for PS's competitor in the New RFP. Among other things, the letter's authors highlighted that PS's competitor had been awarded the Contract under the Original RFP; featured members that were from Virginia; and had, in the

4926-1406-4524.1

authors' estimation, enough experience to handle operation of a private terminal. *See id.*

Just 9 days after this letter was sent, MWAA issued an amendment ("Amendment 2") to the New RFP. Ex. 11, Amendment 2. Amendment 2 deleted, without explanation, the "reality failsafe" from the New RFP. *Id.* In other words, the fact that DAAI's financial projections are entirely untethered from reality became irrelevant because MWAA elected to remove that critical factor from the factors it was required to analyze. Instead, Amendment 2 only requires that MWAA review the proposal for "responsive[ness] to the [RFP] requirements." *Id.*

To remind, those RFP requirements are simply that the proposal meet the minimum technical requirements and feature the highest price. So, under the amended New RFP, MWAA would be *required* to award the contract to any entity that minimally achieves the technical requirements and puts forth the highest price. Put another way, MWAA adopted an amendment that ensures it is powerless to evaluate the highest price proposal it receives for "reasonableness" or "realism"— all without an explanation, much less a reasonable one.

**D.    PS protests MWAA's changes to the solicitation, but MWAA denies the protest at every level of review.**

MWAA's addition of Amendment 2 left PS with no option but to file another protest challenging Amendment 2 as arbitrary and capricious. Ex. 12, November 2025 Protest to VP. PS explained that the removal of the failsafe perversely incentivizes offerors to provide the highest number they could conceivably propose, with little to no regard for feasibility, and guarantees that no analysis or evaluation

4926-1406-4524.1

of feasibility would occur. PS also highlighted that MWAA is statutorily required to follow "procedures that followed sound Government contracting principles" and that analogous federal contracting regulations *universally* require similar public entities to evaluate proposals for reasonableness and provide for cost realism analyses to determine whether cost elements are realistic. On top of that, PS explained the obvious prejudice it suffered by having to undergo a competitive procurement in which its financial projections are constrained by reality, and its competitor's projections are not. PS cannot ethically inflate its pricing to match the fanciful speculation of DAAI.

But PS's protests fell on deaf ears. On December 8, 2025, MWAA's vice president denied PS's protest, claiming among other things that MWAA is under no obligation to follow sound Government contracting principles as developed in federal law and that MWAA is entitled to delete the "reality failsafe" because its Manual doesn't expressly say it can't do so. Ex. 13, VP Denial.

When PS escalated its protest to MWAA's CEO, *see* Ex. 14, December 2025 Protest to CEO, the CEO similarly claimed MWAA has no obligation to follow sound Government contracting principles as developed in federal caselaw—including that it is under no obligation to follow "reasonableness or realism principles" in making an award. Ex. 15, CEO Denial. Nowhere did the CEO explain the rationale behind deleting the failsafe from the amended New RFP, other than to argue generally that there are other sufficient safeguards elsewhere in the procurement. *Id.*

4926-1406-4524.1

MWAA's Board of Directors ("the Board") trotted out the same hollow explanations when PS raised its protest to the Board. Ex. 16, Board Denial; Ex. 17, December 2025 Protest to Board. Echoing previous layers of MWAA review, the Board repeated the bold claim that it is under no obligation to follow federal caselaw or regulations regarding reasonableness or realism, and that MWAA's decision to delete the failsafe can't be arbitrary and capricious because there are other safeguards in the New RFP. Ex. 16. The safeguards that the Board identified are that MWAA would ensure DAAI was "responsible" and that MWAA could always sue DAAI if it fails to meet its contract obligations. *Id.* Tellingly, though, the Board again offered no rationale whatsoever for its decision to delete the "reality failsafe."

Though reserving its rights to challenge the solicitation and procurement conducted by MWAA as unlawful, arbitrary, capricious, and prejudicial, PS ultimately submitted a proposal to MWAA. MWAA has not made an award of the Contract at the time of this motion. Despite this fact, PS reasonably expects that the MWAA's unlawful, arbitrary, capricious, and prejudicial procurement process will eventually lead to the preordained selection of DAAI for this Contract.

PS moves for temporary injunctive relief.

## ARGUMENT

**I.    PS is entitled to injunctive relief halting MWAA's award of the Contract to PS's competitor during the pendency of this dispute.**

"The decision of whether to award a TRO is 'analyzed using the same "factors applicable to preliminary injunctive relief,"' and a TRO 'may only be awarded upon

a clear showing that the plaintiff is entitled to such relief.'" *Chef Time 1520 LLC v. Small Bus. Admin.*, 646 F. Supp. 3d 101, 109 (D.D.C. 2022) (quoting *Costa v. Bazron*, 456 F. Supp. 3d 126, 133 (D.D.C. 2020)). "To obtain a TRO, a movant 'must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest.'" *Id.* (quoting *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014)). "When seeking such relief, 'the movant has the burden to show that all four factors, taken together, weigh in favor of the injunction.'" *Id.* (quoting *Abdullah v. Obama*, 753 F.3d 193, 197 (D.C. Cir. 2014)).

Here, all four factors support entry of injunctive relief in PS's favor.

### a. PS has shown a likelihood of success on the merits because MWAA's anticompetitive actions are arbitrary and prejudicial.

The first factor the Court considers when determining whether to issue injunctive relief is whether the movant has shown a likelihood of success on the merits. *Chef Time 1520 LLC*, 646 F. Supp. 3d at 109. PS handily shows such likelihood of success because MWAA's procurement decisions were the epitome of "arbitrary and capricious" under any reasonable definition of that phrase.

Though the cases challenging MWAA's procurement actions are few, this Court has made clear that a jilted bidder may petition this Court for redress of a violation of "its right to a legally valid procurement process" with the MWAA if it is prejudiced thereby. *See LTMC/Dragonfly, Inc.*, 699 F. Supp. 2d at 291 (quoting *Nat'l Maritime Union of Am. v. Commander, Military Sealift Command*, 824 F.2d

1228, 1237 (D.C. Cir. 1987). Moreover, both a panel of the Fourth Circuit and this Court have emphasized that an aggrieved party is entitled to challenge MWAA's actions as both a "violation of applicable statutes or regulations" or as "an arbitrary or irrational decision." *See Washington-Dulles Transp. Ltd. v. MWAA*, 87 F. App'x 843, 849 (4th Cir. 2004) ("*WDT II*"); *see also LTMC/Dragonfly, Inc.*, 699 F. Supp. 2d at 291. Thus, the familiar arbitrary and capricious standard governs this Court's review of MWAA's actions.

As this Court has pointed out, "[t]he goal of such review is to assess whether or not the agency reached its decision through a 'logical and rational' process." *Pol'y & Rsch., LLC v. United States Dep't of Health & Hum. Servs.*, 313 F. Supp. 3d 62, 72 (D.D.C. 2018) (Jackson, J.) (quoting *Michigan v. E.P.A.*, 576 U.S. 743, 750 (2015)). What that means in practice is that an agency must "articulate a satisfactory explanation for its action." *Id.* (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513, (2009)). Action "accompanied by '*no* explanation' is the epitome of 'arbitrary and capricious' decision-making." *Id.* (quoting *Commc'ns & Control, Inc. v. FCC*, 374 F.3d 1329, 1335–36 (D.C. Cir. 2004)). And of course, "i[t] is also clear beyond cavil that an agency acts arbitrarily and capriciously if it acts in a manner that is contrary to its own regulations or a congressional statute." *Id.* (citing *Nat'l Envtl. Dev. Ass'n's Clean Air Project v. EPA*, 752 F.3d 999, 1009 (D.C. Cir. 2014)).

Here, it can't be seriously disputed that MWAA's collection of decisions related to this procurement was arbitrary and capricious and ran afoul of the

Enabling Act's (and the Lease's) clear dictate that MWAA hew to "sound Government contracting principles" in its procurements. *See* 49 U.S.C. § 41906(g). MWAA began by cancelling (without explanation) the original best-value RFP and an intended award to PS's lone competitor after PS pointed out that DAAI's proposal was both technically weaker than PS's proposal and financially impossible. That reasonless cancellation violated MWAA's own procedures requiring that MWAA document its reasons for cancelling a solicitation. Ex. 3, Manual, at § 4.2.3.

Unfortunately, the reason MWAA cancelled the solicitation was put into sharp relief by MWAA's next arbitrary and capricious decision: reissuing a substantively identical New RFP with an entirely different evaluation methodology—the HTPA methodology. Under that standard, MWAA would no longer accept the proposal that offered the best value to the airport, but would instead accept the proposal that offered the most proposed rent to the airport, even if the proposal was technically much weaker than another proposal. Given that there were only two offerors for the Original RFP—PS and DAAI—it is plain that MWAA swapped methodologies between the RFPs to ensure that DAAI's technically weaker (and financially unrealistic) proposal would be accepted over PS's proposal.

This was all but confirmed by MWAA's arbitrary and capricious adoption of Amendment 2, which was added just days after MWAA received a letter from multiple Democratic congressmen who not-so-subtly threw their support behind PS's competitor. Amendment Two deleted the requirement that MWAA review a proposal's financial offering for "reasonableness" and "realism"—the exact concerns

-14-

raised by PS with respect to its competitor's unrealistic and evidentially baseless financial projections. Not only are these requirements standard fare in federal government contracting,[1] but MWAA has *never* explained its decision to remove this "reality failsafe" from the New RFP, other than to baldly claim its purposes could be served with replacement language requiring MWAA to review a proposal for "responsiveness" to the New RFP's requirements. That nonanswer is the antithesis of a logical explanation for the change. Rather than justify the *reason* for the change, MWAA has instead said its amendment offers the same safeguards as the language did before the change. But, as the saying goes, if it ain't broke, why fix it?

When these actions are viewed together in this procurement's context, PS need not strain to show a substantial likelihood of success on its claim that MWAA acted arbitrarily and capriciously. MWAA's actions evince an unrelenting desire by MWAA to award this nine-figure contract to PS's competitor no matter how technically inferior or financially unrealistic the competing proposal may be. MWAA's series of unexplained decisions in this procurement run roughshod over the Enabling Act's requirements that MWAA promote competitive bidding and conduct its procurements in accordance with sound government contracting principles. And there can be no doubt PS is "significantly prejudiced by the errors in the procurement process"—PS is the only other competitor and is therefore "next in line to be awarded the contract if the protest is sustained." *Monument Realty LLC v. Washington Metro. Area Transit Auth.*, 540 F. Supp. 2d 66, 77 (D.D.C. 2008).

This factor cuts in favor of injunctive relief.

---

[1] 48 C.F.R. § 15.402; 48 C.F.R. § 15.404-1(a); 48 C.F.R. § 15.404-1(d).

### b. PS will suffer irreparable harm if MWAA is allowed to award the Contract while this dispute is underway.

The next factor the Court must consider is whether PS will suffer "irreparable harm" if MWAA's imminent award of the contract is allowed to occur. *See Chef Time 1520*, 646 F. Supp. 3d at 109. PS easily shows that, too.

This Court has noted that "courts have held that the loss of a chance to bid on a contract can constitute irreparable harm." *E.B. v. U.S. Dep't of State*, 422 F. Supp. 3d 81, 90 (D.D.C. 2019). Other courts—including those who regularly traffic in bid protests—agree "that denial of an opportunity to compete may itself constitute irreparable injury." *See Def. Tech., Inc. v. United States*, 99 Fed. Cl. 103, 131 (2011). That's effectively what has happened here, as PS cannot compete on equal footing with an inexperienced company that has been greenlit by MWAA to submit financial projections unsupported by evidence and unconstrained by reality. PS could not—indeed, cannot—ethically submit financial proposals based on anything but the data it has generated in actually operating private terminals at other airports. By removing Amendment 2 from the solicitation, MWAA stripped PS of the ability to compete fairly with DAAI in the financial phase of the New RFP.

Another reason that PS will suffer irreparable harm is because the Enabling Act does not give PS the right to recover monetary damages from MWAA for its violations of the Enabling Act, whether that be bid costs, lost income, or lost business opportunities. *See LTMC/Dragonfly Inc.*, 699 F. Supp. 2d at 295 (holding that "claims for damages are not authorized by the Enabling Act."). This means that any monetary damage "suffered by a plaintiff is irreparable *per se*." *See Feinerman*

-16-

*v. Bernardi*, 558 F. Supp. 2d 36, 51 (D.D.C. 2008). This provides yet more support for PS's application for temporary injunctive relief.

Taking these considerations together, PS has demonstrated that this factor weighs in favor of temporary injunctive relief.

### c. The balance of the equities (and harm to the public interest) favors PS because the Contract can be awarded once its dispute with MWAA is resolved.

"The balance of the equities weighs the harm to [PS] absent a TRO against the harm to the agency if the Court grants the motion." *Chef Time 1520*, 646 F. Supp. 3d at 116. Where, as here, a government agency is the defendant, this third factor of the TRO inquiry merges with the fourth factor because "[MWAA's] interest is the public interest." *See id.* (quoting *Pursuing America's Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016)).

This Court has noted that "the public interest [is] served by ensuring that the government obtains the most advantageous contracts *by complying with the procedures which Congress and applicable regulations have provided." Eco Tour Adventures, Inc. v. Zinke*, 249 F. Supp. 3d 360, 386 (D.D.C. 2017) (citation omitted) (emphasis added). Further, "the public interest strongly favors maximizing competition in all federal government procurements." *Abel Converting, Inc. v. United States*, 679 F. Supp. 1133, 1142 (D.D.C. 1988). While this procurement is not technically federal, the Enabling Act makes it clear that the same principles apply to MWAA's procurements. *See, e.g.*, 49 U.S.C. § 49106(g). And where, as here, "a preliminary injunction would simply maintain the status quo," an agency "will

-17-

suffer no cognizable injury from a delay in the award of contracts." *Abel Converting, Inc.*, 679 F. Supp at 1142.

This factor therefore cuts in favor of temporary relief.

## CONCLUSION

PS is not asking for drastic relief in its motion. It only asks that the Court pause MWAA's award of the Contract pending resolution of this dispute.

**RESPECTFULLY SUBMITTED** this the 5th day of February, 2026.

**THE PRIVATE SUITE IAD, LLC**

*/s/ Andrew J. Narod*
Andrew J. Narod (D.C. Bar No. 1006083)
Erik M. Coon (D.C. Bar No. 1656075)
Bradley Arant Boult Cummings LLP
1900 K Street, NW
Suite 800
Washington, D.C. 20006
P: 202.719.8271
F: 202.719.8371
anarod@bradley.com
ecoon@bradley.com

R. Sumner Fortenberry (MS Bar No. 106292)
*Pro Hac Vice Application Forthcoming*
Bradley Arant Boult Cummings LLP
188 E. Capitol St., Suite 1000
Jackson, MS 39202
Tel: (601) 592-9922
Email: sfortenberry@bradley.com

*Attorneys for The Private Suite IAD, LLC*

4926-1406-4524.1

## CERTIFICATE OF SERVICE

Pursuant to Local Rule 65.1, I hereby certify that on the 5th day of February, 2026, a copy of the foregoing was submitted via the Court's CM/ECF system. In addition, I certify that the following additional parties were served on the same date via hand delivery; certified mail; and email to:

Felice C. Smith
Vice President and Secretary, Board of Directors
Metropolitan Washington Airports Authority
Felice.Smith@MWAA.com
2733 Crystal Drive,
Arlington VA 22202

And via email only to:

Julia Hodge
Vice President, Office of Supply Chain Management
Metropolitan Washington Airports Authority
Julia.Hodge@MWAA.com

Donald Laffert
Senior Attorney
Metropolitan Washington Airports Authority
Donald.Laffert@MWAA.com

/s/ *Andrew J. Narod*
Andrew J. Narod

4926-1406-4524.1