**Aron C. Beezley**
abeezley@bradley.com
202.719.8254 direct



February 14, 2025

**_VIA hand delivery to the Authority's Procurement & Contracts Department; certified mail, return receipt requested; and email._**

Julia Hodge
Vice President, Office of Supply Chain Management
Metropolitan Washington Airports Authority

       **RE:**            **Solicitation No. RFP-23-21311**

       **SUBJ:**        **Protest of The Private Suite IAD, LLC (dba PS)**

Dear Ms. Hodge:

       The Private Suite IAD, LLC (dba PS) ("PS"), by and through the undersigned counsel, hereby respectfully files this timely Protest of the Metropolitan Washington Airports Authority's ("MWAA" or the "Authority") evaluation of proposals under Solicitation No. RFP-23-21311 (the "RFP") and intended award of the Contract thereunder to daa International ("DAAI"), an entity wholly owned by the Irish State.  As discussed below, the Authority erred in evaluating both PS's and DAAI's proposals—by undervaluing PS's technically strong proposal and overvaluing DAAI's technically weaker proposal and its unrealistic revenue projections—and therefore conducting a flawed best-value procurement.  Furthermore, the Authority does not have authority to grant awards on behalf of the TSA or other Federal Agencies.  Each of these unreasonable and unlawful actions by the Authority caused substantial prejudice to PS—a highly qualified offeror who would have had more than a substantial chance of receiving the Contract award, but for the Authority's missteps.  Accordingly, and as set forth in greater detail below, the Vice President, Office of Supply Chain Management, should sustain this Protest.

**I.**       **Contact Information for the Parties**

       **A.**   **Contact Information for the Protester.**

**CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE**

February 14, 2025
Page 2

Contact information for The Private Suite IAD, LLC (dba PS) is as follows:

> Steven Gargaro
> Vice President - Airport Development
> The Private Suite IAD, LLC (dba PS)
> 212 Eucalyptus Dr.
> Suite 200
> El Segundo, CA 90245
> Tel: (213) 784-6837
> Email: sgargaro@reserveps.com

All communications, however, should be directed to PS's counsel of record, the contact information for whom is as follows:

> Aron C. Beezley
> Bradley Arant Boult Cummings LLP
> 1615 L Street, NW, Suite 1350
> Washington, D.C. 20036
> Tel.: (202) 719-8254
> Fax: (202) 719-8354
> Email: abeezley@bradley.com

**B.  Contact Information for the Authority.**

The contact information for the Contracting Officer in this procurement is as follows:

> Kevin Green
> Tel.: (703) 417-8466

**II.    Threshold Matters**

**A.  This Protest is Timely Filed by an Actual Offeror.**

Pursuant to Section 21, page 19, of the RFP, Exhibit 1 and Chapter 9.2.2 of the MWAA's Contracting Manual, Revised Fifth Edition (5.2) ("Contracting Manual"), a protest ground based on the manner in which offers were evaluated or on which a contract was awarded is timely if the protest is submitted by an offeror within seven days after the offeror knew or should have known the basis of the protest.

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

February 14, 2025
Page 3

_____

Here, PS timely submitted its Phase 1 proposal on or about September 15, 2023, Exhibit 2, and its Phase 2 Proposal on or about October 7, 2024.  Exhibit 3.  On February 7, 2025, PS received a notice from Mr. Laffert at the Authority advising PS that the "Authority intend[ed] to award a contract to daa International in the amount of $104,716,074.17 for the total Ground Rent and Minimum Annual Guarantee."  Exhibit 4.   Accordingly, it was on February 7, 2025 that PS first learned of the bases for its Protest.  This Protest is being filed within seven days of that date and, therefore, is timely.

**B.  The Authority Must Not Award the Contract During the Pendency of this Protest.**

Pursuant to Section 21 of the RFP, "[i]f a Contract has not been awarded at the time a protest is timely filed, the Contract may not be awarded while the protest is pending, unless the President and CEO determines that award of the Contract, and, if applicable, issuance of a notice to proceed, is in the Authority's best interest."  Exhibit 1 at 20.

As of the date of this Protest, no award has been made, according to the MWAA's New Contract Awards Webpage.[1]  Further, Mr. Laffert's February 7, 2025 notice to PS stated that the "Authority ***intends*** to award a contract to daa International in the amount of $104,716,074.17 for the total Ground Rent and Minimum Annual Guarantee."  Exhibit 4 (emphasis added).  Therefore, while there apparently is an ***intention*** to award the Contract, no Contact award has actually been made, and thus the Authority may not award the Contract to DAAI while PS's Protest is pending unless the President and CEO determines that award is in the Authority's best interest.  Based on the Authority's extensions to the original offer due date of September 15, 2023 in the RFP, Exhibit 1 at 15, to October 7, 2024 in RFP Amendment 3, Exhibit 5, and for the reasons explained below,

_____

[1] Available at https://www.mwaa.com/business/new-contract-awards

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

February 14, 2025
Page 4

there is no plausible explanation that it would be in the Authority's best interest to award the

Contract to DAAI during the pendency of PS's Protest.[2]

## III.    Factual Background

### A.    Relevant Terms of the RFP.

On or about June 26, 2023, the Authority issued RFP-23-21311 entitled, "Remote VIP

Passenger Processing Service Concession, IAD."  Exhibit 1.  As stated in the RFP, the Purpose

and Scope was to solicit proposals from offerors to:

> develop, lease, and operate a Remote VIP Passenger Processing Service for
> Commercial Airline Flights at Washington Dulles International Airport (herein
> after referred to as "Remote VIP Services") to receive, screen, and transport
> passengers and their luggage to/from gated commercial aircraft, obtain and provide
> the necessary airport, airline, and federal approvals and contracts, such as those
> required by the FAA, Transportation Security Administration ("TSA"), and U.S.
> Customs and Border Protection ("CBP"), and to provide passenger lounge services
> and amenities.

*Id*. at 13.  The RFP further explained that the contractor will be required to:

- Construct a new, state-of-the-art Remote VIP Services facility at 45041
  Compass Court, Dulles, VA 20166.[3]  The offered site is located in a historic
  district and requires that any improvement, modification, or new
  construction adhere to Section 106 of the National Historic Preservation Act
  of 1966 ("NHPA").
- Receive, screen, and transport passengers and their luggage to/from gated
  commercial aircraft.
- Within the facility, provide:

  1.    Passenger and luggage check-in services through established
        agreements with airlines.
  2.    A dedicated security screening checkpoint approved by the
        Department of Homeland Security.
  3.    A facilitated customs experience for passengers arriving
        internationally.

---

[2] PS reserves the right to move for injunctive relief should a Contract be awarded during the pendency of this Protest.

[3] RFP Amendment 2 deleted the reference to "45041 Compass Court, Dulles, VA 20166" and replaced it with "the site North of Cargo 6 that is identified on Attachment 03."

**CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE**

February 14, 2025
Page 5

> 4.    A sterile area that shall host TSA and CBP personnel.
> 5.    Amenities such as food and bar service, private suites, restrooms, Wi-Fi and secured parking.

> •    Escort passengers on the airfield between the facility and the commercial aircraft via luxury vehicle.
> •    Obtain and maintain the necessary airport, airline, and federal approvals and contracts, such as those required by the FAA, TSA, and CBP to provide the Remote VIP services.

*Id.*

The RFP advised that the Authority contemplated "the award of a Contract with payment of a ground rent to begin at Contract execution, a Minimum Annual Guarantee ('MAG') and a percentage of rent to be remitted to the Airports Authority for all sales in the operation of the Remote VIP Services."  *Id.* at 14.  As for the Method of Procurement and Basis for Award, the RFP stated, in relevant part:

> The Authority is utilizing a two-phase, competitively negotiated "Best Value" procurement method.[4]
>
> Phase I requires submission of technical proposals based on the Statement of Work provided in Attachment 01.  Technical proposals will be evaluated based on the Phase I Technical Evaluation Criteria provided in Attachment 02.
>
> Upon completion of Phase I technical evaluation, the Authority will select and notify one or more qualified Offerors (competitive range) who it determines submitted the most highly-rated technical proposals to participate in Phase II of the procurement process.

---

[4] The MWAA Contracting Manual defines "Best Value" as:

> competitive proposals procurement process in which the Airports Authority reserves the right to select the most advantageous Offer by evaluating and comparing factors in addition to cost or price (*e.g.*, qualifications of the Offeror and its proposed personnel, and technical designs and approaches), such that the Airports Authority may acquire technical superiority even if it must pay a premium price.  …  Best Value also means the expected outcome of an acquisition that, in the Airports Authority's estimation, provides the greatest overall benefit in response to its material requirements.  To achieve best value in the context of acquisitions for public transportation purposes, the evaluation factors for a specific procurement are to reflect the subject matter and the elements that are most important to the Airports Authority.  …  Evaluation factors may include, but are not limited to, qualifications of the [o]fferor and its proposed personnel, technical design, technical approach, length of delivery schedules, past performance, and management plan. (citing FTA C 4220.1F, Ch. I, para. 5.b).

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

February 14, 2025
Page 6

The Authority may hold discussions with those Offerors determined to be in the competitive range following Phase I. In Phase II, the Authority will issue the draft Contract, Phase II Technical Requirements, and Phase II Technical Evaluation Criteria and Proposal Submission Requirements to those Offerors determined to be in the competitive range.
\*\*\*

Offerors will submit a technical proposal for the proposed facility and a financial offer based on Phase II Technical Requirements.

The Authority, at its sole discretion, may enter into negotiations with the Offeror it determines provided the best technical approach and financial offer, which may include a request for Best and Final Offers.

Given the proposed 20-year operating term, the FAA will need to approve the final contract.

*Id*. at 14 -15.

Finally, the RFP incorporated five (5) attachments, including: 01 Statement of Work; 02 Phase I Technical Evaluation Criteria and Proposal Submission Requirements; 03 Site Map Image; 04 Washington Dulles International Airport Air Traffic Statistics; and 05 Standard Provisions for Concession Contracts (March 23, 2022). *Id*. at 31.

## B.  Relevant Terms of the Statement of Work (Attachment 01).

Attachment 01 of the RFP, Statement of Work ("SOW"), Exhibit 6, included several pertinent requirements. The Background in Section I of the SOW explained:

The Authority continues to look for ways to distinguish itself by providing new and innovative services to its customers. Remote VIP Services provide an elevated travel experience by completely bypassing the need for a passenger to enter the terminal.

Departing passengers are transported airside directly to scheduled commercial aircraft from a private facility. All requirements for check-in, including Transportation Security Administration (TSA) screening, baggage check, and airline check-in, are handled within the facility.

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

February 14, 2025
Page 7

> Arriving passengers utilizing the Remote VIP Services are deplaned and transported to the facility in a private vehicle or luxury bus for small groups. International passengers using this service will have a facilitated customs experience.

Exhibit 6 at 1.

 Section II, General Requirements, detailed requirements of the Remote VIP Services, Improvements to the Premises, and Financial Components.  As for the Remote VIP Services requirements, the SOW stated, in pertinent part:

> The Contractor must provide, at its sole cost, a range of services and amenities, all of which must comply with the American with Disabilities Act (ADA), and include, at a minimum:

> *A. Client Services and Amenities*

> 1. Passenger and luggage check-in services through established agreements with airlines.
> 2. A dedicated security screening checkpoint approved by the Department of Homeland Security.
> 3. A facilitated customs experience for passengers arriving internationally.
> 4. A sterile area that shall host TSA and U.S. Customs and Border Protection ("CBP") personnel.
> 5. Amenities, such as food and bar service, private suites, restrooms, Wi-Fi, and secured parking.

> \*\*\*

> *C. Transportation Logistics Within the Security Controlled Area(s)*

> 1. Facilities for, and in compliance with, all security measures as required by the TSA and the Authority.
> 2. Facilities for and compliance with all measures required by CBP.
> 3. Compliance with all Authority rules, regulations, and requirements; and logistics for operations entering and within the various security-controlled area(s), including but not limited to, access control measures and a secured travel route to/from the premises to the departing terminal gate(s).
> 4. Departing passenger screening within the facility in accordance with TSA requirements and then taken under escort by a driver and security detail via a waiting automobile to the terminal gate of the commercial aircraft.

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

February 14, 2025
Page 8

5.    Arriving passengers shall be met at the aircraft by a driver and the appropriate security, escorted to a waiting automobile, and driven to the Premises to clear CBP, if necessary, and to exit the Airport. Passengers shall be escorted at all times between the Premises and terminal gate of the commercial aircraft. The automobiles used for transport of passengers and their carry-on luggage shall be luxury-class vehicles. All vehicles used to transport passengers shall be no more than three years old from the current model year.

***

*D. Passenger Processing and Checkpoint Screening Areas*

The Premises shall be used as a facility for the security screening and transfer of passengers and their baggage to and from commercial aircraft through a dedicated checkpoint within the facility and approved by the Department of Homeland Security (DHS). The Contractor shall obtain all necessary written approvals and/or agreements and provide acceptable arrangements with all applicable federal, state, and local entities for the screening of passengers and their baggage, such as TSA, CBP, DHS, the Authority, as well as, relevant airlines and airport tenants, if applicable.

1.    **Security requiremen**ts: The Contractor shall be fully responsible for ensuring that all security measures, operations, and associated requirements for any personnel, customers, vehicles and other property which may require access to the security-controlled area(s) are in compliance with all Authority and federal rules and regulations throughout the term of the Contract.

2.    **TSA**: The Contractor shall design the Premises to include a sterile area that shall host TSA personnel and equipment on-site during all operating hours when security screening is required. It is the Contractor's responsibility to work with TSA and to ensure compliance with all federal rules and regulations.

3.    **CBP**: The Premises shall be designed to include a Federal Inspection Station that shall host CBP personnel, equipment, and officers, if required, on-site during all operating hours when security screening is required. It is the Contractor's responsibility to work with CBP and to ensure compliance with all federal rules and regulations.

*Id*. at 2-3. As for the Improvements to the Premises, the SOW provides in relevant part:

The Authority will demolish the existing building, and the Contractor is responsible for constructing a state-of-the art facility at which it will provide the Remove VIP Services. The Authority is not responsible for any other Work to the Premises, and

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

February 14, 2025
Page 9

the Authority will not contribute any funds for such Work.  The Premises are provided as-is with no warranties.  The development of the Premises shall conform to the requirements of the Authority Design Manual [https://www.mwaa.com/business/airports-authority-design-manual] and shall be subject to approval by the Authority prior to the commencement of construction.

***

*B. Historic Preservation Guidelines*

1.      The offered Premises are located in a historic district. The historic district requires any improvements, modifications, new construction, or demolitions to adhere to Section 106 of the NHPA, which is administered by SHPO.  Archaeological and historic architecture resources are identified that may be impacted by the project and an effects determination letter is typically drafted (based upon diligence prepared by the Contractor).  These materials are then reviewed by the Authority and submitted to SHPO for review and concurrence.  Once SHPO has approved the effects determination letter, it is submitted to the FAA as part of and a condition of the National Environmental Policy Act ("NEPA") approval process.  The Authority will work with the Contractor throughout the NEPA and SHPO processes; however, the Contractor shall be responsible for all costs related to these processes.

*Id*. at 3.

## C. Relevant Terms of the Phase I Technical Evaluation Criteria and Offer Submission Requirements.

Attachment 02 of the RFP, Phase I Technical Evaluation Criteria and Offer Submission Requirements, Exhibit 7, explained how Phase I Proposals would be evaluated and how offers were to be submitted.  In the attachment, MWAA listed three Technical Evaluation Criteria, listed in descending order of importance, as follows:

**Criterion 1: Past Performance**
This criterion will be evaluated on the Offeror's:
a.      Experience operating Remote VIP Services comparable to the Authority's requirement based on the submitted representative contract(s).
b.      Past performance based on the Offeror's submitted professional references.

**Criterion 2: Financial Capacity**

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

February 14, 2025
Page 10

This criterion will be evaluated on the Offeror's financial position, including its ability to demonstrate:

a.      Positive cash flow from operations.

b.      An ability to undertake the anticipated obligations required to construct and operate the Remote VIP Services in accordance with Attachment 01, Statement of Work.

**Criterion 3: Proposed Offering & Marketing Approach**

This criterion will be evaluated on the Offeror's proposed approach to facilitate successful delivery of VIP Remote Services, including how the Offeror intends to:

a.      Deliver the services and amenities required in Attachment 01 – Statement of Work and those proposed by the Offeror.

b.      Manage the permitting, design, and construction process, including coordination with the Authority, and how the Offeror proposes to secure all approvals required in Attachment 01, Statement of Work, to deliver the new facility within 30 months of contract award.

c.      Market the proposed Remote VIP Services to the airlines and traveling public.

*Id*. at 3-4.

Technical Proposals "w[ould] be evaluated by their strengths, weaknesses and deficiencies against the evaluation factors," and would be assigned one of the following five Technical Proposal Evaluation Ratings, "depicting how well the Offeror's Technical Proposal meets or exceeds the stated evaluation criteria:"

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

February 14, 2025
Page 11

| Unacceptable | The proposal fails to meet the evaluation standard and the Deficiency is uncorrectable. The proposal would have to undergo a major revision to become Acceptable. The proposal has a demonstrated lack of understanding of the Authority's requirements or omissions of major areas. |
|---|---|
| Marginal | The proposal lacks essential information to support a rating of Unacceptable, Acceptable, Good or Excellent. Deficiencies found are not material and are curable with Clarification. The Clarification is not intended as a re-write of the proposal. Marginal is not intended as a final rating but used as a placeholder to obtain a Clarification from the Offeror. |
| Acceptable | The proposal meets the evaluation standard. Any Weaknesses the proposal has are correctable. The proposal has no Deficiencies. |
| Good | The proposal meets the evaluation standard and has some Strengths. The proposal has no Deficiencies. |
| Excellent | The proposal exceeds the evaluation standard by having all Strengths. The proposal has no Weaknesses and no Deficiencies. |

*Id*. at 1-2.

In addition to the Technical Evaluation Criteria, the attachment included Technical Proposal Requirements, which instructed offerors to submit certain information in support of each of Technical Evaluation Criterion. *Id*. at 3-4. For example, to satisfy the Technical Proposal Requirements, offerors needed to submit at least one ***representative contract*** demonstrating its provision of Remote VIP Services, "***including TSA screening services*** and direct access to gated commercial aircraft, for a minimum of two consecutive years," which detailed, among other things, a "[d]escription of ***the relationships between Offeror and TSA, CBP, and the airlines served***," and at least one ***professional reference*** for the following:

i.    An airport client for whom relevant services are currently or were provided within the past ten (10) years and can serve as a source of information regarding the Offeror's past performance.

ii.    TSA or CBP representative with whom the Offeror has/had a relationship to provide relevant services (currently or within the past ten (10) years) and can serve as a source of information regarding the Offeror's past performance.

iii.    An airline representative with whom the Offeror has/had a relationship to provide relevant services (currently or within the past ten (10) years) and

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

February 14, 2025
Page 12

> can serve as a source of information regarding the Offeror's past
> performance.

*Id*. at 3 (emphasis added).

Another Technical Proposal Requirement was the Proposed Offering and Marketing

Approach, which required proposals to address how the Offeror will:

> i.   Develop and execute agreements with the airlines operating at Washington
>      Dulles International Airport, TSA, CBP, and other entities to deliver the
>      Remote VIP Services, including all services and amenities required in
>      Attachment 01, Statement of Work and any additional amenities or services
>      proposed by Offeror.
> ii.  Manage the permitting, design, and construction process, to include
>      coordinating with the Authority and securing all approvals required in
>      Attachment 01, Statement of Work, to deliver the new facility within 30
>      months of contract award.

*Id*. at 4.

MWAA reserved the right to establish a competitive range of offerors, conduct oral

interviews with those offerors, and to request best and final offers. *Id*. at 1. The Attachment also

stated:

> Contract award will be made to the Offeror whose Offer is judged by an integrated
> assessment of the Technical Proposal (based on the technical evaluation criteria)
> and Price Proposal to be most advantageous to the Airports Authority based on
> technical merit and price (best value) and that the Airports Authority deems
> responsible in accordance with the Airports Authority Contracting Manual.

> *Id*.; *see also* Contracting Manual, Section 3.5.9.2 ("Award of a Contract shall be made to
> the responsible [o]fferor (See Section 4.5) whose proposal is determined to be the most
> advantageous for and in the best interests of the Airports Authority.").   Finally, the Attachment
> included detailed submittal instructions.  *Id*. at 4.

### D. Relevant Terms of the Standard Provisions for Concession Contracts (March 23, 2022) (Attachment 05).

Attachment 05 of the RFP, Standard Provisions for Concession Contracts (March 23,

2022), Exhibit 8, under Article 9, Laws, Regulations and Compliance, contains several pertinent

provisions relating to federal laws and regulations, including:

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

February 14, 2025
Page 13

9.01 Laws and Regulations.  The Contractor and the Authority shall each comply with all applicable Federal, state and local laws, codes, regulations, including regulations of the Authority, ordinances, rules and orders now or hereafter enacted.

\*\*\*

9.03 Airport Security.  The Contractor shall be familiar with and conduct its operations in accordance with all regulations and directives of the Authority and the Transportation Security Administration, and any other federal, state or local government having jurisdiction over the airport, with respect to the maintenance of airport security.

Exhibit 8 at 10.

**E.  Relevant Terms of the Evaluation Criteria and Technical Proposal Requirements for Phase 2 (Attachment 02).**

Following an offeror's successful Phase I evaluation, offerors received Attachment 02: Evaluation Criteria and Technical Proposal Requirements for Phase 2.  Exhibit 9.  The analysis by which the Authority would measure the evaluation criteria for Phase 2 mirrored the analysis used to evaluate the Phase 1 evaluation criteria, including the same reservation of rights by the Authority to establish a competitive range, conduct discussions, and request best and final offers, *id*. at 1, and the use of the same five Technical Proposal Evaluation Ratings.  *Id*. at 2-3.  Phase 2 Technical Proposals were to be evaluated on the following four criteria: 1. Revenue Projections; 2. Initial Capital Investment and Mid-Term Refurbishment; 3. Sustainability Plan; and 4. Plan to Meet Small Local Business Enterprise (SLBE) and Airport Concession Disadvantaged Business Enterprise (ACDBE) Participation Requirements/Goals Plan.  *Id*. at 3.  Like the Phase 1 Attachment, each criterion included details regarding the evaluation, *id*. at 3-5, as well as Technical Proposal Requirements for each of the four Technical Evaluation Criteria.  *Id*. at 5-6.  Most relevant to the analysis below, Criterion 1: Revenue Projections required the following:

This criterion will be evaluated on the Offeror's financial ability to perform the Lease based on its submitted five-year financial pro forma, including the following:

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

February 14, 2025
Page 14

a.    Anticipated itemized revenues and any other Gross Receipts from the operation of the concession;

b.    Anticipated itemized expenses, including, but not limited to, salaries and benefits, marketing, maintenance, insurance, technology and connectivity costs, administrative, and other operating expenses;

c.    Anticipated debt service and other financing costs, including the amortization of any cash capital contributions used to fund capital expenditures;

d.    Anticipated payment to the Airports Authority of the Ground Rent and Percentage Rent; and

e.    Offeror's annual profit.

*Id.* at 3; *see also id.* at 5 (directing offerors to include the financial pro forma containing the elements above). Finally, the document provided detailed offer submission instructions. *Id.* at 8.

**F.  Proposal Submission, Evaluation, and Contract Award.**

MWAA initially issued the RFP on June 26, 2023. *See* Exhibit 1. On July 13, 2023, MWAA conducted a Pre-Proposal/Pre-Bid Conference, which was attended by PS. *Id.* at 16. The RFP provided for the submission of questions by offerors, which were due on July 28, 2023. *Id.* Phase 1 proposal submittals were due September 15, 2023, *id.*, and PS timely submitted its Phase 1 proposal. Exhibit 2.

On March 22, 2024, MWAA issued the first Solicitation Amendment, which provided the Phase 2 requirements and set deadlines for questions regarding those requirements, originally April 22, 2024, and for Phase 2 proposal submission, originally June 21, 2024. Exhibit 10. On April 19, 2024, MWAA issued a second Solicitation Amendment which extended the time to submit questions regarding Phase 2 to June 7, 2024, the time to submit Phase 2 offers to September 20, 2024, and provided for a site visit on May 8, 2024. Exhibit 11. Representatives from PS and

February 14, 2025
Page 15

DAAI attended that site visit.  A third and final Solicitation Amendment extended the due date for Phase 2 offers to October 7, 2024.  Exhibit 5.  PS timely submitted its proposal.  *See* Exhibit 3.

Following proposal submission, MWAA communicated with PS regarding clarifications of PS's price calculations.  On February 7, 2025, Donald Laffert, MWAA Procurement Director, informed PS that MWAA intended to award the Contract to DAAI for $104,716,074.17 in total Ground Rent and Minimum Annual Guarantee.  Exhibit 4.  On February 11, 2025, PS requested feedback from MWAA as to why its proposal was not selected, and PS followed up the following day clarifying that its request constituted a formal request for debriefing pursuant to Section 4.7 of the MWAA's Contracting Manual, Revised Fifth Edition (5.2).  On February 13, 2025, MWAA acknowledged that request and offered to provide a debriefing on February 18, 2025.

This timely Protest follows.

IV.    **Grounds for Protest**

   A.    **DAAI Cannot Meet the Solicitation Requirements.**

      i.    **DAAI falls short of the Phase 1 Technical Requirements and Relevant Experience.**

MWAA inappropriately issued an award under the Solicitation because the apparent awardee, DAAI, cannot fulfil the Solicitation requirements, under either the Phase 1 Technical Proposal Evaluation or the Phase 2 Price Proposal Evaluation.  DAAI cannot fulfil the Solicitation requirements under the Phase 1 Technical Evaluation Criteria because, among other things, it lacks the requisite Past Performance experience.  As part of the Technical Evaluation Criteria, the Solicitation included as evaluation criteria "[e]xperience operating Remote VIP Services comparable to the Authority's requirement…."  Exhibit 7 at 2.  But DAAI's experience with

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

February 14, 2025
Page 16

Remote VIP services is not comparable to the Authority's requirements. Accordingly, and as discussed more fully below, DAAI is unable to meet the Solicitation requirements.

The SOW makes clear that the Authority sought proposals for "***Remote*** VIP Services [to] provide an elevated travel experience by completely ***bypassing the need for a passenger to enter the terminal***." Exhibit 6 at 1 (emphasis added). Prospective offerors needed to demonstrate their ability to provide such services by demonstrating their past performance (Criterion 1 of the Phase 1 Technical Evaluation Criteria), specifically by describing their "[e]xperience operating Remote VIP Services comparable to the Authority's requirement based on … submitted representative contract(s) … [and] based on the Offeror's submitted professional references. Exhibit 7 at 4. DAAI cannot provide those examples because it lacks the requisite past experience comparable to the Authority's requirements. First, DAAI's current offerings consist of a VIP terminal at Dublin Airport, operated as Dublin Airport's "Platinum Services." However, this service is operated by Dublin Airport, ***not*** DAAI.[5] While these entities may be related in a hyper technical corporate sense as members of the same ownership group, DAAI is not the entity that provides Dublin Airport's Platinum Services. *See* Exhibit 12 (describing Dublin Airport's Platinum Services offerings without reference to DAAI). Rather, DAAI styles itself as "the airport and concession investment vehicle for the daa Group."[6] On its own website, DAAI describes its role as "seek[ing] out and participat[ing] in suitable airport and concession investment opportunities for funds, financial institutions and fellow state owned entities" and "advising and supporting the bidding parties in delivering successful proposals." *Id*. That is to say, based on its own representations,

---

[5] *See* dublinairport.com/platinumservices.

[6] *See* https://www.daa-international.com/services/investment/identifying-and-investing-in-profitable-airport-concessions/.

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

February 14, 2025
Page 17

DAAI merely consults and advises other entities on concession investment opportunities instead of actually managing those operations, as required by the Solicitation.[7]

In that regard, DAAI represents its relationship with the actual airport inconsistently, selectively, and misleadingly. DAAI cannot meet the Technical Proposal Requirements for offerors to include a reference from an "airport client for whom relevant services are currently or were provided within the past ten (10) years and can serve as a source of information regarding the Offeror's past performance." Exhibit 7 at 3. To satisfy this requirement, DAAI improperly and inaccurately relies on the capabilities and experience of operations that are not its own, but those owned, operated, and managed by the Dublin Airport Platinum Service. At the same time, DAAI holds out the Dublin Airport as its "airport client" reference for the VIP services. Crucially, the Technical Proposal Requirements required offerors to include (i) *a reference from an "airport client* for whom [(ii)] relevant *services are currently or were provided* within the past ten (10) years and can serve as a source of information regarding the Offeror's past performance." Exhibit 7 at 3 (emphasis added). But Dublin Airport cannot be both an example of DAAI's own past performance *and* simultaneously be its own professional reference from an airport client. Such an arrangement would be blatantly contradictory and self-serving.

as noted above, the entity DAAI is, at best, both the vendor and the customer for which it allegedly provides its services, and, at worst, substituting Dublin Airport's experience as its own while also impermissibly relying on the Airport as a reference.

---

[7] Faced with an analogous corporate relationship, PS avoided referring to its parent company, Groupe ADP, which directly operates a VIP Terminal in CDG that is comparable to the service requested by MWAA, and it did so precisely because MWAA sought a contract for Remote VIP services at IAD with the entity performing the work, not its parent or affiliate. *See generally*, Exhibit 1.

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

February 14, 2025
Page 18

While the Contract Manual indicates that it, and not federal procurement law, governs this MWAA bid protest, analogous federal law, including bid protest decisions issued by the U.S. Government Accountability Office ('GAO') and the U.S. Court of Federal Claims ('COFC'), inform an analysis of the principles of fair competition in similar situations. *See also generally*, 41 U.S.C.A. § 3301, *et seq.* (requiring "full and open competition through the use of competitive procedures" in most federal procurements). Indeed, when utilizing an affiliate or subsidiary as part of a proposal, if an offeror represented that affiliate or subsidiary would "have meaningful involvement in contract performance" but cannot be provided or relied upon in the actual performance of the work, then the affiliate cannot be counted toward the experience or past performance claimed by the offeror. *See, e.g.*, *Hot Shot Express, Inc.*, B-290482, Aug. 2, 2002, 2002 CPD ¶ 139, 2002 WL 1831022 ("[T]he relevant consideration is whether the resources of the parent or affiliated company—its workforce, management, facilities or other resources—will be provided or relied upon, such that the parent or affiliate will have meaningful involvement in contract performance."); *see also Femme Comp Inc. v. United States*, 83 Fed. Cl. 704, 746 (2008).

In addition to DAAI's relationship with Dublin Airport, DAAI improperly utilized a teaming agreement with Pangiam. While the Solicitation does not explicitly prohibit joint ventures or partnerships, *see generally* Exhibit 1, the Solicitation did require offerors to provide specific and detailed information about their type of business organization, parent company and identifying data, firm identification, and additional information regarding, *inter alia*, certifications, conflicts of interest, and insurance. *See* Exhibit 1 at 6-12.

DAAI originally registered for the RFP in partnership with Pangiam. However, that partnership appears to have dissolved, with DAAI bidding on its own for the final proposal. First, the Authority unequally evaluated DAAI's and PS's proposals by extending the deadline for

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

February 14, 2025
Page 19

offerors to submit their Phase 2 proposals from a previous date of September 20, 2024 following

Amendment 2, Exhibit 11, to October 7, 2024 following Amendment 3. Exhibit 5. This extra time

served no purpose other than to allow DAAI additional time to prepare its financial submission,

undoubtedly impacted by the departure of their teaming partner. Meanwhile, PS was prepared to

submit its Phase 2 proposal on the original, September 20 date. The extension of time therefore

unfairly benefited DAAI at PS's expense.

More worrying is the likelihood that DAAI's Phase 1 technical proposal leveraged its

relationship with Pangiam, and then omitted their role from its Phase 2 submission. This

relationship during the bidding process is improper and constituted a failure of the Authority to

adequately review DAAI's technical abilities and responsibility. A combined Pangea-DAAI

technical proposal represents a materially different proposal than a DAAI-only submission. Such

divergent proposals would necessarily impact DAAI's technical abilities and its financial

capabilities, and an evaluation of such a split proposal is patently unreasonable.

Moreover, and notwithstanding the identity of the true operating entity or the actual role of

DAAI, the services offered by Dublin Airport's Platinum Services fail to be "comparable to the

Authority's requirement" because they fall short of key requirements of the RFP. Exhibit 7 at 2.

The SOW requires the Contractor to "obtain all necessary written approvals and/or agreements

and provide acceptable arrangements with all applicable federal, state, and local entities for the

screening of passengers and their baggage, such as TSA, CBP, DHS, the Authority, as well as,

relevant airlines and airport tenants, if applicable." Exhibit 6 at 2.[8] The Technical Proposal

---

[8] At its core, this requirement is an attempt by the Authority to contract on behalf of the TSA, which is
impermissible under federal law. The MWAA is an independent public body corporate and politic with the primary
purpose of operating and improving the Metropolitan Washington Airports. 49 U.S.C.A. § 49106. The MWAA's
authority includes actions benefiting the Metropolitan Washington Airports for public purposes, but it does not

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

February 14, 2025
Page 20

Requirements required offerors to include "a minimum of one (1) representative contract within the last ten years whereby the Offeror provided Remote VIP Services, ***including TSA screening services*** and direct access to gated commercial aircraft, for a minimum of two consecutive years…." Exhibit 7 at 3 (emphasis added). The Technical Proposal Requirements also required offerors to provide a reference from a "TSA or CBP representative with whom the Offeror has/had a relationship to provide relevant services (currently or within the past ten (10) years) and can serve as a source of information regarding the Offeror's past performance." Exhibit 7 at 3. Similarly, the SOW explained:

> The Authority continues to look for ways to distinguish itself by providing new and innovative services to its customers. Remote VIP Services provide an elevated travel experience by ***completely bypassing the need for a passenger to enter the terminal***.

> Departing passengers are transported airside directly to scheduled commercial aircraft from a private facility. ***All requirements for check-in, including Transportation Security Administration (TSA) screening***, baggage check, and airline check-in, are handled ***within the facility***.

Exhibit 6 at 1 (emphasis added); *see also* Exhibit 6 at 2 (requiring "[d]eparting passenger screening ***within the facility*** in accordance with TSA requirements" and that "[a]rriving passengers shall be … driven ***to the Premises*** to clear CBP, if necessary") (emphasis added).

But elements of DAAI's claimed experience—namely, Dublin Airport's Preclearance Facility for certain flights to the United States—does not illustrate relevant remote TSA or CBP service. Rather, that service provides a secondary TSA check in the Dublin main terminal, prior to CBP clearance, for ***all*** passengers traveling to the USA. It is not an arrival clearance or departure

---

extend to contracting on behalf of federal agencies such as the TSA. *See id*. Conversely, the TSA is responsible for civil aviation security functions and directly manages and oversees these security functions and contracts. In other words, the MWAA does not have the authority to contract on behalf of the TSA. By seemingly requiring the TSA to work with and provide DAAI the necessary approvals and agreements, the Authority appears to be contracting on behalf of the TSA. The TSA is unlikely to approve such an arrangement with a foreign-state owned entity.

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

February 14, 2025
Page 21

screening for VIPs, and thus it does not comply with the RFP and SOW requirements described above.[9]

More concretely, the Preclearance facility at Dublin Airport is not located in a remote VIP terminal—it is located in Terminal 2 of the main airport facility. *See id*. And Dublin Airport's Platinum Services does not offer that service in its own facility, but rather offers to "chauffeur [clients] directly to US Pre-Clearance." Exhibit 12 at 11. Similarly, Dublin Airport's Platinum Services cannot offer remote VIP customs services, as its brochure indicates only that guests are to "be guided through our priority Immigration channel and onto [their suite.]" *Id*. at 9. But the RFP does not call for chaperoning a guest through a priority Immigration or TSA line. Rather, it explicitly calls for "[a]ll requirements for check-in, including Transportation Security Administration (TSA) screening, … [to be] handled within the facility," "completely bypassing the need for a passenger to enter the terminal." Exhibit 6 at 1. Additionally, the SOW calls for secure parking, and Dublin Airport's Platinum Service does not have a secure car park. *See* Exhibit 12 at 11, 22 (describing Platinum Services' car park as exclusive on-site, but not secure). Simply put, the Phase 1 Technical Evaluation Criteria require concrete experience in providing fully remote, secure VIP services, and DAAI cannot provide that relevant experience, because it does not have it. *See generally*, Exhibit 7.

Lastly, as an international entity with no experience working with airports located in the United States, DAAI has no demonstrated experience complying with the numerous and byzantine technical and licensing requirements, crossing Federal, State, and local governments and agencies. *See* Exhibit 6 (requiring compliance with, *inter alia*, the MWAA Design Manual and Section 106

---

[9] *See* https://www.dublinairport.com/flight-information/travelling-to-usa/usa-preclearance/us-customs-and-border-protection-video.

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

February 14, 2025
Page 22

of the National Historic Preservation Act of 1966, permits required to work with commercial airlines, motor vehicle identification permits, any permits and licenses required to operate the premises (including an Alcoholic Beverage Control license), and requiring "full compliance with all county, state, and federal permitting entities, laws, rules and regulations, and building codes"). Conversely, PS's extensive and demonstrated experience with U.S.-based airports demonstrates its familiarity and experience with U.S.-based permitting.  *See* Exhibit 2 at 3 (including a highlight of PS's current endeavors in Miami, where it is in the process of renovating the historic Pan-American Regional Headquarters into a Remove VIP Terminal).

    **ii.**  **DAAI's Phase 2 Submittals Regarding Financial Projections are Unrealistic.**

MWAA indicated that it intends to issue an award to DAAI for $104,716,074.17 in total Ground Rent and Minimum Annual Guarantee.  Exhibit 4.  This price, roughly five times what PS bid, represents an extravagantly overstated and unrealistic sum.  Whereas PS's proposal is based on its own extensive experience with this **exact** type of service in the United States, *see* Section A, *supra*, DAAI's projections cannot hold up to even a cursory evaluation.  The Solicitation makes clear that price was to be evaluated according to the Evaluation Criteria and Technical Proposal Requirements for Phase 2 (Attachment 02), which, in turn, consisted of four Technical Evaluation Criteria: 1. Revenue Projections; 2. Initial Capital Investment and Mid-Term Refurbishment; 3. Sustainability Plan; and 4. Plan to Meet Small Local Business Enterprise (SLBE) and Airport Concession Disadvantaged Business Enterprise (ACDBE) Participation Requirements/Goals Plan. Exhibit 9 at 1-2.  Rents, as evaluated therein, consisted of "the higher of a minimum annual guarantee ('MAG') amount or percentage rent for all sales in the operation of the Remote VIP Services."  Exhibit 6 at 5.  The Authority planned to award based on, inter alia, a "Price Proposal to be most advantageous to the Airports Authority based on technical merit and price (best value)

**CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE**

February 14, 2025
Page 23

and that the Airports Authority deems responsible in accordance with the Airports Authority Contracting Manual."  Exhibit 9 at 1; *see also* Contracting Manual at 10.1.3.

DAAI's revenue projections are patently unrealistic given the services provided by DAAI, the requirements of the RFP, and American market dynamics.  According to MWAA, DAAI anticipates providing $104,716,074.17 in rent to MWAA over 20 years, for an average of $5,235,803.71 per year.  *See* Exhibit 4.  DAAI bid a highly unrealistic amount, considering the prices it charges at the Dublin Airport for roughly comparable services.  There, Dublin Airport Platinum Services charges a flat fee of €395 for each person, with discounted rates for additional persons and children.  Exhibit 12 at 25.  DAAI's sole existing client network—its customer base that it will presumably leverage to cross-sell its services at IAD—is the Dublin Airport Platinum Services network.  Not only does this network fail to provide comparable experience, as required by the SOW, but it also does not support the financial modeling that would support over $100M in rents.  In short, this extremely limited Irish-centric customer base cannot support the American and International market bases required to sustain DAAI's astronomical revenue projections.

By contrast, PS proposed a highly researched and reasonable gross revenue projection of $52 million over the full term of the lease based on its extensive experience providing the exact type of services identified in the RFP.  *See* Exhibit 3 at 5.  PS has decades of actual market data and market experience, which it drew upon in building its price models.  In addition to experience, PS's rates are substantially higher than those that Dublin Airport Premium Services charges, and include an annual fee of up to $4,850, an individual rate of at least $750 per person, and additional rates for private suite access of up to $4,850 per 4 travelers.[10]  In other words, DAAI's existing customer base would have to pay 10x the price they are accustomed to just to meet PS's existing

---

[10] *See* https://reserveps.com/pricing.

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

February 14, 2025
Page 24

pricing model, and that is before DAAI has to make up $104M in rents. DAAI's limited existing customer base cannot support DAAI's projections, and even if DAAI somehow captured all of PS's existing customer-base—which it cannot—it *still* would fall well short of DAAI's price projections. PS's prices not only reflect more realistic market rates for this type of service, but also allow PS to deliver a truly premium experience that separates its offerings from run-of-the-mill "premium" airport lounges and concierge services that already exist at IAD. *See e.g.*, Marhaba Services[11] (charging $436.88 for departure or arrival, plus additional costs for luggage assistance); US VIP Services[12] (charging $425 plus $104 additional for luggage assistance); Royal Airport Concierge[13] (charging $450). In sum, DAAI has neither the market knowledge nor proven ability to generate sufficient revenue to support its proposed price. The price proposal alone is evidence of this, but a cursory review of the applicable market dynamics, and comparable competitor dynamics illustrate this glaring discrepancy.

Furthermore, and as mentioned above, DAAI's single experiential point of reference for Remote VIP services—Platinum Services at Dublin Airport—does not have the customer base that PS does. PS already operates two Remote VIP terminals in the United States, with two more terminals in the planning and/or construction process. Exhibit 2 at 3. PS has served over 250,000 passengers, including over 45,000 unique customers through its LAX VIP Terminal alone. Exhibit 2 at 3. On top of that, PS's network extends its customer base in a way that Dublin's cannot, by connecting its existing and future operations at LAX, ATL, MIA, DFW and CDG[14] to IAD. *See*

---

[11] *See* https://www.marhabaservices.com/ae/english/airport-meet-and-greet/washington-airport.html.
[12] https://usvipservices.com/booking?receptionType=DEPARTURE&serviceType=MEET_AND_GREET&serviceDate=2025-02-28&airportSlug=washington-dulles-iad-kiad-us&adults=1&children=0&lead=6ad33798-03a8-4db3-8eec-623c37ac82f2
[13] https://royalairportconcierge.com/Airport/iad/
[14] CDG via its parent company, Groupe ADP.

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

February 14, 2025
Page 25

Exhibit 3 at 5. A single connection to Dublin cannot replicate that connectivity, which would drive traffic, prestige, and revenues to PS IAD. Thus, based on the discrepancy in passenger count, locations, and offerings as compared to PS, plus the lower amount charged by DAAI, it is unreasonable to conclude that DAAI could provide *five times* the amount in ground rent + MAG as PS. This unrealistic and implausible price discrepancy should have disqualified DAAI during MWAA's Phase 2 analysis.

Not only did DAAI submit an unrealistic price, but MWAA utterly failed to properly evaluate that overinflated and unattainable price. Section 10.5.1.2 of the Contracting Manual requires that the Authority "only award Contracts to responsible Contractors… [*i.e.*,] those capable of successfully performing under the terms and conditions of the proposed Contract." *See also* Contracting Manual, Section 4.5.1 (2) ("To be found responsible, an [o]fferor must… [h]ave the ability to comply with the required delivery or performance schedule, taking into consideration other business commitments."). Furthermore, the Contracting Manual makes clear that, when determining a best value procurement, the decision maker evaluates whether "a given price differential outweighs the difference in technical merit." Contracting Manual, Section 3.5.9.1. And the Evaluation Criteria and Technical Proposal Requirements for Phase 2 require the Authority to evaluate offerors' revenue projections, including an evaluation of "[a]nticipated itemized revenues and any other Gross Receipts from the operation of the concession," "[a]nticipated itemized expenses," and "[a]nticipated payment to the Airports Authority of the Ground Rent and Percentage Rent." Exhibit 9 at 3. Here, it is clear that the Authority failed to conduct any reasonable analysis into the DAAI's proposed anticipated revenues or presented projections. Had the Authority conducted a meaningful review or analysis of DAAI's proposed anticipated revenue models, they would have shown DAAI had no viable path to $104M in rents.

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

February 14, 2025
Page 26

_____

In accepting DAAI's unrealistic price, the Authority failed to reasonably evaluate DAAI's proposal and its proposed ability to perform under the terms and conditions of the Contract. DAAI's offer proposed rent at five times the established market leader in the United States, Exhibit 4, with a markedly more limited corporate experience, Exhibit 12, a smaller network, *see id.*, and a history of charging significantly lower prices. *Id*. at 25. Such a proposal cannot withstand the reasonable scrutiny that comes with a best value evaluation. Nor does it meet the requirements of MWAA's Contracting Manual that offerors be found responsible—*i.e.*, "[able] to comply with the required delivery or performance schedule." Contracting Manual, Section 3.5.9.1. DAAI cannot possibly provide MWAA with five times the rent using lower prices and a smaller customer base while still maintaining the Remote VIP service called for by the procurement. To evaluate DAAI's proposal otherwise evidences an unreasonable analysis by the Authority and does not conform to the requirements of the Solicitation or the MWAA Contracting Manual. The Authority's evaluation of DAAI's price proposal, and its evaluation of DAAI's technical proposal *vis a vis* its proposed price, demonstrates that the Authority was so blinded by DAAI's promise of $104M in rents, that it failed to meaningfully and critically analyze DAAI's proposed pricing strategy, as required by the Solicitation.

**B. PS's Proposal Exceeded the Solicitation's Technical Requirements.**

PS submitted a proposal that not only met MWAA's requirements, but it also exceeded them, and in doing so demonstrated its unique and unmatched value proposition.

One of the stronger elements of PS's proposal, and a key source of distinction compared to DAAI's proposal, pertained to the RFP requirement that offerors demonstrate their ability to "obtain and provide the necessary airport, airline, and federal approvals and contracts, such as those required by the FAA, Transportation Security Administration ('TSA'), and U.S. Customs

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

February 14, 2025
Page 27

and Border Protection ('CBP')."  Exhibit 1 at 13.  Relatedly, the SOW required that offerors "obtain all necessary written approvals and/or agreements and provide acceptable arrangements with all applicable federal, state, and local entities for the screening of passengers and their baggage, such as TSA, CBP, DHS," and required offerors to specifically design the Remote VIP premises to provide for on-site TSA security screening and CBP customs and immigration facilities.  Exhibit 6 at 3.  PS not only met those requirements, *see* Exhibit 2 at 3 (highlighting PS's "unique experience in developing and operating remote VIP services" in the US as the "only operator for commercial flights in the United States"), but exceeded them through its unique relationships with both agencies and one of only two participants in the TSA reimbursable Screening Service program (the other being Delta Airlines).[15]  *See id*.  In this regard, PS offers relationships with those security agencies that are literally unparalleled.

Additionally, the SOW sought, inter alia, the following regarding Client Services and Amenities

1.  Passenger and luggage check-in services through established agreements with airlines.
2.  A dedicated security screening checkpoint approved by the Department of Homeland Security.
3.  A facilitated customs experience for passengers arriving internationally.
4.  A sterile area that shall host TSA and U.S. Customs and Border Protection ("CBP") personnel.
5.  Amenities, such as food and bar service, private suites, restrooms, Wi-Fi, and secured parking.

Exhibit 6 at 2.

For each of these requirements, PS's offer went beyond the base requirements.  First, PS already has existing agreements in place with multiple U.S. and foreign airlines, including

---

[15] Information about this program can be found at the following weblink: https://www.tsa.gov/for-industry/reimbursable-screening-services-program.

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

February 14, 2025
Page 28

agreements in place at LAX and ATL with over seventy airlines.  *See* Exhibit 2 at 5.  These relationships include an existing partnership with a ground handler at IAD for passenger and luggage check-in for several airlines.  *Id*.  Second, as mentioned above, PS is one of only two companies, and the only private company, to have agreements with TSA under the Capability Acceptance Process ("CAP"), approving PS to purchase screening equipment with TSA specifications, and the Reimbursable Screening Services Program ("RSSP"), enabling PS to pay for TSA Officers to operate the checkpoint.  *See id*. at 3.  PS was instrumental in creating this program and having it written into law.  Third, PS is the only private company in the United States with an agreement in place to have CBP provide Federal Inspection Services at multiple airports.  *Id*. at 10.  Fourth, PS has already constructed TSA and CBP areas at LAX and ATL to current technical Design Standards for both agencies and is now working with both agencies on the design process for those areas at DFW and MIA, demonstrating its ability to comply with applicable permitting and construction approvals.  *Id*. at 3, 14.  Finally, PS is recognized globally as a leading provider of such amenities and services.  *See id*. at 74.

### C.  **MWAA Failed to Conduct an Appropriate Best-Value Evaluation.**

Despite the various Technical deficiencies of DAAI's Technical Proposals, the Authority intends to award DAAI the Contract in the amount of $104,716,074.17.  Exhibit 4, five times more than what PS proposed, which suggests that the only criterion used in the proposals' assessment was the financial one.

In the Solicitation, the Authority proposed using "a two-phase, competitively negotiated 'Best Value' procurement method … applicable to both phases, hereinafter referred to as Phase I and Phase II."  Exhibit 1 at 5.  Furthermore, the Contracting Manual describes a best value procurement process as one "in which the Airports Authority reserves the right to select the most

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

February 14, 2025
Page 29

advantageous Offer by evaluating and comparing factors in addition to cost or price (e.g., qualifications of the Offeror and its proposed personnel, and technical designs and approaches), such that the Airports Authority may acquire technical superiority even if it must pay a premium price."  Contracting Manual at 10.1.3.

But based on the Authority's award here, it ignored a technically superior proposal in favor of a (purportedly) better-priced, technically inferior option without adequate justification.  Such an evaluation does not meet the standards of either the Contracting Manual or the Solicitation itself.  The Contracting Manual explicitly contemplates that the Authority "may acquire technical superiority even if it must pay a premium price."  *Id*.  But here, even *if*, *arguendo*, DAAI's proposed price was realistic (which it is not), the Authority failed to recognize PS's technically superior plan, considering factors in addition to cost or price, that provided the Authority with the most advantageous offer.

Nor does such an evaluation meet analogous legal standards for a best-value procurement.  *See, e.g.*, *Blue Rock Structures, Inc.*, B-293134, Feb. 6, 2004, 2004 CPD ¶ 63 at 6 ("A tradeoff analysis that fails to furnish any explanation as to why a higher-rated proposal does not in fact offer technical advantages or why those technical advantages are not worth a price premium does not satisfy the requirement for a documented tradeoff rationale, particularly where, as here, price is secondary to technical considerations under the RFP's evaluation scheme."); *EPSCO, Inc.*, B-183816, Nov. 21, 1975, 75-2 CPD 338 at 7 ("It is also conceivable that, notwithstanding an established evaluation and source selection plan placing primary importance on technical considerations, a source selection official could judge that the cost of a technically superior proposal is so high that selection of a lower-priced, technically inferior proposal is justified.  Such

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

February 14, 2025
Page 30

a selection, however, would be a departure from the established criteria and would have to be supported by an extremely strong justification.").

Here, as described in Sections A and B, *supra*, the Authority failed to credit PS for its uniquely strong technical proposal, failed to properly evaluate DAAI's inferior technical proposal, including its complete lack of relevant experience, failed to account for the serious security risks posed by DAAI, and relied on DAAI's unreasonable and overstated price to issue an award. Based on such an evaluation, the Authority did not conduct a meaningful best-value procurement—to the prejudice of PS and in contravention of the stated evaluation criteria.

**D.  The Authority's Unreasonable and Unlawful Acts Caused Substantial Prejudice to PS.**

As established herein, PS submitted an exceptionally strong proposal with its extensive experience in Remote VIP Services.

But for any and all of the Authority's errors described herein, PS—a highly qualified and highly rated U.S.-based offeror—would have received the Contract award. Thus, for each of the reasons stated above, PS suffered undeniable prejudice as a result of the Authority's unbalanced evaluation. *See, e.g.*, *Deloitte Consulting, et al.*, B-411884, *et al.*, Nov. 16, 2015, 2016 CPD ¶ 2 at 15 ("[B]ecause we find that certain areas of the agency's evaluation were not reasonable, and because the record does not show how a proper evaluation would have affected the ranking of vendors' quotations, we conclude that the protesters were prejudiced by the agency's evaluation."); *Solers, Inc.*, B-409079, Jan. 27, 2014, 2014 CPD ¶ 74 at 11 ("Because the record does not demonstrate that the agency reasonably considered the relative merits of the offerors' quotations, we have no basis to conclude whether this review would or would not have changed the agency's view of this competition."); *Celta Servs., Inc.*, B-411835, Nov. 2, 2015, 2015 CPD ¶ 362 at 10 ("[W]e resolve any doubts regarding prejudice in favor of a protester since a reasonable possibility

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

February 14, 2025
Page 31

of prejudice is a sufficient basis for sustaining a protest."). Accordingly, PS's Protest should be sustained.

## V.    **Document Requests**

Subject to the provisions of the RFP's Freedom of Information Policy, Exhibit 1 at 20, Chapter 4.8, Public Release of Information, of the MWAA Contracting Manual - Revised Fifth Edition (5.2), and WMAA's Freedom of Information Policy,[16] PS respectfully requests that the Authority provide the following documents, which include electronic documents and emails:

1.    A complete copy of the Solicitation, including any appendices, questions and answers, and attachments, and copies of all amendments thereto;

2.    The acquisition plan and source selection plan for the subject Project;

3.    All instructions, guides, checklists, or templates provided to evaluators;

4.    A complete copy of DAAI's Proposal, and any revisions thereto, including all information submitted in response to Phase I and Phase II of the RFP;

5.    All documents referring to, discussing, or reflecting MWAA's evaluation of DAAI's Proposal and PS's Proposal, including, but not limited to, the Evaluation Committee's final evaluation, including its evaluation for each offeror relative to each evaluation criterion as well as the Evaluation Committee's rationales for each such evaluation, including, but not limited to, Phase I and Phase II of the RFP;

6.    Any and all evaluation documents pertaining to the MWAA and the Evaluation Committee's evaluation of PS's Proposal and DAAI's Proposal, including both Phase I and Phase II;

7.    An unredacted copy of the MWAA's and/or the Evaluation Committee's source selection decision and best value tradeoff documents;

8.    Any and all communications pertaining to the decision to extend the time to submit Phase 2 offers to October 7, 2024; and,

9.    Any and all communications between MWAA and DAAI regarding the RFP, evaluation, and/or intent to award the Contract.

---

[16] In accordance with MWAA Freedom on Information Policy's Procedures, a formal Freedom of Information request was submitted to the Authority on February 12, 2025 requesting the same documents requested herein.

**CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE**

February 14, 2025
Page 32

Each of the foregoing documents and categories of documents are relevant to the Protest grounds set forth herein because they directly relate to the subject procurement and the Authority's evaluation of proposals thereunder.

## VI.    **Request for Relief**

Based on the foregoing, the Authority's evaluation of proposals, and stated intention to award the Contract to DAAI, a foreign-state-owned entity, was unreasonable and unlawful in multiple material respects and has caused, and will continue to cause, undeniable prejudice to PS. Accordingly, PS respectfully requests a ruling from the WMAA's Vice President, Office of Supply Chain Management that:

1.  Sustains PS's Protest;

2.  Recommends that the Authority take corrective action, including but not limited to disqualifying DAAI from the competition, conducting a reasonable evaluation of PS's Proposal in accordance with the terms of the RFP, and awarding PS the Contract;

3.  Grants such other relief and remedies as the Vice President, Office of Supply Chain Management determines to be just and equitable.

Respectfully submitted,

*/s/ Aron C. Beezley*

Aron C. Beezley
Nathaniel J. Greeson
Erik M. Coon
Charles F. Blanchard

*Counsel for The Private Suite IAD, LLC (dba PS)*

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE