**Aron C. Beezley**
abeezley@bradley.com
202.719.8254 direct



April 2, 2025

**_VIA hand delivery to the Authority's Procurement & Contracts Department; certified mail, return receipt requested; and email._**

Julia Hodge
Vice President, Office of Supply Chain Management
Metropolitan Washington Airports Authority

> **RE:**       **Solicitation No. RFP-23-21311**
>
> **SUBJ:**     **Supplemental Protest of The Private Suite IAD, LLC (dba PS)**

Dear Ms. Hodge:

The Private Suite IAD, LLC (dba PS) ("PS"), by and through the undersigned counsel, hereby submits this Supplemental Protest regarding the Solicitation identified above (the "Solicitation") and in support of the February 14, 2025 protest previously submitted (the "Protest"), an appeal of which is currently pending before the of the Metropolitan Washington Airports Authority's ("MWAA" or the "Authority") CEO. PS submits this Supplemental Protest to note additional support for its protest grounds following the March 26, 2025 Debriefing meeting between representatives of PS and MWAA, to reiterate its now 7-week-old request for documents under an open records request, and to provide additional support from PS customers.

**I.      Threshold Matters**

    **A.      This Supplemental Protest is Timely Filed.**

Pursuant to Section 21, page 19, of the RFP, Exhibit 1 and Chapter 9.2.2 of the MWAA's Contracting Manual, Revised Fifth Edition (Version 5.2) ("Contracting Manual"), a protest ground based on the manner in which offers were evaluated or on which a contract was awarded is timely if the protest is submitted by an offeror within seven days after the offeror knew or

April 2, 2025
Page 2

should have known the basis of the protest.  Here, PS participated in a Debriefing with MWAA

on March 26, 2025.  The information first learned in the Debriefing formed the bases for this

Supplemental Protest.  This Supplemental Protest is being filed within seven days of that date

and, therefore, is timely.

**B.** **The Authority Must Not Award the Contract During the Pendency of this Request.**

Any actions to award the Remote VIP contract should be stayed, and the VP-OSCM was

wrong to initiate or process award of the Remote VIP contract during the pendency of her initial

review.  Pursuant to Section 21 of the RFP, "[i]f a Contract has not been awarded at the time a

protest is timely filed, the Contract *may not* be awarded while the protest is pending, unless the

President and CEO determines that award of the Contract, and, if applicable, issuance of a notice

to proceed, is in the Authority's best interest."  RFP at 20 (emphasis added); *see also* Contracting

Manual, § 9.6.  The Protest is still pending because the protest process continues through the

resolution of this request, the resolution of the Appeal currently pending before the CEO, or any

subsequent appeals.  The Contracting Manual specifically includes the ongoing review

mechanism as part of the protest process, and notes that a decision is final only after the CEO, or

the MWAA Board where applicable, issues a final decision.  Contracting Manual, § 9.5.

Therefore, the Protest remains pending, and the Contract may not be awarded.  RFP at 20; *see*

*also* Contracting Manual, § 9.6.

**C.** **PS Reiterates its Records Request.  The Authority Should Complete PS's Records Request Before Continuing the Protest, Review of the Appeal, or the Procurement.**

While PS is grateful for the opportunity to learn about its proposal and MWAA's

evaluation through the debriefing process, PS reiterates its request for documents, initially

submitted on February 12, 2025.  *See* FOIA Request.  That request, submitted pursuant to the

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

April 2, 2025
Page 3

MWAA Freedom of Information Policy's procedures and the RFP's Freedom of Information

Policy, requested nine (9) categories of documents and emails related to the procurement at issue.

*Id*.  PS reiterated that request in its Protest and in its Appeal.  Protest at 31-32; Appeal at 3-5.

But PS has received no response regarding the status of those document requests other than

boilerplate confirmations of receipt.  *See* Decision at 7 ("The Airports Authority is in receipt of

PS's Freedom of Information request, and the Freedom of Information Officer will process PS's

request accordingly.").

This response, or lack thereof, unnecessarily delays the protest process, unreasonably

prejudices PS in its protest, and erodes the institutional trust in MWAA's ability to conduct an

efficient and fair protest procedure.  The Authority's continued withholding of the requested

documents only serves to delay and extend this process.  The Contracting Manual Section 9.2.2

and the RFP at 19 each require an offeror to file a protest within seven (7) days of the date it

knew or should have known of the basis for the protest.  In the likely event that there are grounds

for protest PS discovers within the documents it requested—as was the predictable outcome of

the Debriefing—PS will have seven (7) days to file *another* protest, and this protest and appeal

process will restart *again*.  *See id*.  Thus, producing the relevant documents to PS according to

MWAA's contracting rules would allow PS to consolidate its protest grounds into one document

for MWAA's consideration.  For the same reasons, MWAA's review of the Appeal should be

stayed following the release of those documents in order to consolidate the Protest.

As indicated in PS's Appeal, typical protest procedures at the Federal, State, and Local

levels provide for the production of documents before protest filing in order to deal with protest

issues efficiently and fairly by issuing a single decision on the full record, allowing for a

transparent and fair protest process that is also expedient.  *See, e.g.*, 4 C.F.R. § 21.3(d) ("The

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

April 2, 2025
Page 4

report shall include … a copy of all relevant documents, or portions of documents, not previously produced, including, as appropriate: the bid or proposal submitted by the protester; the bid or proposal of the firm which is being considered for award, or whose bid or proposal is being protested; all evaluation documents; the solicitation, including the specifications; the abstract of bids or offers; and any other relevant documents.").  Other policies, such as protective orders, allow for the exchange of information in a manner that protects confidential or proprietary information.  *See e.g.*, 4 C.F.R. § 21.4.  Again, these well-established protest procedures for public procurements are intentionally structured to deal with protest issues efficiently and fairly by issuing a single decision on the full record, allowing for a transparent and fair protest process that is also expedient.

Conversely, failure to provide relevant documents during a protest represents a material process failure by MWAA, not only by staggering the production of procurement information, and thus staggering the protest process, but also wherein the Authority loses credibility—and the process becomes non-transparent—by failing to meaningfully engage with bidders who are following the established protest procedures.  Additionally, by continuing to review existing protest grounds while anticipating and eventually receiving subsequent protest grounds, the Authority spends unnecessary time, energy, and expertise duplicating its efforts on reviews and responses that could have been dealt with in one decision and appeal.  Not only is the review process elongated, but so is the procurement process because a contract cannot be awarded until the protest process is complete.  RFP at 20; Contracting Manual, § 9.6.  Thus, the Authority's procedures are not only inefficient and ineffective, but they also undermine transparency, and they affect the ultimate ability of MWAA to provide services through its airports by drawing out

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

April 2, 2025
Page 5
_____

the process unnecessarily.  Respectfully, the Authority should release the requested documents

and stay its review of PS's Appeal before continuing this protest process.

Regardless of the procedure and its request, PS has asked three times now for these

documents and has not heard a substantive response yet.  PS will continue to request these

documents and reserves its rights to file supplemental protest grounds based on the contents

therein—whether those documents are produced in time to consolidate those into one efficient

procedure or not.

## II.    <u>Background</u>

Following MWAA's notice on February 7, 2025 that it would award the Contract to daa

International ("DAAI"), PS requested feedback from MWAA as to why its proposal was not

selected on February 11, 2025.  The next day, PS followed up clarifying that its request

constituted a formal request for debriefing pursuant to Section 4.7 of the  Contracting Manual

(Version 5.2).  That same day, pursuant to the MWAA Freedom of Information Policy's

procedures, PS submitted a formal Freedom of Information request to the Authority requesting

nine (9) categories of documents and emails related to the procurement at issue.  *See* Freedom of

Information Request.  On February 13, 2025, MWAA acknowledged PS's debriefing request and

offered to provide a debriefing on February 18, 2025.

On February 14, 2025, PS timely filed the Protest, contesting MWAA's evaluation of the

Solicitation and its intent to award to DAAI.  In the Protest, PS reiterated its document request.

*See* Protest at 31-32.  The same day PS filed its Protest, MWAA cancelled its previously

scheduled debriefing.  MWAA issued an initial decision—a denial—on the Protest on March 10,

2025 (the "Decision").  PS submitted an appeal, pursuant to the Decision, Page 8, and Chapter

9.5 of the Contracting Manual on March 17, 2025, again reiterating its request for a debriefing

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

April 2, 2025
Page 6

and for the documents it requested (the "Appeal").  Finally, on March 26, the Authority

conducted a debriefing meeting with representatives from PS (the "Debriefing").  The Appeal

remains pending; the records request remains unanswered.

### III.    The Debriefing Bolstered Elements of PS's Protest of Unequal Treatment and Unstated Evaluation Criteria.

In the March 26, 2025 Debriefing, the Authority stated that its intentions were to discuss

PS's proposal to see where PS did well and where it had room for improvement.  Declaration at

12.  The Authority stated it would not address allegations contained in either the protest or the

current appeal, nor would the Authority be able to share information about DAAI's proposal.  *Id*.

Notwithstanding those limitations, the Debriefing included a discussion of PS's proposal, the

overall Solicitation, and MWAA's evaluation of PS's proposal.  *See generally*, i*d*.  And despite

MWAA's inability to discuss DAAI's proposal or the ongoing protest documents, its discussions

about PS's proposal and how MWAA evaluated PS's proposal still shed light on elements of the

Protest, notably regarding MWAA's evaluation of corporate experience, price, and MWAA's

overall evaluation process.

The Debriefing confirmed that MWAA unreasonably evaluated proposals in this

Solicitation by evaluating DAAI's parent's corporate experience, selectively ignoring PS's

relevant experience, mischaracterizing and misevaluating PS's financial proposal, and by failing

to engage in a "Best Value" procurement.  For the reasons identified below, PS respectfully

requests that the Authority pauses its review of the Appeal, reverses the VP-OSCM's Decision,

sustains the Protest, and resolicits the RFP once its shortcomings are addressed.

### A.    Past Performance

PS used the Debriefing, in part, to ask about MWAA's evaluation of its proposal,

including elements MWAA may have evaluated inconsistently with respect to DAAI.  PS chose

April 2, 2025
Page 7

not to include information in its proposal regarding its parent corporation based on its

interpretation of the Solicitation, which contained no mention of parent companies or their

experience except for a short section requiring offerors to identify their ownership that explicitly

distinguished between "offeror" and "parent company."  RFP at 6; *see also* Appeal at 10-11.  But

because MWAA's decision indicated it had considered parent corporation experience in DAAI's

proposal, PS asked how the Authority evaluated offerors' parent companies.  Declaration at 13.

Notably, MWAA acknowledged during the Debriefing that the consideration of an offeror's

parent company was not a stated evaluation criterion and indicated that parent corporate

experience was "minimally relevant" to Phase 1, Criteria 1, regarding offerors' experience.  *Id*. at

14.  MWAA's admission that parent corporate experience was not an evaluation criterion

supports PS's Protest grounds that the Authority wrongfully considered offerors' corporate

parents' experience.  Moreover, this concession during the debriefing directly conflicts with the

Authority's rationale in its Decision.

In the Decision, MWAA noted, regarding DAAI's proposal, that "***[a]s an airport***

***operator***, the company has vast experience working with airlines, ground handlers, travel

retailers, State agencies, and U.S. TSA and CBP."  Decision at 3 (emphasis added).  But DAAI is

not an airport operator—DAAI's parent company, daa, is.  This means MWAA necessarily

considered DAAI's parent corporate experience when it evaluated proposals, despite confirming

in the Debriefing that "[i]t was not a stated evaluation criterion."  Declaration at 13.  This is

much more than a "minimally relevant" evaluation of an offeror's parent company's experience

where the Authority gave direct credit to DAAI for the most important and basic requirements of

the Solicitation.

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

April 2, 2025
Page 8

      Additionally, during the Debriefing, MWAA confirmed the Solicitation requirements that offerors were required to include "a minimum of one (1) representative contract within the last ten years whereby the Offeror provided Remote VIP Services, including TSA screening services and direct access to gated commercial aircraft, for a minimum of two consecutive years." Declaration at 28; *see also* RFP, Attachment 02, Phase 1 at 3.  As previously discussed, *see e.g.*, Protest at 14-20, DAAI cannot meet those requirements, especially not as an individual entity without considering its parent company's experience—Dublin Platinum Services is ***not*** a remote service, does ***not*** "include" TSA screening services, and  does ***not*** have direct access to gated commercial aircraft for all travelers.  Again, the Authority's concession during the Debrief that a parent company's corporate experience was (1) not an evaluation criterion and (2) "minimally relevant" to the evaluation is belied by the fact that the Authority's evaluation relied heavily on DAAI's parent company's experience to arguably become technically acceptable under Phase 1.

      Lastly, while it appears MWAA considered DAAI's corporate experience in its evaluation, the Debriefing demonstrated that MWAA did not consider PS's full experience consistently in its evaluation, much less that of its parent company or other related entities. During the Debriefing, PS asked MWAA about its evaluation of offerors' past performance. Declaration at 31.  Regarding PS, MWAA stated that it did ***not*** consider PS's Atlanta location, despite it having been operational for several months before Phase 1 submission, because of the relatively short length of time it had been open.[1]  Declaration at 32-35.  While the Solicitation indicated that past experience would be limited to locations that had been opened for a minimum of two years, RFP, Attachment 02, Phase 1 at 3, the same limitation did not apply to professional references regarding airport clients, TSA and CBP representatives, and airlines representatives.

---

[1] By the time Phase 2 proposals were submitted, PS's Atlanta location had been open for about one year.

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

April 2, 2025
Page 9

*Id*.  Moreover, failing to evaluate PS's Atlanta experience ignores both the success of PS's Atlanta location and the auxiliary benefits of multiple open locations.  It was unreasonable for MWAA to ignore that prior experience because, despite the length of operation, that experience still showed PS's ability to perform similar contracts successfully and illustrated the combined benefits of multiple locations.

During the Debriefing, MWAA noted for the first time that it also did not credit PS for past performance experience for Miami or Dallas/Fort Worth, which were awarded but not yet operational at the time of submission.  Declaration at 35.  MWAA's exclusion is particularly notable because of the emphasis in the Debriefing on capital contributions.  MWAA stated during the Debriefing that part of the reason it did not evaluate PS's experience in Atlanta was the smaller capital contribution compared with the Dulles requirements.  *Id*.  But this further confirms that MWAA ignored PS's proven experience in raising sufficient capital to execute at Atlanta, Miami, and DFW.  What is more, MWAA **did** evaluate those additional locations in the context of using small and local businesses and ACDBE requirements and goals, reflecting an unequal and uneven evaluation of PS's past experience.  *See id*. at 43.

These newly discovered evaluation errors regarding past performance negatively affected PS's past performance evaluation.  The Authority gave PS an "Acceptable" rating rather than a "Good" rating because PS only had one example of comparable work that MWAA considered.  *Id*. at 34.  MWAA's unreasonable exclusion of PS's relevant experience, especially when considered in the context of its inclusion of DAAI's tangentially related parent company experience (and exclusion of PS's parent company's experience), further demonstrates an unreasonable and unequal evaluation.  The "Acceptable" rating further confounds because of MWAA's representation in the Debriefing that PS's LAX facility provided the **exact** services

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

April 2, 2025
Page 10

identified in the RFP and resulted in an **exact** past performance experience.  Declaration at 14.

PS provided MWAA with a perfect example of past performance, and, as the only remote VIP

airport services operator in the United States that meets the Solicitation requirements with more

than one location, necessarily could not have been surpassed in its evaluation.  Nevertheless, PS

only received an "Acceptable" past performance criterion rating.  *Id*.

MWAA arbitrarily handicapped PS's proposal by limiting its evaluated experience while

artificially inflating DAAI's through the inclusion of unrelated and inapplicable airport

operations executed by subcontractors managed by DAAI's parent company.  In short, PS's

directly relevant self-performed operations and experience were severely discounted in favor of

tangentially—at best—related past performance of DAAI's parent company's subcontractor

performance.  As such, the Debriefing supports PS's conclusion that MWAA conducted a flawed

evaluation, and PS respectfully requests MWAA reopen the Solicitation following its issuance of

clarifications to the terms of the RFP.

### B.    Financial Offer Evaluation

The Debriefing also illuminated MWAA's evaluation regarding Phase 2, Financial Offer

Evaluation.  In the Debriefing, MWAA told PS that its financial projections were a weak element

of its proposal because they allegedly lacked detail and information.  Declaration at  19.  MWAA

further stated that they asked PS for a clarification of the projections page and claimed PS's

response was not detailed.  *Id*.  However, MWAA did not ask for a full clarification of the

projections page, it asked for PS's "anticipated Percentage Rent payment for each of the first five

years of operation" and for "Private Suites to explain in detail how it calculated 'PS IAD

Reservation Revenue, PS IAD Membership Revenue, and PS IAD Other Reservation Related

Revenue' listed on page 5 of [PS's] proposal."  *See* Exhibit 1 at 6.  PS promptly and timely

**CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE**

April 2, 2025
Page 11

responded to those discrete and narrow questions.  *Id*. at 4-6.  MWAA followed up with more

discrete clarifying questions about PS's input "on how [PS] calculated the estimates for

Reservation and Membership revenue (*i.e.* the basis for the assumptions that support the

estimated revenues)" and regarding specific ground amounts of ground rent and how that was

accounted.  *Id*. at 3.  PS promptly and timely provided those answers.  *Id*. at 1-3.  So, not only

did MWAA not request a full clarification of the page at issue, but when MWAA requested

clarification on discrete issues, PS gave detailed responses to the specific questions MWAA

asked.  *See id*.  Had MWAA needed or wanted different information, all it had to do was ask.  It

is improper to downgrade an offeror for an alleged failure to provide specific information where

that information could have been but was not solicited during discussions.

PS's pricing questions during the Debriefing also questioned ***how*** MWAA evaluated

offerors' price component.  MWAA stated that it did not use an outside consultant to look at the

proposals, instead relying entirely on its own internal evaluation of each offeror's price.  That

exchange—and the Authority's concession—further confirms PS's protest allegation that MWAA

failed to adequately evaluate offerors' price proposals by taking them at face value rather than

reviewing them for accuracy and realism.  *See* Protest at 21-29; Appeal at 22-26.

Lastly, the Debriefing illuminated how MWAA evaluated different elements of the

offerors' proposals.  For example, MWAA unfairly evaluated construction firms in the context of

offerors' Phase 2 price proposals.  Declaration at 22.  Again, MWAA stretched the limit of its

evaluation to include more than the RFP suggested.  Phase 2, Criterion 2 required that offerors

propose a:

> plan to design and construct the facilities within thirty (30) months of award of the
> Lease and its plan to complete the Mid-Term Refurbishment by the end of the tenth
> (11th) year of operation including:

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

April 2, 2025
Page 12

_____

    a.      A design and construction schedule demonstrating the Offeror's ability to construct the facilities in accordance with historic preservation guidelines within the required timeframe and a proposed Mid-Term Refurbishment Plan, including the estimated costs for the Initial Capital Investment and Mid-Term Refurbishment.

    b.      Conceptual designs that conform to the historic preservation guidelines, as mandated by the Historic Preservation ordinance, interior and exterior renderings, and conceptual site plans of the facilities that the Offeror plans to construct.

RFP, Attachment 02, Phase 2 at 3-4. Nothing in those requirements indicated that MWAA considered the identity of the construction contractor was relevant or that the construction contractor's experience working at Dulles would be evaluated more favorably. The RFP indicated only that "[a] design and construction schedule demonstrating the Offeror's ability to construct the facilities…" and conceptual drawings would be evaluated. *Id*. And PS's proposal provided a design and construction schedule that indicated completion within 24 months—six months ahead of the required schedule. However, when PS asked MWAA about its evaluation of construction firms, MWAA stated that DAAI's proposed contractor's experience ***was*** considered, which indicated the Authority evaluated the offerors based on a metric that was not included in the RFP or known to PS. Declaration at 27. Therefore, again, MWAA granted DAAI additional credit for an unstated evaluation criterion despite PS's proposal fully complying with—even exceeding—the stated terms of the RFP.

       Moreover, although the Decision stated that "the construction firm that [DAAI] proposed to lead project delivery has experience ***working at Dulles International*** and expertise in the permitting processes, having successfully delivered many projects ***within active airport operations***," Decision at 3 (emphasis added), construction on the project will not occur within active airport operations. Rather, construction will take place ***outside the existing airport fence-***

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

April 2, 2025
Page 13

_line_ and would only become part of the airside operation when construction realigned the fence

at the very end of the project.  Thus, MWAA again unreasonably favorably evaluated DAAI's

proposal using unstated evaluation criteria and generous interpretations of its proposal to PS's

prejudice.

> **C.**     **Overall Evaluation**
>
> **i.**     **The Authority Failed to Conduct a Proper Best Value Procurement.**

Much of the Debriefing focused on the process by which MWAA conducted its

evaluation.  But PS left the Debriefing with more questions about the evaluation than answers.

While the RFP included definitions for MWAA's technical proposal evaluation ratings, _see e.g._,

RFP, Attachment 02, Phase 2 at 2-3, neither the RFP nor the Debriefing indicated how those

ratings fit together when the Authority holistically evaluated them.  The RFP stated the Authority

would conduct "a two-phase, competitively negotiated "Best Value" procurement method."  RFP

at 14.  But following the Debriefing, it is clear the Agency evaluated the proposals without a

cohesive analysis of the technical elements or how those related to the comparative value

offerors were evaluated to provide.

For instance, during the Debriefing, MWAA stated that PS received overall ratings of

"Good" for both Phase 1 and Phase 2.  Debriefing at 37.  The Decision stated that "[DAAI]'s

technical proposals were "Acceptable" in Phase 1 and "Excellent" in Phase 2."  Decision at 6.

But MWAA has not explained how those two "Good" ratings for PS compared to the

"Acceptable" and "Excellent" ratings for DAAI.  In other words, the Authority assigned values

to the individual elements of the proposals but failed to review those individual elements in a

manner that explained why an "Acceptable" rating and an "Excellent" rating represented a better

value than two "Good" ratings.  Such a result suggests that Phase 2 was more important than

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

April 2, 2025
Page 14

Phase 1 because DAAI's higher "Excellent" rating in Phase 2 apparently outweighed PS's "Good" rating, despite PS's superior "Good" to DAAI's inferior "Acceptable" in Phase 1.  But the Solicitation does not indicate that Phase 2 would be more important than Phase 1.  And in any event, such a result does not suggest a "Best Value" procurement, which requires a weighing of all technical elements against price.[2]  Had PS been made aware of the relative importance of each Phase or that MWAA might weigh price as significantly more important than technical evaluations, PS may have altered its proposal.

Furthermore, the Authority's inability to describe how or why two "Good" ratings fall short of an "Acceptable" and "Excellent" rating demonstrate flawed documentation by the Authority, in addition to the flawed reasoning described above.  It is axiomatic that an awarding entity must document the sensible rationale it uses to conduct a best-value procurement.  *See e.g.*, *Standard Commc'ns, Inc. v. United States*, 101 Fed. Cl. 723, 737 (2011) ("Without adequate documentation, it is not possible to determine whether the SSA engaged in an appropriate best-value tradeoff analysis."); *Freealliance.com, LLC*, *et al.*, B-419201.3, Jan. 19, 2021, 2021 CPD ¶ 56 at *7 ("Agencies are required to evaluate quotations based solely on the factors identified in the solicitation, and must adequately document the bases for their evaluation.").  However, here, MWAA's responses in the Debriefing suggested that MWAA was unwilling or unable to describe just how it compared its evaluations between Phases.  Such an evaluation does not reflect a "Best Value" procurement, and thus ran afoul of the terms of the Solicitation.

---

[2] Logically, the only explanation for an offeror's higher rated Factor 2 Financial Offer carrying so much more weight than its lower rated Factor 1 Technical Proposal would be that the Financial Offer (price) represented so much value to the Authority that it offset the better technical proposal.  The Debrief confirmed this scenario here, which further supports PS's Protest grounds that MWAA unreasonably evaluated DAAI's unrealistic financial projections as realistic and reasonable.  *See* Protest at 22-26; Appeal at 21-29.

April 2, 2025
Page 15

ii.    **The Authority Unequally Evaluated Proposals Based on Adjectival Ratings.**

Similarly, MWAA's debriefing failed to explain fully how it evaluated the ratings it assigned for each individual criteria within each phase collectively.  When PS asked MWAA about the evaluation method, MWAA stated that the committee would come to a consensus after individual evaluations of a proposal, that it would evaluate all criteria in descending order of importance, and that each item could have equal or lesser weight than the one in front of it. Declaration at 45; *see also* RFP, Attachment 02, Phase 2 at 1-3.  But MWAA also indicated that it could not share what the weights/ratings were for each Criterion.  *Id.*  So, while MWAA insisted it evaluated proposals equally, MWAA will not or cannot share how it evaluated those proposals and came to those conclusions.

The problem with MWAA's unavailable evaluation ratings is exemplified by how it evaluated the overall phases.  MWAA stated that PS received three "Good" ratings and one "Excellent" rating in Phase 2 for an overall rating of "Good," Declaration at 44, while the Authority's Decision indicated that DAAI received an overall Phase 2 rating of "Excellent." Decision at 6.  But MWAA also stated that it would not share the weights or ratings of each individual Criterion.  Declaration at 45.  How MWAA considered PS's financial capacity as "Good" but DAAI's final rating as "Excellent" reflects the lack of transparency in how the individual rating elements were combined and suggests that the Authority evaluated proposals less based on a holistic "Best Value" analysis and more on a mechanical summation of adjectival ratings for each criterion.[3]  Such an evaluation was not contemplated in the Solicitation.  Thus,

---

[3] Not to mention, DAAI's favorable rating here begs the question of whether its parent company, a state-owned entity better suited than private industry to weather the effects of COVID, constituted its financial capacity evaluation submission.

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

April 2, 2025
Page 16

PS was prejudiced by an evaluation that focused less on the value PS provided to the Authority and more on the myopic and mechanical sum of its evaluation factor ratings.

The mechanical analysis appears to have continued into the analysis of individual technical evaluation criterion.  For example, in the Debriefing, MWAA stated that PS received a "Good" rating for its financial capacity criterion rating based on the fact that PS showed positive cashflow.  Declaration at  39-40.  MWAA also stated that the reason PS was not rated "Excellent" was that COVID impacted that cashflow over the past few years.  *Id*.  MWAA noted that positive cashflow during COVID would have been difficult, if not impossible, to achieve for anyone.  *Id*. at 39.  Nevertheless, MWAA still held PS to such a standard wherein it was difficult if not impossible to achieve an "Excellent" rating for that criterion.  That inability to earn an "Excellent" rating, despite PS's strong post-COVID numbers, prejudiced PS because, apparently, it limited PS's ceiling in the total evaluation under Phase 2 based on the way in which the Authority evaluated each criterion.

Similarly, MWAA noted in the Debriefing that PS received an "Acceptable" rating for its experience based chiefly on its experience operating its LAX location for more than seven years, and in spite of the Authority's refusal to consider PS's Atlanta location.  Declaration at 34.  But such a rating again reflects how the deck was stacked against PS.  PS was, and remains, the only remote luxury VIP airport services operator in the world with more than one location.  DAAI's Platinum Services location in Dublin remains its only location that arguably provides similar services.  Based on MWAA's representations in the Debriefing, it is apparent that no one could receive a rating of "Good" or "Excellent" for experience because it would be impossible to exceed PS's experience as the United States' only operator of these specific services with multiple locations.

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

April 2, 2025
Page 17

In practice, it appears that MWAA's evaluation presented PS with an impossible task: for those areas of its proposal in which it was the strongest, the Authority's evaluation made it impossible to achieve an "Excellent" rating. PS's strong financial capacity performance was rated "Good" but could never be rated "Excellent" because of COVID. Declaration at 39. And PS's past experience was rated "Acceptable," but could never be rated "Good" or "Excellent" because the Authority would only evaluate one location, despite ignoring PS's additional locations, ignoring the fact that no other entity in the United States operated more than one location, and accounting for MWAA's own admission during the Debriefing that PS's LAW location was **exactly** the experience called for in the RFP. *See* Declaration at 14, 34. And because MWAA's collective adjectival ratings appear to have dictated the overall Phase rating, MWAA's impossible targets artificially limited PS to lower overall ratings.

"It is a fundamental principle of federal procurement law that a contracting agency must treat all offerors equally and evaluate their proposals evenhandedly against the solicitation's requirements and evaluation criteria." *Arctic Slope Mission Servs., LLC*, B-410992.5, Jan. 8, 2016, 2016 CPD ¶ 39 at *6. But that is exactly what happened here—PS was unable to receive higher ratings on criteria in which it excelled because it was literally impossible to achieve "Excellent" ratings for those criteria. Those lower criteria ratings, in turn, affected PS' overall Phase ratings. Meanwhile, DAAI received an overall "Excellent" rating for its Phase Two proposal compared to PS's "Good" and while DAAI received an "Acceptable" for Phase One, PS only received a "Good." Decision at 6; Declaration at 34, 39. Thus, for each of the two Phases, PS's proposal was negatively impacted by technical evaluation criteria in which PS could never have achieved an "Excellent" rating. Nevertheless, DAAI received an "Excellent" overall Phase Two rating. Such results indicate unequal treatment between offerors because while PS was

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

April 2, 2025
Page 18

hamstrung, MWAA afforded DAAI leeway.  Had PS received higher ratings on its past experience and/or financial capacity criteria, those higher ratings would have been enough to improve its overall Phase ratings, altering the balance of the Authority's evaluation.  Because MWAA's evaluation unequally treated offerors, PS respectfully requests the Authority rescind its decision to award to DAAI and resolicit the RFP after addressing the identified procurement irregularities.

**IV.    Additional Support**

Notwithstanding the procurement irregularities and the Authority's errors in evaluating and awarding this Solicitation, PS remains a strong offeror whose highly regarded services elicit support from its current clientele.  As a demonstration of that support, PS attaches the following letters from its clientele, which illustrate the power of the PS brand and the strong relationships it has with VIP customers.

**V.    Conclusion and Request for Relief**

PS remains grateful for MWAA's time and the information it was willing and able to share in the Debriefing.  PS respectfully requests that MWAA considers the additional facts and arguments identified in the Debriefing.  Furthermore, PS respectfully requests that MWAA produce the documents it requested in its February 12, 2025 Freedom of Information request and previous protests, and that it pauses its review of the Appeal until such time as a fulsome protest process can be completed in such a way that does not needlessly extend this process through piecemeal protests, reviews, and appeals.  Lastly, PS draws MWAA's attention to the letters of support attached to this letter.  Accordingly, PS respectfully requests a ruling from MWAA's Vice President, Office of Supply Chain Management that:

1.    Withdraws in its entirety the VP-OSCM's Decision to Deny PS's Protest;

**CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE**

April 2, 2025
Page 19

2.    Suspends the CEO's review of the Appeal until MWAA produces PS's requested documents;

3.    If applicable, cancels, stays, or rescinds any award of the Remote VIP Services contract;

4.    Recommends that the Authority take corrective action, including but not limited to cancelling the intended award, revising the RFP, and reissuing the revised RFP for further competition;

5.    Grants such other relief and remedies as the Authority determines to be just and equitable.

Respectfully submitted,


*/s/ Aron C. Beezley*

Aron C. Beezley
Nathaniel J. Greeson
Charles F. Blanchard

*Counsel for The Private Suite IAD, LLC (dba PS)*

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

### Declaration of Amina Belouizdad Porter

I, Amina Belouizdad Porter, declare as follows:

1.  My name is Amina Belouizdad Porter. I am the CEO of The Private Suite IAD, LLC (dba PS) ("PS"). I have personal knowledge of and am competent to testify as to the matters stated.

2.  At all times referenced herein, either I or another employee of PS acting at my direction spoke on behalf of PS.

3.  Unless otherwise indicated, at all times referenced herein, Mr. Donald Laffert spoke on behalf of MWAA.

4.  PS intended to bid for, and did bid on, the contract to be awarded under Solicitation No. RFP-23-21311 (the "Solicitation").

5.  On February 7, 2025, the Metropolitan Washington Airports Authority ("MWAA") indicated it would award the Solicitation to daa International ("DAAI").

6.  PS requested feedback from MWAA as to why its proposal was not selected on February 11, 2025. The next day, PS followed up clarifying that its request constituted a formal request for debriefing pursuant to Section 4.7 of the Contracting Manual (Version 5.2). MWAA acknowledged PS's debriefing request and offered to provide a debriefing on February 18, 2025.

7.  On February 14, 2025, PS timely filed a Protest, contesting MWAA's evaluation of the Solicitation and its intent to award the Solicitation to DAAI (the "Protest"). The same day PS filed its Protest, MWAA cancelled its previously scheduled debriefing.

8.  MWAA issued an initial decision—a denial—on the Protest on March 10, 2025 (the "Decision"). PS submitted an appeal on March 17, 2025 (the "Appeal").

9.  On March 26, 2025, the Authority conducted a debriefing meeting with representatives from PS (the "Debriefing").

10. The Debriefing was held virtually, with representatives from MWAA and PS, including myself, Terina Tsai, and Steven Gargaro from PS, Donald Laffert from MWAA, and our respective counsel.

11. The content of the Debriefing is described below to the best of PS's collective recollection.

12. The Debriefing opened with a general statement from MWAA, stating that PS submitted a good proposal. Mr. Laffert stated that he was happy to go through the evaluation and see where PS's proposal could have been stronger. Mr. Laffert also asserted ground rules: that he would not address allegations in either protest or regarding the current appeal in front of the CEO, and that he would not be able to discuss other proposals. Mr. Laffert

indicated that normally, in these debriefs, people can learn where they can improve, and that he was happy to go through the instances where the proposal was not rated highly. Mr. Laffert reiterated that that neither of the two topics should be addressed: the ongoing protest review by the CEO and the other proposal.

13.    PS asked how the Authority evaluated offerors' related entities / parent companies.

14.    Mr. Laffert responded that it was not a stated evaluation criterion and acknowledged that PS's protest alleged that MWAA improperly evaluated the entities regarding related entities. Mr. Laffert continued that the evaluation criteria in Phase 1, where related entities was minimally relevant, was about experience. Phase 1 Criteria 1 was about experience operating a facility where the service was equivalent to the service sought in the Solicitation. MWAA noted that PS operated and had operated a facility in LAX which provided these exact services, that MWAA evaluated PS on that experience, and that PS met the "Acceptable" standard without question.

15.    PS asked MWAA to provide the definition of Remote VIP services, to which MWAA responded that the definition was in the SOW and that MWAA was looking for experience performing those types of services.

16.    When PS noted that publicly available information demonstrates that Platinum Services is within the terminal and not remote, MWAA responded that the parties would not talk about another proposal.

17.    PS asked if MWAA had visited Platinum Services and PS to understand the variances in the VIP offering. MWAA responded that the evaluators obviously did not visit PS's facility and claimed PS was aware of that. MWAA continued that it evaluated PS's proposal, and the rating was based on what was in that proposal.

18.    PS asked who the evaluators were and if they had a background or knowledge of airport operations—specifically of VIP operations and services. MWAA could not disclose who was on the evaluation committee.

19.    PS asked about how the Authority conducted its due diligence of offerors' financial proposals and projections. MWAA responded that PS did not do a good job on the projections in Phase 2. MWAA claimed PS spent less than half a page and three bullet points to support its projection, which was more than half of that page. MWAA also claimed that PS should recall that MWAA asked for a clarification of the financial projections page and the response it received was not detailed.

20.    Regarding revenue projections, MWAA stated that it evaluated those based on the listed evaluation criteria. There were five items which PS completed.

21.    MWAA continued regarding Phase 2 revenue projections that PS was evaluated overall "Good." To be "Acceptable," PS had to address all five items which it did in your performance and pro forma. MWAA said PS met all requirements on page 5. MWAA said PS met the "Good" standard largely because PS was showing a profit after year one, projected a profit in year two, and showed growth growing steadily thereafter.

22.    MWAA noted that it did not use an outside consultant to look at the proposal.

23.    Regarding the Refurbishment category, MWAA noted the contract had a minimum requirement of 30 months and PS proposed completion in 24 months, which was better than the 30 months as listed in the contract.  This earned PS a "Good" rating for that criterion.

24.    MWAA noted that while capital investment was not directly a factor, the midterm refurbishment could be significant, and PS's was not—it was the minimum.  MWAA noted that it would have made PS's proposal higher rated if it had larger midterm than the minimum 20%.

25.    When PS asked if there was a financial expert or consultant used to verify offerors' financial proposals and projections, or if offerors' proposals taken at face value, MWAA responded that proposals were evaluated based entirely on the proposal submitted by the evaluation team without additional materials.

26.    PS brought up that the Protest response mentioned daa proposed a construction firm that has worked at Dulles International and asked if that was an important factor in this decision.

27.    MWAA responded that the construction firm was not an important factor.  But MWAA also stated that the refurbishment component under Phase 2 Criterion 2 was evaluated based on the scheduled provided—i.e., whether the refurbishment could be done in 30 months with a midterm refurbishment, 20% in year 11, and the conception design could form with historic guidelines and provide interior and exterior rendering and concept design.

28.    PS reminded MWAA that the RFP required offerors to include: a minimum of one (1) representative contract within the last ten years whereby the Offeror provided Remote VIP Services, including TSA screening services and direct access to gated commercial aircraft, for a minimum of two consecutive years.

29.    MWAA responded that PS had established it has past experiences doing that and MWAA rated PS accordingly.  PS was rated as meeting that requirement—i.e., an "Acceptable" rating.

30.    When PS asked for MWAA to define what was required for "direct access to gated aircraft," MWAA responded that PS met the requirements for this.

31.    PS also asked about Past Performance.

32.    MWAA noted that, at the time of the proposal, PS had only been operating in ATL for a few months and that proposals were based on the time of submission of the proposal.  MWAA continued that Phase 1 related to past performance, and that MWAA evaluated past performance relying principally on LAX.

33.     PS also asked about past performance based on the Offerors' submitted professional references.

34.     MWAA responded that it rated PS "Acceptable" because it had provided the services at LAX for some time that are nearly identical to the ones in the contract; PS met the requirement.  MWAA did not consider ATL because it had just opened, so it was hard to consider it as an additional example.  MWAA continued that, in Phase Two, past performance references were not part of the evaluation criteria and highlighted that the criteria were different—Phase 1 looked at where an offeror had done it before, and Phase 2 looked to what an offeror was going to do at Dulles.

35.     MWAA told PS it was "Acceptable," not "Good" because it had one example that was comparable to the work it was looking for.  But MWAA noted that if PS had submitted a proposal now, it could have included other locations and would have more information.  MWAA told PS that its contracts at MIA and DFW were not proof of anything and the other thing about ATL was that it is a much smaller capital investment compared to LAX which was more similar in cost as DC.  MWAA noted that ATL in September 2023 was less relevant than LAX, but that the reference did not hurt PS. MWAA noted that PS successfully operated the LAX facility for almost seven years, but that more representative contracts would have helped PS's case, especially if PS had more than one.

36.     Regarding the evaluation criteria, MWAA noted that "Acceptable" meant an offeror met the minimum requirements.  Proposals could be rated higher.  There is "Unacceptable" which was not applicable to PS's proposal, there was "Good" and there was "Excellent."  MWAA noted that those ratings were not numerical.

37.     MWAA told PS that overall, for Phase One PS was "Good" and overall, for Phase Two PS was "Good" and overall PS was "Good."

38.     PS also asked about Financial Capacity.

39.     MWAA responded that PS was rated "Good," and that MWAA evaluated only the contents of PS's proposal.  MWAA pointed to PS's proposal on page 8, where it provided PS's financial capacity based on MWAA's determination that PS showed cash flow as possible.  MWAA noted that the reason PS was not "Excellent" was that for the period the last few years involved, COVID impacted PS.  MWAA noted that "Excellent" was not likely for any offeror.  MWAA told PS that obviously its 2020 and 2021 were not successful, and that was why PS only received a "Good" rating versus an "Excellent" rating.

40.     MWAA noted that it would not engage in hypotheticals of what PS could have submitted or how the committee would have evaluated in a different scenario.  MWAA continued that regarding COVID, MWAA may have evaluated PS as "Excellent," but PS did not have as great of years, which MWAA did not hold against PS.  MWAA noted that PS provided positive cash flow for all three years even during COVID, which was the requirement.

41. PS asked about the Proposed Offering & Marketing Approach. MWAA responded that PS was rated "Excellent." The committee thought PS had detailed discussions about your plans for airlines and the traveling public. PS met the goal and exceeded it with the highest rating possible.

42. PS asked about Sustainability. MWAA responded that the review entailed emissions, water, energy, waste, and sustainable constructions. MWAA noted they wanted to see specific examples of how offerors were going to continue to achieve on those fronts. MWAA clarified that included what PS does today and what MWAA is trying to achieve, and how PS might do that using specific examples. MWAA claimed PS did not provide it with that.

43. PS asked about Small and Local Businesses and ACDBE goals. MWAA responded that PS was rated "Good" and met the requirements and goals. MWAA continued that PS was rated "Good" because PS talked about its experience in DFW, proving that PS was experienced in beating the small business and diversity goals. MWAA noted that PS got a "Good" rating because it talked about exceeding in Dallas.

44. MWAA noted that overall, for Phase Two, PS received three "Good" ratings and one "Excellent," for an overall rating of "Good." MWAA noted PS was rated "Good" overall for both Phases, which indicated PS provided a proposal that exceeded MWAA's overall requirements.

45. PS asked about the order of importance in reviewing criteria. MWAA responded that the committee comes to a consensus after individual evaluations of a proposal, that all criteria are in descending order of importance, and that each item could have equal or lesser weight that the one in front of it. MWAA stated that it could not share what the weights/ratings were.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 2nd day of April, 2025.

_____

Amina Belouizdad Porter

CEO, The Private Suite IAD, LLC (dba PS)

# EXHIBIT 1

**Blanchard, Charlie**

| | |
|---|---|
| **From:** | Laffert, Donald <Donald.Laffert@MWAA.com> |
| **Sent:** | Thursday, October 31, 2024 1:35 PM |
| **To:** | Jordi Mena; Steven Gargaro |
| **Cc:** | Callie McKay |
| **Subject:** | RE: RFP 23-21311 – Remote VIP at IAD |

Jordi,

What I need this the payments to the Authority for the first five years of operation for ground rent and estimated percentage rent payment.

The Financial Offer form has the correct amount for the payments to the Authority of ground rent but for accounting purposes, you took the total payment of $3.9M and divided it by the number of years and came up with $186K per year.  Is that correct?

Don

**Donald Laffert**
Procurement Director - Revenue

**Metropolitan Washington Airports Authority**
1 Aviation Circle
Washington, DC 20001-6000

O: 703-417-8433
donald.laffert@mwaa.com

**mwaa.com**

---

**From:** Jordi Mena <jmena@reserveps.com>
**Sent:** Thursday, October 31, 2024 1:19 PM
**To:** Laffert, Donald <Donald.Laffert@MWAA.com>; Steven Gargaro <sgargaro@reserveps.com>
**Cc:** Callie McKay <cmckay@reserveps.com>
**Subject:** RE: RFP 23-21311 – Remote VIP at IAD

> **CAUTION:** This email originated from outside of Airports Authority. Do not click links or open attachments unless you recognize the sender and have verified the authenticity of the message.

Hi Donald,

Let me chime in here.

The financial offer is cash base, that is how much cash each year we are offering to IAD.

The financials must follow the lease accounting standard ASC842 under US GAAP, which has a different pattern than cash. I'm happy to walk you or the evaluation team in more detail how this lease standard works.

Thanks,

Jordi
*CFO – PS*

---

**From:** Laffert, Donald <Donald.Laffert@MWAA.com>
**Sent:** Thursday, October 31, 2024 10:15 AM
**To:** Steven Gargaro <sgargaro@reserveps.com>
**Cc:** Callie McKay <cmckay@reserveps.com>; Jordi Mena <jmena@reserveps.com>
**Subject:** RE: RFP 23-21311 - Remote VIP at IAD

Steve,

You have ground rent for $186,830 for each of the first five years of operation.  In your Financial Offer Form, the ground rents is: Y1 $134,600.40   Y2 $138,638.41      Y3 $142,797.56   Y4 $147,081.49      Y5 $151,493.94

Please confirm the financial offer numbers are correct.

Thanks,

Don


**Donald Laffert**
Procurement Director - Revenue

**Metropolitan Washington Airports Authority**
1 Aviation Circle
Washington, DC 20001-6000

O: 703-417-8433
donald.laffert@mwaa.com

**mwaa.com**

---

**From:** Steven Gargaro <sgargaro@reserveps.com>
**Sent:** Thursday, October 31, 2024 12:46 PM
**To:** Laffert, Donald <Donald.Laffert@MWAA.com>
**Cc:** Callie McKay <cmckay@reserveps.com>; Jordi Mena <jmena@reserveps.com>
**Subject:** Re: RFP 23-21311 - Remote VIP at IAD

> **CAUTION:** This email originated from outside of Airports Authority. Do not click links or open attachments unless you recognize the sender and have verified the authenticity of the message.

Hi Don,
Does this suit your purposes?

We are happy to have a call or meeting with the evaluation team if that helps.

Reservation and Membership Revenue assumptions:

There are 4 main areas that PS has analyzed to size the IAD market and PS IAD Revenue:

1. Airport Profile – reviewed size of the Airport in terms of volume of passengers, domestic/international mix, current VIP areas, VIP protocols, and Airlines operating
2. Route Analysis – reviewed the premium seats (that is first and business class) for every route in-and-out of IAD and compared that to our internal PS benchmark at LAX and ATL
3. Wealth Overview – reviewed various reports on concentration of wealth in the area that serves IAD
4. Corporate & Diplomatic – Analyzed the global influence in terms of political power of the DC area and economic power: number of embassies and international visiting delegations, conventions, concentration of International Organizations, total number of Fortune 500 companies, lobbying firms

<u>For the Rent</u>
Below are the numbers based on our financial statements. Please remember the below follows the lease accounting standard ASC842 under US GAAP. For the annual **cash** payments for Ground Rent and MAG, please refer to the financial offer.

| Financial Statement - PS IAD | Year 00 | Year 0 | Year 1 | Year 2 | Year 3 | |
|---|---|---|---|---|---|---|
| Ground Rent to IAD* | 186,830 | 186,830 | 186,830 | 186,830 | 186,830 | 1 |
| MAG Rent to IAD* | - | - | 854,916 | 854,916 | 854,916 | 8 |
| Percentage Rent to IAD | - | - | 446,417 | 1,113,379 | 1,252,627 | 1,3 |

*STEVEN GARGARO*
*Vice President - Airport Development*
*213.784.6837*
[reservePS.com](reservePS.com)



*Confidentiality:  This email, like all PS communications, is privileged and confidential. If you are not the addressee or responsible for delivery of the message to the addressee, please notify us immediately, and then delete this email.*

---

**From:** Laffert, Donald <Donald.Laffert@MWAA.com>
**Date:** Wednesday, October 30, 2024 at 1:08 PM
**To:** Steven Gargaro <sgargaro@reserveps.com>
**Cc:** Callie McKay <cmckay@reserveps.com>, Jordi Mena <jmena@reserveps.com>
**Subject:** RE: RFP 23-21311 - Remote VIP at IAD

Steve,

Thanks for the quick turn-around.  However, for the Percentage Rent, we were looking for the number – not rounded to the closest number in millions.  For example, you have 0.4 M for year one.  Is that $400,000 or $4XX,XXX?  If you could provide the numbers for years 1 through 5 that would be great.

On the second question, the Committee  was looking for more information on how Private Suites calculated the estimates for Reservation and Membership revenue (i.e the basis for the assumptions that support the estimated revenues).

Don

**Donald Laffert**
Procurement Director - Revenue

**Metropolitan Washington Airports Authority**
1 Aviation Circle
Washington, DC 20001-6000
O: 703-417-8433
donald.laffert@mwaa.com
**mwaa.com**

---

**From:** Steven Gargaro <sgargaro@reserveps.com>
**Sent:** Wednesday, October 30, 2024 10:43 AM
**To:** Laffert, Donald <Donald.Laffert@MWAA.com>
**Cc:** Callie McKay <cmckay@reserveps.com>; Jordi Mena <jmena@reserveps.com>
**Subject:** Re: RFP 23-21311 - Remote VIP at IAD

> **CAUTION:** This email originated from outside of Airports Authority. Do not click links or open attachments unless you recognize the sender and have verified the authenticity of the message.

Don,
I think the table below from our submission answers the percentage rent question. If you need something different or additional, can you please clarify?

Revenue definitions are below.

**PS IAD**
**RFP-23-21311**
**Financial Proposal - Criterion 1**
in Millions of USD

| Financial Statement - PS IAD | Year 00 | Year 0 | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|---|---|
| | Planning & Construction | | | | | | |
| **Revenue** | | | | | | | |
| PS IAD Reservation Revenue | - | - | 15.4 | 30.1 | 37.4 | 40.0 | 42.0 |
| PS IAD Membership Revenue | - | - | 0.6 | 1.8 | 2.4 | 2.7 | 3.0 |
| PS IAD Other Reservation Related Revenue | - | - | 0.6 | 1.3 | 1.6 | 1.7 | 1.8 |
| **Total Revenue** | - | - | 16.7 | 33.1 | 41.3 | 44.3 | 46.7 |
| **Operating Expenses** | | | | | | | |
| Pre-Opening Expenses | 0.1 | 3.0 | - | - | - | - | - |
| PS Wages and Benefits | - | - | 10.0 | 12.7 | 14.0 | 14.5 | 14.9 |
| Federal Agencies expenses | - | - | 1.3 | 1.6 | 1.7 | 1.7 | 1.8 |
| Depreciation and Amortization | - | - | 3.2 | 3.3 | 3.3 | 3.3 | 3.4 |
| Sales and Marketing | - | 0.1 | 0.3 | 0.3 | 0.3 | 0.3 | 0.4 |
| Ground Rent to IAD* | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 |
| MAG Rent to IAD* | - | - | 0.9 | 0.9 | 0.9 | 0.9 | 0.9 |
| Percentage Rent to IAD | - | - | 0.4 | 1.1 | 1.3 | 1.4 | 1.4 |
| Other Occupancy cost (Utilities & R&M) | - | - | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 |
| Business Insurance | - | - | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 |
| Administrative | - | - | 0.8 | 0.9 | 0.9 | 0.9 | 0.9 |
| Other Operating Expenses | - | - | 4.2 | 7.1 | 8.3 | 8.6 | 8.9 |
| **Total Expenses** | 0.3 | 3.3 | 21.8 | 28.5 | 31.3 | 32.4 | 33.3 |
| **Results from Operating Activities** | (0.3) | (3.3) | (5.1) | 4.6 | 10.1 | 11.9 | 13.4 |
| Interest and Other (Income) | - | - | - | - | - | - | - |
| **Results from Operating Before Taxes** | (0.3) | (3.3) | (5.1) | 4.6 | 10.1 | 11.9 | 13.4 |
| Income Tax | - | - | - | - | 2.1 | 3.2 | 3.6 |
| **Results** | (0.3) | (3.3) | (5.1) | 4.6 | 8.0 | 8.7 | 9.7 |

*Note: Ground and MAG Rent follows ASC 842 Lease Accounting

- **PS IAD Reservation Revenue -** Refers to the revenue generated for every reservation that occurs in IAD. That is the fee that we charge the Member every time they use the Suite, the Salon or PS Direct.
- **PS IAD Membership Revenue -** Refers to the revenue generated for all paid memberships that are signed in IAD.
- **PS IAD Other Reservation Related Revenue -** Refers to other ancillary revenue associated with a reservation (Parking, Baggage, Cancellation and Late fees)

Thanks,
Steve

*STEVEN GARGARO*
*Vice President - Airport Development*

5

*213.784.6837*
*reservePS.com*



*Confidentiality:  This email, like all PS communications, is privileged and confidential. If you are not the addressee or responsible for delivery of the message to the addressee, please notify us immediately, and then delete this email.*

---

**From:** Steven Gargaro <sgargaro@reserveps.com>
**Date:** Tuesday, October 29, 2024 at 7:02 PM
**To:** Laffert, Donald <Donald.Laffert@MWAA.com>
**Subject:** Re: RFP 23-21311 - Remote VIP at IAD

Thanks Don,
We will work on these numbers. I'll get back to you if we have any questions.

Thanks,

Steve


*STEVEN GARGARO*
*Vice President - Airport Development*
*213.784.6837*
*reservePS.com*

**Error! Filename not specified.**
*Confidentiality:  This email, like all PS communications, is privileged and confidential. If you are not the addressee or responsible for delivery of the message to the addressee, please notify us immediately,*

---

**From:** Laffert, Donald <Donald.Laffert@MWAA.com>
**Sent:** Tuesday, October 29, 2024 3:47:46 PM
**To:** Steven Gargaro <sgargaro@reserveps.com>
**Subject:** RFP 23-21311 - Remote VIP at IAD

Steve,

The evaluation committee is in the process of evaluating proposals.  Criteria 1 asks offerors to provide

> d. Anticipated payment to the Airports Authority of the Ground Rent and Percentage Rent, using the percentages set out in Article 6, Financial Consideration, of the draft Lease

Please provide your anticipated Percentage Rent payment for each of the first five years of operation.

Also, the Committee would like Private Suites to explain in detail how it calculated "PS IAD Reservation Revenue, PS IAD Membership Revenue, and PS IAD Other Reservation Related Revenue" listed on page 5 of the proposal.

Please provide the requested information by noon on Friday, November 1, 2024.

Let me know if you have any questions.

Don

**Donald Laffert**
Procurement Director - Revenue
**Metropolitan Washington Airports Authority**
1 Aviation Circle
Washington, DC 20001-6000
O: 703-417-8433
donald.laffert@mwaa.com
**mwaa.com**

James Siminoff
March 24th, 2025

Metropolitan Washington Airports Authority (MWAA)
1 Aviation Circle
Washington, DC 20001-6000

Subject: Support for the Expansion of Private Suite Services

Dear MWAA Leadership,

As a frequent traveler and dedicated Private Suite (PS) customer, I urge you to consider the immense value PS would bring to MWAA-operated airports. PS is the only U.S.-operated VIP airport service with a proven ability to transform air travel into a seamless, secure, and stress-free experience.

As someone who frequently travels to Washington, DC, I have come to rely on PS's exceptional service at LAX and would only entrust them to provide the same VIP experience at Dulles International Airport. Bringing PS to your airport would be a game-changer for business and luxury travelers alike.

I strongly urge MWAA to seize this opportunity to enhance the passenger experience. Please support PS's expansion—I, and countless other travelers, would greatly appreciate it.

Sincerely,

Jamie Siminoff
Founder
Ring

March 21, 2025

Metropolitan Washington Airports Authority (MWAA)
1 Aviation Circle
Washington, DC 20001-6000

Subject: Endorsement for the Expansion of Private Suite Services

Dear MWAA Leadership,

I am a frequent traveler and devoted customer of Private Suite (PS), and I am writing to express my strong support for its expansion to Dulles International. PS has redefined the travel experience by offering an unparalleled level of service, security, and discretion. Expanding this esteemed service to MWAA airports presents an opportunity to elevate the passenger experience and position MWAA at the forefront of premium airport services.

As someone who regularly travels to Washington, DC from my home in Los Angeles, I rely on PS at LAX and would greatly value its presence at Dulles International Airport. The absence of such a service leaves a noticeable gap in the premium travel experience for those who expect and require the highest standards. I have experienced other 'similar' services around the world – in London, etc – and PS is by far the best and the only one worth having in the United States.

I respectfully urge MWAA to recognize the transformative value that PS brings to modern air travel and to support its expansion. This is an opportunity to set a new precedent for excellence, ensuring MWAA remains a leader in global airport services.

Thank you for your time and consideration. I look forward to seeing PS's continued growth and the opportunity to experience its exceptional services at MWAA-operated airports.

Sincerely,

James Vito Mazzo
Executive Chairman
Email: mazjim@mac.com
Mobile: 714.227.9879