# **<u>Delivery Acknowledgment Receipt</u>**

**Date:** November 25, 2025

**To:** Julia Hodge, Vice President, Office of Supply Chain Management

**Company:** Metropolitan Washington Airports Authority

**Airport:** Ronald Regan Washington National Airport

**Dept.:** Procurement and Contracts Department, MA-29

**Address:** 2733 Crystal Drive, Arlington, VA 22202

**Contact Number:** (703) 417-8660

      Metropolitan Washington Airports Authority hereby acknowledges the receipt of the

package delivered with this form.

**Received by:** _____
                 (Signature)

**Print Name:** _____

**Date:** _____

Thank you for your acknowledgement.

**<u>Note to Messenger</u>:** Please return this signed acknowledgement to:

    Aron C. Beezley, Esq.
    Bradley Arant Boult Cummings LLP
    1900 K Street, NW, Suite 800
    Washington, DC 20006
    Tele: (202) 719-8254

**Aron Beezley**
Partner
abeezley@bradley.com
(202) 719-8254 direct



November 25, 2025

_VIA HAND DELIVERY AND EMAIL._

Julia Hodge
Vice President, Office of Supply Chain Management
Metropolitan Washington Airports Authority
Procurement and Contracts Department, MA-29
2733 Crystal Drive
Arlington, VA 22202

      **RE:**      **Solicitation No. RFP-25-24520**

      **SUBJ:**      **Protest of The Private Suite IAD, LLC (dba PS)**

Dear Ms. Hodge:

      The Private Suite IAD, LLC (dba PS) ("PS"), by and through the undersigned counsel, hereby files this timely Protest of the terms of Solicitation No. RFP-25-24520 (the "RFP") issued by the Metropolitan Washington Airports Authority ("MWAA" or the "Authority"), and specifically identifies Amendment 02 to the RFP as the focus of its Protest. As discussed below, the Authority erred in amending the initial RFP terms to remove and replace Section 02 B within RFP Attachment 1, Evaluation Criteria and Proposal Submission Requirements. That section included critical and common-sense language that the Authority would evaluate offers "for reasonableness, completeness, and realism." By removing that language, the Authority unnecessarily surrenders an important guardrail that protects other bidders, taxpayers, and, ultimately, the Authority itself. Accordingly, and as set forth in greater detail below, the Vice President, Office of Supply Chain Management, should sustain this Protest.

**CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE**

Ms. Julia Hodge
November 25, 2025
Page 2

I.  **Contact Information for the Parties**

    A.  **Contact Information for the Protester.**

Contact information for The Private Suite IAD, LLC (dba PS) is as follows:

        Steven Gargaro
        Vice President - Airport Development
        The Private Suite IAD, LLC (dba PS)
        212 Eucalyptus Dr., Suite 200
        El Segundo, CA 90245
        Tel: 213.784.6837
        Email: sgargaro@reserveps.com

All communications, however, should be directed to PS's counsel of record, the contact

information for whom is as follows:

        Aron C. Beezley
        Bradley Arant Boult Cummings LLP
        1615 L Street, NW, Suite 1350
        Washington, D.C. 20036
        Tel.: (202) 719-8254
        Fax: (202) 719-8354
        Email: abeezley@bradley.com

    B.  **Contact Information for the Authority.**

The contact information for the Contracting Officer in this procurement is as follows:

        Donald Laffert
        (703) 417-8433
        donald.laffert@mwaa.com

II.  **Threshold Matters**

    A.  **This Protest is Timely Filed by an Interested Party.**

Pursuant to Section V, Number 19 of the RFP, **Exhibit 1**, and Chapter 9.2.1 of the

MWAA's Contracting Manual, Revised Fifth Edition (5.3) ("Contracting Manual"), a protest

ground based on the terms and conditions within or omitted from a Solicitation or amendment is

timely if the protest is received by the Authority on the earlier of the following dates: fourteen

<p align="center" style="color:red">**CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE**</p>

Ms. Julia Hodge
November 25, 2025
Page 3

(14) days after the issuance date of the Solicitation or amendment, or the due date for submission of offers.

Here, the Authority issued the initial RFP on September 25, 2025, and issued Amendment 02 on November 12, 2025. Fourteen days after the Authority issued Amendment 02 is November 26, 2025, and a protest challenging the terms of that Amendment must be received by the Authority by that date.[1] This Protest is being filed before that date and, therefore, is timely.

Furthermore, PS has a legitimate interest in the procurement. PS fully intends to submit a competitive proposal in response to the RFP, and PS submitted a bid on MWAA's previous RFP for a Remote VIP Services Facility at Dulles International Airport. Thus, PS is an interested party. *See* Contracting Manual § 9.3.

**B.  The Authority Must Suspend the Solicitation During the Pendency of this Protest.**

Pursuant to Section V, Number 19 of the RFP, "[i]f a Contract has not been awarded at the time a protest is timely filed, the Contract ***may not be awarded*** while the protest is pending, unless the President and CEO determines that award of the Contract, and, if applicable, issuance of a notice to proceed, is in the Authority's best interest." **Exhibit 1** at 15, § 9.6 (emphasis added).

Because PS submits this Protest before the proposal due date, as of the date of this Protest, no award has been made, and MWAA must not issue an award until the Protest has been resolved. Furthermore, because this Protest deals directly with how offerors will structure and

---

[1] Amendment 02 also extended the Solicitation due date to December 5, 2025. Because the date 14 days after the Authority issued Amendment 02, November 26, is earlier than December 5, the deadline is November 26.

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

Ms. Julia Hodge
November 25, 2025
Page 4

submit their financial proposals, and how MWAA will evaluate those proposals, MWAA must

suspend the Solicitation until the protest has been resolved and clear direction can be given to

offerors.

### III.    Factual Background

#### A.    MWAA's Previous Remote VIP RFP

Among MWAA's many goals is the desire to continually improve the level of service at

its airports.  *About the Airports Authority*, Metropolitan Washington Airports Authority,

https://www.mwaa.com/about-airports-authority (last visited Nov. 25, 2025) ("The Authority's

mission is to develop, promote, and operate safely Reagan National and Dulles International

airports, continually striving to improve our efficiency, customer orientation, and the level of air

service offered at National and Dulles.").  In support of MWAA's mission, the Authority has

sought to expand its offerings in the luxury and VIP travel space, which represents a lucrative

and growing segment in the travel industry:

> The luxury travel market, a substantial and rapidly growing sector with a global
> reach, generates about $1.5 trillion each year.  Projections indicate a continued
> strong growth trajectory, with the market expected to reach $2.36 trillion within the
> next five years.  Luxury travel is characterized by a focus on bespoke itineraries
> and exceptional service that caters to affluent travelers seeking premium,
> personalized and exclusive travel experiences.   It encompasses high-end
> accommodations, luxurious transportation, curated activities and bespoke services
> designed to offer comfort, privacy and unique cultural engagements.

Roger Sands, *The Luxury Travel Market Continues Its Rapid Upward Trajectory*, FORBES

(Aug. 8, 2025, 06:38 AM EDT), https://www.forbes.com/sites/rogersands/2025/08/08/the-

luxury-travel-market-continues-its-rapid-upward-trajectory/.

Seeking to capitalize on that growing luxury market, on or about June 26, 2023, the

Authority issued RFP-23-21311 entitled, "Remote VIP Passenger Processing Service

**CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC
RELEASE**

Ms. Julia Hodge
November 25, 2025
Page 5

Concession, IAD." **Exhibit 2**; *see also* **Exhibit 3** at 1 ("The Authority continues to look for

ways to distinguish itself by providing new and innovative services to its customers. Remote

VIP Services provide an elevated travel experience by completely bypassing the need for a

passenger to enter the terminal."). As stated in the RFP, the Purpose and Scope was to solicit

proposals from offerors to:

> develop, lease, and operate a Remote VIP Passenger Processing Service for
> Commercial Airline Flights at Washington Dulles International Airport (herein
> after referred to as "Remote VIP Services") to receive, screen, and transport
> passengers and their luggage to/from gated commercial aircraft, obtain and provide
> the necessary airport, airline, and federal approvals and contracts, such as those
> required by the FAA, Transportation Security Administration ("TSA"), and U.S.
> Customs and Border Protection ("CBP"), and to provide passenger lounge services
> and amenities.

*Id*. at 13.

The RFP required submission of offers in two phases, Phase 1, dealing with the Technical

Proposal, and Phase 2, dealing with the financial proposal. **Exhibit 2** at 14-15. Phase 1

proposals were due on July 28, 2023. *Id*. at 1. Following several amendments, the RFP

ultimately required a Phase 2 proposal submission date of October 7, 2024.

Moreover, the RFP contemplated an evaluation based on a "negotiated Best-Value

procurement method." *Id*. at 14-15. The Contracting Manual defines "Best Value" as:

> The best value with trade-off procurement method takes into consideration
> technical factors and price, which are separately evaluated. Once the technical
> evaluation is complete, the Contracting Officer will consider both the technical
> evaluation and the price proposed by each Offeror and determine which Offer
> provides the best value to the Airports Authority.

> Such a comparison involves a trade-off between price and non-price factors. The
> relative importance of price and non-price factors varies based on the specific goods
> and services that are being procured. If proposals are found to be technically
> equivalent, then price becomes the determining factor.

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC
RELEASE

Ms. Julia Hodge
November 25, 2025
Page 6

> If it is determined that the additional technical merit offered is worth the additional cost in relation to other proposals received, the Authority may select other than the lowest priced Offer. Similarly, with respect to revenue Contracts, if it is determined that the additional technical merit offered is worth the decrease in revenue in relation to other proposals received, the Authority may select other than the highest priced Offer. The rationale for the selection and for technical-price tradeoffs shall be documented in the Contract file.

Contracting Manual at § 3.5.2.2; *see also id.* at § 3.5.9.1 ("Award of a Contract shall be made to the responsible Offeror (See Section 4.5) whose proposal is determined to be the most advantageous for and in the best interests of the Airports Authority.").

Thus, while price was an undoubtedly important consideration in the contemplated evaluation scheme, any price had to be supported by the elements of an offeror's technical proposal.

### B. Previous Offer Submissions and Protests.

Ultimately, only two offerors submitted proposals for both Phases of that RFP: PS and daa International ("DAAI"). Following proposal submissions, MWAA communicated with PS to clarify aspects of PS's price calculations. On February 7, 2025, MWAA informed PS that MWAA intended to award the Contract to DAAI for $104,716,074.17 in total Ground Rent and Minimum Annual Guarantee. **Exhibit 4**. On February 14, 2025, PS protested that decision pursuant to Chapter 9 of the Contracting Manual.[2] **Exhibit 5**. PS challenged MWAA's award to DAAI because, among other things, MWAA undervalued PS's technically strong proposal and overvalued DAAI's technically weaker proposal and its unrealistic revenue projections, thereby

---

[2] In parallel with its submissions made as part of the protest process, PS also submitted a Freedom of Information ("FOI") request to MWAA pursuant to MWAA's Freedom of Information Policy ("FOIP"), the Contracting Manual, and Section V, Paragraph 22 of Solicitation No. RFP-23-21311 ("RFP"). **Exhibit 12**. MWAA produced some documents responsive to that request, but withheld others. Following an appeal, MWAA's Risk Management Committee remanded certain requests to the FOI Officer. **Exhibit 13**. It is our understanding that those requests remain outstanding.

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

Ms. Julia Hodge
November 25, 2025
Page 7

conducting a flawed best-value procurement. In other words, the ostensible awardee—an

international entity without the requisite experience or a footprint in the United States—

submitted a proposal that was appreciably weaker from a technical standpoint than PS's

proposal. However, DAAI's proposal offered a higher price than PS's proposal, and that price

became the predominant evaluation factor despite the solicitation's stated evaluation method of a

"best-value" procurement.

PS submitted a supplemental protest on April 4, 2025, based on information MWAA

provided to PS during a debriefing session. **Exhibit 6**. After MWAA denied PS's protests, PS

escalated them in accordance with Contracting Manual § 9.5, first to the MWAA CEO on March

17, 2025[3], and then to the MWAA Board of Directors on April 17, 2025. **Exhibits 7**, **8**. The

message across each protest filing was clear and consistent—MWAA selected a technically

impossible offer based predominantly on an unrealistic price proposal, without regard to whether

that proposal was economically feasible, whether the awardee was capable of performing the

work, or whether the offer would actually provide the remote VIP terminal contemplated in the

RFP. In response to these protests, MWAA cancelled RFP-23-21311 on June 13, 2025. **Exhibit**

**9.**

    **C.** **The New Solicitation: RFP-25-24520.**

Roughly three months after MWAA cancelled the previous solicitation, the Authority

issued a new solicitation for Remote VIP Services. **Exhibit 1**. On or about September 25, 2023,

the Authority issued RFP-25-24520 entitled, "Remote VIP Services Facility, IAD." **Exhibit 1** at

---

[3] PS requested review of its initial protest to the CEO before it had received a debriefing, and thus, submitted it
before it submitted its supplemental protest. The MWAA CEO responded to both PS's request for review and the
supplemental protest in one document, and PS requested further review of that consolidated decision by the Board of
Directors.

**CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC
RELEASE**

Ms. Julia Hodge
November 25, 2025
Page 8

1. Much of the new RFP included substantially similar language to the previous RFP. As stated in the RFP, the Purpose and Scope of the Solicitation is to engage a contractor to:

> develop, lease, and operate a Remote Very Important Person (VIP) Services facility, including performing security screening, processing, and transfer of VIP passengers and their baggage to and from commercial aircraft in accordance with government guidelines, airline check-in arrangements, and providing goods and services commonly available in a commercial airport terminal or VIP airport lounge.

*Id*. at § V, 1. This Solicitation contemplates "the following term: Thirty (30) months to design and construct the facility and twenty (20) years to operate the facility." *Id*. at § VI, 1.

In a crucial and telling departure from the previous RFP, however, MWAA changed the way in which it would evaluate proposals and issue an award. Regarding the Method of Procurement and Basis for Award, the RFP advises that this procurement:

> is using a competitively negotiated procurement process to award this Contract, and selection will be made on a highest price, technically acceptable [("HPTA")] basis. For purposes of evaluation, price is defined as the highest total cumulative Ground Rent (Construction Period and Contract Period) and total MAG offered on the Financial Offer Form. Award will be made to the responsible Offeror who meets the Solicitation's technical requirements and offers the highest financial offer (Grand Total of Ground Rent and MAG).

*Id*. at § V, 4. That method of selection—HPTA—explicitly requires price to be the only important characteristic of an offer that meets minimum technical requirements.[4] As described in the Contracting Manual:

> The HPTA method is appropriate when selection of the technically acceptable proposal with the highest offered price is preferred (e.g., concessions Contracts). The evaluation factors that establish the requirements of acceptability shall be set forth in the Solicitation, and Solicitations shall specify that award will be made on the basis of the lowest (or highest) price proposals meeting or exceeding the

---

[4] HPTA solicitations, by their very nature, reward proposals that minimally meet technical requirements. The fact that MWAA insists on treating a remote VIP terminal as a product that meets minimally acceptability is inappropriate for such a technically demanding and security-sensitive operation.

**CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE**

Ms. Julia Hodge
November 25, 2025
Page 9

acceptability standards.  Proposals are evaluated for acceptability only, and trade-off is not permitted.

Contracting Manual § 3.5.2.1.

The RFP also includes financial offer instructions, which state:

The Offeror must provide a complete Financial Offer Form.  The structure of the Financial Offeror form is protected, and it shall not be modified in any way.  Modified Financial Offer Forms may be deemed non-conforming.

Offers must include (1) Ground Rent and (2) a Minimum Annual Guarantee (MAG) for each Contract Year and both the Ground Rend and the MAG must escalate at least three percent (3%) annually.  The minimum Ground Rent must be no less than $17,108.00 per month for the first 30 months of the Lease and the minimum MAG must be no less than $2,100,000.00 for the first year of operation.

*Id*. at § III.

Finally, the RFP incorporates three (3) attachments, including: 01 Evaluation Criteria and Proposal Submission Requirements; 02 Financial Offer Form; and 03 Draft Land and Concession Lease and Development Agreement, which itself contains nine (9) exhibits.  *Id*. at § VIII.

Attachment 01 of the RFP, Evaluation Criteria and Technical Proposal Submission Requirements ("Criteria and Requirements"), includes several pertinent requirements.  Section 02 of the Criteria and Requirements identifies two bases for evaluation—technical proposal evaluation and financial offer evaluation.  **Exhibit 10** at 2.  The Criteria and Requirements also explains that technical proposals would be judged based on three criteria: (1) "Ability to Meet the Authority's Requirements (Technical Approach);" (2) "Past Performance (Experience);" and (3) "VIP Facility Construction."  *Id*. at § 02, A.  Those criteria are to be given adjectival ratings as follows:

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

Ms. Julia Hodge
November 25, 2025
Page 10

| | |
|---|---|
| **Unacceptable** | The proposal fails to meet the evaluation standard and the Deficiency is uncorrectable. The proposal would have to undergo a major revision to become Acceptable. The proposal has a demonstrated lack of understanding of the Authority's requirements or omissions of major areas. |
| **Marginal** | The proposal lacks essential information to support a rating of Unacceptable or Acceptable. Deficiencies found are not Material and are Curable through Discussions. These communications are not intended as a re-write of the proposal. Marginal is not intended as a final rating but used as a placeholder. |
| **Acceptable** | The proposal meets the evaluation standard. Any weaknesses the proposal has are correctable. The proposal has no Deficiencies. |

While proposals need only clear a minimum technical hurdle, with the primary evaluation based on price, financial offers would nonetheless be evaluated for "reasonableness, completeness, and realism as appropriate." *Id*. at § 02, B. Thus, while MWAA distinguished the new RFP from the previous RFP by making the new procurement primarily a price-based decision, the new RFP still mostly protected the competitive selection process—and MWAA itself—from unrealistic or unfeasible offers by requiring prices to be reasonable and realistic.

### D. **MWAA Issues Amendment 2.**

That paradigm shifted when MWAA issued Amendment 2[5] to the RFP on November 12, 2025, containing six (6) changes. Of relevance here, the Amendment states:

> 4. Attachment 1 Evaluation Criteria and Proposal Submission Requirements is amended to delete Section 02 B. Financial Offer Evaluation and add "The Airports Authority will evaluate the completeness of a financial offer by determining whether it is complete and responsive to the requirements set forth in the Solicitation."

**Exhibit 11** at 1.

That is to say, Amendment 2 eliminates the requirement that financial offers be reasonable, complete, and realistic, *see* **Exhibit 10** at 2, § 02, B, and replaces it with only a

---

[5] MWAA issued Amendment 1 to the RFP on October 24, 2025, which extended the due date for proposals and included a Microsoft Word copy of the Draft Land and Concession Lease and Development Agreement.

**CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE**

Ms. Julia Hodge
November 25, 2025
Page 11

requirement to be "complete and responsive to the [RFP] requirements." **Exhibit 11** at 1.  Doing

so removes the built-in check on proposals that promise more than they can deliver, and strips

MWAA of its ability to evaluate those offers for reasonableness or realism.  The shift from a best

value procurement under the previous RFP to a HPTA procurement here already placed a

premium on price over technical expertise and will necessarily lead to offers prioritizing revenue

over technical performance.  But the removal and replacement of § 02, B means that offers are

no longer bound even by reality, and to the extent MWAA wants or needs to challenge or

downgrade a proposal, the Solicitation provides no avenue to do so.

     This timely Protest follows.

**IV.**    **Grounds for Protest**

    **A.**  **MWAA Should Not Have Removed and Replaced the Language in Criteria and Requirements § 02, B.**

    The original language in the Criteria and Requirements § 02, B is both required and

practical, and the arbitrary and capricious decision to remove that language puts MWAA at risk

of issuing an award based on an impossible offer, *i.e.*, the precise issue of the prior post-award

protest.  As identified above, MWAA has already changed this procurement from a best-value

procurement to a HPTA procurement, with the effect of making price the principal factor.  The

change to financial proposal requirements made in Amendment 2 takes the emphasis on price at

the expense of technical qualifications one step too far by eliminating the requirement that

financial offers be reasonable and realistic.  Such a change is not only ill-advised, but also

unnecessary, arbitrary, and capricious.

    Practically, RFP Amendment 2, change #4 eliminates one of MWAA's important risk

evaluation tools.  The original Criteria and Requirements § 02, B required MWAA to evaluate

**CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE**

Ms. Julia Hodge
November 25, 2025
Page 12

financial proposals as reasonable, complete, and realistic—*i.e.*, the requirement afforded MWAA the **power** to decline an award to an unreasonable, incomplete, or unrealistic offer.  *See* __Exhibit 10__ at 2.  But Amendment 2 requires only that a financial offer be complete and conform to the requirements of the RFP.[6]  __Exhibit 11__ at 1.  Thus, in issuing Amendment 2, MWAA surrendered its ability, meaningfully or critically, to differentiate comprehensive proposals with a high likelihood of success from unreasonable, unrealistic proposals which contain large numbers but lack substance.  Those unrealistic proposals are not only allowed under this methodology but are in effect encouraged because there is no oversight over them.  MWAA cannot review financial offers for reasonableness or realism, per the terms of the RFP, and other offerors cannot protest an award to an unrealistic offeror.  Like a referee who has swallowed their whistle, MWAA has discarded the ability to call foul on a proposal.

Especially in the context of an HPTA evaluation, removing these guardrails leads to a predictable outcome—uneconomically high-priced proposals.  Without the check on proposals requiring them to be reasonable and realistic, offerors in an HPTA procurement are incentivized only to provide the highest number they could conceivably propose, with little regard for feasibility.  While, in theory, the risk of underperforming on the contract lies with the concessionaire, *see e.g.*, __Exhibit 1__ § III (requiring, *inter alia*, a six-figure Minimum Annual Guarantee), in reality, MWAA will pay a heavy price for an unrealized offer.  For example, a concessionaire who fails to make its unattainable financial projections will cause significant

---

[6] The redundant requirement that a financial offer be "responsive to the requirements set forth in the Solicitation," __Exhibit 3__ at 1, is already addressed in the RFP.  *See* Exhibit 1 at § V, 6(B) ("Responses that do not include all requested information, that do not conform to the Solicitation's instructions or do not acknowledge all amendments to the Solicitation may be deemed nonconforming by the Authority and rejected without evaluation.").

**CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE**

Ms. Julia Hodge
November 25, 2025
Page 13

impacts to MWAA's operating budget and future financial planning where MWAA bases its

own financial projections on that bid.

Equally concerning is the risk that a successful offeror who overpromises on its bid

suddenly must underperform on its services to provide MWAA with the promised rent.  Because

operation of the VIP terminal includes managing airport security, *see e.g.*, **Exhibit 10** at 3, § 04,

cutting corners on operations will impact airport safety.  Because the expected clientele for a

remote VIP terminal servicing Washington, D.C. includes politicians and lobbyists, dignitaries,

businesspeople, celebrities, and professional athletes, a failure to provide a VIP-level service

risks the loss of reputation for Dulles Airport with far-reaching impact.  And because this

Solicitation seeks a contract for a term of 22.5 years, the financial risk to MWAA in relying on

unattainable financial projections will last over two decades.  Instead of holding offerors

accountable for achievable financial outcomes, the new rules allow a runaway auction of the

project with complete disregard for the long-term financial viability of any offer.  The practical

impacts make clear that this change to the Solicitation in RFP Amendment 2 represents an

arbitrary and capricious decision that must be reconsidered.

Moreover, the change violates the law.  While the Contract Manual indicates that it, and

not federal procurement law, governs this MWAA bid protest, Contracting Manual § 1.7; the law

subjects contracting at MWAA to review by the Comptroller General[7] "to decide whether the

contracts were awarded by procedures that follow sound Government contracting principles."  49

U.S.C.A. § 49106(g).  The law also requires that MWAA, "to the maximum extent practicable[,]

shall obtain complete and open competition through the use of published competitive

---

[7] The Comptroller General must also report its findings to Congress.  49 U.S.C.A. § 49106(g).

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC
RELEASE

Ms. Julia Hodge
November 25, 2025
Page 14

procedures." 49 U.S.C.A. § 49104(a)(4). Necessarily, analogous federal law, including the

Federal Acquisition Regulation ("FAR") and bid protest decisions issued by the U.S.

Government Accountability Office ("GAO") and the U.S. Court of Federal Claims ("COFC"),

informs any analysis of what constitutes "sound government contracting principles" and

"complete and open competition" in similar situations. *Id*.; *see also MORI Assocs., Inc. v.*

*United States*, 102 Fed. Cl. 503, 530 (2011) ("The Court looks to the opinions of the GAO,

which can be persuasive, for guidance on this point.").

Here, analogous Federal Government contracting law reflects the imperative to field

reasonable, complete, and realistic offers. Indeed, the FAR ***requires*** contracting officers to

conduct business with "responsible sources at ***fair and reasonable prices***." 48 C.F.R. § 15.402

(emphasis added); *see also* 48 C.F.R. § 15.404-1(a) ("The objective of proposal analysis is to

ensure that the final agreed-to price is ***fair and reasonable***.") (emphasis added).

More to the point, the FAR identifies cost realism analyses "to determine whether the

estimated proposed cost elements are realistic for the work to be performed; reflect a clear

understanding of the requirements; and are consistent with the unique methods of performance

and materials described in the offeror's technical proposal." 48 C.F.R. § 15.404-1(d); *see also*

*id*. at (d)(2) ("Cost realism analyses may also be used … when new requirements may not be

fully understood by competing offerors, there are quality concerns, or past experience indicates

that contractors' proposed costs have resulted in quality or service shortfalls."). Those realism

concerns are precisely the concerns that RFP Amendment 2 exacerbate.

Providing a remote VIP terminal according to the terms of the RFP is a complex

undertaking, involving construction of a new building, close coordination with Federal security

agencies and airport operations (both landside and airside), and working with carriers to process

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

Ms. Julia Hodge
November 25, 2025
Page 15

confidential travel data, all while running a luxury hospitality operation.  Stated differently, this

Solicitation includes complicated requirements that may not be fully understood by competing

offerors, necessarily encompasses quality concerns, and based on the past experience of the

procurement and protest history of this Solicitation, includes well-founded concerns about

quality or service shortfalls.  *See* 48 C.F.R. § 15.404-1(d)(2).  Such a review requires evaluation

of financial proposals that ensures offers are realistic, reflect a clear understanding of the

requirements consistent with an offeror's technical proposal, and are consistent with the unique

methods of performance and materials described in the offeror's technical proposal.  *See* 48

C.F.R. § 15.404-1(d).

Thus, "sound government contracting principles" include the requirement that contracting

officers select proposals based on fair and reasonable prices.  By removing the original

requirement in the Criteria and Requirements § 02, B that offers must be reasonable, complete,

and realistic, the RFP fails to meet sound government contracting principles.

**B.  The Authority's Unreasonable and Unlawful Acts Caused Substantial Prejudice to PS.**

The Agency's unreasonable decision to modify the terms of the Solicitation and remove

the requirement that financial offers be reasonable and realistic directly prejudices PS.

"Competitive prejudice is an essential element of a viable protest, and [a reviewing authority]

will sustain a protest only where the protester demonstrates that, but for the agency's improper

actions, it would have had a substantial chance of receiving the award."  *FreeAlliance.com, LLC,*

*et al.*, B-419201.3, *et al.*, Jan. 19, 2021, 2021 CPD ¶ 56 at 3.  "In the context of a protest

challenging the terms of a solicitation, competitive prejudice occurs where the challenged terms

place the protester at a competitive disadvantage or otherwise affect the protester's ability to

**CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE**

Ms. Julia Hodge
November 25, 2025
Page 16

compete." *MAXIMUS Federal Services, Inc.*, B- 422676, Sept. 16, 2024, 2024 CPD ¶ 222 at

*19.  Here, the change to the RFP affects PS's ability to compete.  Because the Solicitation

contemplates an HPTA evaluation, MWAA will consider any bidder who meets the minimum

technical requirements.  *See* **Exhibit 1** at § V, 4.  However, without the requirement to prepare a

reasonable and realistic estimate, PS's ability to submit a competitive price offer is severely

hampered.

PS is recognized globally as a leading provider of the precise amenities and services

sought in the RFP.  As PS has decades of actual market data and market experience, it draws

upon that experience in building its price models.  PS's prices not only reflect realistic market

rates for this type of service, but also allow PS to deliver a truly premium experience that

separates its offerings from run-of-the-mill "premium" airport lounges and concierge services.

Through its extensive experience pricing and operating the exact type of service contemplated by

the RFP, PS already has existing agreements in place with multiple U.S. and foreign airlines, and

is currently working at LAX and ATL with over seventy airlines; PS is one of only two

companies, and the only private company, to have agreements with TSA under the Capability

Acceptance Process ("CAP"), approving PS to purchase screening equipment with TSA

specifications, and the Reimbursable Screening Services Program ("RSSP"), enabling PS to pay

for TSA Officers to operate the checkpoint; PS is the only private company in the United States

with an agreement in place to have CBP provide Federal Inspection Services at multiple airports;

and PS has already constructed TSA and CBP areas at LAX and ATL to current technical Design

Standards for both agencies and is now working with both agencies during the construction of

those areas at DFW and MIA, demonstrating its ability to comply with applicable permitting and

construction approvals.  In short, PS knows how to price a reasonable, complete, and realistic

**CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE**

financial offer.  What it will not do ethically—and what affects its ability to compete under these new Solicitation terms—is price an **un**reasonable and **un**realistic financial offer.  Therefore, the change enacted in Amendment 2, mere weeks before the proposal submission date, would necessitate a complete change in PS's pricing strategy, irrefutably prejudicing PS.

## V.    **Document Requests**

Subject to the provisions of the RFP's Freedom of Information Policy, **Exhibit 1** § 20, Chapter 4.8, Public Release of Information, of the MWAA Contracting Manual - Revised Fifth Edition (5.2), and MWAA's Freedom of Information Policy, PS respectfully requests that the Authority provide the following documents, which include electronic documents and emails:

1.  A complete copy of the solicitation, including any appendices, questions and answers, and attachments, and copies of all amendments thereto;

2.  The acquisition plan and source selection plan for the subject procurement;

3.  All instructions, guides, checklists, or templates provided to evaluators (both government and non-government);

4.  All documents referring to, discussing, or reflecting the Agency's decision to enact the changes identified in RFP Amendment 2 (**Exhibit 11**);

5.  Copies of any and all internal and external government communications and exchanges regarding the Solicitation;

6.  All documents responsive to PS's February 12, 2025 FOIA request which were remanded to the FOI Officer pursuant to the June 12, 2025 decision by the MWAA Risk Management Committee (*see* **Exhibits 12**, **13**); and,

7.  All other documents and records relevant to the protest grounds set forth herein.

Each of the foregoing documents and categories of documents are relevant to the Protest grounds set forth herein because they directly relate to the subject procurement and the Authority's evaluation of proposals thereunder.

**CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE**

Ms. Julia Hodge
November 25, 2025
Page 18

## VI.    **Request for Relief**

The Authority's Decision denying PS's protest was fundamentally flawed and legally insufficient.  The underlying evaluation violated basic procurement principles through the use of unstated criteria, acceptance of unrealistic financial projections, and unequal treatment of offerors.  These errors have caused substantial prejudice to PS and undermine the integrity of the procurement process.

Accordingly, PS respectfully requests a ruling from the MWAA's Vice President, Office of Supply Chain Management that:

1. Sustains PS's Protest;

2. Recommends that the Authority rescind the changes to the Solicitation made by RFP Amendment 2, #4;

3. Orders immediate production of all documents responsive to PS's February 12, 2025 FOIA request which were remanded to the FOI Officer pursuant to the June 12, 2025 decision by the MWAA Risk Management Committee (*see* **Exhibits 12**, **13**);

4. Grants such other relief and remedies as the Vice President, Office of Supply Chain Management determines to be just and equitable.


Respectfully submitted,


*/s/ Aron C. Beezley*

Aron C. Beezley
Nathaniel J. Greeson
Charles F. Blanchard

*Counsel for The Private Suite IAD, LLC (dba PS)*


**CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE**

# EXHIBIT 1

**METROPOLITAN WASHINGTON AIRPORTS AUTHORITY**

PROCUREMENT AND CONTRACTS DEPARTMENT
1 AVIATION CIRCLE | WASHINGTON, DC 20001-6000 | (703) 417-8660 | WWW.MWAA.COM

# SOLICITATION, OFFER AND AWARD

## SOLICITATION

| | |
|---|---|
| Number | **RFP-25-24520** |
| Title | **Remote VIP Passenger Services at IAD** |
| Point of Contact | **Donald Laffert, 703-417-8433, donald.laffert@mwaa.com** |

## OFFER

| | |
|---|---|
| Company Name | |
| Company Address | |
| Name & Title of Primary Point of Contact (POC) | |
| POC Telephone Number & Email | |

Acknowledgment of Amendments
*(Offeror acknowledges receipt of Amendments to this Solicitation.  Provide number and date of each.)*

| Number | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Date | | | | | | | | |

| | |
|---|---|
| Name & Title of Authorized Signatory | |
| Signature | |
| Date | |

## AWARD (MWAA Use Only)

| | |
|---|---|
| Contract Number | |
| Award Amount | |
| Contract Effective Date | |
| Contracting Officer | |
| Signature | |
| Date | |

# TABLE OF CONTENTS

## SECTION I: SOLICITATION OFFER AND AWARD                                    1

## SECTION II: TABLE OF CONTENTS                                              2

## SECTION III: FINANCIAL OFFER                                              4

## SECTION IV: REPRESENTATIONS AND CERTIFICATIONS                            5

1    Type of Business Organization                                          5

2    Parent Company and Identifying Data                                    5

3    Firm Identification                                                    6

4    Authorized Negotiators                                                 6

5    Small Local Business Enterprise (SLBE) Representation                  6

6    Minority Business Enterprise (MBE) Representation                      6

7    Women Business Enterprise (WBE) Representation                         7

8    Subcontractors                                                         7

9    Conflict of Interest                                                   7

10   Certification of Independent Price Determination                       7

11   Certification of Compliance With Employment Eligibility Verification, Form I-9    8

12   Certification of Compliance With Minimum Living Wage Requirements      8

13   Certification Regarding Debarment, Suspension and Other Responsibility Matters    8

14   Insurance Affidavit                                                    9

15   SAFETY Act                                                            10

16   Telecommunications and Video Surveillance Services or Equipment        10

17   Certification of Compliance With Sensitive Data Protection Requirements    10

## SECTION V: SOLICITATION PROVISIONS                                        11

1    Purpose and Scope                                                      11

2    Definitions                                                            11

3    Contract Type                                                          12

4    Method of Procurement; Basis of Award                                  12

**5**   **Submission of Offers**                 12

**6**   **Documents Required in Response to Solicitation**       12

**7**   **Pre-Proposal/Pre-Bid Conference**         12

**8**   **Questions and Answers**         13

**9**   **Acknowledgment of Amendments to Solicitations**     13

**10**   **Late Submission, Modifications, and Withdrawals of Offers**    13

**11**   **Minimum Acceptance Period**        13

**13**   **Small Local / Disadvantaged Business Participation**     13

**16**   **Due Diligence**         14

**17**   **Prerequisites for Award**        14

**18**   **Notice to Offerors**         15

**19**   **Protests**         15

**20**   **Freedom of Information Policy**       15

**21**   **Title VI Solicitation Notice**       15

**22.**   **Proposal Guarantee**        16

**SECTION VI: SPECIAL PROVISIONS**       **17**

**1**   **Contract Term**         17

**2**   **Location and Working Hours**       17

**4**   **Performance Guarantee**        17

**5**   **Insurance Requirements**        17

**6**   **Workers Wage Requirement**       23

**7**   **Sensitive Data Protection Provision**      23

**SECTION VII: ATTACHMENTS**       **25**

## SECTION III: FINANCIAL OFFER

The Offeror must provide a complete Financial Offer Form. The structure of the Financial Offeror form is protected, and it shall not be modified in any way. Modified Financial Offer Forms may be deemed non-conforming.

Offers must include (1) Ground Rent and (2) a Minimum Annual Guarantee (MAG) for each Contract Year and both the Ground Rend and the MAG must escalate at least three percent (3%) annually. The minimum Ground Rent must be no less than $17,108.00 per month for the first 30 months of the Lease and the minimum MAG must be no less than $2,100,000.00 for the first year of operation.

## SECTION IV: REPRESENTATIONS AND CERTIFICATIONS

**1    Type of Business Organization**

The Offeror, by checking the applicable box, represents that:

A.    It operates as [ ] a corporation incorporated under the laws of the State of _____,
[ ] an individual, [ ] a partnership, [ ] a nonprofit organization, or [ ] a joint venture.

B.    If the Offeror is a foreign entity, it operates as [ ] an individual, [ ] a partnership, [ ] a nonprofit organization, [ ] a joint venture, or [ ] a corporation, registered for business in _____ (country).

**2    Parent Company and Identifying Data**

A.    A parent company, for the purpose of this provision, is one that owns or controls the activities and basic business policies of the Offeror. To own the Offeror's company means that the parent company must own at least 51% of the voting rights in that company. A company may control an Offeror as a parent company even though it does not meet the requirement for such ownership if the parent company is able to formulate, determine, or veto basic policy decisions of the Offeror through the use of dominant minority voting rights, use of proxy voting, or otherwise.

B.    The Offeror _____ (Company Name) [ ] is, [ ] is not (check applicable box) owned or controlled by a parent company.

C.    If the Offeror checked "is" in paragraph B. above, it shall provide the following information:

Name and Main Office Address of          Parent Company's Employer's
Parent Company (include zip code)         Identification Number

_____          _____
_____
_____
_____

D.    If the Offeror checked "is not" in paragraph B. above, it shall insert its own Employer's Identification Number on the following line:

_____

E.    The Offeror (or its parent company) [ ] is, [ ] is not (check applicable box) a publicly traded company.

F.    Principal(s), for the purposes of this certification, means officers; directors; owners; partners; and persons having primary management or supervisory responsibilities within a business entity (*e.g.*, general manager; plant manager; head of a subsidiary, division, or business segment, and similar  positions).

The Offeror shall insert the name(s) of its principal(s) on the following line:

_____

**3        Firm Identification**

The Offeror is requested to complete the below:

DUNS Identification Number _____ (assigned by Dun & Bradstreet, Inc., and contained in its Data Universal Numbering System, D-U-N-S). If no number has been assigned by Dun & Bradstreet, Inc., insert the word "none."

**4        Authorized Negotiators**

The Offeror represents that the following persons are authorized to negotiate on its behalf with the Metropolitan Washington Airports Authority (Authority) in connection with this Solicitation:

_____

_____

**5        Small Local Business Enterprise (SLBE) Representation**

A.      An SLBE is defined as a small business concern that is organized for profit and is located within a 100-mile radius of the District of Columbia's zero-mile marker.  Located means that as of the date of its SLBE application, the business entity has an established office or place of business within a city, county, or town within the 100-mile radius referenced above.  A small business is defined, for SLBE purposes, as a firm that is not dominant in its field, and that meets the U.S. Small Business Administration's (SBA) small business size standards for the goods or services it will be providing in response to a specific solicitation.

B.      The Offeror represents and certifies that it [ ] is, [ ] is not an SLBE as defined above.  If the Offeror is an SLBE, it further represents and certifies that there have been no material changes in the information provided with its most recent application for certification, and the Offeror continues to meet the Authority's criteria for SLBE certification.

C.      Proposed SLBEs must be certified by the Authority's Department of Small and Disadvantaged Business Programs by no later than the Solicitation due date.   Additional information is available at https://mwaa.gob2g.com/.

**6        Minority Business Enterprise (MBE) Representation**

A.      A Minority Business Enterprise is:

A firm of any size which is at least 51% owned by one or more minority persons or, in the case of a publicly-owned corporation, at least 51% of all stock must be owned by one or more minority persons; and whose management and daily business operations are controlled by such persons. A person is considered to be a minority if he or she is a citizen of lawful resident of the  United States and is:

1.      Black (a person having origins in any of the black racial groups in Africa);

2.      Hispanic (a person of Mexican, Puerto Rican, Cuban, Central or South American, or other Spanish culture or origin, regardless of race);

3.      Portuguese (a person of Portugal, Brazilian, or other Portuguese culture or origin, regardless of race);

4.      Asian American (a person having origins in any of the original peoples of the Far East, Southeast Asia, the Indian subcontinent, or the Pacific Islands); or

5. American Indian and Alaskan Native (a person having origins in any of the original peoples of North America).

B. The Offeror represents that it [ ] is, [ ] is not a MBE.

**7 Women Business Enterprise (WBE) Representation**

A. A Women Business Enterprise is:

A firm of any size which is at least 51% owned by one or more women or, in the case of a publicly-owned corporation, at least 51% of stock must be owned by one or more such women; and whose management and daily business operations are controlled by such persons.

B. The Offeror represents that it [ ] is, [ ] is not a WBE.

**8 Subcontractors**

A. If the Offeror proposes to use any Subcontractor, the Offeror must furnish with its Offer:

1. a signed Subcontractor Utilization Plan;

2. a signed Letter of Intent or executed subcontract agreement for each SLBE Subcontractor included on the Subcontractor Utilization Plan. Templates are available at https://www.mwaa.com/business/contracting-manuals-forms-and-other-resources

B. The Offeror represents that it intends to utilize the Subcontractor(s) listed on its Subcontractor Utilization Plan if awarded a Contract as a result of this Solicitation. Once Contract award has been made, the Offeror shall not deviate from use of the Subcontractor(s) listed on its Subcontractor Utilization Plan without Contracting Officer approval.

C. Any Subcontractors identified as SLBE must meet the criteria outlined above.

Note: Commitment Letters are acceptable in lieu of the Subcontractor Utilization Plan and Letter of Intent for Task Contracts. An approved Subcontractor Utilization Plan is required prior to the execution of any task in accordance with Section VII, Subcontractor Utilization.

**9 Conflict of Interest**

The Offeror shall disclose below any representation, activity, or relationship involving the Offeror or its employees that may give rise to a conflict of interest were it selected for Contract award, which conflict would or could disqualify it from providing goods or services under the Contract absent a waiver from the Authority and/or other entities.  In the case of such a conflict of interest, the Authority will make the final determination whether the conflict prevents the Offeror from participating in this Solicitation.  If no conflicts exist, insert the word, "none."

_____

_____

**10 Certification of Independent Price Determination**

A. The Offeror certifies that:

1. The prices in this Offer have been arrived at independently, without, for the purpose of restricting competition, any consultation, communication, or agreement with any other Offeror or competitor relating to (a) those prices, (b) the intention to submit an Offer, or (c) the methods or factors used to calculate the prices offered;

2.     The prices in this Offer have not been and will not be knowingly disclosed by the Offeror, directly or indirectly, to any other Offeror or competitor before bid opening or contract award, as appropriate, unless otherwise required by law; and

3.     No attempt has been made or will be made by the Offeror to induce any other concern to submit or not to submit an Offer for the purpose of restricting competition.

B.    Each signature of the Offeror is considered to be a certification by the signatory that the signatory:

1.     Is the person in the Offeror's organization responsible for determining the prices being offered in its Offer, and that the signatory has not participated and will not participate in any action contrary to subparagraphs A.1. through A.3. above, or

2.    a.    Has been authorized, in writing, to act as agent for the following principals in certifying that those principals have not participated, and will not participate in any action contrary to subparagraphs A.1. through A.3. above

_____

*(Insert full name of person(s) in the Offeror's organization responsible for determining the prices offered in this Offer, Bid, or Proposal, and the title of his or her position in the Offeror's organization.)*

b.    As an authorized agent, certifies that the principals named in subdivision B.2.a. above have not participated, and will not participate, in any action contrary to subparagraphs A.1. through A.3. above, and

c.    As an agent, has not personally participated, and will not participate, in any action contrary to subparagraphs A.1. through A.3. above.

C.    If the Offeror deletes or modifies subparagraph A.2. above, the Offeror must furnish with its Offer a signed statement setting forth in detail the circumstances of the disclosure.

## 11    Certification of Compliance With Employment Eligibility Verification, Form I-9

The Offeror certifies that it [ ] is [ ] is not in compliance with the Immigration Reform and Control Act of 1986, Pub. L. 99-603 (8 U.S.C. 1324a) and the regulations issued thereunder.  The Offeror also certifies that its subcontractors are in compliance with the Immigration Reform and Control Act of 1986 and the regulations issued thereunder.

## 12    Certification of Compliance With Minimum Living Wage Requirements

The Offeror agrees to compensate all employees working on this Contract at least the Minimum Living Wage established in the Contract.  The Minimum Living Wage is applicable throughout the entire term of the Contract.

## 13    Certification Regarding Debarment, Suspension and Other Responsibility Matters

A.    The Offeror certifies, to the best of its knowledge and belief, that, within the three (3) year period preceding submission of this Offer:

1.     The Offeror and any of its Principals -

a.    Have [ ] have not [ ] been debarred, suspended, proposed for debarment, or declared ineligible for the award of contracts by any Federal, state, or local agency;

b.      Have [  ] have not [  ] had contractor or business license revoked;

c.      Have [  ] have not [  ] been declared non-responsible by any public agency;

d.      Have [  ] have not [  ] been convicted of or had a civil judgment rendered against them for: commission of fraud or a criminal offense in connection with obtaining, attempting to obtain, or performing a public (Federal, state, or local) contract or subcontract; violation of Federal or state antitrust statutes relating to the submission of quotes or offers; or commission of embezzlement, theft, forgery, bribery, falsification or destruction of records, making false statements, tax evasion, or receiving stolen property; violation of labor, employment, health, safety or environmental laws or regulations;

e.      Have [  ] have not [  ] been indicted for, or otherwise criminally or civilly charged by a governmental entity with, commission of any of the offenses enumerated in subparagraph A.1.d. of this provision.

2.      All performance evaluations have [  ] have not [  ] received a rating of satisfactory or better. If not, please provide a copy of the evaluation with detailed explanation.

3.      The Offeror has [  ] has not [  ] had one or more contracts terminated for default by any Federal, state, or local agency. If so, please provide a detailed explanation.

B.      The Offeror shall provide immediate written notice to the Contracting Officer if, at any time prior to Contract award, the Offeror learns that its certification was erroneous when submitted or has become erroneous by reason of changed circumstances.

C.      A certification that any of the items in paragraph A. of this provision exists will not necessarily result in withholding of an award under this Solicitation. However, the certification will be considered in connection with a determination of the Offeror's responsibility. Failure of the Offeror to furnish a certification or provide such additional information as requested by the Contracting Officer may render the Offeror non-responsible.

D.      Nothing contained in the foregoing shall be construed to require establishment of a system of records in order to render, in good faith, the certification required by paragraph A. of this provision. The knowledge and information of an Offeror is not required to exceed that which is normally possessed by a prudent person in the ordinary course of business dealings.

E.      The certification in paragraph A. of this provision is a material representation of fact upon which reliance is placed when making award. If it is later determined that the Offeror knowingly rendered an erroneous certification, the Contracting Officer may terminate the Contract resulting from this Solicitation for default.

## 14     Insurance Affidavit

The Offeror certifies that it [  ] has [  ] has not read and reviewed the insurance provisions of the Solicitation with its insurance agent, broker, or representative.  The Offeror is required to submit an Insurance Affidavit form (Affidavit) with its Offer and proof of insurance as a condition of Contract award.  The Affidavit, which can be accessed at   https://www.mwaa.com/business/contracting-manuals-forms-and-other-resources,   must be completed by the Offeror and its insurance provider.

The Authority may declare any Offer as non-responsive if it is made without this Affidavit or if it is made with an incomplete Affidavit.  For purpose of defining Additional Insured and Waiver of Subrogation, the term "MWAA, Airports Authority, or Authority" shall mean the elected officials, boards, officers, employees, agents, and representatives of the Board.

**15    SAFETY Act**

With respect to the goods and/or services the Authority is procuring in this Solicitation, the Offeror certifies that it [  ] has [  ] does not have a Designation and/ or Certification for such goods and/or services under the SAFETY Act (6 U.S.C. 441 *et seq.*) or such Designation or Certification is [  ] not applicable for such goods and/or services.

**16    Telecommunications and Video Surveillance Services or Equipment**

In accordance with Federal Acquisition Regulation (FAR) 52.204-25, Prohibition on Contracting for Certain Telecommunications and Video Surveillance Services or Equipment, the Offeror is prohibited from providing covered telecommunications equipment or services as a substantial or essential component of any system, or as critical technology as part of any system.

The Offeror represents that it is not providing to the Authority any equipment, system, or service that uses covered telecommunications equipment or services as a substantial or essential component of any system, or as critical technology as part of any system, as such terms are defined in FAR 52.204-25.

**17    Certification of Compliance With Sensitive Data Protection Requirements**

Sensitive Data is any data that: (1) requires safeguarding or dissemination controls pursuant to applicable law or regulation; (2) is not disclosable to the public under the Airports Authority's Freedom of Information Policy; or (3) personally identifiable information (PII).

The Offeror certifies that it will comply with the Airports Authority's Sensitive Data Protection Requirements, which are available at: https://www.mwaa.com/business/contracting-manuals-forms-and-other-resources, and the Offeror agrees to provide immediate written notice to the Contracting Officer if the Offeror comes into possession of Airports Authority Sensitive Data.

## SECTION V: SOLICITATION PROVISIONS

**1      Purpose and Scope**

The Authority is seeking a contractor to develop, lease, and operate a Remote Very Important Person (VIP) Services facility, including performing security screening, processing, and transfer of VIP passengers and their baggage to and from commercial aircraft in accordance with government guidelines, airline check-in arrangements, and providing goods and services commonly available in a commercial airport terminal or VIP airport lounge. This Solicitation and the Attachments listed in Section VII, which are incorporated into the Solicitation by reference, set forth the terms and conditions that govern the Solicitation, as well as, those that will become binding upon execution of the Contract awarded as a result of this Solicitation.

**2      Definitions**

"Acceptance" means the act of an authorized representative of the Authority by which the Authority assumes for itself, or as an agent of another, ownership of existing and identified supplies, or approves specific services, as partial or complete performance of the Contract.

"Acceptance Period" means the number of calendar days available to the Authority for awarding a Contract/BPA/PO from the date specified in this Solicitation for submission of Offers.

"Airports Authority (Authority)" means the Metropolitan Washington Airports Authority.

"Blanket Purchase Agreement (BPA)" is an order between the Authority and Seller that allows the Authority to order future goods or services on a repetitive basis, and to be billed for the goods or services received on an as-ordered basis.

"Buyer" means the Authority and includes its designated representatives, successors, and assignees.

"CLMS" refers to the Authority's Contract Lifecycle Management System, accessible at https://mwaa.odysseyautomation.com/odyssey.

"Contract" means the mutually binding legal relationship created by the parties' agreement after receiving Offers, Bids, or Proposals in response to this Solicitation.

"Contracting Officer" means a person with the authority to enter into, administer, and/or terminate contracts and make related determinations and findings.

"Contractor," "Seller," "Supplier," or "Vendor" means the person, firm, corporation, or other business entity to whom the Contract or Purchase Order is awarded.

"Correction" means the elimination of a defect.

"COTR" refers to the Contracting Officer's Technical Representative.

"Offer," "Bid," or "Proposal" means a response to the Solicitation, that if accepted, would bind the Offeror to perform the resulting Contract.

"Offeror" means the person, firm, corporation, or other business entity responding to the Solicitation.

"Purchase Order (PO)" is an Authority contractual instrument with specified terms and conditions to purchase goods and services issued to the Seller upon receipt of quotations of price and delivery schedule.

"SBCMS" refers to the Authority's Small Business Compliance Management System, accessible at https://mwaa.gob2g.com/.

"Solicitation" means any request to submit an Offer or quotation to the Authority.  Following the Contracting Officer's execution of the Solicitation, Offer and Award the Solicitation will become a part of the Contract.

"Work" means everything required to be furnished or performed by the Contractor pursuant to the statement of work, specifications, and the Contract.

## 3    Contract Type

The Authority contemplates award of a Contract with payment to the Authority of ground rent and either the Minimum Annual Guarantee ("MAG"), as outlined in the Offeror's Financial Offer Form, or a percentage of annual gross receipts.

## 4    Method of Procurement; Basis of Award

The Authority is using a competitively negotiated procurement process to award this Contract, and selection will be made on a highest price, technically acceptable basis.  For purposes of evaluation, price is defined as the highest total cumulative Ground Rent (Construction Period and Contract Period) and total MAG offered on the Financial Offer Form. Award will be made to the responsible Offeror who meets the Solicitation's technical requirements and offers the highest financial offer (Grand Total of Ground Rent and MAG).

## 5    Submission of Offers

The Offeror shall submit its Offer electronically in the Authority's CLMS no later than 02:00 PM November 05, 2025.

## 6    Documents Required in Response to Solicitation

A.    The Offeror shall include in its electronic submission all documents required by this Solicitation including, but not limited to, the following, as separate PDF or Microsoft Excel files, as noted:

1.    Solicitation Offer and Award (PDF)
2.    Financial Offer Form (Microsoft Excel)
3.    Representations and Certifications (Section IV) (PDF)
4.    Proposal Guarantee (Mail Physical/Original to address in Section V.22 AND upload a Copy (PDF)
5.    Small Business Program Documents (as applicable) (single PDF) Subcontractor Utilization Plan. Templates and other documents are available at https://www.mwaa.com/business/contracting-manuals-forms-and-other-resources
    a.    ACDBE Certification Letter
    b.    Subcontractor Utilization Plan and/or Commitment Letter
    c.    Letter of Intent
    d.    Waiver Request
6.    Insurance Affidavit (PDF)
7.    Technical Proposal required by Section VII, as applicable (PDF)

B.    Responses that do not include all requested information, that do not conform to the Solicitation's instructions or do not acknowledge all amendments to the Solicitation may be deemed nonconforming by the Authority and rejected without evaluation.

## 7    Pre-Proposal/Pre-Bid Conference

A pre-proposal/pre-bid conference will be held on October 8, 2025 at 10:00 AM Local Time. If applicable, a site visit will follow the conference.

**8       Questions and Answers**

Any prospective offeror desiring an explanation or interpretation of the Solicitation must submit its questions via the CLMS no later than 02:00 PM October 15, 2025. The Authority may not consider any questions received after this date. Oral explanations or instructions given before the award of a Contract are not binding. Any information given to a prospective offeror concerning this Solicitation will be furnished promptly to all other prospective offerors as a Solicitation Amendment (Amendment) if that information is necessary or if the lack of it would be prejudicial to any other prospective offeror.

**9       Acknowledgment of Amendments to Solicitations**

The Authority reserves the right to amend the Solicitation, through the CLMS, prior to the date specified for submission of Offers. If the revisions under the Amendment require material changes to the Solicitation, the Authority may revise the date specified for submission of Offers and will include a revised submission date in the Amendment.

Offerors are required to acknowledge receipt of all Amendments to this Solicitation on the Solicitation Offer and Award. Failure to acknowledge all Amendments may cause the Offer to be considered non-responsive to the Solicitation.

**10      Late Submission, Modifications, and Withdrawals of Offers**

Offerors are responsible for timely submission. If an Offer is received after the time set for receipt, it is considered late and may not be considered. Offerors may submit a written revision to an Offer prior to the submission deadline. A late revision of the successful Offer may be accepted if it makes the terms of the Offer more favorable to the Authority. Offers may be withdrawn at any time prior to Contract award.

**11      Minimum Acceptance Period**

The Authority requires a minimum acceptance period of 180 calendar days from the receipt of Offer.

**13      Small Local / Disadvantaged Business Participation**

This Solicitation has been assigned a Small Local Business Enterprise (SLBE) participation requirement of 25% of the costs for design and construction of the facility.

This Solicitation has been assigned a Disadvantaged Business Enterprise (DBE) participation goal of 0% of the total Contract amount, including any potential option periods.

This Solicitation has been assigned an Airport Concession Disadvantaged Business Enterprise (ACDBE) participation goal of 5% applicable to the operations of the Remote VIP Services, including any potential option periods.

The Offeror must ensure that any firm that is proposed for SLBE, DBE, or ACDBE participation is certified as such no later than the Solicitation due date.  Certification information and directories of certified firms are available in the Authority's SBCMS.

The Offeror must meet the Small Local / Disadvantaged Business Participation requirement / goal outlined in the Solicitation. The Offeror must either submit a plan to achieve the Small Local / Disadvantaged Business Participation requirement / goal or submit with its Offer a request for waiver to the goal or requirement. Offers that do not conform may be rejected.

By signing the Solicitation, Offer and Award, the Offeror commits itself to achievement of the Small Local / Disadvantaged Business Participation requirement / goal outlined in the Solicitation or at the level stated in the Offeror's approved Subcontractor Utilization Plan.

## 16    Due Diligence

The Offeror is responsible for satisfying itself as to the conditions affecting the requirements of the Solicitation. Any failure of the Offeror to acquaint itself with the requirements of the Solicitation shall not relieve it from estimating properly the difficulty or cost of successful performance. The Authority assumes no responsibility for any conclusions or interpretations made by the Offeror based on the information made available by the Authority.

The Authority reserves the right to perform, or have performed, due diligence procedures, including, but not limited to, on-site survey of the Offeror's facilities or examination of previous work products, to determine Offeror's capability of performing the Contract requirements.

## 17    Prerequisites for Award

A.    Banking Instructions

The Offeror shall complete all parts of the Internal Revenue Service ("IRS") Form W-9 (Request for Taxpayer Identification Number and Certification). Contract award will not be made until the Authority has received the Offeror's completed form. The form and instructions are available at www.irs.gov.

The W-9 information is requested so that the Authority may determine the need to file IRS Form 1099 in connection with payments made under the Contract. The Authority may request periodic resubmission of the W-9. If the Contractor fails to submit the form by the deadline stated in the resubmission request, the Authority may refuse to pay invoices until the Contractor has submitted the form.

The Authority requires participation in a program whereby payments under this Contract are made via electronic funds transfer into the Contractor's bank. Contractor requests to initiate such service shall include the bank name, address, account number, contact person, telephone number, and American Bankers Association (ABA) 9-digit identifying number. The initial request and any subsequent changes must be signed by the Contractor's signatory of the Contract and shall be submitted directly to the Authority's Office of Finance at vendor.setup@mwaa.com. The Contracting Officer must approve any exceptions to this requirement in writing.

B.    Information Security

All connections to the Authority networks or hosts must be certified by the Authority's Chief Information Security Officer (CISO) in writing prior to authorization for use. This includes, but is not limited to, all hardware and applications, whether hosted on Authority property or in the cloud, or managed by Authority staff or Contractor.

Prior to award, prospective Contractors must submit either a (i) recent Statement on Standards for Attestation Engagements or (ii) completed Authority Information Security Assessment Questionnaire (Questionnaire) for review and certification by the Authority's CISO. The Questionnaire is available at http://www.mwaa.com/business/contracting-manuals-forms-and-other-resources.

Offerors are not required to submit supporting documentation of compliance with this provision at the time of Offer submission.

C.    Insurance

Offeror shall maintain adequate liability, employer's liability, and workers' compensation insurance to protect the Authority and the Authority's agents, employees and contractors with respect to the indemnity

provision here within and any claims under workers' compensation, safety and health and similar laws and regulations relating to the goods or services furnished hereunder. Offeror shall furnish evidence of such insurance in form and substance satisfactory to the Authority as specified in the Solicitation and upon request.

## 18    Notice to Offerors

The fact that an Offeror demonstrates alignment with Authority policies or submits the highest Financial Offer does not automatically result in Contract award. Factors, including conformity of the Offer to the Solicitation, the Offeror's responsibility, and any change in the Authority's requirements must be considered.  No contractual obligation or liability on the part of the Authority shall exist unless and until the Contract is awarded. No Offeror should begin Work until after formal notice of Contract award has been made by the Authority.

## 19    Protests

Protests must be addressed to the Vice President, Office of Supply Chain Management. Protests must be sent by (1) registered or certified mail, return receipt requested; or (2) nationally recognized delivery service which provides tracking records of at least the date sent and date received or hand delivered to the Authority's Procurement and Contracts Department. Protests sent electronically will not be accepted.

Protests that are based on the terms and conditions set forth in or omitted from a Solicitation or Amendment must be received by the earlier of the following two dates: (1) fourteen (14) days after the issuance date of the Solicitation or Amendment containing the terms and conditions that are the subject of the protest; or (2) the due date set out in the Solicitation.

Protests that are based on the manner in which Offers were evaluated or on which a Contract was awarded may only be made by an Offeror who submitted an Offer and must be received no later than seven (7) days after the Offeror knew or should have known of the basis for the protest.

If a Contract has not been awarded at the time a protest is timely filed, the Contract may not be awarded while the protest is pending, unless the President and CEO determines that award of the Contract, and, if applicable, issuance of a notice to proceed, is in the Authority's best interest.

## 20    Freedom of Information Policy

Except as otherwise noted, all related documents submitted to the Authority in response to this Solicitation, including, but not limited to, quotes, Offers, Proposals, Bids, statements of work, and/or specifications, will be open to the inspection of any citizen, or any interested person, firm, or corporation, in accordance with the Authority's Freedom of Information Policy. Trade secrets or confidential information submitted as part of an Offer will not be subject to public disclosure if exempted by the Authority's Freedom of Information Policy; however, the Offeror must invoke the protections of this section prior to or upon submission of its Offer and must identify the specific data or other materials to be protected and state the reasons why protection is necessary. The Offeror may not request that its Offer in its entirety be treated as a trade secret or confidential information, nor may an Offeror request that its pricing be treated as a trade secret or confidential information.

## 21    Title VI Solicitation Notice

The Authority, in accordance with the provisions of Title VI of the Civil Rights Act of 1964 (78 Stat. 252, 42 U.S.C. §§ 2000d to 2000d-4) and the Regulations, hereby notifies all bidders or offerors that it will affirmatively ensure that any contract entered into pursuant to this advertisement, disadvantaged business enterprises will be afforded full and fair opportunity to submit bids in response to this invitation and no businesses will be discriminated against on the grounds of race, color, or national origin (including limited English proficiency), creed, sex, age, or disability in consideration for an award.

**22.    Proposal Guarantee**

A Proposal Guarantee in the sum of Fifty Thousand Dollars ($50,000) must be submitted by each Offeror with its Proposal. Failure to submit the Proposal Guarantee shall result in rejection of the Proposal. The Proposal Guarantee serves to guarantee execution of a Contract by the selected Offeror. In the event the selected Offeror fails to execute a Contract offered by the Authority based on the selected Offeror's Proposal, the Proposal Guarantee shall be forfeited.

The Proposal Guarantee, at the option of the Offeror, may be in the form of a certified check, cashier's check, or money order acceptable to the Authority and made payable to the Metropolitan Washington Airports Authority. Checks or money orders will be deposited into an Authority bank account designated for this purpose.

The Proposal Guarantee will be returned without interest to the unsuccessful Offeror(s) following execution of the Contract between the Authority and the selected Offeror. The Proposal Guarantee of the selected Offeror will not be released until the Contract is executed and the Contract Performance Guarantee is received by the Authority.

**Mail physical/original Proposal Guarantee to the following address:**

> **Metropolitan Washington Airports Authority**
> **2733 Crystal Drive**
> **ATTN: Donald Laffert, 7TH FLOOR**
> **Arlington, VA 22202**

## SECTION VI: SPECIAL PROVISIONS

**1        Contract Term**

This Contract has the following term: Thirty (30) months to design and construct the facility and twenty (20) years to operate the facility.

**2        Location and Working Hours**

This Contract shall be performed on the Premises. The Successful Offer must have the ability to operate the Premises 24 hours per day, 7 days per week, and 365 days per year. The Successful Offeror's daily operational schedules must revolve around customers' arrival and departure times and services requested by passengers. (See . Attachment 3, draft Lease Section 4.01 G 5)

**4        Performance Guarantee**

A.      The successful Offeror shall deliver to the Airports Authority upon the execution of the Contract a Performance Guarantee in the amount of one hundred (100%) percent of the MAG and ground rent for the first Contract year after Beneficial Occupancy as stated in the Financial Offer Form. This Performance Guarantee is required in order to guarantee the full and faithful performance of the terms and conditions of the Contract by the Contractor and shall be subject to claim in full or part by the Airports Authority in the event of default by the Contractor or the Contractor's failure to fully perform the Contract.  The Contractor shall ensure that the Performance Guarantee is maintained at all times in the proper amount throughout the Contract Term of the Contract.  (See Attachment 3, draft Lease Section 13.02)

 B.      The Performance Guarantee, at the option of the Contractor, may be in the form of: 1) a certified check, cashier's check, or money order acceptable to the Airports Authority and made payable to the Airports Authority; or 2) a performance bond issued by an insurance company acceptable to the Airports Authority.

 C.      If the Contractor fails to provide or maintain the Performance Guarantee in effect at any time during the period of the Contract, the Contractor shall be in default and the Contract may be terminated by the Airports Authority.

**5        Insurance Requirements**

A.        The Contractor shall procure and maintain at its expense during the Contract period the following minimum, not maximum, insurance coverage from an insurance company or companies that is/are financially sound possessing a rating of A- VII or higher from the A.M. Best Company or an equivalent rating service, insuring the Contractor against all liability, subject to policy terms, conditions, and exclusions, for injuries to persons (including wrongful death) and damages to property and any other liability arising from or caused by the Contractor's and its agents, representatives, employees, or subcontractors activities on Airports Authority premises or for services performed under this Contract. For those companies not subject to A.M. Best's ratings or equivalent, they shall have a nationally or internationally recognized reputation and responsibility and shall be approved by the Airports Authority with such approval not to be unreasonably withheld. The Metropolitan Washington Airports Authority premises are physically located in the Commonwealth of Virginia and it is important for Contractor to ensure that all insurance policies have Commonwealth of Virginia amendatory endorsements.

B.        Contractor shall advise the Airports Authority of any cancellation, non-renewal, or material change in any policy within fifteen (15) business days of Contractor receiving notification of such action from the insurer.

C.        All of the policies, excluding Professional Liability, required of the Contractor shall be primary and the Contractor agrees that any insurance, including self-insurance, whether primary, excess, or on any other basis, maintained by the Airports Authority shall be non-contributing with respect to the Contractor's

insurance. Any self-insured retention, deductible, or similar obligation on all of the policies shall be the sole responsibility of the Contractor.

D.      The minimum limits and types of insurance coverage requirements set forth herein will in no way be construed as the maximum as required by the Contractor or as a limitation of any potential liability, or limiting the scope of the indemnity as defined in the Contract. The Contractor must protect the Personally Identifiable Information data to which the Contractor has access to or is holding. If the Contractor maintains broader coverage and/or higher limits than the minimums shown below, the Airports Authority requires and shall be entitled to the broader coverage and/or higher limits maintained by the Contractor.

E.      The Contractor may use commercial umbrella/excess liability insurance so that Contractor has the flexibility to select the best combination of primary and excess limits to meet the total insurance limits required by this Contract. Any umbrella or excess liability coverage must be at least as broad as the primary coverage and contain all coverage provisions that are required of the primary coverage.

F.      The Contractor and its Subcontractors are prohibited from operating Airports Authority owned vehicles and mobile equipment.

G.      A portion of the work requires Contractor and its Subcontractors to operate a vehicle and/or mobile equipment on the restricted areas of the airport such as Air Operations Area (AOA) and **unescorted vehicle access on AOA is permitted.**

H.      By requiring insurance herein, the Airports Authority does not represent that coverage, and limits will necessarily be adequate to protect Contractor, and such coverage and limits shall not be deemed as a limitation on Contractor's liability under the indemnities granted to the Airports Authority in this Contract.

I.      The Airports Authority reserves the right at any time throughout the term of the Contract to adjust the aforementioned insurance requirements, if, in Airports Authority's reasonable judgment, the insurance required by the Contract is deemed inadequate to properly protect the Airports Authority's interest. The Contractor agrees that it will procure the adjusted insurance provided the coverage is available at commercially reasonable rates.

J.      The Airports Authority reserves the right to inspect relevant endorsements, declaration pages, and/or a complete copy of the insurance policy(s) from the Contractor, evidencing the coverage required herein, upon written demand. The Contractor shall provide a reasonable opportunity for the Airports Authority to inspect such insurance documents, at the Contractor's corporate office located closest to the Airports Authority's main administrative office, within fifteen (15) business days of the Airports Authority's written request for such inspection.

K.      The failure of the Airports Authority at any time to enforce the insurance provisions, to demand such certificate or other evidence of full compliance with the insurance requirements, or to identify a deficiency from evidence that is provided shall not constitute a waiver of those provisions nor in any respect reduce the obligations of the Contractor to maintain such insurance or to defend and hold the Airports Authority harmless with respect to any items of injury or damage covered by this Contract.

L.      Should any required insurance lapse during the Contract term, requests for payments originating after such lapse may not be processed at the Airports Authority's discretion until the Airports Authority's Contracting Officer receives satisfactory evidence of reinstated coverage as required by this Contract, effective as of the lapse date. The Contractor's failure to maintain the insurance required by this Contract shall also be the basis for immediate termination of this Contract at the Airports Authority's option.

M.      The Contractor shall ensure that all its Subcontractors, if any, independently carry insurance appropriate to cover the Subcontractors' exposures, *or are covered under the Contractor's policies*. The Contractor shall require and verify that all Subcontractors maintain insurance meeting the Contractor's requirements on specific coverages and limits and as stated herein and Contractor shall ensure that the

*Metropolitan Washington Airports Authority* is also included as an additional insured and with waiver of subrogation provision to waive all rights of recovery under subrogation or otherwise against the *Metropolitan Washington Airports Authority* on insurance required from its Subcontractors. The Contractor is responsible for monitoring its Subcontractors' evidence of insurance to ensure compliance with their subcontract with Contractor. Copies of all Subcontractors' evidence of insurance should be maintained by the Contractor, and upon request, be supplied to the Contracting Officer.

N.   **Construction Insurance Coverage**
The following insurance shall be provided with the policy limits thereof to be in the minimum(s), not maximum(s), as set forth below and are required during the design and construct phase of the Contract and ending upon Date of Beneficial Occupancy. The Contractor shall procure and maintain, or require its contractor(s) performing design, construction, improvements, maintenance, or repair work to the Premises to procure and maintain and furnish satisfactory evidence of the following:

1.   **Professional Liability (Design Professionals Errors & Omissions**)
   a.   Subject to policy terms, conditions, and limitations there shall be a limit of not less than Three Million Dollars ($3,000,000) per claim covering negligent acts, errors, mistakes, and omissions arising out of the work or services performed by Contractor or Contractor's design team, or any person employed or contracted by Contractor or Contractor's design team.
   b.   Continuous coverage shall be maintained or an extended reporting period will be exercised for a period of not less than two years from Date of completion. The retroactive date shall precede the effective date of this Contract.
   c.   Coverage shall not contain any exclusion or limitation related to environmental impairments.
   d.   If this coverage is provided by contractor(s) to Contractor, Contractor shall provide to the Airports Authority a certificate of insurance from Contractor's contractor(s) evidencing coverage is in effect.

2.   **Course of Construction (Builder's Risk)**
   Shall cover all risks of loss for completed value of project with no coinsurance penalty provisions and shall include an installation floater. Contractor shall be named as loss payee.

3.   **Commercial General Liability**
   a.   Shall be written on an "occurrence" basis with a limit of not less than Twenty Million Dollars ($20,000,000) per occurrence. Coverage written on a "claims-made" basis is not acceptable.
   b.   Coverage shall include with sub limits and aggregates where applicable, but not be limited to, Mobile Equipment Liability; Bodily Injury and Property Damage to Third Parties, Contractual Liability, Products-Completed Operations, Personal Injury and Advertising Injury Liability, Premises-Operations, Independent Contractors and Subcontractors, and Damage to Rented Premises.
   c.   The Products-Completed Operations coverage shall be provided for a minimum of two years following final acceptance of the work.
   d.   Additional Insured: The *Metropolitan Washington Airports Authority* shall be included as an Additional Insured. A copy of the endorsement must be submitted.
   e.   Waiver of Subrogation: Coverage shall include a waiver of subrogation provision to waive all rights of recovery under subrogation or otherwise against the *Metropolitan Washington Airports Authority*. A copy of the endorsement must be submitted.

4.   **Business Automobile Liability**
   a.   In the event Contractor does not own automobiles in the corporate name, Contractor shall maintain coverage with each accident limit identified below for Hired and Non-Owned Autos, which may be satisfied by way of endorsement to the Commercial General Liability

policy described above or separate Business Auto Liability policy. Evidence of either must be provided.

b.     Shall be a limit of not less than Ten Million Dollars ($10,000,000) each accident for any vehicle (owned, non-owned, or hired/leased) used by the Contractor or its subcontractors.

c.     Coverage shall include handling of property for loading and unloading.

d.     If hazardous materials are to be transported, coverage shall include hauling of hazardous cargo at least as broad as that provided under the ISO pollution liability CA 99-48, and the Motor Carrier Act endorsement (MCS 90). Contractor shall comply with all Federal laws and with all states' laws and insurance requirements where hazardous materials may be transported.

e.     <u>Additional Insured for Vicarious Liability:</u> The *Metropolitan Washington Airports Authority* shall be included as an Additional Insured for Vicarious Liability. This shall be documented using ISO (Insurance Services Office, Inc.) endorsement CA 20 48 DESIGNATED INSURED or an equivalent form.  A copy of the endorsement must be submitted.

f.     <u>Waiver of Subrogation:</u> Coverage shall include a waiver of subrogation provision to waive all rights of recovery under subrogation or otherwise against the *Metropolitan Washington Airports Authority*. A copy of the endorsement must be submitted.

5.    **Workers Compensation and Employers Liability**

a.     Contractor shall satisfy all compulsory requirements relating to workers compensation in any jurisdiction in which benefits may be claimed to cover each employee who is or may be engaged in work under this Contract.

b.     Coverage is compulsory in the Commonwealth of Virginia for employers of three or more employees, to include the employer and subcontractors. If the Contractor is required by Virginia law to carry Workers Compensation coverage, the coverage shall be at Virginia Statutory Limits with Virginia coverage added to item 3A of the policy; <u>a Virginia listing under item 3C of the policy is not sufficient</u>.

c.     Employers Liability shall be a limit of not be less than One Million Dollars ($1,000,000) for bodily injury by accident and One Million Dollars ($1,000,000) each employee for bodily injury by disease.

d.     <u>Waiver of Subrogation:</u> Coverage shall include a waiver of subrogation provision to waive all rights of recovery under subrogation or otherwise against the *Metropolitan Washington Airports Authority*. A copy of the endorsement must be submitted.

6.    **Environmental Liability**

a.     Shall be a limit of not less than One Million Dollars ($1,000,000) per loss for bodily injury, property damage, and environmental cleanup costs caused by pollution conditions, both sudden and non-sudden.

b.     This requirement can be satisfied by either a separate environmental liability policy or through a modification to the Commercial General Liability policy. Evidence of either must be provided.

c.     If the coverage is written on a claims-made basis, the Contractor warrants that any retroactive date applicable to coverage under the policy precedes the effective date of this Contract and that continuous coverage shall be maintained and evidenced to the Authority, or an extended reporting period will be exercised for a period of not less than two (2) years from termination or expiration of this Contract.

d.     <u>Additional Insured:</u>

    (1)    The *Metropolitan Washington Airports Authority* shall be included as an Additional Insured.

    (2)    A copy of the Additional Insured endorsement must be submitted in accordance with the requirements of Section O below.

e.     <u>Waiver of Subrogation:</u>

(1) Coverage shall include a waiver of subrogation provision to waive all rights of recovery under subrogation or otherwise against the *Metropolitan Washington Airports Authority*.

(2) A copy of the waiver of subrogation provision or endorsement must be submitted in accordance with the requirements of Section O below.

7.   **"All Risk" Property (Contractor's Property)**
   a.   Full value and full replacement cost coverage under an "All Risk" policy for any of the Contractor's real or personal property used or situated on Airports Authority's property.

O.   **Operational Insurance Coverage and Minimum Limits**
   The following insurance shall be provided with the policy limits thereof to be in the minimum(s), not maximum(s), as set forth below and are required during the Contract period.

1.   **Commercial General Liability**
   a.   Shall be written on an "occurrence" basis with a limit of not less than Five Million Dollars ($5,000,000) per occurrence with sub limits and aggregates where applicable. Coverage written on a "claims-made" basis is not acceptable.
   b.   Coverage shall include, with sub limits and aggregates where applicable, but not be limited to, Bodily Injury and Property Damage to Third Parties, Contractual Liability, Products-Completed Operations, Personal Injury and Advertising Injury Liability, Premises-Operations, Independent Contractors and Subcontractors, Mobile Equipment, Liquor Liability, and Damage to Rented Premises.
   c.   The Products-Completed Operations coverage shall be provided for a minimum of two years following final acceptance of the work.
   d.   Additional Insured:
      (1)   The *Metropolitan Washington Airports Authority* shall be included as an Additional Insured.
      (2)   A copy of the Additional Insured endorsement must be submitted in accordance with the requirements of Section P below.
   e.   Waiver of Subrogation:
      (1)   Coverage shall include a waiver of subrogation provision to waive all rights of recovery under subrogation or otherwise against the *Metropolitan Washington Airports Authority*.
      (2)   A copy of the waiver of subrogation provision or endorsement must be submitted in accordance with the requirements of Section P below.

2.   **Business Automobile Liability**
   a.   In the event Contractor does not own automobiles in the corporate name, Contractor shall maintain coverage with each accident limit identified below for Hired and Non-Owned Autos, which may be satisfied by way of endorsement to the General Liability policy described above or separate Business Auto Liability policy. Evidence of either must be provided.
   b.   Shall be a limit of not less than Five Million Dollars ($5,000,000) each accident for any vehicle (owned, non-owned, or hired/leased) used by the Contractor to fulfill the services contemplated by this Contract.
   c.   Coverage shall include operating on the restricted areas of the Airport or be covered by the General Liability policy described above.
   d.   Coverage shall include handling of property for loading and unloading.
   e.   Additional Insured for Vicarious Liability: The *Metropolitan Washington Airports Authority* shall be included as an Additional Insured for Vicarious Liability. This shall be documented using ISO (Insurance Services Office, Inc.) endorsement CA 20 48 DESIGNATED INSURED or an equivalent form. A copy of the endorsement must be submitted.

f. <u>Waiver of Subrogation:</u> Coverage shall include a waiver of subrogation provision to waive all rights of recovery under subrogation or otherwise against the *Metropolitan Washington Airports Authority*. A copy of the endorsement must be submitted.

3. **Workers Compensation and Employers Liability**

 a. Contractor shall satisfy all compulsory requirements relating to workers compensation in any jurisdiction in which benefits may be claimed to cover each employee who is or may be engaged in work under this Contract.

 b. Coverage is compulsory in the Commonwealth of Virginia for employers of two or more employees, to include the employer and subcontractors. If the Contractor is required by Virginia law to carry Workers Compensation coverage, the coverage shall be at Virginia Statutory Limits with Virginia coverage added to item 3A of the policy; <u>a Virginia listing under item 3C of the policy is not sufficient</u>.

 c. Employers Liability shall be a limit of not be less than One Million Dollars ($1,000,000) for bodily injury by accident and One Million Dollars ($1,000,000) each employee for bodily injury by disease.

 d. <u>Waiver of Subrogation:</u> Coverage shall include a waiver of subrogation provision to waive all rights of recovery under subrogation or otherwise against the *Metropolitan Washington Airports Authority*. A copy of the endorsement must be submitted.

4. **"All Risk" Property Insurance**

 a. Insurance coverage at full value and full replacement cost for the Contractor's Real and Personal Property, the Authority's building, and all improvements and betterments, including all subsequent alterations, rebuilding, replacements, changes, and additions thereto made by the Contractor against loss or damage by reason of fire, lightning, wind, hail, floods, explosion, smoke, vandalism, malicious mischief, riot, civil commotion, damage, removal of debris, business interruption, extra expense, and hazards and risks included with so-called "extended coverage endorsements" or "all-risk".

 b. The policy shall name the Contractor as the insured owner and shall contain an endorsement in favor of the *Metropolitan Washington Airports Authority* as Loss Payee in a form satisfactory to the Airports Authority.

 c. The policy shall be issued in an aggregate amount which shall not be less than the full replacement value (exclusive of paved surfaces, excavation, basements, and foundations) of all property on the Assigned Premises.

 d. The policy shall provide that all proceeds of such insurance shall be payable to the Contractor, in trust, to be used for the sole purpose of repairing or replacing the damaged or destroyed property on the Assigned Premises

P. The Contractor shall provide the Contracting Officer with <u>all</u> of the required insurance policy endorsements and evidence of insurance issued by insurance company or broker/agent, in advance of the performance of any work and as soon as possible after renewal but no later than twenty (20) business days after said renewal, exhibiting coverage as required by the *Metropolitan Washington Airports Authority's* contract terms and conditions for the entire term of the Contract, including any renewal or extension terms, and until all work has been completed to the satisfaction of the Airports Authority.

 1. The Airports Authority has the right, but not the obligation, of prohibiting Contractor from performing work under this Contract until such evidence of insurance has been provided to the Contracting Officer in complete compliance with the Contract terms and conditions.

 2. The evidence of insurance shall be provided on the most current industry standard form by ACORD (Association for Cooperative Operations Research and Development) or other form acceptable to the Airports Authority.

  a. For Liability Insurance, the ACORD 25 forms older than 2016/03 will not be accepted.

  b. Other evidence of insurance forms which may be acceptable include, but are not limited to, certificate forms created by the insurance company, Memorandum of Insurance, Certificate of Commercial Liability Insurance by ISO (Insurance Services Office, Inc.), and

Manuscript Certificate of Insurance for certain offshore policy placements. Forms of these types will be considered on a case-by-case basis.

3.    The evidence of insurance shall include the Contract Number in the Certificate Holder section.

4.    If the Contractor is an entity (e.g., corporation, limited liability company, etc.) or a partnership (e.g., general partnership, limited partnership, joint venture, etc.) then Contractor shall provide the evidence of insurance in the name of Contractor's entity or partnership as the primary insured.

5.    If an Umbrella policy is used to meet the total insurance limits required by this Contract and covers more than General Liability and Automobile Liability, a statement must be provided on the evidence of insurance to indicate which policies are covered by the Umbrella policy.

6.    If an Excess policy is used to meet the total insurance limits required by this Contract, a statement must be provided on the evidence of insurance to indicate which policy it follows.

7.    The ***Metropolitan Washington Airports Authority*** must be specifically named as Certificate Holder on the evidence of insurance and the evidence of insurance and any other insurance-related notices shall be issued to:

**METROPOLITAN WASHINGTON AIRPORTS AUTHORITY**
**Procurement and Contracts Department**
**ATTN: REQ Number 25-24520**
**1 Aviation Circle**
**Washington DC 20001-6000**

## 6    Workers Wage Requirement

The Successful Offeror shall comply with the Airports Authority's Airport Workers Wage Program. Details of the program can be found on the Airports Authority's website at:

https://www.mwaa.com/policies-regulations/airport-workers-wage-program.

## 7    Sensitive Data Protection Provision

A.    To the extent the Contractor creates, maintains, acquires, uses, disseminates, or has access to Sensitive Data in furtherance of the Contract, the Contractor shall comply with all applicable laws, guidance, standards, and Authority directives and policies pertaining to its protection.

B.    The Contractor shall notify the Authority in writing immediately upon the discovery that the Contractor is no longer in compliance with the Authority's Sensitive Data Protection Requirements, which are available at: https://www.mwaa.com/business/contracting-manuals-forms-and-other-resources.

C.    The Contractor shall report all Breaches involving Sensitive Data in writing to the Contracting Officer as soon as possible, but no more than twenty-four (24) hours after discovery. "Breach" refers to any loss of control, compromise, unauthorized disclosure, acquisition, access, or use of Sensitive Data.

D.    The Contractor shall include this clause in any subcontracts awarded under this Contract which include the creation, maintenance, acquisition, use, dissemination of, or access to Authority Sensitive Data.

E.    Prior to permitting any subcontractor access to Authority Sensitive Data, the Contractor shall require that the subcontractor agrees to:

1    Abide by this provision, including without limitation, provisions regarding compliance with Authority's Sensitive Data Protection Requirements, including Breach reporting.

2    Restrict use of and access to Authority Sensitive Data only to the subcontractor's employees with a legitimate "need to know" of the data in connection with the subcontractor's performance under the Contract; and

3     Certify in writing upon completion of the subcontractor's services, that the subcontractor has adhered to the Airports Authority's sensitive data protection requirements. The Contractor must report the subcontractor's failure to comply with this requirement to the Contracting Officer.

F.     The Contractor shall bear all costs, losses, and damages resulting from its failure to comply with this provision. The Contractor agrees to release, defend, indemnify, and hold harmless the Authority for claims, losses, penalties, damages, and costs arising out of the Contractor's or its subcontractor's negligence, unauthorized use or disclosure of Authority Sensitive Data and/or the Contractor's or its subcontractor's breach of its obligations under this provision.

## SECTION VII: ATTACHMENTS

**1**      **Evaluation Criteria and Proposal Submission Requirements**

**2**      **Financial Offer Form**

**3**      **Draft Land and Concession Lease and Development Agreement**

Exhibits to Draft Land and Concession Lease and Development Agreement
1.  Premises
2.  List of Client Services and Amenities
3.  Lessee's Proposal
4.  Financial Offer Form
5.  Itemized Certified Statement
6.  ACDBE Participation Monthly Report Form
7.  Spill Notification Checklist
8.  Form Stormwater Management Facility Maintenance Agreement
9.  Covered Transaction Certification

# EXHIBIT 2

METROPOLITAN WASHINGTON AIRPORTS AUTHORITY

PROCUREMENT AND CONTRACTS DEPARTMENT
1 AVIATION CIRCLE | WASHINGTON, DC 20001-6000 | (703) 417-8660 | WWW.MWAA.COM

# SOLICITATION, OFFER AND AWARD

## SOLICITATION

| | |
|---|---|
| Number | **RFP-23-21311** |
| Title | **Remote VIP Passenger Processing Services for Commercial Airline Flights at Washington Dulles International Airport** |
| Point of Contact | **Kevin Green (703) 417-8666** |

## OFFER

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Company Name | | | | | | | | |
| Company Address | | | | | | | | |
| Name & Title of Primary Point of Contact (POC) | | | | | | | | |
| POC Telephone Number & Email | | | | | | | | |
| Acknowledgment of Amendments<br>*(Offeror acknowledges receipt of Amendments to this Solicitation. Provide number and date of each.)* | | | | | | | | |
| Number | | | | | | | | |
| Date | | | | | | | | |
| Name & Title of Authorized Signatory | | | | | | | | |
| Signature | | | | | | | | |
| Date | | | | | | | | |

## AWARD (MWAA Use Only)

| | |
|---|---|
| Contract Number | |
| Award Amount | |
| Contract Effective Date | |
| Contracting Officer | |
| Signature | |
| Date | |

# TABLE OF CONTENTS

**SECTION I: SOLICITATION OFFER AND AWARD**    **1**

**SECTION II: TABLE OF CONTENTS**    **2**

**SECTION III: FINANCIAL OFFER**    **5**

**SECTION IV: REPRESENTATIONS AND CERTIFICATIONS**    **6**

| | | |
|---|---|---|
| 1 | Type of Business Organization | 6 |
| 2 | Parent Company and Identifying Data | 6 |
| 3 | Firm Identification | 7 |
| 4 | Authorized Negotiators | 7 |
| 5 | Small Local Business Enterprise (SLBE) Representation | 7 |
| 6 | Airport Disadvantaged Business Enterprise (ACDBE) Representation | 7 |
| 7 | Subcontractors (Concessions) | 7 |
| 8 | Conflict of Interest | 8 |
| 9 | Certification of Independent Price Determination | 8 |
| 10 | Certification of Compliance With Employment Eligibility Verification, Form I-9 | 9 |
| 11 | Certification of Enrollment in E-Verify | 9 |
| 12 | Certification Regarding Debarment, Suspension and Other Responsibility Matters | 9 |
| 13 | Insurance Affidavit | 11 |
| 14 | SAFETY Act | 11 |
| 15 | Telecommunications and Video Surveillance Services or Equipment | 11 |
| 16 | RESERVED | 12 |
| 17 | RESERVED | 12 |
| 18 | RESERVED | 12 |
| 19 | RESERVED | 12 |
| 20 | Authorization to Do Business in the Commonwealth of Virginia | 12 |

**SECTION V: SOLICITATION PROVISIONS**    **13**

| | | |
|---|---|---|
| 1 | Purpose and Scope | 13 |

| 2 | Definitions | 13 |
| 3 | Contract Type | 14 |
| 4 | RESERVED | 14 |
| 5 | Method of Procurement; Basis of Award | 14 |
| 6 | Submission of Offers | 15 |
| 7 | Documents Required in Response to Solicitation | 16 |
| 8 | Pre-Proposal/Pre-Bid Conference | 16 |
| 9 | Questions and Answers | 16 |
| 10 | Acknowledgment of Amendments to Solicitations | 16 |
| 11 | Late Submission, Modifications, and Withdrawals of Offers | 17 |
| 12 | Reserved | 17 |
| 13 | Minimum Acceptance Period | 17 |
| 14 | Reserved | 17 |
| 15 | Taxes | 17 |
| 16 | Small Local / Airport Concession Disadvantaged Business Participation | 17 |
| 17 | Due Diligence | 17 |
| 18 | Prerequisites for Award | 18 |
| 19 | Policies of the Authority | 19 |
| 20 | Notice to Offerors | 19 |
| 21 | Protests | 19 |
| 22 | Freedom of Information Policy | 20 |
| 23 | Title VI Solicitation Notice | 20 |
| 24 | Proposal Guarantee | 20 |

**SECTION VI: SPECIAL PROVISIONS** — **21**

| 1 | Contract Term | 21 |
| 2 | RESERVED | 21 |
| 3 | Location and Working Hours | 21 |
| 4 | RESERVED | 21 |

5      RESERVED                                                                      21

6      RESERVED                                                                      21

7      Insurance                                                                     21

8      Department of Labor Occupational Safety and Health Standards                  26

9      Non-Disclosure and Confidentiality Agreement                                  27

10     Prohibition on Posting of Plans and Specifications on Web Sites               27

11     Indemnification                                                               27

12     Contractor Personnel                                                          27

13     Key Personnel                                                                 27

14     English Speaking Representative                                               28

15     Contracting Officer's Technical Representative (COTR)                         28

16     Telecommunications and Video Surveillance Services or Equipment              28

17     RESERVED                                                                      29

18     Performance Guarantee                                                         29

**SECTION VII: RESERVED**                                                           **30**

**SECTION VIII: ATTACHMENTS**                                                       **31**

01: Statement of Work                                                               31

02: Phase I Technical Evaluation Criteria and Proposal Submission Requirements      31

03: Site Map Image                                                                  31

04: Washington Dulles International Airport Air Traffic Statistics                  31

05: Standard Provisions for Concession Contracts (March 23, 2022)                   31

## SECTION III: FINANCIAL OFFER

The Airports Authority (Authority) is utilizing a two-phase, competitively negotiated "Best Value" procurement method as detailed in Section V.5.  This Solicitation is applicable to both phases, hereinafter referred to as Phase I and Phase II.

Phase I requires submission of a Technical Proposal based on the Statement of Work provided in Attachment 01.  A Financial Offer is not required as part of Phase I.

Those Offerors who are invited to participate in Phase II of the procurement process will be required to submit a Technical Proposal based on the Phase II proposal submission requirements and evaluation criteria and complete a Financial Offer.

## SECTION IV: REPRESENTATIONS AND CERTIFICATIONS

**1      Type of Business Organization**

The Offeror, by checking the applicable box, represents that:

A.    It operates as [ ] a corporation incorporated under the laws of the State of _____,
       [ ] an individual, [ ] a partnership, [ ] a nonprofit organization, or [ ] a joint venture.

B.    If the Offeror is a foreign entity, it operates as [ ] an individual, [ ] a partnership, [ ] a nonprofit
       organization, [ ] a joint venture, or [ ] a corporation, registered for business in _____ (country).

**2      Parent Company and Identifying Data**

A.    A parent company, for the purpose of this provision, is one that owns or controls the activities and basic
       business policies of the Offeror. To own the Offeror's company means that the parent company must own
       at least 51% of the voting rights in that company. A company may control an Offeror as a parent company
       even though it does not meet the requirement for such ownership if the parent company is able to
       formulate, determine, or veto basic policy decisions of the Offeror through the use of dominant minority
       voting rights, use of proxy voting, or otherwise.

B.    The Offeror _____ (Company Name) [ ] is, [ ] is not (check applicable box)
       owned or controlled by a parent company.

C.    If the Offeror checked "is" in paragraph B. above, it shall provide the following information:

       Name and Main Office Address of          Parent Company's Employer's
       Parent Company (include zip code)        Identification Number

       _____          _____
       _____
       _____
       _____

D.    If the Offeror checked "is not" in paragraph B. above, it shall insert its own Employer's Identification
       Number on the following line:

       _____

E.    The Offeror (or its parent company) [ ] is, [ ] is not (check applicable box) a publicly traded company.

F.    Principal(s), for the purposes of this certification, means officers; directors; owners; partners; and persons
       having primary management or supervisory responsibilities within a business entity (*e.g.*, general
       manager; plant manager; head of a subsidiary, division, or business segment, and similar  positions).

       The Offeror shall insert the name(s) of its principal(s) on the following line:

       _____

**3      Firm Identification**

The Offeror is requested to complete the below:

DUNS Identification Number _____ (assigned by Dun & Bradstreet, Inc., and contained in its Data Universal Numbering System, D-U-N-S). If no number has been assigned by Dun & Bradstreet, Inc., insert the word "none."

**4      Authorized Negotiators**

The Offeror represents that the following persons are authorized to negotiate on its behalf with the Metropolitan Washington Airports Authority (Authority) in connection with this Solicitation:

_____
_____

**5      Small Local Business Enterprise (SLBE) Representation**

A.    An SLBE is defined as a small business concern that is organized for profit and is located within a 100-mile radius of the District of Columbia's zero-mile marker.  Located means that as of the date of its SLBE application, the business entity has an established office or place of business within a city, county, or town within the 100-mile radius referenced above.  A small business is defined, for SLBE purposes, as a firm that is not dominant in its field, and that meets the U.S. Small Business Administration's (SBA) small business size standards for the goods or services it will be providing in response to a specific solicitation.

B.    The Offeror represents and certifies that it [  ] is, [  ] is not an SLBE as defined above.  If the Offeror is an SLBE, it further represents and certifies that there have been no material changes in the information provided with its most recent application for certification, and the Offeror continues to meet the Authority's criteria for SLBE certification.

C.    Proposed SLBEs must be certified by the Authority's Department of Supplier Diversity by no later than the Solicitation due date.  Additional information is available at https://mwaa.diversitycompliance.com.

**6      Airport Disadvantaged Business Enterprise (ACDBE) Representation**

A.    To qualify as an ACDBE under 49 CFR Part 23 and 26, a business concern must meet the applicable size standard and must be a small business (as defined by the Small Business Administration), which is: a) at least 51% owned and controlled by one or more socially and economically disadvantaged individuals, or in the case of any publicly owned business, at least 51% of the stock is owned by one or more socially and economically disadvantaged individuals; and (b) whose management and daily business operations are controlled by one or more of the socially and economically disadvantaged individuals who own

B.    The Offeror represents and certifies that it [  ] is, [  ] is not an ACDBE as defined above.  If the Offeror is an ACDBE, it further represents and certifies that there have been no material changes in the information provided with its most recent application for certification, and the Offeror continues to meet the Authority's criteria for ACDBE certification.

**7      Subcontractors (Concessions)**

A.    If the Offeror proposes to use any Subcontractor, the Offeror must furnish with its Phase II Offer:

1.    a signed Subcontractor Utilization Plan (SLBE);

2.   a signed Letter of Intent or executed subcontract agreement for each SLBE Subcontractor included on the Subcontractor Utilization Plan.

3.   a signed Utilization Plan (ACDBE);

4.   a signed Letter of Intent and draft subcontract agreement for each Subcontractor included on the Utilization Plan.

Templates of Authority forms are available at: https://www.mwaa.com/business/contracting-manuals-forms-and-other-resources

B.   The Offeror represents that it intends to utilize the Subcontractor(s) listed on its (Subcontractor) Utilization Plan(s) if awarded a Contract as a result of this Solicitation. Once Contract award has been made, the Offeror shall not deviate from use of the Subcontractor(s) listed on its (Subcontractor) Utilization Plan(s) without Contracting Officer approval.

C.   Any Subcontractors identified as SLBE or ACDBE must meet the criteria outlined above.

Note:   Commitment Letters are acceptable in lieu of the Subcontractor Utilization Plan and Letter of Intent for the design and construction portion of the contract.

## 8   Conflict of Interest

The Offeror shall disclose below any representation, activity, or relationship involving the Offeror or its employees that may give rise to a conflict of interest were it selected for Contract award, which conflict would or could disqualify it from providing goods or services under the Contract absent a waiver from the Authority and/or other entities.  In the case of such a conflict of interest, the Authority will make the final determination whether the conflict prevents the Offeror from participating in this Solicitation.  If no conflicts exist, insert the word, "none."

_____
_____

## 9   Certification of Independent Price Determination

A.   The Offeror certifies that :

1.   The prices in its Offer will be arrived at independently, without, for the purpose of restricting competition, any consultation, communication, or agreement with any other Offeror or competitor relating to (a) those prices, (b) the intention to submit an offer, or (c) the methods or factors used to calculate the prices offered;

2.   The prices in its Offer will not be knowingly disclosed by the Offeror, directly or indirectly, to any other offeror or competitor before bid opening or contract award, as appropriate, unless otherwise required by law; and

3.   No attempt will be made by the Offeror to induce any other concern to submit or not to submit an offer for the purpose of restricting competition.

B.   Each signature of the Offeror is considered to be a certification by the signatory that the signatory:

1.   Is the person in the Offeror's organization responsible for determining the prices being offered in its Offer, and that the signatory has not participated and will not participate in any action contrary to subparagraphs A.1. through A.3. above, or

2.   a.   Has been authorized, in writing, to act as agent for the following principals in certifying that those principals have not participated, and will not participate in any action contrary to subparagraphs A.1. through A.3. above

_____

*(Insert full name of person(s) in the Offeror's organization responsible for determining the prices offered in this Offer, Bid, or Proposal, and the title of his or her position in the Offeror's organization.)*

    b.    As an authorized agent, certifies that the principals named in subdivision B.2.a. above have not participated, and will not participate, in any action contrary to subparagraphs A.1. through A.3. above, and

    c.    As an agent, has not personally participated, and will not participate, in any action contrary to subparagraphs A.1. through A.3. above.

C.    If the Offeror deletes or modifies subparagraph A.2. above, the Offeror must furnish with its Offer a signed statement setting forth in detail the circumstances of the disclosure.

## 10     Certification of Compliance With Employment Eligibility Verification, Form I-9

The Offeror certifies that it [ ] is [ ] is not in compliance with the Immigration Reform and Control Act of 1986, Pub. L. 99-603 (8 U.S.C. 1324a) and the regulations issued thereunder. The Offeror also certifies that its subcontractors are in compliance with the Immigration Reform and Control Act of 1986 and the regulations issued thereunder.

## 11     Certification of Enrollment in E-Verify

A.    If the Phase II financial offer is anticipated to be over $100,000 the following applies:

    1.    The Offeror certifies that it:

    [ ]    is currently enrolled as a [ ] non-Federal Contractor, [ ] Federal Contractor (note that the Airports Authority is not a federal entity and contractors are prohibited from verification of existing employees under any contract with the Airports Authority) in the E-Verify Program for employment verification operated by the U.S. Department of Homeland Security in partnership with the Social Security Administration and will continue to be enrolled, if awarded a Contract, for the entire term of such Contract.

    OR

    [ ]    will enroll as a non-Federal contractor in the E-Verify Program for employment verification operated by the U.S. Department of Homeland Security in partnership with the Social Security Administration within 30 days of Contract award and will continue to be enrolled, if awarded a Contract, for the entire term of such Contract, but is not currently enrolled in the E-Verify Program.

    2.    <u>Certification</u>. As verification of this representation, the Offeror is encouraged to attach a copy of proof of enrollment, such as its "Maintain Company" page from the E-Verify Website

B.    If the Phase II financial offer is anticipated to be less than $100,000, this provision is not applicable.

## 12     Certification Regarding Debarment, Suspension and Other Responsibility Matters

A.    1.    The Offeror certifies, to the best of its knowledge and belief, that -

    a.    The Offeror and/or any of its Principals -

(1) Have [ ] have not [ ] been debarred, suspended, proposed for debarment, or declared ineligible for the award of contracts by any Federal, state, or local agency within the three (3) year period preceding this offer;

(2) Have [ ] have not [ ] had contractor or business license revoked within the three (3) year period preceding this offer;

(3) Have [ ] have not [ ] been declared non responsible by any public agency within the three (3) year period preceding this offer;

(4) Have [ ] have not [ ], within the three (3) year period preceding this offer, been convicted of or had a civil judgment rendered against them for: commission of fraud or a criminal offense in connection with obtaining, attempting to obtain, or performing a public (Federal, state, or local) contract or sub-contract; violation of Federal or state antitrust statutes relating to the submission of offers; or commission of embezzlement, theft, forgery, bribery, falsification or destruction of records, making false statements, tax evasion, or receiving stolen property; violation of labor, employment, health, safety or environmental laws or regulations;

(5) Have [ ] have not [ ], within the three (3) year period preceding this offer, been indicted for, or otherwise criminally or civilly charged by a governmental entity with, commission of any of the offenses enumerated in subparagraph A.1.a.(4). of this provision; and

(6) All performance evaluations within the three (3) year period preceding this offer have [ ] have not [ ] received a rating of satisfactory or better. If not, please provide a copy of the evaluation with detailed explanation.

b. The Offeror has [ ] has not [ ] within the three (3) year period preceding this offer, had one or more contracts terminated for default by any Federal, state or local agency.

c. The Offeror represents that it is [ ] is not [ ] a corporation that has any unpaid Federal tax liability that has been assessed, for which all judicial and administrative remedies have been exhausted or have lapsed, and that is not being paid in a timely manner pursuant to an agreement with the authority responsible for collecting the tax liability.

d. The Offeror represents that it is [ ] is not [ ] a corporation that was convicted of a criminal violation under any Federal law within the preceding 24 months.

2. "Principals," for the purposes of this certification, means officers; directors; owners; partners; and, persons having primary management or supervisory responsibilities within a business entity (e.g., general manager; plant manager; head of a subsidiary, division, or business segment, and similar positions).

B. The Offeror shall provide immediate written notice to the Contracting Officer if, at any time prior to Contract award, the Offeror learns that its certification was erroneous when submitted or has become erroneous by reason of changed circumstances.

C. A certification that any of the items in paragraph A. of this provision exists will not necessarily result in withholding of an award under this Solicitation. However, the certification will be considered in connection with a determination of the Offeror's responsibility. Failure of the Offeror to furnish a certification or provide such additional information as requested by the Contracting Officer may render the Offeror non-responsible.

D.      Nothing contained in the foregoing shall be construed to require establishment of a system of records in order to render, in good faith, the certification required by paragraph A. of this provision. The knowledge and information of an Offeror is not required to exceed that which is normally possessed by a prudent person in the ordinary course of business dealings.

E.      The certification in paragraph A. of this provision is a material representation of fact upon which reliance was placed when making award. If it is later determined that the Offeror knowingly rendered an erroneous certification, the Contracting Officer may terminate the Contract resulting from this Solicitation for default.

F.      **Offeror Certification**. By submitting an offer under this Solicitation, the Offeror certifies that neither it nor its principals are presently debarred or suspended by any Federal department or agency from participation in this transaction.

G.      **Lower Tier Contractor Certification** The successful Offeror, by administering each lower tier subcontract that exceeds $25,000 as a "covered transaction", must verify each lower tier participant of a "covered transaction" under the project is not presently debarred or otherwise disqualified from participation in this federally assisted project. The successful Offeror will accomplish this by:

1.      Checking the System for Award Management at website:  http://www.sam.gov

2.      Collecting a certification statement similar to the Certificate Regarding Debarment and Suspension (Bidder or Offeror), above.

3.      Inserting a clause or condition in the covered transaction with the lower tier contract

 If the Federal Aviation Administration ("FAA") later determines that a lower tier participant failed to disclose to a higher tier participant that it was excluded or disqualified at the time it entered the covered transaction, the FAA may pursue any available remedies, including suspension and debarment of the non-compliant participant.

## 13      Insurance Affidavit

 The Offeror certifies that it [ ] has [ ] has not read and reviewed the insurance provisions of the Solicitation with its insurance agent, broker, or representative.  The Offeror is required to submit an Insurance Affidavit form (Affidavit) with its Phase II Offer and proof of insurance as a condition of Contract award.  The Affidavit, which can be accessed at https://www.mwaa.com/business/contracting-manuals-forms-and-other-resources, must be completed by the Offeror and its insurance provider.

 The Authority may declare any Offer as non-responsive if it is made without this Affidavit or if it is made with an incomplete Affidavit.  For purpose of defining Additional Insured and Waiver of Subrogation, the term "MWAA, Airports Authority, or Authority" shall mean the elected officials, boards, officers, employees, agents, and representatives of the Board.

## 14      SAFETY Act

 With respect to the goods and/or services the Authority is procuring in this Solicitation, the Offeror certifies that it [ ] has [ ] does not have a Designation and/ or Certification for such goods and/or services under the SAFETY Act (6 U.S.C. 441 *et seq.*) or such Designation or Certification is [ ] not applicable for such goods and/or services.

## 15      Telecommunications and Video Surveillance Services or Equipment

 In accordance with Federal Acquisition Regulation (FAR) 52.204-25, Prohibition on Contracting for Certain Telecommunications and Video Surveillance Services or Equipment, the Offeror is prohibited from providing covered telecommunications equipment or services as a substantial or essential component of any system, or as critical technology as part of any system.

The Offeror represents that it is not providing to the Authority any equipment, system, or service that uses covered telecommunications equipment or services as a substantial or essential component of any system, or as critical technology as part of any system, as such terms are defined in FAR 52.204-25.

**16    RESERVED**

**17    RESERVED**

**18    RESERVED**

**19    RESERVED**

**20    Authorization to Do Business in the Commonwealth of Virginia**

The Offeror certifies that it [ ] is [ ] is not authorized to do business in the Commonwealth of Virginia.

## SECTION V: SOLICITATION PROVISIONS

**1    Purpose and Scope**

The Airports Authority is seeking proposals from all interested and qualified offerors desiring to develop, lease, and operate a Remote VIP Passenger Processing Service for Commercial Airline Flights at Washington Dulles International Airport (herein after referred to as "Remote VIP Services") to receive, screen, and transport passengers and their luggage to/from gated commercial aircraft, obtain and provide the necessary airport, airline, and federal approvals and contracts, such as those required by the FAA, Transportation Security Administration ("TSA"), and U.S. Customs and Border Protection ("CBP"), and to provide passenger lounge services and amenities.

The contractor will be required to:
- Construct a new, state-of-the-art Remote VIP Services facility at 45041 Compass Court, Dulles, VA 20166. The offered site is located in a historic district and requires that any improvement, modification, or new construction adhere to Section 106 of the National Historic Preservation Act of 1966 ("NHPA").
- Receive, screen, and transport passengers and their luggage to/from gated commercial aircraft.
- Within the facility, provide:
    1. Passenger and luggage check-in services through established agreements with airlines.
    2. A dedicated security screening checkpoint approved by the Department of Homeland Security.
    3. A facilitated customs experience for passengers arriving internationally.
    4. A sterile area that shall host TSA and CBP personnel.
    5. Amenities such as food and bar service, private suites, restrooms, Wi-Fi and secured parking.
- Escort passengers on the airfield between the facility and the commercial aircraft via luxury vehicle.
- Obtain and maintain the necessary airport, airline, and federal approvals and contracts, such as those required by the FAA, TSA, and CBP to provide the Remote VIP services.

The Airports Authority will review and approve the Contractor's design and construction plans. The plans will also be subject to all applicable federal, state, and local regulations, including, but not limited to, the Airports Authority's Design Manual, which requires Leadership in Energy and Environmental Design certifiable construction standards.

**2    Definitions**

"Acceptance" means the act of an authorized representative of the Authority by which the Authority assumes for itself, or as an agent of another, ownership of existing and identified supplies, or approves specific services, as partial or complete performance of the Contract.

"Acceptance Period" means the number of calendar days available to the Authority for awarding the Contract from the date specified in this Solicitation for submission of Offers.

 "Airports Authority (Authority)" or "Owner" means the Metropolitan Washington Airports Authority.

"Beneficial Occupancy" means the occupancy of an uncompleted but functionally usable building, structure, or facility for its intended purpose under circumstances that are advantageous to the occupant and which produce relatively little interference with the Contractor in completing construction or alterations.

"Blanket Purchase Agreement (BPA)" is an order between the Authority and Seller that allows the Authority to order future goods or services on a repetitive basis, and to be billed for the goods or services received on an as-ordered basis.

"CLMS" refers to the Authority's Contract Lifecycle Management System, accessible at https://mwaa.odysseyautomation.com/odyssey.

"Contract" means the mutually binding legal relationship created by the parties' agreement after receiving Offers, Bids, or Proposals in response to this Solicitation.

"Contracting Officer" means a person with the authority to enter into, administer, and/or terminate contracts and make related determinations and findings.

"Contractor" or "Concessionaire" means the person, firm, corporation, or other business entity to whom the Contract is awarded.

"Correction" means the elimination of a defect.

"COTR" refers to the Contracting Officer's Technical Representative.

"Day" means calendar day unless otherwise stated. "Notice to Proceed" means the notice issued by the Authority directing the Contractor to commence the Work.

"Offer," "Bid," or "Proposal" means a response to the Solicitation, that if accepted, would bind the Offeror to perform the resulting Contract.

"Offeror" means the person, firm, corporation, or other business entity responding to the Solicitation.

"Purchase Order (PO)" is an Authority contractual instrument with specified terms and conditions to purchase goods and services issued to the Seller upon receipt of quotations of price and delivery schedule.

"SDMS" refers to the Authority's Supplier Diversity Management System, accessible at https://mwaa.diversitycompliance.com.

"Solicitation" means any request to submit an Offer or quotation to the Authority. Following the Contracting Officer's execution of the Solicitation, Offer and Award the Solicitation will become a part of the Contract.

"Subcontract" means any agreement by Contractor with any contractor, vendor, supplier, consultant, or other person or entity to perform any part of the Work, including but not limited to the furnishing of equipment and materials, as well as any agreements between a Subcontractor and its lower tier Subcontractor(s).

"Subcontractor" means any person or entity of any tier that has entered into a Subcontract to perform any part of the Work.

"Work" means everything required to be furnished or performed by the Contractor pursuant to the statement of work, specifications, and the Contract.

## 3    Contract Type

The Authority contemplates award of a Contract with payment of a ground rent to begin at Contract execution, a Minimum Annual Guarantee ("MAG") and a percentage of rent to be remitted to the Airports Authority for all sales in the operation of the Remote VIP Services..

## 4    RESERVED

## 5    Method of Procurement; Basis of Award

The Authority is utilizing a two-phase, competitively negotiated "Best Value" procurement method.

Phase I requires submission of technical proposals based on the Statement of Work provided in Attachment 01. Technical proposals will be evaluated based on the Phase I Technical Evaluation Criteria provided in Attachment 02.

Upon completion of Phase I technical evaluation, the Authority will select and notify one or more qualified Offerors (competitive range) who it determines submitted the most highly-rated technical proposals to participate in Phase II of the procurement process.

The Authority may hold discussions with those Offerors determined to be in the competitive range following Phase I. In Phase II, the Authority will issue the draft Contract, Phase II Technical Requirements, and Phase II Technical Evaluation Criteria and Proposal Submission Requirements to those Offerors determined to be in the competitive range.

The draft Contract, which will be executed by both parties upon finalization and selection of the successful Offeror, may address the following points, among others:

1.  Insurance.

2.  Capital investment requirements, including required initial and mid-term investments.

3.  Environmental requirements.

4.  Performance guarantee in an amount equal to [100%] of the annual MAG amount and a completion guarantee.

5.  Non-binding evaluative mediation will be the alternative dispute resolution process.

6.  Binding dispute resolution will be litigation before a court of competent jurisdiction within the Commonwealth of Virginia, without a jury.

7.  Title to the facilities will remain with the Contractor throughout the term and revert to the Authority at the expiration or termination of the term.

8.  Compliance with the Standard Provisions for Concession Contracts. (Attachment 05)

9.  Liquidated damages for failure to meet construction milestones or operational requirements.

The Authority reserves the right to eliminate, change and/or supplement any of the points included above in connection with its preparation of the draft Contract, as well as its finalization of the same. The above list and description of certain potential Contract points is non-exclusive and preliminary and will not bind the Authority in any way.

Offerors will submit a technical proposal for the proposed facility and a financial offer based on Phase II Technical Requirements.

The Authority, at its sole discretion, may enter into negotiations with the Offeror it determines provided the best technical approach and financial offer, which may include a request for Best and Final Offers.

Given the proposed 20-year operating term, the FAA will need to approve the final contract.

## 6    Submission of Offers

The Offeror shall submit its Phase I Offer electronically in the Authority's CLMS no later than 2:00 PM September 15, 2023.

**7    Documents Required in Response to Solicitation**

A.    Offerors shall include the following documents in their electronic submission for Phase I:

1.    Signed Solicitation Offer and Award
2.    Representations and Certifications
3.    Phase I Technical Proposal

B.    It is anticipated that Offerors will be required to include the following documents in their electronic submission for Phase II:

1.    Phase II Technical Proposal
2.    Financial Offer
3.    Insurance Affidavit
4.    Proposal Guarantee
5.    Subcontractor Utilization Plan
6.    ACDBE Utilization Plan
7.    ACDBE/SLBE Forms, as applicable:
      ▪ Letter of Intent
      ▪ Waiver Request

The Authority reserves the right to eliminate, change and/or supplement any of the anticipated Phase II document submission requirements.  The above Phase II list is non-exclusive and preliminary and will not bind the Authority in any way.

Refer to Section VIII, Attachments, for documentation that, in addition to the items listed above, the Offeror is required to acknowledge or submit in response to this Solicitation.

**8    Pre-Proposal/Pre-Bid Conference**

A pre-proposal/pre-bid conference for Phase I will be held on July 13, 2023 at 10:00 AM EST at 45045 Aviation Drive Suite 200, Dulles, VA.  A site visit will follow the conference.

**9    Questions and Answers**

Any prospective Phase I Offeror desiring an explanation or interpretation of the Solicitation must submit its questions via the CLMS no later than 03:00 PM July 28, 2023. The Authority may not consider any questions received after this date. Oral explanations or instructions given before the award of a Contract are not binding. Any information given to a prospective offeror concerning this Solicitation will be furnished promptly to all other prospective offerors as a Solicitation Amendment (Amendment) if that information is necessary or if the lack of it would be prejudicial to any other prospective offeror.

**10    Acknowledgment of Amendments to Solicitations**

The Authority reserves the right to amend the Solicitation, through the CLMS, prior to the date specified for submission of Offers. If the revisions under the Amendment require material changes to the Solicitation, the Authority may revise the date specified for submission of Offers and will include a revised submission date in the Amendment.

Offerors are required to acknowledge receipt of all Amendments to this Solicitation on the Solicitation Offer and Award. Failure to acknowledge all Amendments may cause the Offer to be considered non-responsive to the Solicitation.

**11    Late Submission, Modifications, and Withdrawals of Offers**

Offerors are responsible for timely submission. If an Offer is received after the time set for receipt, it is considered late and may not be considered. Offerors may submit a written revision to an Offer prior to the submission deadline. A late revision of the successful Offer may be accepted if it makes the terms of the Offer more favorable to the Authority. Offers may be withdrawn at any time prior to Contract award.

**12    Reserved**

**13    Minimum Acceptance Period**

The Authority requires a minimum Acceptance Period of 180 calendar days from the receipt of Phase II Offer.

**14    Reserved**

**15    Taxes**

Authority purchases are exempt from sales and use taxation, both state and municipal. The Offeror is responsible for all applicable Federal, state, and local taxes on materials, labor, or services furnished by it or arising out of its operations under the Contract. Such taxes shall include, without limitation, sales, use, excise, employee benefit and unemployment taxes, customs duties, and income taxes. The Offeror therefore certifies that there are no such taxes included in its Offer.

**16    Small Local / Airport Concession Disadvantaged Business Participation**

This Solicitation has been assigned a Small Local Business Enterprise (SLBE) participation requirement of twenty-five percent (25%) of the total costs incurred in the design and construction of the facility to include any capital investments and fixed improvements made during the Term of the Contract.

The Solicitation has been assigned an initial five percent Airport Concessions Disadvantaged Business Enterprise (ACDBE) goal applicable to the operations of the Remote VIP Services. The Contract will include a requirement for compliance with the then-current ACDBE goal.

The Offeror must ensure that any firm that is proposed for SLBE or ACDBE participation is certified as such no later than the due date for Phase II Offers. Certification information and directories of certified firms are available in the Authority's SDMS.

The Offeror must meet the Small Local / Airport Concession Disadvantaged Business Enterprise participation requirement / goal outlined in the Solicitation. The Offeror must submit a plan to achieve the SLBE requirement and a plan to meet the ACDBE goal or submit with its Phase II Offer a request for waiver. Phase II Offers that do not conform may be rejected.

By signing the Solicitation, Offer and Award, the Offeror commits itself to achievement of the SLBE participation requirement and the ACDBE goal in the Solicitation or at the level stated in the Offeror's approved Subcontractor Utilization and ACDBE Utilization Plans.

**17    Due Diligence**

The Offeror is responsible for satisfying itself as to the conditions affecting the requirements of the Solicitation. Any failure of the Offeror to acquaint itself with the requirements of the Solicitation shall not relieve it from estimating properly the difficulty or cost of successful performance. The Authority assumes no responsibility for any conclusions or interpretations made by the Offeror based on the information made available by the Authority.

The Authority reserves the right to perform, or have performed, due diligence procedures, including, but not limited to, on-site survey of the Offeror's facilities or examination of previous work products, to determine Offeror's capability of performing the Contract requirements.

## 18    Prerequisites for Award

A.    Banking Instructions

The Offeror shall complete all parts of the Internal Revenue Service ("IRS") Form W-9 (Request for Taxpayer Identification Number and Certification). Contract award will not be made until the Authority has received the Offeror's completed form. The form and instructions are available at www.irs.gov.

The W-9 information is requested so that the Authority may determine the need to file IRS Form 1099 in connection with payments made under the Contract. The Authority may request periodic resubmission of the W-9. If the Contractor fails to submit the form by the deadline stated in the resubmission request, the Authority may refuse to pay invoices until the Contractor has submitted the form.

The Authority requires participation in a program whereby payments under this Contract are made via electronic funds transfer into the Contractor's bank. Contractor requests to initiate such service shall include the bank name, address, account number, contact person, telephone number, and American Bankers Association (ABA) 9-digit identifying number. The initial request and any subsequent changes must be signed by the Contractor's signatory of the Contract and shall be submitted directly to the Authority's Office of Finance at vendor.setup@mwaa.com. The Contracting Officer must approve any exceptions to this requirement in writing.

Offerors are encouraged to utilize local banks and those owned and controlled by socially and economically disadvantaged individuals. For additional information, contact the Department of Supplier Diversity at supplierdiversity@mwaa.com.

B.    Information Security

All connections to the Authority networks or hosts must be certified by the Authority's Chief Information Security Officer (CISO) in writing prior to authorization for use. This includes, but is not limited to, all hardware and applications, whether hosted on Authority property or in the cloud, or managed by Authority staff or Contractor.

Prior to award, prospective Contractors must submit either a (i) recent Statement on Standards for Attestation Engagements or (ii) completed Authority Information Security Assessment Questionnaire (Questionnaire) for review and certification by the Authority's CISO. The Questionnaire is available at http://www.mwaa.com/business/contracting-manuals-forms-and-other-resources.

Offerors are not required to submit supporting documentation of compliance with this provision at the time of Offer submission.

C.    Insurance

Offeror shall maintain adequate liability, employer's liability, and workers' compensation insurance to protect the Authority and the Authority's agents, employees and contractors with respect to the indemnity provision here within and any claims under workers' compensation, safety and health and similar laws and regulations relating to the goods or services furnished hereunder. Offeror shall furnish evidence of such insurance in form and substance satisfactory to the Authority as specified in the Solicitation and upon request.

**19    Policies of the Authority**

A.    Fair Opportunity

The Authority's contracting opportunities are open to all, and it is Authority policy that no Offeror will be discriminated against because of race, color, national origin, sex, or disability in contract award. Further, Contractors shall not discriminate on the basis of race, color, national origin, sex, or disability in the performance of Authority contracts.

B.    Local, Small & Disadvantaged Business Participation

The Authority is committed to full participation in its contracting programs by local, small, and disadvantaged business enterprises and enterprises owned by minorities and women.  In addition to the stated Solicitation requirements and goals, Offerors are encouraged to include qualified MBEs and WBEs in the performance of Authority contracts to the greatest extent practicable.

C.    Sustainability

The Authority is committed to adopting and implementing sustainable policies and practices in aspects of its business to the greatest extent practicable. Offerors are encouraged to review the Authority's corporate Sustainability Plan available at https://www.mwaa.com/about/sustainability-plan and the Authority's Design Manual available at https://www.mwaa.com/business/airports-authority-design-manual and maximize the utilization of sustainable initiatives in the performance of Authority contracts.

D.    Banking

Offerors are encouraged to utilize local banks and those owned and controlled by socially and economically disadvantaged individuals. For additional information, contact the Department of Supplier Diversity at supplierdiversity@mwaa.com.

**20    Notice to Offerors**

The fact that an Offeror demonstrates alignment with Authority policies or submits the apparent successful Offer does not automatically result in Contract award. Factors, including conformity of the Offer to the Solicitation, the Offeror's responsibility, and any change in the Authority's requirements must be considered.  No contractual obligation or liability on the part of the Authority shall exist unless and until the Contract is awarded. No Offeror should begin Work until after formal notice of Contract award has been made by the Authority.

**21    Protests**

Protests must be addressed to the Vice President, Office of Supply Chain Management. Protests must be sent by (1) registered or certified mail, return receipt requested; or (2) nationally recognized delivery service which provides tracking records of at least the date sent and date received or hand delivered to the Authority's Procurement and Contracts Department. Protests sent electronically will not be accepted.

Protests that are based on the terms and conditions set forth in or omitted from a Solicitation or Amendment must be received by the earlier of the following two dates: (1) fourteen (14) days after the issuance date of the Solicitation or Amendment containing the terms and conditions that are the subject of the protest; or (2) the due date set out in the Solicitation.

Protests that are based on the manner in which Offers were evaluated or on which a Contract was awarded may only be made by an Offeror who submitted an Offer and must be received no later than seven (7) days after the Offeror knew or should have known of the basis for the protest.

If a Contract has not been awarded at the time a protest is timely filed, the Contract may not be awarded while the protest is pending, unless the President and CEO determines that award of the Contract, and, if applicable, issuance of a notice to proceed, is in the Authority's best interest.

## 22    Freedom of Information Policy

Except as otherwise noted, all related documents submitted to the Authority in response to this Solicitation, including, but not limited to, quotes, Offers, Proposals, Bids, statements of work, and/or specifications, will be open to the inspection of any citizen, or any interested person, firm, or corporation, in accordance with the Authority's Freedom of Information Policy. Trade secrets or confidential information submitted as part of an Offer will not be subject to public disclosure if exempted by the Authority's Freedom of Information Policy; however, the Offeror must invoke the protections of this section prior to or upon submission of its Offer and must identify the specific data or other materials to be protected and state the reasons why protection is necessary. The Offeror may not request that its Offer in its entirety be treated as a trade secret or confidential information, nor may an Offeror request that its pricing be treated as a trade secret or confidential information.

## 23    Title VI Solicitation Notice

The Authority, in accordance with the provisions of Title VI of the Civil Rights Act of 1964 (78 Stat. 252, 42 U.S.C. §§ 2000d to 2000d-4) and the Regulations, hereby notifies all Offerors that it will affirmatively ensure that any contract entered into pursuant to this advertisement, disadvantaged business enterprises will be afforded full and fair opportunity to submit Offers in response to this invitation and will not be discriminated against on the grounds of race, color, or national origin in consideration for an award.

## 24    Proposal Guarantee

A Proposal Guarantee in the sum of Fifty Thousand Dollars ($50,000) must be submitted by each Offeror with its Phase II Proposal. Failure to submit the Proposal Guarantee shall result in rejection of the Proposal. The Proposal Guarantee serves to guarantee execution of a Contract by the selected Offeror. In the event the selected Offeror fails to execute a Contract offered by the Authority based on the selected Offeror's Proposal, the Proposal Guarantee shall be forfeited.

The Proposal Guarantee, at the option of the Offeror, may be in the form of a certified check, cashier's check, or money order acceptable to the Authority and made payable to the Metropolitan Washington Airports Authority. Checks or money orders will be deposited into an Authority bank account designated for this purpose.

The Proposal Guarantee will be returned without interest to the unsuccessful Offeror(s) following execution of the Contract between the Authority and the selected Offeror. The Proposal Guarantee of the selected Offeror will not be released until the Contract is executed and the Contract Performance Guarantee is received by the Authority.

## SECTION VI: SPECIAL PROVISIONS

**1      Contract Term**

The term of the Contract includes a design and construction period not to exceed thirty (30) months and an operating term of twenty (20) years from the date of beneficial occupancy.

**2      RESERVED**

**3      Location and Working Hours**

This Contract shall be performed at 45041 Compass Court, Dulles VA 20166. Working hours under this Contract shall be 24 hours, 7 days a week.

**4      RESERVED**

**5      RESERVED**

**6      RESERVED**

**7      Insurance**

A.      The Contractor shall procure and maintain at its expense during the Contract period the following minimum, not maximum, insurance coverage from an insurance company or companies that is/are financially sound possessing a rating of A- VII or higher from the A.M. Best Company or an equivalent rating service, insuring the Contractor against all liability, subject to policy terms, conditions, and exclusions, for injuries to persons (including wrongful death) and damages to property and any other liability arising from or caused by the Contractor's and its agents, representatives, employees, or subcontractors activities on Airports Authority premises or for services performed under this Contract. For those companies not subject to A.M. Best's ratings or equivalent, they shall have a nationally or internationally recognized reputation and responsibility and shall be approved by the Airports Authority with such approval not to be unreasonably withheld.  The Metropolitan Washington Airports Authority premises are physically located in the Commonwealth of Virginia and it is important for Contractor to ensure that all insurance policies have Commonwealth of Virginia amendatory endorsements.

B.      Contractor shall advise the Airports Authority of any cancellation, non-renewal, or material change in any policy within fifteen (15) business days of Contractor receiving notification of such action from the insurer.

C.      All of the policies, excluding Professional Liability, required of the Contractor shall be primary and the Contractor agrees that any insurance, including self-insurance, whether primary, excess, or on any other basis, maintained by the Airports Authority shall be non-contributing with respect to the Contractor's insurance.  Any self-insured retention, deductible, or similar obligation on all of the policies shall be the sole responsibility of the Contractor.

D.      The minimum limits and types of insurance coverage requirements set forth herein will in no way be construed as the maximum as required by the Contract or as a limitation of any potential liability, or limiting the scope of the indemnity as defined in the Contract.  The Contractor must protect the Personally Identifiable Information data to which the Contractor has access to or is holding.  If the Contractor maintains broader coverage and/or higher limits than the minimums shown below, the Airports Authority requires and shall be entitled to the broader coverage and/or higher limits maintained by the Contractor.

E.      The Contractor may use commercial umbrella/excess liability insurance so that Contractor has the flexibility to select the best combination of primary and excess limits to meet the total insurance limits required by this Contract.  Any umbrella or excess liability coverage must be at least as broad as the primary coverage and contain all coverage provisions that are required of the primary coverage.

F.   The Contractor and its Subcontractors are prohibited from operating Airports Authority owned vehicles and mobile equipment.

G.   A portion of the Work requires Contractor and its Subcontractors to operate a vehicle and/or mobile equipment on the restricted areas of the airport such as Air Operations Area (AOA) and **unescorted vehicle access on restricted areas of the airport is permitted**.

H.   By requiring insurance herein, the Airports Authority does not represent that coverage and limits will necessarily be adequate to protect Contractor, and such coverage and limits shall not be deemed as a limitation on Contractor's liability under the indemnities granted to the Airports Authority in this Contract.

I.   The Airports Authority reserves the right at any time throughout the term of the Contract to adjust the aforementioned insurance requirements, if, in Airports Authority's reasonable judgment, the insurance required by the Contract is deemed inadequate to properly protect the Airports Authority's interest.  The Contractor agrees that it will procure the adjusted insurance provided the coverage is available at commercially reasonable rates.

J.   The Airports Authority reserves the right to inspect relevant endorsements, declaration pages, and/or a complete copy of the insurance policy(s) from the Contractor, evidencing the coverage required herein, upon written demand.  The Contractor shall provide a reasonable opportunity for the Airports Authority to inspect such insurance documents, at the Contractor's corporate office located closest to the Airports Authority's main administrative office, within fifteen (15) business days of the Airports Authority's written request for such inspection.

K.   The failure of the Airports Authority at any time to enforce the insurance provisions, to demand such certificate or other evidence of full compliance with the insurance requirements, or to identify a deficiency from evidence that is provided shall not constitute a waiver of those provisions nor in any respect reduce the obligations of the Contractor to maintain such insurance or to defend and hold the Airports Authority harmless with respect to any items of injury or damage covered by this Contract.

L.   Should any required insurance lapse during the Contract term, requests for payments originating after such lapse may not be processed at the Airports Authority's discretion until the Airports Authority's Contracting Officer receives satisfactory evidence of reinstated coverage as required by this Contract, effective as of the lapse date.  The Contractor's failure to maintain the insurance required by this Contract shall also be the basis for immediate termination of this Contract at the Airports Authority's option.

M.   The Contractor shall ensure that all its Subcontractors, if any, independently carry insurance appropriate to cover the Subcontractors' exposures, or are covered under the Contractor's policies.  The Contractor shall require and verify that all Subcontractors maintain insurance meeting the Contractor's requirements on specific coverages and limits and as stated herein and Contractor shall ensure that the *Metropolitan Washington Airports Authority* is also included as an additional insured and with waiver of subrogation provision to waive all rights of recovery under subrogation or otherwise against the *Metropolitan Washington Airports Authority* on insurance required from its Subcontractors.  The Contractor is responsible for monitoring its Subcontractors' evidence of insurance to ensure compliance with their subcontract with Contractor.  Copies of all Subcontractors' evidence of insurance should be maintained by the Contractor, and upon request, be supplied to the Contracting Officer.

N.   **Construction Insurance Coverage**

The following insurance shall be provided with the policy limits thereof to be in the minimum(s), not maximum(s), as set forth below and are required during the design and construct phase of the Contract and ending upon Date of Beneficial Occupancy.  The Contractor shall procure and maintain, or require its contractor(s) performing design, construction, improvements, maintenance, or repair work to the Premises to procure and maintain and furnish satisfactory evidence of the following:

1. **Professional Liability (Design Professionals Errors & Omissions)**
   a. Subject to policy terms, conditions, and limitations there shall be a limit of not less than Three Million Dollars ($3,000,000) per claim covering negligent acts, errors, mistakes, and omissions arising out of the Work or services performed by Contractor or Contractor's design team, or any person employed or contracted by Contractor or Contractor's design team.
   b. Continuous coverage shall be maintained or an extended reporting period will be exercised for a period of not less than one year from Date of Beneficial Occupancy. The retroactive date shall precede the effective date of this Contract.
   c. Coverage shall not contain any exclusion or limitation related to environmental impairments.
   d. If this coverage is provided by contractor(s) to Contractor, Contractor shall provide to the Airports Authority a certificate of insurance from Contractor's contractor(s) evidencing coverage is in effect.

2. **Course of Construction (Builder's Risk)**
   Shall cover all risks of loss for completed value of project with no coinsurance penalty provisions and shall include an installation floater. Contractor shall be named as loss payee.

3. **Commercial General Liability**
   a. Shall be written on an "occurrence" basis with a limit of not less than Ten Million Dollars ($10,000,000) per occurrence. Coverage written on a "claims-made" basis is not acceptable.
   b. Coverage shall include with sublimits and aggregates where applicable, but not be limited to, Mobile Equipment Liability; Bodily Injury and Property Damage to Third Parties, Contractual Liability, Products-Completed Operations, Personal Injury and Advertising Injury Liability, Premises-Operations, Independent Contractors and Subcontractors, and Damage to Rented Premises.
   c. The Products-Completed Operations coverage shall be provided for a minimum of one year following Date of Beneficial Occupancy.
   d. <u>Additional Insured:</u> The *Metropolitan Washington Airports Authority* shall be included as an Additional Insured. A copy of the endorsement must be submitted.
   e. <u>Waiver of Subrogation:</u> Coverage shall include a waiver of subrogation provision to waive all rights of recovery under subrogation or otherwise against the *Metropolitan Washington Airports Authority.* A copy of the endorsement must be submitted.

4. **Business Automobile Liability**
   a. In the event Contractor does not own automobiles in the corporate name, Contractor shall maintain coverage with the each accident limit identified below for Hired and Non-Owned Autos, which may be satisfied by way of endorsement to the Commercial General Liability policy described above or separate Business Auto Liability policy. Evidence of either must be provided.
   b. Shall be a limit of not less than Five Million Dollars ($5,000,000) each accident for any vehicle (owned, non-owned, or hired/leased) used by the Contractor or its subcontractors.
   c. Coverage shall include handling of property for loading and unloading.
   d. If hazardous materials are to be transported, coverage shall include hauling of hazardous cargo at least as broad as that provided under the ISO pollution liability CA 99-48, and the Motor Carrier Act endorsement (MCS 90). Contractor shall comply with all Federal laws and with all states' laws and insurance requirements where hazardous materials may be transported.
   e. <u>Additional Insured for Vicarious Liability:</u> The *Metropolitan Washington Airports Authority* shall be included as an Additional Insured for Vicarious Liability. This shall be documented using ISO (Insurance Services Office, Inc.) endorsement CA 20 48 DESIGNATED INSURED or an equivalent form. A copy of the endorsement must be submitted.

    f.    <u>Waiver of Subrogation:</u>  Coverage shall include a waiver of subrogation provision to waive all rights of recovery under subrogation or otherwise against the *Metropolitan Washington Airports Authority*.  A copy of the endorsement must be submitted.

5.    **Workers Compensation and Employers Liability**

    a.    Contractor shall satisfy all compulsory requirements relating to workers compensation in any jurisdiction in which benefits may be claimed to cover each employee who is or may be engaged in Work under this Contract.

    b.    Coverage is compulsory in the Commonwealth of Virginia for employers of three or more employees, to include the employer and subcontractors.  If the Contractor is required by Virginia law to carry Workers Compensation coverage, the coverage shall be at Virginia Statutory Limits with Virginia coverage added to item 3A of the policy; <u>a Virginia listing under item 3C of the policy is not sufficient</u>.

    c.    Employers Liability shall be a limit of not be less than One Million Dollars ($1,000,000) for bodily injury by accident and One Million Dollars ($1,000,000) each employee for bodily injury by disease.

    d.    <u>Waiver of Subrogation:</u>  Coverage shall include a waiver of subrogation provision to waive all rights of recovery under subrogation or otherwise against the *Metropolitan Washington Airports Authority*.  A copy of the endorsement must be submitted.

6.    **Environmental Liability**

    a.    Shall be a limit of not less than One Million Dollars ($1,000,000) per loss for bodily injury, property damage, and environmental cleanup costs caused by pollution conditions, both sudden and non-sudden.

    b.    This requirement can be satisfied by either a separate environmental liability policy or through a modification to the Commercial General Liability policy.  Evidence of either must be provided.

    c.    If the coverage is written on a claims-made basis, the Contractor warrants that any retroactive date applicable to coverage under the policy precedes the effective date of this Contract and that continuous coverage shall be maintained or an extended reporting period will be exercised for a period of not less than two years from Date of Beneficial Occupancy.

    d.    <u>Additional Insured:</u>  The *Metropolitan Washington Airports Authority* shall be included as an Additional Insured.  A copy of the endorsement must be submitted.

    e.    <u>Waiver of Subrogation:</u>  Coverage shall include a waiver of subrogation provision to waive all rights of recovery under subrogation or otherwise against the *Metropolitan Washington Airports Authority*.  A copy of the endorsement must be submitted.

7.    **"All Risk" Property (Contractor's Property)**

    Full value and full replacement cost coverage under an "All Risk" policy for any of the Contractor's real or personal property used or situated on Airports Authority's property.

O.    **Operational Insurance Coverage and Minimum Limits**

The following insurance shall be provided with the policy limits thereof to be in the minimum(s), not maximum(s), as set forth below and are required during the Contract period.

1.    **Commercial General Liability**

    a.    Shall be written on an "occurrence" basis with a limit of not less than Five Million Dollars ($5,000,000) per occurrence with sublimits and aggregates where applicable.  Coverage written on a "claims-made" basis is not acceptable.

    b.    Coverage shall include, with sublimits and aggregates where applicable, but not be limited to, Bodily Injury and Property Damage to Third Parties, Contractual Liability, Products-Completed Operations, Personal Injury and Advertising Injury Liability, Premises-

Operations, Independent Contractors and Subcontractors, Mobile Equipment, Liquor Liability, and Damage to Rented Premises.

c. Coverage shall include the Assigned Premises and all on-airport vehicles and mobile equipment, and all activities of the Contractor on the Assigned Premises and the Airport Premises and all indemnifications made in the Contract.

d. <u>Additional Insured:</u>  The *Metropolitan Washington Airports Authority* shall be included as an Additional Insured.  A copy of the endorsement must be submitted.

e. <u>Waiver of Subrogation:</u>  Coverage shall include a waiver of subrogation provision to waive all rights of recovery under subrogation or otherwise against the *Metropolitan Washington Airports Authority*.  A copy of the endorsement must be submitted.

2. **Business Automobile Liability**

a. In the event Contractor does not own automobiles in the corporate name, Contractor shall maintain coverage with the each accident limit identified below for Hired and Non-Owned Autos, which may be satisfied by way of endorsement to the General Liability policy described above or separate Business Auto Liability policy.  Evidence of either must be provided.

b. Shall be a limit of not less than Five Million Dollars ($5,000,000) each accident for any vehicle (owned, non-owned, or hired/leased) used by the Contractor to fulfill the services contemplated by this Contract.

c. Coverage shall include operating on the restricted areas of the Airport or be covered by the General Liability policy described above.

d. Coverage shall include handling of property for loading and unloading.

e. <u>Additional Insured for Vicarious Liability:</u>  The *Metropolitan Washington Airports Authority* shall be included as an Additional Insured for Vicarious Liability.  This shall be documented using ISO (Insurance Services Office, Inc.) endorsement CA 20 48 DESIGNATED INSURED or an equivalent form.   A copy of the endorsement must be submitted.

f. <u>Waiver of Subrogation:</u>  Coverage shall include a waiver of subrogation provision to waive all rights of recovery under subrogation or otherwise against the *Metropolitan Washington Airports Authority*.  A copy of the endorsement must be submitted.

3. **Workers Compensation and Employers Liability**

a. Contractor shall satisfy all compulsory requirements relating to workers compensation in any jurisdiction in which benefits may be claimed to cover each employee who is or may be engaged in Work under this Contract.

b. Coverage is compulsory in the Commonwealth of Virginia for employers of three or more employees, to include the employer and subcontractors.  If the Contractor is required by Virginia law to carry Workers Compensation coverage, the coverage shall be at Virginia Statutory Limits with Virginia coverage added to item 3A of the policy; <u>a Virginia listing under item 3C of the policy is not sufficient</u>.

c. Employers Liability shall be a limit of not be less than One Million Dollars ($1,000,000) for bodily injury by accident and One Million Dollars ($1,000,000) each employee for bodily injury by disease.

d. <u>Waiver of Subrogation:</u>  Coverage shall include a waiver of subrogation provision to waive all rights of recovery under subrogation or otherwise against the *Metropolitan Washington Airports Authority*.  A copy of the endorsement must be submitted.

4. **"All Risk" Property Insurance for the Assigned Premises**

a. Insurance coverage at full value and full replacement cost for the Contractor's Real and Personal Property, the Assigned Premises building, and all improvements and betterments, including all subsequent alterations, rebuilding, replacements, changes, and additions thereto made by the Contractor against loss or damage by reason of fire, lightning, wind, hail, floods, explosion, smoke, vandalism, malicious mischief, riot, civil commotion, damage from aircraft, coverage of demolition of buildings and removal of debris, business interruption, extra expense, and hazards and risks included with so-called

"extended coverage endorsements" or "all-risk".

    b.    The policy shall name the Contractor as the insured owner and shall contain an endorsement in favor of the *Metropolitan Washington Airports Authority* as Loss Payee in a form satisfactory to the Airports Authority.

    c.    The policy shall be issued in an aggregate amount which shall not be less than the full replacement value (exclusive of paved surfaces, excavation, basements, and foundations) of all property on the Assigned Premises.

    d.    The policy shall provide that all proceeds of such insurance shall be payable to the Contractor, in trust, to be used for the sole purpose of repairing or replacing the damaged or destroyed property on the Assigned Premises

P.    The Contractor shall provide the Contracting Officer with <u>all</u> of the required insurance policy endorsements and evidence of insurance issued by insurance company or broker/agent, in advance of the performance of any Work and as soon as possible after renewal but no later than twenty (20) business days after said renewal, exhibiting coverage as required by the *Metropolitan Washington Airports Authority's* contract terms and conditions for the entire term of the Contract, including any renewal or extension terms, and until all Work has been completed to the satisfaction of the Airports Authority.

    1.    The Airports Authority has the right, but not the obligation, of prohibiting Contractor from performing Work under this Contract until such evidence of insurance has been provided to the Contracting Officer in complete compliance with the Contract terms and conditions.

    2.    The evidence of insurance shall be provided on the most current industry standard form by ACORD (Association for Cooperative Operations Research and Development) or other form acceptable to the Airports Authority.

        a.    For Liability Insurance, the ACORD 25 forms older than 2016/03 will not be accepted.

        b.    Other evidence of insurance forms which may be acceptable include, but are not limited to, certificate forms created by the insurance company, Memorandum of Insurance, Certificate of Commercial Liability Insurance by ISO (Insurance Services Office, Inc.), and Manuscript Certificate of Insurance for certain offshore policy placements. Forms of these types will be considered on a case-by-case basis.

    3.    The evidence of insurance shall include the Contract Number in the Certificate Holder section.

    4.    If the Contractor is an entity (e.g., corporation, limited liability company, etc.) or a partnership (e.g., general partnership, limited partnership, joint venture, etc.) then Contractor shall provide the evidence of insurance in the name of Contractor's entity or partnership as the primary insured.

    5.    If an Umbrella policy is used to meet the total insurance limits required by this Contract and covers more than General Liability and Automobile Liability, a statement must be provided on the evidence of insurance to indicate which policies are covered by the Umbrella policy.

    6.    If an Excess policy is used to meet the total insurance limits required by this Contract, a statement must be provided on the evidence of insurance to indicate which policy it follows.

    7.    The *Metropolitan Washington Airports Authority* must be specifically named as Certificate Holder on the evidence of insurance and the evidence of insurance and any other insurance-related notices shall be issued to:

**METROPOLITAN WASHINGTON AIRPORTS AUTHORITY**
**Airport Administration Department**
**ATTN: Solicitation Number 23-21311**
**PO BOX 17045**
**Washington DC  20041**

## 8   Occupational Safety and Health Standards

The Contractor shall apprise itself of and comply with all federal and state Occupational Safety and Health standards, including the General Duty Clause of the Occupational Safety and Health Act of 1970.

**9    Non-Disclosure and Confidentiality Agreement**

The Authority reserves the right to require that the Contractor sign a non-disclosure and confidentiality agreement in connection with the performance of this Contract.

**10    Prohibition on Posting of Plans and Specifications on Web Sites**

The posting of Metropolitan Washington Airports Authority (Authority) construction plans and specifications to individual web sites is prohibited, unless proper controls are instituted as identified below. Firms wishing to make these documents available to potential Subcontractors/suppliers may do so by providing hard copies, downloading onto CDs, or posting them onto web sites behind a secure firewall with a password for subcontractors' access. Regardless of the format used to make the documents available to potential subcontractors/suppliers, a record must be kept of who receives the documents. While the documents may not be classified per se, for security reasons, Authority construction project plans and specifications should always be considered sensitive and not made available to others without controls in place.

**11    Indemnification**

A.    To the fullest extent permitted by law, the Contractor shall hold harmless, defend and indemnify the Authority, the Authority's officers, directors, and employees, and the Authority's agents, contractors, subcontractors, and consultants, and agents and employees of any of them, from and against all claims, suits, damages, losses, expenses, and attorneys' fees, arising out of or resulting from performance of the Work, provided that such claim, suit, damage, loss or expense is attributable to bodily injury, sickness, disease or death, or to injury or damage to or destruction of tangible property (other than the Work itself) including loss of use resulting therefrom, except to the extent such injury, sickness, disease, death, damage or destruction is caused by the sole negligent act(s) or omission(s) or willful misconduct of the Authority.

B.    In claims against any person or entity indemnified under this provision by an employee of the Contractor, a subcontractor, an employee of a subcontractor, or an agent of the Contractor or a subcontractor, the indemnification obligation under this provision shall not be limited by a limitation on amount or type of damages, compensation or benefits payable by or for the Contractor or a subcontractor under workers' or workmen's compensation acts, disability benefit acts or other employee benefit acts.

**12    Contractor Personnel**

The Contracting Officer may, at any time under this Contract, require an investigation of Contractor personnel. When notified of such a requirement, the Contractor shall have completed on each employee who would have a requirement to visit and/or work at an Authority facility, such investigative forms as are furnished by the Contracting Officer.

**13    Key Personnel**

The Contractor is responsible for its employees. The Authority will not supervise the Contractor's employees, directly or indirectly. The Contractor shall not substitute any key personnel without the written consent of the Contracting Officer.

A.    <u>Superintendence by Contractor</u>

At all times during performance of this Contract , the Contractor shall directly superintend the Work or assign and have on the Work a competent superintendent who is satisfactory to the Contracting Officer and has authority to act for the Contractor.

B.   <u>Requirements for Registration of Designers</u>

The design of architectural, structural, mechanical, electrical, civil, or other engineering features of the Work shall be accomplished or reviewed and approved by architects or engineers registered to practice in the Commonwealth of Virginia. All Professional Corporations shall also be licensed in the Commonwealth of Virginia as required by the Board of Architects, Professional Engineers, Land Surveyors, Certified Interior Designers and Landscape Architects Board Regulations.

## 14    English Speaking Representative

At all times when Work is being performed on site, the Contractor shall have a representative present who has the capability of receiving instructions in the English language, speaking the English language, and explaining the Work to Contractor employees and Subcontractors performing the Work in a language in which they are capable of understanding.  The Contractor must demonstrate that the proposed representative has sufficient technical and lingual capabilities and shall immediately replace any individual not acceptable to the Authority.

## 15    Contracting Officer's Technical Representative (COTR)

The Contracting Officer may designate Authority personnel to act as his or her authorized representatives for one or more contract administration functions not involving a change in the scope, price, terms, or conditions of the Contract. Such designation will be set forth in writing by the Contracting Officer and will contain specific instructions as to the extent to which the representative may take action.

## 16    Telecommunications and Video Surveillance Services or Equipment

A.   In accordance with Federal Acquisition Regulation (FAR) 52.204-25, Prohibition on Contracting for Certain Telecommunications and Video Surveillance Services or Equipment, the Contractor is prohibited from providing covered telecommunications equipment or services as a substantial or essential component of any system, or as critical technology as part of any system, as such terms are defined in FAR 52.204-25, unless an exception as outlined in paragraph (B) applies or the covered telecommunication equipment or services are covered by a waiver described in FAR 4.2104.

B.   This provision does not prohibit the Contractor from providing:

1.   A service that connects to the facilities of a third-party, such as backhaul, roaming, or interconnection arrangements; or

2.   Telecommunications equipment that cannot route or redirect user traffic or permit visibility into any user data or packets that such equipment transmits or otherwise handles.

C.   In the event the Contractor identifies covered telecommunications equipment or services used as a substantial or essential component of any system, or as critical technology as part of any system, during Contract performance, or the Contractor is notified of such by a subcontractor at any tier or by any other source, the Contractor shall report the information in paragraph (D) of this clause to the Contracting Officer, unless procedures for reporting the information are established elsewhere in this Contract.

D.   The Contractor shall report the following information pursuant to paragraph (C) of this clause:

1.   Within one business day from the date of such identification or notification: the Contract number; the order number(s), if applicable; supplier name; supplier unique entity identifier (if known); supplier Commercial and Government Entity (CAGE) code (if known); brand; model number (original equipment manufacturer number, manufacturer part number, or wholesaler number); item description; and any readily available information about mitigation actions undertaken or recommended.

2.   Within 10 business days of submitting the information in paragraph (D)(1) of this clause: any further available information about mitigation actions undertaken or recommended. In addition, the Contractor shall describe the efforts it undertook to prevent use or submission of covered telecommunications equipment or services, and any additional efforts that will be incorporated to prevent future use or submission of covered telecommunications equipment or services.

E.   The Contractor shall insert the substance of this clause, including this paragraph (E), in all subcontracts and other contractual instruments, including subcontracts for the acquisition of commercial products or commercial services.

## 17    RESERVED

## 18    Performance Guarantee

A.   The successful Offeror shall deliver to the Airports Authority upon the execution of the Contract, each contract year, a Performance Guarantee in the amount equal to 100 percent (100%) of the Minimum Annual Guarantee.

B.   This Performance Guarantee is required in order to guarantee the full and faithful performance of the terms and conditions of the Contract by the Contractor and shall be subject to claim in full or part by the Airports Authority in the event of default by the Contractor or the Contractor's failure to fully perform the Contract.  The Contractor shall ensure that the Performance Guarantee is maintained at all times in the proper amount throughout the Contract Term.

C.   The Performance Guarantee, at the option of the Contractor, may be in the form of: 1) a certified check, cashier's check, or money order acceptable to the Airports Authority and made payable to the Airports Authority; or 2) a performance bond issued by an insurance company acceptable to the Airports Authority.

D.   If the Contractor fails to provide or maintain the Performance Guarantee in effect at any time during the period of the Contract, the Contractor shall be in default and the Contract may be terminated by the Airports Authority.

**SECTION VII: RESERVED**

## SECTION VIII: ATTACHMENTS

**01: Statement of Work**

**02: Phase I Technical Evaluation Criteria and Proposal Submission Requirements**

**03: Site Map Image**

**04: Washington Dulles International Airport Air Traffic Statistics**

**05: Standard Provisions for Concession Contracts (March 23, 2022)**

**Attachment 04**

**Washington Dulles International Airport Air Traffic Statistics**

**Please refer to the following URL: https://www.mwaa.com/dulles-air-traffic-statistics**

# EXHIBIT 3

| METROPOLITAN WASHINGTON AIRPORTS AUTHORITY | RFP-23-21311 |
|---|---|

## ATTACHMENT 01

## STATEMENT OF WORK
## FOR
## REMOTE VIP PASSENGER PROCESSING SERVICES
## AT
## WASHINGTON DULLES INTERNATIONAL AIRPORT

## SECTION I    INTRODUCTION

### 01    ABOUT THE AUTHORITY

The Metropolitan Washington Airports Authority ("Authority"), a public body corporate and politic created by interstate compact between the Commonwealth of Virginia and the District of Columbia, with the consent of the U.S. Congress, has been given the responsibility for the operation, maintenance, protection, promotion, and development of Ronald Reagan Washington National Airport and Washington Dulles International Airport (hereinafter referred to as "Dulles International" or "Airport").

### 02    BACKGROUND

The Authority continues to look for ways to distinguish itself by providing new and innovative services to its customers. Remote VIP Services provide an elevated travel experience by completely bypassing the need for a passenger to enter the terminal.

Departing passengers are transported airside directly to scheduled commercial aircraft from a private facility. All requirements for check-in, including Transportation Security Administration (TSA) screening, baggage check, and airline check-in, are handled within the facility.

Arriving passengers utilizing the Remote VIP Services are deplaned and transported to the facility in a private vehicle or luxury bus for small groups. International passengers using this service will have a facilitated customs experience.

### 03    LOCATION

The location of the Premises is:

45041 Compass Court, Dulles, VA 20166

The Authority will require the Contractor to construct a new facility that conforms to the requirements of its Design Manual, available at: https://www.mwaa.com/business/airports-authority-design-manual and Section 106 of the National Historic Preservation Act of 1966 ("NHPA"), which is administered by SHPO ("State Historic Preservation Office of Virginia)".  All utilities will be metered in accordance with the Design Manual. electric, water, sewer, and natural gas are all available at the Premises.

| METROPOLITAN WASHINGTON AIRPORTS AUTHORITY | RFP-23-21311 |
|---|---|

## SECTION II     GENERAL REQUIREMENTS

**01     REMOTE VIP SERVICES**

The Contractor must provide, at its sole cost, a range of services and amenities, all of which must comply with the American with Disabilities Act (ADA), and include, at a minimum:

A.     <u>**Client Services and Amenities**</u>

1.     Passenger and luggage check-in services through established agreements with airlines.
2.     A dedicated security screening checkpoint approved by the Department of Homeland Security.
3.     A facilitated customs experience for passengers arriving internationally.
4.     A sterile area that shall host TSA and U.S. Customs and Border Protection ("CBP") personnel.
5.     Amenities, such as food and bar service, private suites, restrooms, Wi-Fi, and secured parking.

B.     <u>**Airline Check-In Arrangements**</u>
The Contractor shall provide passenger and baggage check-in services. It is the Contractor's responsibility to coordinate with all applicable commercial airlines for the timely check-in of departing passengers, and the coordination of all passenger baggage, including securing and maintaining any additional agreements, permits, and coordination with commercial airlines.

C.     <u>**Transportation Logistics Within the Security Controlled Area(s)**</u>

1.     Facilities for, and in compliance with, all security measures as required by the TSA and the Authority.
2.     Facilities for and compliance with all measures required by CBP.
3.     Compliance with all Authority rules, regulations, and requirements; and logistics for operations entering and within the various security-controlled area(s), including but not limited to, access control measures and a secured travel route to/from the premises to the departing terminal gate(s).
4.     Departing passenger screening within the facility in accordance with TSA requirements and then taken under escort by a driver and security detail via a waiting automobile to the terminal gate of the commercial aircraft.
5.     Arriving passengers shall be met at the aircraft by a driver and the appropriate security, escorted to a waiting automobile, and driven to the Premises to clear CBP, if necessary, and to exit the Airport. Passengers shall be escorted at all times between the Premises and terminal gate of the commercial aircraft.  The automobiles used for transport of passengers and their carry-on luggage shall be luxury-class vehicles.  All vehicles used to transport passengers shall be no more than three years old from the current model year.
6.     Subject to concurrence from the specific air carrier on which the passengers are traveling, the Contractor may escort enplaning and deplaning customers via the service access in the passenger boarding bridge to the ground level ramp apron.  The Authority encourages the Contractor to use the interior building stairs for passenger enplaning and deplaning and not the passenger boarding bridge service stairs.  The Authority shall not be held responsible for any injuries or property damage that occurs by the Contractor escorting customers via the passenger boarding bridge service stairs.  It is important to note that the passenger boarding bridge service stairs are not designed for passenger use.
7.     The Contractor must ensure that all personnel and all persons accessing the security-controlled area(s) by way of the Premises on behalf of the Contractor, have appropriate Airport issued identification badges in accordance with all Federal and Authority security requirements.
8.     The Contractor shall be responsible for ensuring that all of the personnel assigned to operate a motor vehicle of any kind or type in or on the security-controlled area(s), are in compliance with the Authority training requirements, including but not limited to, completion of the Air Operations

**METROPOLITAN WASHINGTON AIRPORTS AUTHORITY**    **RFP-23-21311**

Area Driver Training Course. Additionally, the Contractor shall be responsible for ensuring that all vehicles and equipment assigned to operate in or on the security-controlled area(s) are in compliance with the Authority requirements, including but not limited to, issuance of an official motor vehicle identification permit.

Refer to the Authority's website for more information on applicable training, requirements, and fees: https://www.mwaa.com/business/dulles-pass-id-office

D.    **Passenger Processing and Checkpoint Screening Areas**
The Premises shall be used as a facility for the security screening and transfer of passengers and their baggage to and from commercial aircraft through a dedicated checkpoint within the facility and approved by the Department of Homeland Security (DHS). The Contractor shall obtain all necessary written approvals and/or agreements and provide acceptable arrangements with all applicable federal, state, and local entities for the screening of passengers and their baggage, such as TSA, CBP, DHS, the Authority, as well as, relevant airlines and airport tenants, if applicable.

1.    **Security requirements**: The Contractor shall be fully responsible for ensuring that all security measures, operations, and associated requirements for any personnel, customers, vehicles and other property which may require access to the security-controlled area(s) are in compliance with all Authority and federal rules and regulations throughout the term of the Contract.
2.    **TSA**: The Contractor shall design the Premises to include a sterile area that shall host TSA personnel and equipment on-site during all operating hours when security screening is required. It is the Contractor's responsibility to work with TSA and to ensure compliance with all federal rules and regulations.
3.    **CBP**: The Premises shall be designed to include a Federal Inspection Station that shall host CBP personnel, equipment, and officers, if required, on-site during all operating hours when security screening is required. It is the Contractor's responsibility to work with CBP and to ensure compliance with all federal rules and regulations.

E.    **Operation and Management**

1.    **Hours of Operation**: The Contractor must have the ability to operate the premises 24 hours per day, 7 days per week, and 365 days per year. Daily operational schedules must revolve around customers' arrival and departure times and services requested by customer.
2.    **Cleaning, and Garbage Removal**: The Contractor will be solely responsible for all utility charges, maintenance, interior and exterior repairs and janitorial services fees. The Premises must be kept in a clean, sanitized, business-like, and orderly condition at all times.
3.    **Security**: The Contractor shall be fully responsible for any security measures and associated costs deemed necessary on the Premises, throughout the term of the Contract.
4.    **Staffing**: The Contractor must provide appropriate staffing levels to provide the proposed Remote VIP Services. The Contractor shall have customer service policies that address the outward appearance of its personnel, such as proper cleanliness and grooming, and the proposed attire model to distinguish its personnel, such as through the use of uniforms or insignias.
5.    **Permits and Licenses**: The Contractor will be responsible for obtaining all permits and licenses required to operate at their own cost, including but not limited to including an Alcoholic Beverage Control license, if applicable.

**02    IMPROVEMENTS TO THE PREMISES**

The Authority will demolish the existing building, and the Contractor is responsible for constructing a state-of-the art facility at which it will provide the Remove VIP Services. The Authority is not responsible for any other Work to the Premises, and the Authority will not contribute any funds for such Work. The Premises are provided as-is with no warranties. The development of the Premises shall conform to the requirements of the Authority Design

| METROPOLITAN WASHINGTON AIRPORTS AUTHORITY | RFP-23-21311 |
|---|---|

Manual [https://www.mwaa.com/business/airports-authority-design-manual] and shall be subject to approval by the Authority prior to the commencement of construction.

A. **Environmental Considerations**

1. It is the Contractor's responsibility to prepare any environmental assessment, and/or studies, and to undertake any remediation of the Premises in order to complete the Contractor's proposed development and use of the Premises. The Contractor shall be solely and fully responsible for providing any and all information and paying the cost of any and all studies and analyses required for the completion of any such assessment and/or study.

2. The Contractor will be solely responsible for performing any environmental remediation of the Premises, if required. The Authority does not make or offer any representation or warranty whatsoever regarding the condition of the Premises.

B. **Historic Preservation Guidelines**

1. The offered Premises are located in a historic district.  The historic district requires any improvements, modifications, new construction, or demolitions to adhere to Section 106 of the NHPA, which is administered by SHPO.  Archaeological and historic architecture resources are identified that may be impacted by the project and an effects determination letter is typically drafted (based upon diligence prepared by the Contractor).  These materials are then reviewed by the Authority and submitted to SHPO for review and concurrence.  Once SHPO has approved the effects determination letter, it is submitted to the FAA as part of and a condition of the National Environmental Policy Act ("NEPA") approval process. The Authority will work with the Contractor throughout the NEPA and SHPO processes; however, the Contractor shall be responsible for all costs related to these processes.

2. Contractors are strongly encouraged to propose conceptual designs that conform to the historic guidelines as mandated by Historic Preservation ordinance.

3. A Certificate of Appropriateness (COA) application and review by the Historic Preservation Board may be required.

4. It is the Contractor's responsibility to fully understand the requirements as mandated by the Historic Preservation ordinance before submitting a proposal with design aspects that may require a COA.

5. It is the Contractor's responsibility to submit any COA application for review by the Office of Historic Preservation. Proposals that entail substantial alterations to the historic resource may require review by the Historic Preservation Board.

6. The Contractor shall bear all costs associated with submitting a COA application, inclusive of all costs subsequent to any decision by the Office of Historic Preservation or Historic Preservation Board, on the design, all costs for alterations to regulated areas and construction of the Premises, all costs of any design or construction needed to comply with any COA or Historic Preservation Board requirement.

7. All design plans must be approved by the Authority before any construction begins. The Authority does not guarantee design approval upon award of the contract.

C. **Fixed Improvements**

The Premises will be conveyed to the Contractor in "as is" condition.

1. **Initial improvements**: The Contractor shall make a minimum initial investment to build out the existing premises or develop new premises.

2. **Mid-Term Refurbishment**: The Contractor shall be required to undertake a mid-term refurbishment by no later than the conclusion of the tenth (10th) Contract Year. The Contractor shall submit a proposed reinvestment construction project plan for the mid-term refurbishment to the Authority for approval by no later than the end of the ninth (9th) Contract Year.

| METROPOLITAN WASHINGTON AIRPORTS AUTHORITY | RFP-23-21311 |
|---|---|

D. **Design and Development Guidelines**

    1.    The Authority strongly encourages cohesive and engaging designs. All aspects of design must conform to the Authority's Design Manual. All plans and specifications, materials and color selections are subject to review and approval by the Authority.

    2.    The Contractor will be required to design, construct, and install all rough and finishes, including lighting, power, plumbing, HVAC distribution from main air supply, life safety systems, interior finishes, all furnishings, fixtures, equipment, and signage.

E. **Construction Personnel**

    1.    The Contractor shall utilize certified and experienced architectural, engineering, and construction personnel, including a general contractor, project manager, and any other subcontractor for all construction Work.

    2.    All construction shall be in full compliance with all county, state, and federal permitting entities, laws, rules and regulations, and building codes.

    3.    The Contractor must design, construct and operate the Premises using sustainability principles applicable to air management, water management, power management, waste management, and other environmentally friendly practices consistent with Leadership in Environmental and Energy Design (LEED) principles or an equivalent.  The Premises shall be LEED Silver certifiable.

    4.    ADA Design Standards: The conceptual design and completed work shall incorporate required ADA design standards to ensure the Premises are ADA compliant.

    5.    Off-Site Public Improvements: All off-site public improvements and/or infrastructure required for improvements of the Premises, including but not limited to, streetlights, sidewalks, water/sewer infrastructure, landscaping will be the sole responsibility of the Contractor. Extension, relocation, upgrading or connection of new utilities, if necessary, will be the sole responsibility of the Contractor. All fees imposed by any regulatory jurisdiction will be the sole responsibility of the Contractor.

F. **Anticipated Timeline**
The proposed contract includes a design and construction period not to exceed 30 months and will have an operating term of 20 years from the date of beneficial occupancy.

**03    FINANCIAL COMPONENTS**

A. **Term**: The term of this contract shall be twenty (20) years from the date of beneficial occupancy.

B. **Rents**: Rents shall be in the form of the higher of a minimum annual guarantee ("MAG") amount or percentage rent for all sales in the operation of the Remote VIP Services.

C. **Utilities**: Payment of utilities will be the Contractor's responsibility. The Contractor shall cause utilities to be separately metered.

D. **Workers Wage Requirement**: The Contractor shall comply with the Airports Authority's Airport Workers Wage Program. Details of the program can be found at the Authority's website: https://www.mwaa.com/about/airport-workers-wage-program

E. **Project Financing**: The Contractor shall secure all necessary financing throughout the life of the Contract. No funding shall be provided by the Authority.

F. **Transition Expenses**: The Contractor shall bear all costs associated with transitional expenses including but not limited to,  background and drug checks; operating supplies; office supplies; entry keys or card;

**METROPOLITAN WASHINGTON AIRPORTS AUTHORITY**    **RFP-23-21311**

radios; flags; flashlights; cones; safe/vault; credit card machine; bank account set-up charges; signage; dry chemical fire extinguishers; computer/printer/application software; Flight Information Display ("FIDS") monitors; televisions; information technology setup; website design/implementation; furniture; office space for storage; and other transitional supplies.

G. **Reporting**: The Contractor shall provide certified statements and other deliverables, as required by the Contract.

# EXHIBIT 4

*Confidentiality: This email, like all PS communications, is privileged and confidential. If you are not the addressee or responsible for delivery of the message to the addressee, please notify us immediately, and then delete this email.*

**From:** Steven Gargaro <sgargaro@reserveps.com>
**Date:** Friday, February 7, 2025 at 1:36 PM
**To:** Amina Belouizdad Porter <amina@reserveps.com>, Jordi Mena <jmena@reserveps.com>
**Subject:** FW: RFP-23-21311 - Remote VIP Passenger Processing Service Concession, IAD

*STEVEN GARGARO*
*Vice President - Airport Development*
*213.784.6837*
*reservePS.com*



*Confidentiality: This email, like all PS communications, is privileged and confidential. If you are not the addressee or responsible for delivery of the message to the addressee, please notify us immediately, and then delete this email.*

**From:** noreply.mwaa@odysseyautomation.com <noreply.mwaa@odysseyautomation.com>
**Date:** Friday, February 7, 2025 at 1:19 PM
**To:** Steven Gargaro <sgargaro@reserveps.com>
**Subject:** RFP-23-21311 - Remote VIP Passenger Processing Service Concession, IAD



Solicitation Number: RFP-23-21311

Solicitation Title: Remote VIP Passenger Processing Service Concession, IAD

Mr. Gargaro:

The Metropolitan Washington Airports Authority (Airports Authority) has completed the evaluation of proposals for the Remote Very Important Person (VIP) Passenger Processing Services for Commercial Airline Flights at Washington Dulles International Airport – RFP 23-21311. The Airports Authority intends to award a contract to daa International in the amount of $104,716,074.17 for the total Ground Rent and Minimum Annual Guarantee.

We appreciate the time and effort you expended in responding to this solicitation and regret that we will be unable to work with you at this time. We encourage you to visit our website frequently for future contracting opportunities.

Donald Laffert
Procurement Director
703-417-8433



METROPOLITAN WASHINGTON AIRPORTS AUTHORITY © 2025

# EXHIBIT 5

**Aron C. Beezley**
abeezley@bradley.com
202.719.8254 direct



February 14, 2025

**VIA hand delivery to the Authority's Procurement & Contracts Department; certified mail, return receipt requested; and email.**

Julia Hodge
Vice President, Office of Supply Chain Management
Metropolitan Washington Airports Authority

> **RE:**    **Solicitation No. RFP-23-21311**
>
> **SUBJ:**   **Protest of The Private Suite IAD, LLC (dba PS)**

Dear Ms. Hodge:

The Private Suite IAD, LLC (dba PS) ("PS"), by and through the undersigned counsel, hereby respectfully files this timely Protest of the Metropolitan Washington Airports Authority's ("MWAA" or the "Authority") evaluation of proposals under Solicitation No. RFP-23-21311 (the "RFP") and intended award of the Contract thereunder to daa International ("DAAI"), an entity wholly owned by the Irish State. As discussed below, the Authority erred in evaluating both PS's and DAAI's proposals—by undervaluing PS's technically strong proposal and overvaluing DAAI's technically weaker proposal and its unrealistic revenue projections—and therefore conducting a flawed best-value procurement. Furthermore, the Authority does not have authority to grant awards on behalf of the TSA or other Federal Agencies. Each of these unreasonable and unlawful actions by the Authority caused substantial prejudice to PS—a highly qualified offeror who would have had more than a substantial chance of receiving the Contract award, but for the Authority's missteps. Accordingly, and as set forth in greater detail below, the Vice President, Office of Supply Chain Management, should sustain this Protest.

**I.    Contact Information for the Parties**

      **A.  Contact Information for the Protester.**

**CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE**

February 14, 2025
Page 2

Contact information for The Private Suite IAD, LLC (dba PS) is as follows:

> Steven Gargaro
> Vice President - Airport Development
> The Private Suite IAD, LLC (dba PS)
> 212 Eucalyptus Dr.
> Suite 200
> El Segundo, CA 90245
> Tel: (213) 784-6837
> Email: sgargaro@reserveps.com

All communications, however, should be directed to PS's counsel of record, the contact information for whom is as follows:

> Aron C. Beezley
> Bradley Arant Boult Cummings LLP
> 1615 L Street, NW, Suite 1350
> Washington, D.C. 20036
> Tel.: (202) 719-8254
> Fax: (202) 719-8354
> Email: abeezley@bradley.com

**B.  Contact Information for the Authority.**

The contact information for the Contracting Officer in this procurement is as follows:

> Kevin Green
> Tel.: (703) 417-8466

**II.    Threshold Matters**

**A.  This Protest is Timely Filed by an Actual Offeror.**

Pursuant to Section 21, page 19, of the RFP, Exhibit 1 and Chapter 9.2.2 of the MWAA's Contracting Manual, Revised Fifth Edition (5.2) ("Contracting Manual"), a protest ground based on the manner in which offers were evaluated or on which a contract was awarded is timely if the protest is submitted by an offeror within seven days after the offeror knew or should have known the basis of the protest.

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

February 14, 2025
Page 3

Here, PS timely submitted its Phase 1 proposal on or about September 15, 2023, Exhibit 2, and its Phase 2 Proposal on or about October 7, 2024. Exhibit 3. On February 7, 2025, PS received a notice from Mr. Laffert at the Authority advising PS that the "Authority intend[ed] to award a contract to daa International in the amount of $104,716,074.17 for the total Ground Rent and Minimum Annual Guarantee." Exhibit 4. Accordingly, it was on February 7, 2025 that PS first learned of the bases for its Protest. This Protest is being filed within seven days of that date and, therefore, is timely.

**B.  The Authority Must Not Award the Contract During the Pendency of this Protest.**

Pursuant to Section 21 of the RFP, "[i]f a Contract has not been awarded at the time a protest is timely filed, the Contract may not be awarded while the protest is pending, unless the President and CEO determines that award of the Contract, and, if applicable, issuance of a notice to proceed, is in the Authority's best interest." Exhibit 1 at 20.

As of the date of this Protest, no award has been made, according to the MWAA's New Contract Awards Webpage.[1] Further, Mr. Laffert's February 7, 2025 notice to PS stated that the "Authority **_intends_** to award a contract to daa International in the amount of $104,716,074.17 for the total Ground Rent and Minimum Annual Guarantee." Exhibit 4 (emphasis added). Therefore, while there apparently is an **_intention_** to award the Contract, no Contact award has actually been made, and thus the Authority may not award the Contract to DAAI while PS's Protest is pending unless the President and CEO determines that award is in the Authority's best interest. Based on the Authority's extensions to the original offer due date of September 15, 2023 in the RFP, Exhibit 1 at 15, to October 7, 2024 in RFP Amendment 3, Exhibit 5, and for the reasons explained below,

---

[1] Available at https://www.mwaa.com/business/new-contract-awards

**CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE**

February 14, 2025
Page 4

there is no plausible explanation that it would be in the Authority's best interest to award the

Contract to DAAI during the pendency of PS's Protest.[2]

III.    **Factual Background**

A.    **Relevant Terms of the RFP.**

On or about June 26, 2023, the Authority issued RFP-23-21311 entitled, "Remote VIP

Passenger Processing Service Concession, IAD."  Exhibit 1.  As stated in the RFP, the Purpose

and Scope was to solicit proposals from offerors to:

> develop, lease, and operate a Remote VIP Passenger Processing Service for
> Commercial Airline Flights at Washington Dulles International Airport (herein
> after referred to as "Remote VIP Services") to receive, screen, and transport
> passengers and their luggage to/from gated commercial aircraft, obtain and provide
> the necessary airport, airline, and federal approvals and contracts, such as those
> required by the FAA, Transportation Security Administration ("TSA"), and U.S.
> Customs and Border Protection ("CBP"), and to provide passenger lounge services
> and amenities.

*Id.* at 13.  The RFP further explained that the contractor will be required to:

- Construct a new, state-of-the-art Remote VIP Services facility at 45041
  Compass Court, Dulles, VA 20166.[3]  The offered site is located in a historic
  district and requires that any improvement, modification, or new
  construction adhere to Section 106 of the National Historic Preservation Act
  of 1966 ("NHPA").
- Receive, screen, and transport passengers and their luggage to/from gated
  commercial aircraft.
- Within the facility, provide:

  1.    Passenger and luggage check-in services through established
        agreements with airlines.
  2.    A dedicated security screening checkpoint approved by the
        Department of Homeland Security.
  3.    A facilitated customs experience for passengers arriving
        internationally.

---

[2] PS reserves the right to move for injunctive relief should a Contract be awarded during the pendency of this
Protest.

[3] RFP Amendment 2 deleted the reference to "45041 Compass Court, Dulles, VA 20166" and replaced it with "the
site North of Cargo 6 that is identified on Attachment 03."

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

February 14, 2025
Page 5

    4.    A sterile area that shall host TSA and CBP personnel.

    5.    Amenities such as food and bar service, private suites, restrooms, Wi-Fi and secured parking.

- Escort passengers on the airfield between the facility and the commercial aircraft via luxury vehicle.
- Obtain and maintain the necessary airport, airline, and federal approvals and contracts, such as those required by the FAA, TSA, and CBP to provide the Remote VIP services.

*Id.*

The RFP advised that the Authority contemplated "the award of a Contract with payment of a ground rent to begin at Contract execution, a Minimum Annual Guarantee ('MAG') and a percentage of rent to be remitted to the Airports Authority for all sales in the operation of the Remote VIP Services." *Id.* at 14. As for the Method of Procurement and Basis for Award, the RFP stated, in relevant part:

The Authority is utilizing a two-phase, competitively negotiated "Best Value" procurement method.[4]

Phase I requires submission of technical proposals based on the Statement of Work provided in Attachment 01. Technical proposals will be evaluated based on the Phase I Technical Evaluation Criteria provided in Attachment 02.

Upon completion of Phase I technical evaluation, the Authority will select and notify one or more qualified Offerors (competitive range) who it determines submitted the most highly-rated technical proposals to participate in Phase II of the procurement process.

---

[4] The MWAA Contracting Manual defines "Best Value" as:

competitive proposals procurement process in which the Airports Authority reserves the right to select the most advantageous Offer by evaluating and comparing factors in addition to cost or price (*e.g.*, qualifications of the Offeror and its proposed personnel, and technical designs and approaches), such that the Airports Authority may acquire technical superiority even if it must pay a premium price. … Best Value also means the expected outcome of an acquisition that, in the Airports Authority's estimation, provides the greatest overall benefit in response to its material requirements. To achieve best value in the context of acquisitions for public transportation purposes, the evaluation factors for a specific procurement are to reflect the subject matter and the elements that are most important to the Airports Authority. … Evaluation factors may include, but are not limited to, qualifications of the [o]fferor and its proposed personnel, technical design, technical approach, length of delivery schedules, past performance, and management plan. (citing FTA C 4220.1F, Ch. I, para. 5.b).

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

February 14, 2025
Page 6

> The Authority may hold discussions with those Offerors determined to be in the competitive range following Phase I. In Phase II, the Authority will issue the draft Contract, Phase II Technical Requirements, and Phase II Technical Evaluation Criteria and Proposal Submission Requirements to those Offerors determined to be in the competitive range.
> ***
>
> Offerors will submit a technical proposal for the proposed facility and a financial offer based on Phase II Technical Requirements.
>
> The Authority, at its sole discretion, may enter into negotiations with the Offeror it determines provided the best technical approach and financial offer, which may include a request for Best and Final Offers.
>
> Given the proposed 20-year operating term, the FAA will need to approve the final contract.

*Id*. at 14 -15.

Finally, the RFP incorporated five (5) attachments, including: 01 Statement of Work; 02 Phase I Technical Evaluation Criteria and Proposal Submission Requirements; 03 Site Map Image; 04 Washington Dulles International Airport Air Traffic Statistics; and 05 Standard Provisions for Concession Contracts (March 23, 2022). *Id*. at 31.

### B. Relevant Terms of the Statement of Work (Attachment 01).

Attachment 01 of the RFP, Statement of Work ("SOW"), Exhibit 6, included several pertinent requirements. The Background in Section I of the SOW explained:

> The Authority continues to look for ways to distinguish itself by providing new and innovative services to its customers. Remote VIP Services provide an elevated travel experience by completely bypassing the need for a passenger to enter the terminal.
>
> Departing passengers are transported airside directly to scheduled commercial aircraft from a private facility. All requirements for check-in, including Transportation Security Administration (TSA) screening, baggage check, and airline check-in, are handled within the facility.

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

February 14, 2025
Page 7

Arriving passengers utilizing the Remote VIP Services are deplaned and transported to the facility in a private vehicle or luxury bus for small groups. International passengers using this service will have a facilitated customs experience.

Exhibit 6 at 1.

Section II, General Requirements, detailed requirements of the Remote VIP Services, Improvements to the Premises, and Financial Components. As for the Remote VIP Services requirements, the SOW stated, in pertinent part:

The Contractor must provide, at its sole cost, a range of services and amenities, all of which must comply with the American with Disabilities Act (ADA), and include, at a minimum:

*A. Client Services and Amenities*

1. Passenger and luggage check-in services through established agreements with airlines.
2. A dedicated security screening checkpoint approved by the Department of Homeland Security.
3. A facilitated customs experience for passengers arriving internationally.
4. A sterile area that shall host TSA and U.S. Customs and Border Protection ("CBP") personnel.
5. Amenities, such as food and bar service, private suites, restrooms, Wi-Fi, and secured parking.

\*\*\*

*C. Transportation Logistics Within the Security Controlled Area(s)*

1. Facilities for, and in compliance with, all security measures as required by the TSA and the Authority.
2. Facilities for and compliance with all measures required by CBP.
3. Compliance with all Authority rules, regulations, and requirements; and logistics for operations entering and within the various security-controlled area(s), including but not limited to, access control measures and a secured travel route to/from the premises to the departing terminal gate(s).
4. Departing passenger screening within the facility in accordance with TSA requirements and then taken under escort by a driver and security detail via a waiting automobile to the terminal gate of the commercial aircraft.

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

5.      Arriving passengers shall be met at the aircraft by a driver and the appropriate security, escorted to a waiting automobile, and driven to the Premises to clear CBP, if necessary, and to exit the Airport. Passengers shall be escorted at all times between the Premises and terminal gate of the commercial aircraft. The automobiles used for transport of passengers and their carry-on luggage shall be luxury-class vehicles. All vehicles used to transport passengers shall be no more than three years old from the current model year.

*** 

### D. Passenger Processing and Checkpoint Screening Areas

The Premises shall be used as a facility for the security screening and transfer of passengers and their baggage to and from commercial aircraft through a dedicated checkpoint within the facility and approved by the Department of Homeland Security (DHS). The Contractor shall obtain all necessary written approvals and/or agreements and provide acceptable arrangements with all applicable federal, state, and local entities for the screening of passengers and their baggage, such as TSA, CBP, DHS, the Authority, as well as, relevant airlines and airport tenants, if applicable.

1.      **Security requiremen**ts: The Contractor shall be fully responsible for ensuring that all security measures, operations, and associated requirements for any personnel, customers, vehicles and other property which may require access to the security-controlled area(s) are in compliance with all Authority and federal rules and regulations throughout the term of the Contract.

2.      **TSA**: The Contractor shall design the Premises to include a sterile area that shall host TSA personnel and equipment on-site during all operating hours when security screening is required. It is the Contractor's responsibility to work with TSA and to ensure compliance with all federal rules and regulations.

3.      **CBP**: The Premises shall be designed to include a Federal Inspection Station that shall host CBP personnel, equipment, and officers, if required, on-site during all operating hours when security screening is required. It is the Contractor's responsibility to work with CBP and to ensure compliance with all federal rules and regulations.

*Id*. at 2-3. As for the Improvements to the Premises, the SOW provides in relevant part:

The Authority will demolish the existing building, and the Contractor is responsible for constructing a state-of-the art facility at which it will provide the Remove VIP Services. The Authority is not responsible for any other Work to the Premises, and

**CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE**

February 14, 2025
Page 9

the Authority will not contribute any funds for such Work.  The Premises are provided as-is with no warranties.  The development of the Premises shall conform to the requirements of the Authority Design Manual [https://www.mwaa.com/business/airports-authority-design-manual] and shall be subject to approval by the Authority prior to the commencement of construction.

***

*B. Historic Preservation Guidelines*

1.    The offered Premises are located in a historic district. The historic district requires any improvements, modifications, new construction, or demolitions to adhere to Section 106 of the NHPA, which is administered by SHPO.  Archaeological and historic architecture resources are identified that may be impacted by the project and an effects determination letter is typically drafted (based upon diligence prepared by the Contractor).  These materials are then reviewed by the Authority and submitted to SHPO for review and concurrence.  Once SHPO has approved the effects determination letter, it is submitted to the FAA as part of and a condition of the National Environmental Policy Act ("NEPA") approval process.  The Authority will work with the Contractor throughout the NEPA and SHPO processes; however, the Contractor shall be responsible for all costs related to these processes.

*Id*. at 3.

### C.   Relevant Terms of the Phase I Technical Evaluation Criteria and Offer Submission Requirements.

Attachment 02 of the RFP, Phase I Technical Evaluation Criteria and Offer Submission Requirements, Exhibit 7, explained how Phase I Proposals would be evaluated and how offers were to be submitted.  In the attachment, MWAA listed three Technical Evaluation Criteria, listed in descending order of importance, as follows:

**Criterion 1: Past Performance**
This criterion will be evaluated on the Offeror's:
a.    Experience operating Remote VIP Services comparable to the Authority's requirement based on the submitted representative contract(s).
b.    Past performance based on the Offeror's submitted professional references.

**Criterion 2: Financial Capacity**

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

February 14, 2025
Page 10

This criterion will be evaluated on the Offeror's financial position, including its ability to demonstrate:

a.    Positive cash flow from operations.

b.    An ability to undertake the anticipated obligations required to construct and operate the Remote VIP Services in accordance with Attachment 01, Statement of Work.

**Criterion 3: Proposed Offering & Marketing Approach**

This criterion will be evaluated on the Offeror's proposed approach to facilitate successful delivery of VIP Remote Services, including how the Offeror intends to:

a.    Deliver the services and amenities required in Attachment 01 – Statement of Work and those proposed by the Offeror.

b.    Manage the permitting, design, and construction process, including coordination with the Authority, and how the Offeror proposes to secure all approvals required in Attachment 01, Statement of Work, to deliver the new facility within 30 months of contract award.

c.    Market the proposed Remote VIP Services to the airlines and traveling public.

*Id*. at 3-4.

Technical Proposals "w[ould] be evaluated by their strengths, weaknesses and deficiencies against the evaluation factors," and would be assigned one of the following five Technical Proposal Evaluation Ratings, "depicting how well the Offeror's Technical Proposal meets or exceeds the stated evaluation criteria:"

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

February 14, 2025
Page 11

| Unacceptable | The proposal fails to meet the evaluation standard and the Deficiency is uncorrectable. The proposal would have to undergo a major revision to become Acceptable. The proposal has a demonstrated lack of understanding of the Authority's requirements or omissions of major areas. |
|---|---|
| Marginal | The proposal lacks essential information to support a rating of Unacceptable, Acceptable, Good or Excellent. Deficiencies found are not material and are curable with Clarification. The Clarification is not intended as a re-write of the proposal. Marginal is not intended as a final rating but used as a placeholder to obtain a Clarification from the Offeror. |
| Acceptable | The proposal meets the evaluation standard. Any Weaknesses the proposal has are correctable. The proposal has no Deficiencies. |
| Good | The proposal meets the evaluation standard and has some Strengths. The proposal has no Deficiencies. |
| Excellent | The proposal exceeds the evaluation standard by having all Strengths. The proposal has no Weaknesses and no Deficiencies. |

*Id.* at 1-2.

In addition to the Technical Evaluation Criteria, the attachment included Technical Proposal Requirements, which instructed offerors to submit certain information in support of each of Technical Evaluation Criterion. *Id.* at 3-4. For example, to satisfy the Technical Proposal Requirements, offerors needed to submit at least one *representative contract* demonstrating its provision of Remote VIP Services, "*including TSA screening services* and direct access to gated commercial aircraft, for a minimum of two consecutive years," which detailed, among other things, a "[d]escription of *the relationships between Offeror and TSA, CBP, and the airlines served*," and at least one *professional reference* for the following:

    i.      An airport client for whom relevant services are currently or were provided within the past ten (10) years and can serve as a source of information regarding the Offeror's past performance.

    ii.     TSA or CBP representative with whom the Offeror has/had a relationship to provide relevant services (currently or within the past ten (10) years) and can serve as a source of information regarding the Offeror's past performance.

    iii.    An airline representative with whom the Offeror has/had a relationship to provide relevant services (currently or within the past ten (10) years) and

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

February 14, 2025
Page 12

> can serve as a source of information regarding the Offeror's past
> performance.

*Id*. at 3 (emphasis added).

Another Technical Proposal Requirement was the Proposed Offering and Marketing Approach, which required proposals to address how the Offeror will:

> i.  Develop and execute agreements with the airlines operating at Washington Dulles International Airport, TSA, CBP, and other entities to deliver the Remote VIP Services, including all services and amenities required in Attachment 01, Statement of Work and any additional amenities or services proposed by Offeror.
> ii. Manage the permitting, design, and construction process, to include coordinating with the Authority and securing all approvals required in Attachment 01, Statement of Work, to deliver the new facility within 30 months of contract award.

*Id*. at 4.

MWAA reserved the right to establish a competitive range of offerors, conduct oral interviews with those offerors, and to request best and final offers. *Id*. at 1. The Attachment also stated:

> Contract award will be made to the Offeror whose Offer is judged by an integrated assessment of the Technical Proposal (based on the technical evaluation criteria) and Price Proposal to be most advantageous to the Airports Authority based on technical merit and price (best value) and that the Airports Authority deems responsible in accordance with the Airports Authority Contracting Manual.

*Id*.; *see also* Contracting Manual, Section 3.5.9.2 ("Award of a Contract shall be made to the responsible [o]fferor (See Section 4.5) whose proposal is determined to be the most advantageous for and in the best interests of the Airports Authority."). Finally, the Attachment included detailed submittal instructions. *Id*. at 4.

## D. **Relevant Terms of the Standard Provisions for Concession Contracts (March 23, 2022) (Attachment 05).**

Attachment 05 of the RFP, Standard Provisions for Concession Contracts (March 23, 2022), Exhibit 8, under Article 9, Laws, Regulations and Compliance, contains several pertinent provisions relating to federal laws and regulations, including:

**CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE**

February 14, 2025
Page 13

9.01 Laws and Regulations.  The Contractor and the Authority shall each comply with all applicable Federal, state and local laws, codes, regulations, including regulations of the Authority, ordinances, rules and orders now or hereafter enacted.

\*\*\*

9.03 Airport Security.  The Contractor shall be familiar with and conduct its operations in accordance with all regulations and directives of the Authority and the Transportation Security Administration, and any other federal, state or local government having jurisdiction over the airport, with respect to the maintenance of airport security.

Exhibit 8 at 10.

**E.  Relevant Terms of the Evaluation Criteria and Technical Proposal Requirements for Phase 2 (Attachment 02).**

Following an offeror's successful Phase I evaluation, offerors received Attachment 02: Evaluation Criteria and Technical Proposal Requirements for Phase 2.  Exhibit 9.  The analysis by which the Authority would measure the evaluation criteria for Phase 2 mirrored the analysis used to evaluate the Phase 1 evaluation criteria, including the same reservation of rights by the Authority to establish a competitive range, conduct discussions, and request best and final offers, *id*. at 1, and the use of the same five Technical Proposal Evaluation Ratings.  *Id*. at 2-3.  Phase 2 Technical Proposals were to be evaluated on the following four criteria: 1. Revenue Projections; 2. Initial Capital Investment and Mid-Term Refurbishment; 3. Sustainability Plan; and 4. Plan to Meet Small Local Business Enterprise (SLBE) and Airport Concession Disadvantaged Business Enterprise (ACDBE) Participation Requirements/Goals Plan.  *Id*. at 3.  Like the Phase 1 Attachment, each criterion included details regarding the evaluation, *id*. at 3-5, as well as Technical Proposal Requirements for each of the four Technical Evaluation Criteria.  *Id*. at 5-6.  Most relevant to the analysis below, Criterion 1: Revenue Projections required the following:

This criterion will be evaluated on the Offeror's financial ability to perform the Lease based on its submitted five-year financial pro forma, including the following:

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

February 14, 2025
Page 14

a.   Anticipated itemized revenues and any other Gross Receipts from the operation of the concession;

b.   Anticipated itemized expenses, including, but not limited to, salaries and benefits, marketing, maintenance, insurance, technology and connectivity costs, administrative, and other operating expenses;

c.   Anticipated debt service and other financing costs, including the amortization of any cash capital contributions used to fund capital expenditures;

d.   Anticipated payment to the Airports Authority of the Ground Rent and Percentage Rent; and

e.   Offeror's annual profit.

*Id.* at 3; *see also id.* at 5 (directing offerors to include the financial pro forma containing the elements above). Finally, the document provided detailed offer submission instructions. *Id.* at 8.

### F. Proposal Submission, Evaluation, and Contract Award.

 MWAA initially issued the RFP on June 26, 2023. *See* Exhibit 1.  On July 13, 2023, MWAA conducted a Pre-Proposal/Pre-Bid Conference, which was attended by PS. *Id.* at 16.  The RFP provided for the submission of questions by offerors, which were due on July 28, 2023.  *Id.* Phase 1 proposal submittals were due September 15, 2023, *id.*, and PS timely submitted its Phase 1 proposal.  Exhibit 2.

On March 22, 2024, MWAA issued the first Solicitation Amendment, which provided the Phase 2 requirements and set deadlines for questions regarding those requirements, originally April 22, 2024, and for Phase 2 proposal submission, originally June 21, 2024.  Exhibit 10.  On April 19, 2024, MWAA issued a second Solicitation Amendment which extended the time to submit questions regarding Phase 2 to June 7, 2024, the time to submit Phase 2 offers to September 20, 2024, and provided for a site visit on May 8, 2024.  Exhibit 11.  Representatives from PS and

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

February 14, 2025
Page 15

DAAI attended that site visit.  A third and final Solicitation Amendment extended the due date for

Phase 2 offers to October 7, 2024.  Exhibit 5.  PS timely submitted its proposal.  *See* Exhibit 3.

Following proposal submission, MWAA communicated with PS regarding clarifications

of PS's price calculations.  On February 7, 2025, Donald Laffert, MWAA Procurement Director,

informed PS that MWAA intended to award the Contract to DAAI for $104,716,074.17 in total

Ground Rent and Minimum Annual Guarantee.  Exhibit 4.  On February 11, 2025, PS requested

feedback from MWAA as to why its proposal was not selected, and PS followed up the following

day clarifying that its request constituted a formal request for debriefing pursuant to Section 4.7

of the MWAA's Contracting Manual, Revised Fifth Edition (5.2).  On February 13, 2025, MWAA

acknowledged that request and offered to provide a debriefing on February 18, 2025.

This timely Protest follows.

**IV.    Grounds for Protest**

**A.  DAAI Cannot Meet the Solicitation Requirements.**

**i.  DAAI falls short of the Phase 1 Technical Requirements and Relevant Experience.**

MWAA inappropriately issued an award under the Solicitation because the apparent

awardee, DAAI, cannot fulfil the Solicitation requirements, under either the Phase 1 Technical

Proposal Evaluation or the Phase 2 Price Proposal Evaluation.  DAAI cannot fulfil the Solicitation

requirements under the Phase 1 Technical Evaluation Criteria because, among other things, it lacks

the requisite Past Performance experience.  As part of the Technical Evaluation Criteria, the

Solicitation included as evaluation criteria "[e]xperience operating Remote VIP Services

comparable to the Authority's requirement…."  Exhibit 7 at 2.  But DAAI's experience with

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

February 14, 2025
Page 16

Remote VIP services is not comparable to the Authority's requirements. Accordingly, and as discussed more fully below, DAAI is unable to meet the Solicitation requirements.

The SOW makes clear that the Authority sought proposals for "***Remote*** VIP Services [to] provide an elevated travel experience by completely ***bypassing the need for a passenger to enter the terminal***." Exhibit 6 at 1 (emphasis added). Prospective offerors needed to demonstrate their ability to provide such services by demonstrating their past performance (Criterion 1 of the Phase 1 Technical Evaluation Criteria), specifically by describing their "[e]xperience operating Remote VIP Services comparable to the Authority's requirement based on … submitted representative contract(s) … [and] based on the Offeror's submitted professional references. Exhibit 7 at 4. DAAI cannot provide those examples because it lacks the requisite past experience comparable to the Authority's requirements. First, DAAI's current offerings consist of a VIP terminal at Dublin Airport, operated as Dublin Airport's "Platinum Services." However, this service is operated by Dublin Airport, ***not*** DAAI.[5] While these entities may be related in a hyper technical corporate sense as members of the same ownership group, DAAI is not the entity that provides Dublin Airport's Platinum Services. *See* Exhibit 12 (describing Dublin Airport's Platinum Services offerings without reference to DAAI). Rather, DAAI styles itself as "the airport and concession investment vehicle for the daa Group."[6] On its own website, DAAI describes its role as "seek[ing] out and participat[ing] in suitable airport and concession investment opportunities for funds, financial institutions and fellow state owned entities" and "advising and supporting the bidding parties in delivering successful proposals." *Id*. That is to say, based on its own representations,

---

[5] *See* dublinairport.com/platinumservices.

[6] *See* https://www.daa-international.com/services/investment/identifying-and-investing-in-profitable-airport-concessions/.

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

February 14, 2025
Page 17

DAAI merely consults and advises other entities on concession investment opportunities instead of actually managing those operations, as required by the Solicitation.[7]

In that regard, DAAI represents its relationship with the actual airport inconsistently, selectively, and misleadingly.  DAAI cannot meet the Technical Proposal Requirements for offerors to include a reference from an "airport client for whom relevant services are currently or were provided within the past ten (10) years and can serve as a source of information regarding the Offeror's past performance."  Exhibit 7 at 3.  To satisfy this requirement,  DAAI improperly and inaccurately relies on the capabilities and experience of operations that are not its own, but those owned, operated, and managed by the Dublin Airport Platinum Service.  At the same time, DAAI holds out the Dublin Airport as its "airport client" reference for the VIP services.  Crucially, the Technical Proposal Requirements required offerors to include (i) *a reference from an "airport client* for whom [(ii)] relevant *services are currently or were provided* within the past ten (10) years and can serve as a source of information regarding the Offeror's past performance."  Exhibit 7 at 3 (emphasis added).  But Dublin Airport cannot be both an example of DAAI's own past performance ***and*** simultaneously be its own professional reference from an airport client.  Such an arrangement would be blatantly contradictory and self-serving.

as noted above, the entity DAAI is, at best, both the vendor and the customer for which it allegedly provides its services, and, at worst, substituting Dublin Airport's experience as its own while also impermissibly relying on the Airport as a reference.

---

[7] Faced with an analogous corporate relationship, PS avoided referring to its parent company, Groupe ADP, which directly operates a VIP Terminal in CDG that is comparable to the service requested by MWAA, and it did so precisely because MWAA sought a contract for Remote VIP services at IAD with the entity performing the work, not its parent or affiliate.  *See generally*, Exhibit 1.

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

February 14, 2025
Page 18

While the Contract Manual indicates that it, and not federal procurement law, governs this MWAA bid protest, analogous federal law, including bid protest decisions issued by the U.S. Government Accountability Office ('GAO') and the U.S. Court of Federal Claims ('COFC'), inform an analysis of the principles of fair competition in similar situations. *See also generally*, 41 U.S.C.A. § 3301, *et seq*. (requiring "full and open competition through the use of competitive procedures" in most federal procurements). Indeed, when utilizing an affiliate or subsidiary as part of a proposal, if an offeror represented that affiliate or subsidiary would "have meaningful involvement in contract performance" but cannot be provided or relied upon in the actual performance of the work, then the affiliate cannot be counted toward the experience or past performance claimed by the offeror. *See, e.g.*, *Hot Shot Express, Inc.*, B-290482, Aug. 2, 2002, 2002 CPD ¶ 139, 2002 WL 1831022 ("[T]he relevant consideration is whether the resources of the parent or affiliated company—its workforce, management, facilities or other resources—will be provided or relied upon, such that the parent or affiliate will have meaningful involvement in contract performance."); *see also Femme Comp Inc. v. United States*, 83 Fed. Cl. 704, 746 (2008).

In addition to DAAI's relationship with Dublin Airport, DAAI improperly utilized a teaming agreement with Pangiam. While the Solicitation does not explicitly prohibit joint ventures or partnerships, *see generally* Exhibit 1, the Solicitation did require offerors to provide specific and detailed information about their type of business organization, parent company and identifying data, firm identification, and additional information regarding, *inter alia*, certifications, conflicts of interest, and insurance. *See* Exhibit 1 at 6-12.

DAAI originally registered for the RFP in partnership with Pangiam. However, that partnership appears to have dissolved, with DAAI bidding on its own for the final proposal. First, the Authority unequally evaluated DAAI's and PS's proposals by extending the deadline for

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

February 14, 2025
Page 19

offerors to submit their Phase 2 proposals from a previous date of September 20, 2024 following

Amendment 2, Exhibit 11, to October 7, 2024 following Amendment 3. Exhibit 5. This extra time

served no purpose other than to allow DAAI additional time to prepare its financial submission,

undoubtedly impacted by the departure of their teaming partner. Meanwhile, PS was prepared to

submit its Phase 2 proposal on the original, September 20 date. The extension of time therefore

unfairly benefited DAAI at PS's expense.

More worrying is the likelihood that DAAI's Phase 1 technical proposal leveraged its

relationship with Pangiam, and then omitted their role from its Phase 2 submission. This

relationship during the bidding process is improper and constituted a failure of the Authority to

adequately review DAAI's technical abilities and responsibility. A combined Pangea-DAAI

technical proposal represents a materially different proposal than a DAAI-only submission. Such

divergent proposals would necessarily impact DAAI's technical abilities and its financial

capabilities, and an evaluation of such a split proposal is patently unreasonable.

Moreover, and notwithstanding the identity of the true operating entity or the actual role of

DAAI, the services offered by Dublin Airport's Platinum Services fail to be "comparable to the

Authority's requirement" because they fall short of key requirements of the RFP. Exhibit 7 at 2.

The SOW requires the Contractor to "obtain all necessary written approvals and/or agreements

and provide acceptable arrangements with all applicable federal, state, and local entities for the

screening of passengers and their baggage, such as TSA, CBP, DHS, the Authority, as well as,

relevant airlines and airport tenants, if applicable." Exhibit 6 at 2.[8] The Technical Proposal

---

[8] At its core, this requirement is an attempt by the Authority to contract on behalf of the TSA, which is impermissible under federal law. The MWAA is an independent public body corporate and politic with the primary purpose of operating and improving the Metropolitan Washington Airports. 49 U.S.C.A. § 49106. The MWAA's authority includes actions benefiting the Metropolitan Washington Airports for public purposes, but it does not

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

February 14, 2025
Page 20

Requirements required offerors to include "a minimum of one (1) representative contract within the last ten years whereby the Offeror provided Remote VIP Services, ***including TSA screening services*** and direct access to gated commercial aircraft, for a minimum of two consecutive years…." Exhibit 7 at 3 (emphasis added). The Technical Proposal Requirements also required offerors to provide a reference from a "TSA or CBP representative with whom the Offeror has/had a relationship to provide relevant services (currently or within the past ten (10) years) and can serve as a source of information regarding the Offeror's past performance." Exhibit 7 at 3. Similarly, the SOW explained:

> The Authority continues to look for ways to distinguish itself by providing new and innovative services to its customers. Remote VIP Services provide an elevated travel experience by ***completely bypassing the need for a passenger to enter the terminal***.

> Departing passengers are transported airside directly to scheduled commercial aircraft from a private facility. ***All requirements for check-in, including Transportation Security Administration (TSA) screening***, baggage check, and airline check-in, are handled ***within the facility***.

Exhibit 6 at 1 (emphasis added); *see also* Exhibit 6 at 2 (requiring "[d]eparting passenger screening ***within the facility*** in accordance with TSA requirements" and that "[a]rriving passengers shall be … driven ***to the Premises*** to clear CBP, if necessary") (emphasis added).

But elements of DAAI's claimed experience—namely, Dublin Airport's Preclearance Facility for certain flights to the United States—does not illustrate relevant remote TSA or CBP service. Rather, that service provides a secondary TSA check in the Dublin main terminal, prior to CBP clearance, for ***all*** passengers traveling to the USA. It is not an arrival clearance or departure

---

extend to contracting on behalf of federal agencies such as the TSA. *See id.* Conversely, the TSA is responsible for civil aviation security functions and directly manages and oversees these security functions and contracts. In other words, the MWAA does not have the authority to contract on behalf of the TSA. By seemingly requiring the TSA to work with and provide DAAI the necessary approvals and agreements, the Authority appears to be contracting on behalf of the TSA. The TSA is unlikely to approve such an arrangement with a foreign-state owned entity.

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

February 14, 2025
Page 21

screening for VIPs, and thus it does not comply with the RFP and SOW requirements described above.[9]

More concretely, the Preclearance facility at Dublin Airport is not located in a remote VIP terminal—it is located in Terminal 2 of the main airport facility.  *See id*.  And Dublin Airport's Platinum Services does not offer that service in its own facility, but rather offers to "chauffeur [clients] directly to US Pre-Clearance."  Exhibit 12 at 11.  Similarly, Dublin Airport's Platinum Services cannot offer remote VIP customs services, as its brochure indicates only that guests are to "be guided through our priority Immigration channel and onto [their suite.]"  *Id*. at 9.  But the RFP does not call for chaperoning a guest through a priority Immigration or TSA line.  Rather, it explicitly calls for "[a]ll requirements for check-in, including Transportation Security Administration (TSA) screening, … [to be] handled within the facility," "completely bypassing the need for a passenger to enter the terminal."  Exhibit 6 at 1.  Additionally, the SOW calls for secure parking, and Dublin Airport's Platinum Service does not have a secure car park.  *See* Exhibit 12 at 11, 22 (describing Platinum Services' car park as exclusive on-site, but not secure).  Simply put, the Phase 1 Technical Evaluation Criteria require concrete experience in providing fully remote, secure VIP services, and DAAI cannot provide that relevant experience, because it does not have it.  *See generally*, Exhibit 7.

Lastly, as an international entity with no experience working with airports located in the United States, DAAI has no demonstrated experience complying with the numerous and byzantine technical and licensing requirements, crossing Federal, State, and local governments and agencies. *See* Exhibit 6 (requiring compliance with, *inter alia*, the MWAA Design Manual and Section 106

---

[9] *See* https://www.dublinairport.com/flight-information/travelling-to-usa/usa-preclearance/us-customs-and-border-protection-video.

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

February 14, 2025
Page 22

of the National Historic Preservation Act of 1966, permits required to work with commercial airlines, motor vehicle identification permits, any permits and licenses required to operate the premises (including an Alcoholic Beverage Control license), and requiring "full compliance with all county, state, and federal permitting entities, laws, rules and regulations, and building codes"). Conversely, PS's extensive and demonstrated experience with U.S.-based airports demonstrates its familiarity and experience with U.S.-based permitting. *See* Exhibit 2 at 3 (including a highlight of PS's current endeavors in Miami, where it is in the process of renovating the historic Pan-American Regional Headquarters into a Remove VIP Terminal).

### ii. DAAI's Phase 2 Submittals Regarding Financial Projections are Unrealistic.

MWAA indicated that it intends to issue an award to DAAI for $104,716,074.17 in total Ground Rent and Minimum Annual Guarantee. Exhibit 4. This price, roughly five times what PS bid, represents an extravagantly overstated and unrealistic sum. Whereas PS's proposal is based on its own extensive experience with this ***exact*** type of service in the United States, *see* Section A, *supra*, DAAI's projections cannot hold up to even a cursory evaluation. The Solicitation makes clear that price was to be evaluated according to the Evaluation Criteria and Technical Proposal Requirements for Phase 2 (Attachment 02), which, in turn, consisted of four Technical Evaluation Criteria: 1. Revenue Projections; 2. Initial Capital Investment and Mid-Term Refurbishment; 3. Sustainability Plan; and 4. Plan to Meet Small Local Business Enterprise (SLBE) and Airport Concession Disadvantaged Business Enterprise (ACDBE) Participation Requirements/Goals Plan. Exhibit 9 at 1-2. Rents, as evaluated therein, consisted of "the higher of a minimum annual guarantee ('MAG') amount or percentage rent for all sales in the operation of the Remote VIP Services." Exhibit 6 at 5. The Authority planned to award based on, inter alia, a "Price Proposal to be most advantageous to the Airports Authority based on technical merit and price (best value)

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

February 14, 2025
Page 23

and that the Airports Authority deems responsible in accordance with the Airports Authority Contracting Manual." Exhibit 9 at 1; *see also* Contracting Manual at 10.1.3.

DAAI's revenue projections are patently unrealistic given the services provided by DAAI, the requirements of the RFP, and American market dynamics. According to MWAA, DAAI anticipates providing $104,716,074.17 in rent to MWAA over 20 years, for an average of $5,235,803.71 per year. *See* Exhibit 4. DAAI bid a highly unrealistic amount, considering the prices it charges at the Dublin Airport for roughly comparable services. There, Dublin Airport Platinum Services charges a flat fee of €395 for each person, with discounted rates for additional persons and children. Exhibit 12 at 25. DAAI's sole existing client network—its customer base that it will presumably leverage to cross-sell its services at IAD—is the Dublin Airport Platinum Services network. Not only does this network fail to provide comparable experience, as required by the SOW, but it also does not support the financial modeling that would support over $100M in rents. In short, this extremely limited Irish-centric customer base cannot support the American and International market bases required to sustain DAAI's astronomical revenue projections.

By contrast, PS proposed a highly researched and reasonable gross revenue projection of $52 million over the full term of the lease based on its extensive experience providing the exact type of services identified in the RFP. *See* Exhibit 3 at 5. PS has decades of actual market data and market experience, which it drew upon in building its price models. In addition to experience, PS's rates are substantially higher than those that Dublin Airport Premium Services charges, and include an annual fee of up to $4,850, an individual rate of at least $750 per person, and additional rates for private suite access of up to $4,850 per 4 travelers.[10] In other words, DAAI's existing customer base would have to pay 10x the price they are accustomed to just to meet PS's existing

---

[10] *See* https://reserveps.com/pricing.

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

February 14, 2025
Page 24

pricing model, and that is before DAAI has to make up $104M in rents.  DAAI's limited existing customer base cannot support DAAI's projections, and even if DAAI somehow captured all of PS's existing customer-base—which it cannot—it *still* would fall well short of DAAI's price projections.  PS's prices not only reflect more realistic market rates for this type of service, but also allow PS to deliver a truly premium experience that separates its offerings from run-of-the-mill "premium" airport lounges and concierge services that already exist at IAD.  *See e.g.*, Marhaba Services[11] (charging $436.88 for departure or arrival, plus additional costs for luggage assistance); US VIP Services[12] (charging $425 plus $104 additional for luggage assistance); Royal Airport Concierge[13] (charging $450).  In sum, DAAI has neither the market knowledge nor proven ability to generate sufficient revenue to support its proposed price.  The price proposal alone is evidence of this, but a cursory review of the applicable market dynamics, and comparable competitor dynamics illustrate this glaring discrepancy.

Furthermore, and as mentioned above, DAAI's single experiential point of reference for Remote VIP services—Platinum Services at Dublin Airport—does not have the customer base that PS does.  PS already operates two Remote VIP terminals in the United States, with two more terminals in the planning and/or construction process.  Exhibit 2 at 3.  PS has served over 250,000 passengers, including over 45,000 unique customers through its LAX VIP Terminal alone.  Exhibit 2 at 3.  On top of that, PS's network extends its customer base in a way that Dublin's cannot, by connecting its existing and future operations at LAX, ATL, MIA, DFW and CDG[14] to IAD.  *See*

---

[11] *See* https://www.marhabaservices.com/ae/english/airport-meet-and-greet/washington-airport.html.
[12] https://usvipservices.com/booking?receptionType=DEPARTURE&serviceType=MEET_AND_GREET&serviceDate=2025-02-28&airportSlug=washington-dulles-iad-kiad-us&adults=1&children=0&lead=6ad33798-03a8-4db3-8eec-623c37ac82f2
[13] https://royalairportconcierge.com/Airport/iad/
[14] CDG via its parent company, Groupe ADP.

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

February 14, 2025
Page 25

Exhibit 3 at 5.  A single connection to Dublin cannot replicate that connectivity, which would drive traffic, prestige, and revenues to PS IAD.  Thus, based on the discrepancy in passenger count, locations, and offerings as compared to PS, plus the lower amount charged by DAAI, it is unreasonable to conclude that DAAI could provide *five times* the amount in ground rent + MAG as PS.  This unrealistic and implausible price discrepancy should have disqualified DAAI during MWAA's Phase 2 analysis.

Not only did DAAI submit an unrealistic price, but MWAA utterly failed to properly evaluate that overinflated and unattainable price.  Section 10.5.1.2 of the Contracting Manual requires that the Authority "only award Contracts to responsible Contractors… [*i.e.*,] those capable of successfully performing under the terms and conditions of the proposed Contract."  *See also* Contracting Manual, Section 4.5.1 (2) ("To be found responsible, an [o]fferor must… [h]ave the ability to comply with the required delivery or performance schedule, taking into consideration other business commitments.").  Furthermore, the Contracting Manual makes clear that, when determining a best value procurement, the decision maker evaluates whether "a given price differential outweighs the difference in technical merit."  Contracting Manual, Section 3.5.9.1. And the Evaluation Criteria and Technical Proposal Requirements for Phase 2 require the Authority to evaluate offerors' revenue projections, including an evaluation of "[a]nticipated itemized revenues and any other Gross Receipts from the operation of the concession," "[a]nticipated itemized expenses," and "[a]nticipated payment to the Airports Authority of the Ground Rent and Percentage Rent."  Exhibit 9 at 3.  Here, it is clear that the Authority failed to conduct any reasonable analysis into the DAAI's proposed anticipated revenues or presented projections.  Had the Authority conducted a meaningful review or analysis of DAAI's proposed anticipated revenue models, they would have shown DAAI had no viable path to $104M in rents.

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

February 14, 2025
Page 26

In accepting DAAI's unrealistic price, the Authority failed to reasonably evaluate DAAI's proposal and its proposed ability to perform under the terms and conditions of the Contract. DAAI's offer proposed rent at five times the established market leader in the United States, Exhibit 4, with a markedly more limited corporate experience, Exhibit 12, a smaller network, *see id.*, and a history of charging significantly lower prices. *Id*. at 25. Such a proposal cannot withstand the reasonable scrutiny that comes with a best value evaluation. Nor does it meet the requirements of MWAA's Contracting Manual that offerors be found responsible—*i.e.*, "[able] to comply with the required delivery or performance schedule." Contracting Manual, Section 3.5.9.1. DAAI cannot possibly provide MWAA with five times the rent using lower prices and a smaller customer base while still maintaining the Remote VIP service called for by the procurement. To evaluate DAAI's proposal otherwise evidences an unreasonable analysis by the Authority and does not conform to the requirements of the Solicitation or the MWAA Contracting Manual. The Authority's evaluation of DAAI's price proposal, and its evaluation of DAAI's technical proposal *vis a vis* its proposed price, demonstrates that the Authority was so blinded by DAAI's promise of $104M in rents, that it failed to meaningfully and critically analyze DAAI's proposed pricing strategy, as required by the Solicitation.

## B.  PS's Proposal Exceeded the Solicitation's Technical Requirements.

PS submitted a proposal that not only met MWAA's requirements, but it also exceeded them, and in doing so demonstrated its unique and unmatched value proposition.

One of the stronger elements of PS's proposal, and a key source of distinction compared to DAAI's proposal, pertained to the RFP requirement that offerors demonstrate their ability to "obtain and provide the necessary airport, airline, and federal approvals and contracts, such as those required by the FAA, Transportation Security Administration ('TSA'), and U.S. Customs

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

February 14, 2025
Page 27

and Border Protection ('CBP')."  Exhibit 1 at 13.  Relatedly, the SOW required that offerors "obtain all necessary written approvals and/or agreements and provide acceptable arrangements with all applicable federal, state, and local entities for the screening of passengers and their baggage, such as TSA, CBP, DHS," and required offerors to specifically design the Remote VIP premises to provide for on-site TSA security screening and CBP customs and immigration facilities.  Exhibit 6 at 3.  PS not only met those requirements, *see* Exhibit 2 at 3 (highlighting PS's "unique experience in developing and operating remote VIP services" in the US as the "only operator for commercial flights in the United States"), but exceeded them through its unique relationships with both agencies and one of only two participants in the TSA reimbursable Screening Service program (the other being Delta Airlines). [15]  *See id*.  In this regard, PS offers relationships with those security agencies that are literally unparalleled.

Additionally, the SOW sought, inter alia, the following regarding Client Services and Amenities

1.  Passenger and luggage check-in services through established agreements with airlines.
2.  A dedicated security screening checkpoint approved by the Department of Homeland Security.
3.  A facilitated customs experience for passengers arriving internationally.
4.  A sterile area that shall host TSA and U.S. Customs and Border Protection ("CBP") personnel.
5.  Amenities, such as food and bar service, private suites, restrooms, Wi-Fi, and secured parking.

Exhibit 6 at 2.

For each of these requirements, PS's offer went beyond the base requirements.  First, PS already has existing agreements in place with multiple U.S. and foreign airlines, including

---

[15] Information about this program can be found at the following weblink: https://www.tsa.gov/for-industry/reimbursable-screening-services-program.

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

February 14, 2025
Page 28

agreements in place at LAX and ATL with over seventy airlines.  *See* Exhibit 2 at 5.  These relationships include an existing partnership with a ground handler at IAD for passenger and luggage check-in for several airlines.  *Id*.  Second, as mentioned above, PS is one of only two companies, and the only private company, to have agreements with TSA under the Capability Acceptance Process ("CAP"), approving PS to purchase screening equipment with TSA specifications, and the Reimbursable Screening Services Program ("RSSP"), enabling PS to pay for TSA Officers to operate the checkpoint.  *See id*. at 3.  PS was instrumental in creating this program and having it written into law.  Third, PS is the only private company in the United States with an agreement in place to have CBP provide Federal Inspection Services at multiple airports. *Id*. at 10.  Fourth, PS has already constructed TSA and CBP areas at LAX and ATL to current technical Design Standards for both agencies and is now working with both agencies on the design process for those areas at DFW and MIA, demonstrating its ability to comply with applicable permitting and construction approvals.  *Id*. at 3, 14.  Finally, PS is recognized globally as a leading provider of such amenities and services.  *See id*. at 74.

### C.  **MWAA Failed to Conduct an Appropriate Best-Value Evaluation.**

Despite the various Technical deficiencies of DAAI's Technical Proposals, the Authority intends to award DAAI the Contract in the amount of $104,716,074.17.  Exhibit 4, five times more than what PS proposed, which suggests that the only criterion used in the proposals' assessment was the financial one.

In the Solicitation, the Authority proposed using "a two-phase, competitively negotiated 'Best Value' procurement method … applicable to both phases, hereinafter referred to as Phase I and Phase II."  Exhibit 1 at 5.  Furthermore, the Contracting Manual describes a best value procurement process as one "in which the Airports Authority reserves the right to select the most

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

February 14, 2025
Page 29

advantageous Offer by evaluating and comparing factors in addition to cost or price (e.g., qualifications of the Offeror and its proposed personnel, and technical designs and approaches), such that the Airports Authority may acquire technical superiority even if it must pay a premium price." Contracting Manual at 10.1.3.

But based on the Authority's award here, it ignored a technically superior proposal in favor of a (purportedly) better-priced, technically inferior option without adequate justification. Such an evaluation does not meet the standards of either the Contracting Manual or the Solicitation itself. The Contracting Manual explicitly contemplates that the Authority "may acquire technical superiority even if it must pay a premium price." *Id*. But here, even *if*, *arguendo*, DAAI's proposed price was realistic (which it is not), the Authority failed to recognize PS's technically superior plan, considering factors in addition to cost or price, that provided the Authority with the most advantageous offer.

Nor does such an evaluation meet analogous legal standards for a best-value procurement. *See, e.g.*, *Blue Rock Structures, Inc.*, B-293134, Feb. 6, 2004, 2004 CPD ¶ 63 at 6 ("A tradeoff analysis that fails to furnish any explanation as to why a higher-rated proposal does not in fact offer technical advantages or why those technical advantages are not worth a price premium does not satisfy the requirement for a documented tradeoff rationale, particularly where, as here, price is secondary to technical considerations under the RFP's evaluation scheme."); *EPSCO, Inc.*, B-183816, Nov. 21, 1975, 75-2 CPD 338 at 7 ("It is also conceivable that, notwithstanding an established evaluation and source selection plan placing primary importance on technical considerations, a source selection official could judge that the cost of a technically superior proposal is so high that selection of a lower-priced, technically inferior proposal is justified. Such

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

February 14, 2025
Page 30

a selection, however, would be a departure from the established criteria and would have to be supported by an extremely strong justification.").

Here, as described in Sections A and B, *supra*, the Authority failed to credit PS for its uniquely strong technical proposal, failed to properly evaluate DAAI's inferior technical proposal, including its complete lack of relevant experience, failed to account for the serious security risks posed by DAAI, and relied on DAAI's unreasonable and overstated price to issue an award. Based on such an evaluation, the Authority did not conduct a meaningful best-value procurement—to the prejudice of PS and in contravention of the stated evaluation criteria.

**D.  The Authority's Unreasonable and Unlawful Acts Caused Substantial Prejudice to PS.**

As established herein, PS submitted an exceptionally strong proposal with its extensive experience in Remote VIP Services.

But for any and all of the Authority's errors described herein, PS—a highly qualified and highly rated U.S.-based offeror—would have received the Contract award. Thus, for each of the reasons stated above, PS suffered undeniable prejudice as a result of the Authority's unbalanced evaluation. *See, e.g.*, *Deloitte Consulting, et al.*, B-411884, *et al.*, Nov. 16, 2015, 2016 CPD ¶ 2 at 15 ("[B]ecause we find that certain areas of the agency's evaluation were not reasonable, and because the record does not show how a proper evaluation would have affected the ranking of vendors' quotations, we conclude that the protesters were prejudiced by the agency's evaluation."); *Solers, Inc.*, B-409079, Jan. 27, 2014, 2014 CPD ¶ 74 at 11 ("Because the record does not demonstrate that the agency reasonably considered the relative merits of the offerors' quotations, we have no basis to conclude whether this review would or would not have changed the agency's view of this competition."); *Celta Servs., Inc.*, B-411835, Nov. 2, 2015, 2015 CPD ¶ 362 at 10 ("[W]e resolve any doubts regarding prejudice in favor of a protester since a reasonable possibility

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

February 14, 2025
Page 31

of prejudice is a sufficient basis for sustaining a protest."). Accordingly, PS's Protest should be sustained.

## V.    **Document Requests**

Subject to the provisions of the RFP's Freedom of Information Policy, Exhibit 1 at 20, Chapter 4.8, Public Release of Information, of the MWAA Contracting Manual - Revised Fifth Edition (5.2), and WMAA's Freedom of Information Policy,[16] PS respectfully requests that the Authority provide the following documents, which include electronic documents and emails:

1.    A complete copy of the Solicitation, including any appendices, questions and answers, and attachments, and copies of all amendments thereto;

2.    The acquisition plan and source selection plan for the subject Project;

3.    All instructions, guides, checklists, or templates provided to evaluators;

4.    A complete copy of DAAI's Proposal, and any revisions thereto, including all information submitted in response to Phase I and Phase II of the RFP;

5.    All documents referring to, discussing, or reflecting MWAA's evaluation of DAAI's Proposal and PS's Proposal, including, but not limited to, the Evaluation Committee's final evaluation, including its evaluation for each offeror relative to each evaluation criterion as well as the Evaluation Committee's rationales for each such evaluation, including, but not limited to, Phase I and Phase II of the RFP;

6.    Any and all evaluation documents pertaining to the MWAA and the Evaluation Committee's evaluation of PS's Proposal and DAAI's Proposal, including both Phase I and Phase II;

7.    An unredacted copy of the MWAA's and/or the Evaluation Committee's source selection decision and best value tradeoff documents;

8.    Any and all communications pertaining to the decision to extend the time to submit Phase 2 offers to October 7, 2024; and,

9.    Any and all communications between MWAA and DAAI regarding the RFP, evaluation, and/or intent to award the Contract.

---

[16] In accordance with MWAA Freedom on Information Policy's Procedures, a formal Freedom of Information request was submitted to the Authority on February 12, 2025 requesting the same documents requested herein.

**CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE**

February 14, 2025
Page 32

Each of the foregoing documents and categories of documents are relevant to the Protest grounds set forth herein because they directly relate to the subject procurement and the Authority's evaluation of proposals thereunder.

## VI.    **Request for Relief**

Based on the foregoing, the Authority's evaluation of proposals, and stated intention to award the Contract to DAAI, a foreign-state-owned entity, was unreasonable and unlawful in multiple material respects and has caused, and will continue to cause, undeniable prejudice to PS. Accordingly, PS respectfully requests a ruling from the WMAA's Vice President, Office of Supply Chain Management that:

1. Sustains PS's Protest;

2. Recommends that the Authority take corrective action, including but not limited to disqualifying DAAI from the competition, conducting a reasonable evaluation of PS's Proposal in accordance with the terms of the RFP, and awarding PS the Contract;

3. Grants such other relief and remedies as the Vice President, Office of Supply Chain Management determines to be just and equitable.

Respectfully submitted,

*/s/ Aron C. Beezley*

Aron C. Beezley
Nathaniel J. Greeson
Erik M. Coon
Charles F. Blanchard

*Counsel for The Private Suite IAD, LLC (dba PS)*

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

# EXHIBIT 6

**Aron C. Beezley**
abeezley@bradley.com
202.719.8254 direct



April 2, 2025

**<u>_VIA hand delivery to the Authority's Procurement & Contracts Department; certified mail, return receipt requested; and email._</u>**

Julia Hodge
Vice President, Office of Supply Chain Management
Metropolitan Washington Airports Authority

> **RE:**     **<u>Solicitation No. RFP-23-21311</u>**
>
> **SUBJ:**     **<u>Supplemental Protest of The Private Suite IAD, LLC (dba PS)</u>**

Dear Ms. Hodge:

The Private Suite IAD, LLC (dba PS) ("PS"), by and through the undersigned counsel, hereby submits this Supplemental Protest regarding the Solicitation identified above (the "Solicitation") and in support of the February 14, 2025 protest previously submitted (the "Protest"), an appeal of which is currently pending before the of the Metropolitan Washington Airports Authority's ("MWAA" or the "Authority") CEO.  PS submits this Supplemental Protest to note additional support for its protest grounds following the March 26, 2025 Debriefing meeting between representatives of PS and MWAA, to reiterate its now 7-week-old request for documents under an open records request, and to provide additional support from PS customers.

**I.     <u>Threshold Matters</u>**

> **A.     <u>This Supplemental Protest is Timely Filed.</u>**

Pursuant to Section 21, page 19, of the RFP, Exhibit 1 and Chapter 9.2.2 of the MWAA's Contracting Manual, Revised Fifth Edition (Version 5.2) ("Contracting Manual"), a protest ground based on the manner in which offers were evaluated or on which a contract was awarded is timely if the protest is submitted by an offeror within seven days after the offeror knew or

April 2, 2025
Page 2

should have known the basis of the protest.  Here, PS participated in a Debriefing with MWAA on March 26, 2025.  The information first learned in the Debriefing formed the bases for this Supplemental Protest.  This Supplemental Protest is being filed within seven days of that date and, therefore, is timely.

**B.    The Authority Must Not Award the Contract During the Pendency of this Request.**

Any actions to award the Remote VIP contract should be stayed, and the VP-OSCM was wrong to initiate or process award of the Remote VIP contract during the pendency of her initial review.  Pursuant to Section 21 of the RFP, "[i]f a Contract has not been awarded at the time a protest is timely filed, the Contract ***may not*** be awarded while the protest is pending, unless the President and CEO determines that award of the Contract, and, if applicable, issuance of a notice to proceed, is in the Authority's best interest."  RFP at 20 (emphasis added); *see also* Contracting Manual, § 9.6.  The Protest is still pending because the protest process continues through the resolution of this request, the resolution of the Appeal currently pending before the CEO, or any subsequent appeals.  The Contracting Manual specifically includes the ongoing review mechanism as part of the protest process, and notes that a decision is final only after the CEO, or the MWAA Board where applicable, issues a final decision.  Contracting Manual, § 9.5.  Therefore, the Protest remains pending, and the Contract may not be awarded.  RFP at 20; *see also* Contracting Manual, § 9.6.

**C.    PS Reiterates its Records Request.  The Authority Should Complete PS's Records Request Before Continuing the Protest, Review of the Appeal, or the Procurement.**

While PS is grateful for the opportunity to learn about its proposal and MWAA's evaluation through the debriefing process, PS reiterates its request for documents, initially submitted on February 12, 2025.  *See* FOIA Request.  That request, submitted pursuant to the

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

April 2, 2025
Page 3

_____

MWAA Freedom of Information Policy's procedures and the RFP's Freedom of Information Policy, requested nine (9) categories of documents and emails related to the procurement at issue. *Id.* PS reiterated that request in its Protest and in its Appeal. Protest at 31-32; Appeal at 3-5. But PS has received no response regarding the status of those document requests other than boilerplate confirmations of receipt. *See* Decision at 7 ("The Airports Authority is in receipt of PS's Freedom of Information request, and the Freedom of Information Officer will process PS's request accordingly.").

This response, or lack thereof, unnecessarily delays the protest process, unreasonably prejudices PS in its protest, and erodes the institutional trust in MWAA's ability to conduct an efficient and fair protest procedure. The Authority's continued withholding of the requested documents only serves to delay and extend this process. The Contracting Manual Section 9.2.2 and the RFP at 19 each require an offeror to file a protest within seven (7) days of the date it knew or should have known of the basis for the protest. In the likely event that there are grounds for protest PS discovers within the documents it requested—as was the predictable outcome of the Debriefing—PS will have seven (7) days to file *another* protest, and this protest and appeal process will restart *again*. *See id.* Thus, producing the relevant documents to PS according to MWAA's contracting rules would allow PS to consolidate its protest grounds into one document for MWAA's consideration. For the same reasons, MWAA's review of the Appeal should be stayed following the release of those documents in order to consolidate the Protest.

As indicated in PS's Appeal, typical protest procedures at the Federal, State, and Local levels provide for the production of documents before protest filing in order to deal with protest issues efficiently and fairly by issuing a single decision on the full record, allowing for a transparent and fair protest process that is also expedient. *See, e.g.*, 4 C.F.R. § 21.3(d) ("The

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

April 2, 2025
Page 4

report shall include … a copy of all relevant documents, or portions of documents, not

previously produced, including, as appropriate: the bid or proposal submitted by the protester;

the bid or proposal of the firm which is being considered for award, or whose bid or proposal is

being protested; all evaluation documents; the solicitation, including the specifications; the

abstract of bids or offers; and any other relevant documents."). Other policies, such as protective

orders, allow for the exchange of information in a manner that protects confidential or

proprietary information. *See e.g.*, 4 C.F.R. § 21.4. Again, these well-established protest

procedures for public procurements are intentionally structured to deal with protest issues

efficiently and fairly by issuing a single decision on the full record, allowing for a transparent

and fair protest process that is also expedient.

Conversely, failure to provide relevant documents during a protest represents a material

process failure by MWAA, not only by staggering the production of procurement information,

and thus staggering the protest process, but also wherein the Authority loses credibility—and the

process becomes non-transparent—by failing to meaningfully engage with bidders who are

following the established protest procedures. Additionally, by continuing to review existing

protest grounds while anticipating and eventually receiving subsequent protest grounds, the

Authority spends unnecessary time, energy, and expertise duplicating its efforts on reviews and

responses that could have been dealt with in one decision and appeal. Not only is the review

process elongated, but so is the procurement process because a contract cannot be awarded until

the protest process is complete. RFP at 20; Contracting Manual, § 9.6. Thus, the Authority's

procedures are not only inefficient and ineffective, but they also undermine transparency, and

they affect the ultimate ability of MWAA to provide services through its airports by drawing out

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

April 2, 2025
Page 5

the process unnecessarily.  Respectfully, the Authority should release the requested documents

and stay its review of PS's Appeal before continuing this protest process.

Regardless of the procedure and its request, PS has asked three times now for these

documents and has not heard a substantive response yet.  PS will continue to request these

documents and reserves its rights to file supplemental protest grounds based on the contents

therein—whether those documents are produced in time to consolidate those into one efficient

procedure or not.

## II.    **Background**

Following MWAA's notice on February 7, 2025 that it would award the Contract to daa

International ("DAAI"), PS requested feedback from MWAA as to why its proposal was not

selected on February 11, 2025.  The next day, PS followed up clarifying that its request

constituted a formal request for debriefing pursuant to Section 4.7 of the  Contracting Manual

(Version 5.2).  That same day, pursuant to the MWAA Freedom of Information Policy's

procedures, PS submitted a formal Freedom of Information request to the Authority requesting

nine (9) categories of documents and emails related to the procurement at issue.  *See* Freedom of

Information Request.  On February 13, 2025, MWAA acknowledged PS's debriefing request and

offered to provide a debriefing on February 18, 2025.

On February 14, 2025, PS timely filed the Protest, contesting MWAA's evaluation of the

Solicitation and its intent to award to DAAI.  In the Protest, PS reiterated its document request.

*See* Protest at 31-32.  The same day PS filed its Protest, MWAA cancelled its previously

scheduled debriefing.  MWAA issued an initial decision—a denial—on the Protest on March 10,

2025 (the "Decision").  PS submitted an appeal, pursuant to the Decision, Page 8, and Chapter

9.5 of the Contracting Manual on March 17, 2025, again reiterating its request for a debriefing

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

April 2, 2025
Page 6

and for the documents it requested (the "Appeal"). Finally, on March 26, the Authority

conducted a debriefing meeting with representatives from PS (the "Debriefing"). The Appeal

remains pending; the records request remains unanswered.

**III.    The Debriefing Bolstered Elements of PS's Protest of Unequal Treatment and Unstated Evaluation Criteria.**

In the March 26, 2025 Debriefing, the Authority stated that its intentions were to discuss

PS's proposal to see where PS did well and where it had room for improvement. Declaration at

12. The Authority stated it would not address allegations contained in either the protest or the

current appeal, nor would the Authority be able to share information about DAAI's proposal. *Id.*

Notwithstanding those limitations, the Debriefing included a discussion of PS's proposal, the

overall Solicitation, and MWAA's evaluation of PS's proposal. *See generally*, id. And despite

MWAA's inability to discuss DAAI's proposal or the ongoing protest documents, its discussions

about PS's proposal and how MWAA evaluated PS's proposal still shed light on elements of the

Protest, notably regarding MWAA's evaluation of corporate experience, price, and MWAA's

overall evaluation process.

The Debriefing confirmed that MWAA unreasonably evaluated proposals in this

Solicitation by evaluating DAAI's parent's corporate experience, selectively ignoring PS's

relevant experience, mischaracterizing and misevaluating PS's financial proposal, and by failing

to engage in a "Best Value" procurement. For the reasons identified below, PS respectfully

requests that the Authority pauses its review of the Appeal, reverses the VP-OSCM's Decision,

sustains the Protest, and resolicits the RFP once its shortcomings are addressed.

**A.    Past Performance**

PS used the Debriefing, in part, to ask about MWAA's evaluation of its proposal,

including elements MWAA may have evaluated inconsistently with respect to DAAI. PS chose

**CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE**

April 2, 2025
Page 7

not to include information in its proposal regarding its parent corporation based on its interpretation of the Solicitation, which contained no mention of parent companies or their experience except for a short section requiring offerors to identify their ownership that explicitly distinguished between "offeror" and "parent company."  RFP at 6; *see also* Appeal at 10-11.  But because MWAA's decision indicated it had considered parent corporation experience in DAAI's proposal, PS asked how the Authority evaluated offerors' parent companies.  Declaration at 13.  Notably, MWAA acknowledged during the Debriefing that the consideration of an offeror's parent company was not a stated evaluation criterion and indicated that parent corporate experience was "minimally relevant" to Phase 1, Criteria 1, regarding offerors' experience.  *Id*. at 14.  MWAA's admission that parent corporate experience was not an evaluation criterion supports PS's Protest grounds that the Authority wrongfully considered offerors' corporate parents' experience.  Moreover, this concession during the debriefing directly conflicts with the Authority's rationale in its Decision.

In the Decision, MWAA noted, regarding DAAI's proposal, that "***[a]s an airport operator***, the company has vast experience working with airlines, ground handlers, travel retailers, State agencies, and U.S. TSA and CBP."  Decision at 3 (emphasis added).  But DAAI is not an airport operator—DAAI's parent company, daa, is.  This means MWAA necessarily considered DAAI's parent corporate experience when it evaluated proposals, despite confirming in the Debriefing that "[i]t was not a stated evaluation criterion."  Declaration at 13.  This is much more than a "minimally relevant" evaluation of an offeror's parent company's experience where the Authority gave direct credit to DAAI for the most important and basic requirements of the Solicitation.

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

April 2, 2025
Page 8

Additionally, during the Debriefing, MWAA confirmed the Solicitation requirements that offerors were required to include "a minimum of one (1) representative contract within the last ten years whereby the Offeror provided Remote VIP Services, including TSA screening services and direct access to gated commercial aircraft, for a minimum of two consecutive years." Declaration at 28; *see also* RFP, Attachment 02, Phase 1 at 3. As previously discussed, *see e.g.*, Protest at 14-20, DAAI cannot meet those requirements, especially not as an individual entity without considering its parent company's experience—Dublin Platinum Services is *not* a remote service, does *not* "include" TSA screening services, and does *not* have direct access to gated commercial aircraft for all travelers. Again, the Authority's concession during the Debrief that a parent company's corporate experience was (1) not an evaluation criterion and (2) "minimally relevant" to the evaluation is belied by the fact that the Authority's evaluation relied heavily on DAAI's parent company's experience to arguably become technically acceptable under Phase 1.

Lastly, while it appears MWAA considered DAAI's corporate experience in its evaluation, the Debriefing demonstrated that MWAA did not consider PS's full experience consistently in its evaluation, much less that of its parent company or other related entities. During the Debriefing, PS asked MWAA about its evaluation of offerors' past performance. Declaration at 31. Regarding PS, MWAA stated that it did *not* consider PS's Atlanta location, despite it having been operational for several months before Phase 1 submission, because of the relatively short length of time it had been open.[1] Declaration at 32-35. While the Solicitation indicated that past experience would be limited to locations that had been opened for a minimum of two years, RFP, Attachment 02, Phase 1 at 3, the same limitation did not apply to professional references regarding airport clients, TSA and CBP representatives, and airlines representatives.

---

[1] By the time Phase 2 proposals were submitted, PS's Atlanta location had been open for about one year.

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

April 2, 2025
Page 9

*Id.*  Moreover, failing to evaluate PS's Atlanta experience ignores both the success of PS's Atlanta location and the auxiliary benefits of multiple open locations.  It was unreasonable for MWAA to ignore that prior experience because, despite the length of operation, that experience still showed PS's ability to perform similar contracts successfully and illustrated the combined benefits of multiple locations.

During the Debriefing, MWAA noted for the first time that it also did not credit PS for past performance experience for Miami or Dallas/Fort Worth, which were awarded but not yet operational at the time of submission.  Declaration at 35.  MWAA's exclusion is particularly notable because of the emphasis in the Debriefing on capital contributions.  MWAA stated during the Debriefing that part of the reason it did not evaluate PS's experience in Atlanta was the smaller capital contribution compared with the Dulles requirements.  *Id.*  But this further confirms that MWAA ignored PS's proven experience in raising sufficient capital to execute at Atlanta, Miami, and DFW.  What is more, MWAA **did** evaluate those additional locations in the context of using small and local businesses and ACDBE requirements and goals, reflecting an unequal and uneven evaluation of PS's past experience.  *See id.* at 43.

These newly discovered evaluation errors regarding past performance negatively affected PS's past performance evaluation.  The Authority gave PS an "Acceptable" rating rather than a "Good" rating because PS only had one example of comparable work that MWAA considered.  *Id.* at 34.  MWAA's unreasonable exclusion of PS's relevant experience, especially when considered in the context of its inclusion of DAAI's tangentially related parent company experience (and exclusion of PS's parent company's experience), further demonstrates an unreasonable and unequal evaluation.  The "Acceptable" rating further confounds because of MWAA's representation in the Debriefing that PS's LAX facility provided the **exact** services

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

identified in the RFP and resulted in an ***exact*** past performance experience.  Declaration at 14.

PS provided MWAA with a perfect example of past performance, and, as the only remote VIP

airport services operator in the United States that meets the Solicitation requirements with more

than one location, necessarily could not have been surpassed in its evaluation.  Nevertheless, PS

only received an "Acceptable" past performance criterion rating.  *Id.*

MWAA arbitrarily handicapped PS's proposal by limiting its evaluated experience while

artificially inflating DAAI's through the inclusion of unrelated and inapplicable airport

operations executed by subcontractors managed by DAAI's parent company.  In short, PS's

directly relevant self-performed operations and experience were severely discounted in favor of

tangentially—at best—related past performance of DAAI's parent company's subcontractor

performance.  As such, the Debriefing supports PS's conclusion that MWAA conducted a flawed

evaluation, and PS respectfully requests MWAA reopen the Solicitation following its issuance of

clarifications to the terms of the RFP.

### B.    <u>Financial Offer Evaluation</u>

The Debriefing also illuminated MWAA's evaluation regarding Phase 2, Financial Offer

Evaluation.  In the Debriefing, MWAA told PS that its financial projections were a weak element

of its proposal because they allegedly lacked detail and information.  Declaration at  19.  MWAA

further stated that they asked PS for a clarification of the projections page and claimed PS's

response was not detailed.  *Id.*  However, MWAA did not ask for a full clarification of the

projections page, it asked for PS's "anticipated Percentage Rent payment for each of the first five

years of operation" and for "Private Suites to explain in detail how it calculated 'PS IAD

Reservation Revenue, PS IAD Membership Revenue, and PS IAD Other Reservation Related

Revenue' listed on page 5 of [PS's] proposal."  *See* Exhibit 1 at 6.  PS promptly and timely

**CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE**

April 2, 2025
Page 11

responded to those discrete and narrow questions.  *Id*. at 4-6.  MWAA followed up with more

discrete clarifying questions about PS's input "on how [PS] calculated the estimates for

Reservation and Membership revenue (*i.e.* the basis for the assumptions that support the

estimated revenues)" and regarding specific ground amounts of ground rent and how that was

accounted.  *Id*. at 3.  PS promptly and timely provided those answers.  *Id*. at 1-3.  So, not only

did MWAA not request a full clarification of the page at issue, but when MWAA requested

clarification on discrete issues, PS gave detailed responses to the specific questions MWAA

asked.  *See id*.  Had MWAA needed or wanted different information, all it had to do was ask.  It

is improper to downgrade an offeror for an alleged failure to provide specific information where

that information could have been but was not solicited during discussions.

PS's pricing questions during the Debriefing also questioned **how** MWAA evaluated

offerors' price component.  MWAA stated that it did not use an outside consultant to look at the

proposals, instead relying entirely on its own internal evaluation of each offeror's price.  That

exchange—and the Authority's concession—further confirms PS's protest allegation that MWAA

failed to adequately evaluate offerors' price proposals by taking them at face value rather than

reviewing them for accuracy and realism.  *See* Protest at 21-29; Appeal at 22-26.

Lastly, the Debriefing illuminated how MWAA evaluated different elements of the

offerors' proposals.  For example, MWAA unfairly evaluated construction firms in the context of

offerors' Phase 2 price proposals.  Declaration at 22.  Again, MWAA stretched the limit of its

evaluation to include more than the RFP suggested.  Phase 2, Criterion 2 required that offerors

propose a:

> plan to design and construct the facilities within thirty (30) months of award of the
> Lease and its plan to complete the Mid-Term Refurbishment by the end of the tenth
> (11th) year of operation including:

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

April 2, 2025
Page 12

a.    A design and construction schedule demonstrating the Offeror's ability to construct the facilities in accordance with historic preservation guidelines within the required timeframe and a proposed Mid-Term Refurbishment Plan, including the estimated costs for the Initial Capital Investment and Mid-Term Refurbishment.

b.    Conceptual designs that conform to the historic preservation guidelines, as mandated by the Historic Preservation ordinance, interior and exterior renderings, and conceptual site plans of the facilities that the Offeror plans to construct.

RFP, Attachment 02, Phase 2 at 3-4.  Nothing in those requirements indicated that MWAA considered the identity of the construction contractor was relevant or that the construction contractor's experience working at Dulles would be evaluated more favorably.  The RFP indicated only that "[a] design and construction schedule demonstrating the Offeror's ability to construct the facilities…" and conceptual drawings would be evaluated.  *Id.*  And PS's proposal provided a design and construction schedule that indicated completion within 24 months—six months ahead of the required schedule.  However, when PS asked MWAA about its evaluation of construction firms, MWAA stated that DAAI's proposed contractor's experience **was** considered, which indicated the Authority evaluated the offerors based on a metric that was not included in the RFP or known to PS.  Declaration at 27.  Therefore, again, MWAA granted DAAI additional credit for an unstated evaluation criterion despite PS's proposal fully complying with—even exceeding—the stated terms of the RFP.

Moreover, although the Decision stated that "the construction firm that [DAAI] proposed to lead project delivery has experience **working at Dulles International** and expertise in the permitting processes, having successfully delivered many projects **within active airport operations**," Decision at 3 (emphasis added), construction on the project will not occur within active airport operations.  Rather, construction will take place **outside the existing airport fence-**

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

April 2, 2025
Page 13

*line* and would only become part of the airside operation when construction realigned the fence

at the very end of the project. Thus, MWAA again unreasonably favorably evaluated DAAI's

proposal using unstated evaluation criteria and generous interpretations of its proposal to PS's

prejudice.

    **C.**    <u>**Overall Evaluation**</u>

        **i.**    <u>**The Authority Failed to Conduct a Proper Best Value Procurement.**</u>

    Much of the Debriefing focused on the process by which MWAA conducted its

evaluation. But PS left the Debriefing with more questions about the evaluation than answers.

While the RFP included definitions for MWAA's technical proposal evaluation ratings, *see e.g.*,

RFP, Attachment 02, Phase 2 at 2-3, neither the RFP nor the Debriefing indicated how those

ratings fit together when the Authority holistically evaluated them. The RFP stated the Authority

would conduct "a two-phase, competitively negotiated "Best Value" procurement method." RFP

at 14. But following the Debriefing, it is clear the Agency evaluated the proposals without a

cohesive analysis of the technical elements or how those related to the comparative value

offerors were evaluated to provide.

    For instance, during the Debriefing, MWAA stated that PS received overall ratings of

"Good" for both Phase 1 and Phase 2. Debriefing at 37. The Decision stated that "[DAAI]'s

technical proposals were "Acceptable" in Phase 1 and "Excellent" in Phase 2." Decision at 6.

But MWAA has not explained how those two "Good" ratings for PS compared to the

"Acceptable" and "Excellent" ratings for DAAI. In other words, the Authority assigned values

to the individual elements of the proposals but failed to review those individual elements in a

manner that explained why an "Acceptable" rating and an "Excellent" rating represented a better

value than two "Good" ratings. Such a result suggests that Phase 2 was more important than

**CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE**

April 2, 2025
Page 14

Phase 1 because DAAI's higher "Excellent" rating in Phase 2 apparently outweighed PS's "Good" rating, despite PS's superior "Good" to DAAI's inferior "Acceptable" in Phase 1. But the Solicitation does not indicate that Phase 2 would be more important than Phase 1. And in any event, such a result does not suggest a "Best Value" procurement, which requires a weighing of all technical elements against price.[2]  Had PS been made aware of the relative importance of each Phase or that MWAA might weigh price as significantly more important than technical evaluations, PS may have altered its proposal.

Furthermore, the Authority's inability to describe how or why two "Good" ratings fall short of an "Acceptable" and "Excellent" rating demonstrate flawed documentation by the Authority, in addition to the flawed reasoning described above. It is axiomatic that an awarding entity must document the sensible rationale it uses to conduct a best-value procurement.  *See e.g.*, *Standard Commc'ns, Inc. v. United States*, 101 Fed. Cl. 723, 737 (2011) ("Without adequate documentation, it is not possible to determine whether the SSA engaged in an appropriate best-value tradeoff analysis."); *Freealliance.com, LLC*, *et al.*, B-419201.3, Jan. 19, 2021, 2021 CPD ¶ 56 at *7 ("Agencies are required to evaluate quotations based solely on the factors identified in the solicitation, and must adequately document the bases for their evaluation.").  However, here, MWAA's responses in the Debriefing suggested that MWAA was unwilling or unable to describe just how it compared its evaluations between Phases. Such an evaluation does not reflect a "Best Value" procurement, and thus ran afoul of the terms of the Solicitation.

---

[2] Logically, the only explanation for an offeror's higher rated Factor 2 Financial Offer carrying so much more weight than its lower rated Factor 1 Technical Proposal would be that the Financial Offer (price) represented so much value to the Authority that it offset the better technical proposal. The Debrief confirmed this scenario here, which further supports PS's Protest grounds that MWAA unreasonably evaluated DAAI's unrealistic financial projections as realistic and reasonable. *See* Protest at 22-26; Appeal at 21-29.

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

April 2, 2025
Page 15

ii.     **The Authority Unequally Evaluated Proposals Based on Adjectival Ratings.**

Similarly, MWAA's debriefing failed to explain fully how it evaluated the ratings it assigned for each individual criteria within each phase collectively.  When PS asked MWAA about the evaluation method, MWAA stated that the committee would come to a consensus after individual evaluations of a proposal, that it would evaluate all criteria in descending order of importance, and that each item could have equal or lesser weight than the one in front of it. Declaration at 45; *see also* RFP, Attachment 02, Phase 2 at 1-3.  But MWAA also indicated that it could not share what the weights/ratings were for each Criterion.  *Id.*  So, while MWAA insisted it evaluated proposals equally, MWAA will not or cannot share how it evaluated those proposals and came to those conclusions.

The problem with MWAA's unavailable evaluation ratings is exemplified by how it evaluated the overall phases.  MWAA stated that PS received three "Good" ratings and one "Excellent" rating in Phase 2 for an overall rating of "Good," Declaration at 44, while the Authority's Decision indicated that DAAI received an overall Phase 2 rating of "Excellent." Decision at 6.  But MWAA also stated that it would not share the weights or ratings of each individual Criterion.  Declaration at 45.  How MWAA considered PS's financial capacity as "Good" but DAAI's final rating as "Excellent" reflects the lack of transparency in how the individual rating elements were combined and suggests that the Authority evaluated proposals less based on a holistic "Best Value" analysis and more on a mechanical summation of adjectival ratings for each criterion.[3]  Such an evaluation was not contemplated in the Solicitation.  Thus,

---

[3] Not to mention, DAAI's favorable rating here begs the question of whether its parent company, a state-owned entity better suited than private industry to weather the effects of COVID, constituted its financial capacity evaluation submission.

**CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE**

April 2, 2025
Page 16

PS was prejudiced by an evaluation that focused less on the value PS provided to the Authority and more on the myopic and mechanical sum of its evaluation factor ratings.

The mechanical analysis appears to have continued into the analysis of individual technical evaluation criterion. For example, in the Debriefing, MWAA stated that PS received a "Good" rating for its financial capacity criterion rating based on the fact that PS showed positive cashflow. Declaration at 39-40. MWAA also stated that the reason PS was not rated "Excellent" was that COVID impacted that cashflow over the past few years. *Id.* MWAA noted that positive cashflow during COVID would have been difficult, if not impossible, to achieve for anyone. *Id.* at 39. Nevertheless, MWAA still held PS to such a standard wherein it was difficult if not impossible to achieve an "Excellent" rating for that criterion. That inability to earn an "Excellent" rating, despite PS's strong post-COVID numbers, prejudiced PS because, apparently, it limited PS's ceiling in the total evaluation under Phase 2 based on the way in which the Authority evaluated each criterion.

Similarly, MWAA noted in the Debriefing that PS received an "Acceptable" rating for its experience based chiefly on its experience operating its LAX location for more than seven years, and in spite of the Authority's refusal to consider PS's Atlanta location. Declaration at 34. But such a rating again reflects how the deck was stacked against PS. PS was, and remains, the only remote luxury VIP airport services operator in the world with more than one location. DAAI's Platinum Services location in Dublin remains its only location that arguably provides similar services. Based on MWAA's representations in the Debriefing, it is apparent that no one could receive a rating of "Good" or "Excellent" for experience because it would be impossible to exceed PS's experience as the United States' only operator of these specific services with multiple locations.

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

April 2, 2025
Page 17

In practice, it appears that MWAA's evaluation presented PS with an impossible task: for those areas of its proposal in which it was the strongest, the Authority's evaluation made it impossible to achieve an "Excellent" rating. PS's strong financial capacity performance was rated "Good" but could never be rated "Excellent" because of COVID. Declaration at 39. And PS's past experience was rated "Acceptable," but could never be rated "Good" or "Excellent" because the Authority would only evaluate one location, despite ignoring PS's additional locations, ignoring the fact that no other entity in the United States operated more than one location, and accounting for MWAA's own admission during the Debriefing that PS's LAW location was *exactly* the experience called for in the RFP. *See* Declaration at 14, 34. And because MWAA's collective adjectival ratings appear to have dictated the overall Phase rating, MWAA's impossible targets artificially limited PS to lower overall ratings.

"It is a fundamental principle of federal procurement law that a contracting agency must treat all offerors equally and evaluate their proposals evenhandedly against the solicitation's requirements and evaluation criteria." *Arctic Slope Mission Servs., LLC*, B-410992.5, Jan. 8, 2016, 2016 CPD ¶ 39 at *6. But that is exactly what happened here—PS was unable to receive higher ratings on criteria in which it excelled because it was literally impossible to achieve "Excellent" ratings for those criteria. Those lower criteria ratings, in turn, affected PS' overall Phase ratings. Meanwhile, DAAI received an overall "Excellent" rating for its Phase Two proposal compared to PS's "Good" and while DAAI received an "Acceptable" for Phase One, PS only received a "Good." Decision at 6; Declaration at 34, 39. Thus, for each of the two Phases, PS's proposal was negatively impacted by technical evaluation criteria in which PS could never have achieved an "Excellent" rating. Nevertheless, DAAI received an "Excellent" overall Phase Two rating. Such results indicate unequal treatment between offerors because while PS was

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

April 2, 2025
Page 18

hamstrung, MWAA afforded DAAI leeway.  Had PS received higher ratings on its past experience and/or financial capacity criteria, those higher ratings would have been enough to improve its overall Phase ratings, altering the balance of the Authority's evaluation.  Because MWAA's evaluation unequally treated offerors, PS respectfully requests the Authority rescind its decision to award to DAAI and resolicit the RFP after addressing the identified procurement irregularities.

## IV.    Additional Support

Notwithstanding the procurement irregularities and the Authority's errors in evaluating and awarding this Solicitation, PS remains a strong offeror whose highly regarded services elicit support from its current clientele.  As a demonstration of that support, PS attaches the following letters from its clientele, which illustrate the power of the PS brand and the strong relationships it has with VIP customers.

## V.    Conclusion and Request for Relief

PS remains grateful for MWAA's time and the information it was willing and able to share in the Debriefing.  PS respectfully requests that MWAA considers the additional facts and arguments identified in the Debriefing.  Furthermore, PS respectfully requests that MWAA produce the documents it requested in its February 12, 2025 Freedom of Information request and previous protests, and that it pauses its review of the Appeal until such time as a fulsome protest process can be completed in such a way that does not needlessly extend this process through piecemeal protests, reviews, and appeals.  Lastly, PS draws MWAA's attention to the letters of support attached to this letter.  Accordingly, PS respectfully requests a ruling from MWAA's Vice President, Office of Supply Chain Management that:

1.    Withdraws in its entirety the VP-OSCM's Decision to Deny PS's Protest;

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

April 2, 2025
Page 19

---

2.    Suspends the CEO's review of the Appeal until MWAA produces PS's requested documents;

3.    If applicable, cancels, stays, or rescinds any award of the Remote VIP Services contract;

4.    Recommends that the Authority take corrective action, including but not limited to cancelling the intended award, revising the RFP, and reissuing the revised RFP for further competition;

5.    Grants such other relief and remedies as the Authority determines to be just and equitable.

Respectfully submitted,

*/s/ Aron C. Beezley*

Aron C. Beezley
Nathaniel J. Greeson
Charles F. Blanchard

*Counsel for The Private Suite IAD, LLC (dba PS)*

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

# EXHIBIT 7

**Aron C. Beezley**
abeezley@bradley.com
202.719.8254 direct



March 17, 2025

_**VIA hand delivery; certified mail, return receipt requested; and email.**_

James E. Potter
President and Chief Executive Officer
Metropolitan Washington Airports Authority
2733 Crystal Drive
Arlington, VA 22202

> **RE:**      **Solicitation No. RFP-23-21311**
>
> **SUBJ:**   **Request for Review Regarding the Protest of The Private Suite IAD, LLC (dba PS)**

Dear Mr. Potter:

The Private Suite IAD, LLC (dba PS) ("PS"), by and through the undersigned counsel, hereby respectfully files this timely Request for Review of Vice President, Office of Supply Chain Management ("VP-OSCM") Julia T. Hodge's March 10, 2025 decision (the "Decision") to deny PS's protest (the "Protest") of the Metropolitan Washington Airports Authority's ("MWAA" or the "Authority") evaluation of proposals under Solicitation No. RFP-23-21311 (the "RFP") and intended award of the Contract thereunder to daa International ("DAAI").  As discussed below, the Authority erred in its Decision to deny the Protest by failing to account for latent ambiguities in the RFP, unreasonably evaluating DAAI's technical and price proposals, applying unstated evaluation criteria, and engaging in disparate treatment of the offerors, all of which contributed to an erroneous best-value procurement decision.  By failing to adequately address each of these unreasonable and unlawful actions by the Authority, the Decision demonstrated how the Authority ran afoul of the RFP's terms and the Authority's evaluation criteria. Accordingly, and as set forth in greater detail below, the President and CEO should reverse the

**CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE**

Bradley Arant Boult Cummings LLP | 1615 L Street NW, Ste 1350 | Washington, DC 20036 | 202.393.7150 | bradley.com

March 17, 2025
Page 2

VP-OSCM's Decision, sustain the Protest, and resolicit the RFP once its shortcomings are addressed.

I.    **Threshold Matters**

a.    **This Request for Review is Timely Filed.**

Pursuant to the Decision, Page 8, and Chapter 9.5 of MWAA's Contracting Manual, Revised Fifth Edition (5.2) ("Contracting Manual"), a protester may seek the CEO's review of a protest decision by the VP-OSCM within seven (7) days of the date of the VP-OSCM's response letter. Here, the VP-OSCM dated her response letter to PS's Protest, the Decision, March 10, 2025, and delivered it to PS's counsel that day. This request is submitted within seven (7) days of that date and, therefore, is timely.[1]

b.    **The Authority Must Not Award the Contract During the Pendency of this Request.**

Any actions to award the Remote VIP contract should be stayed, and the VP-OSCM was wrong to initiate or process award of the Remote VIP contract during the pendency of her review. Pursuant to Section 21 of the RFP, "[i]f a Contract has not been awarded at the time a protest is timely filed, the Contract *may not* be awarded while the protest is pending, unless the President and CEO determines that award of the Contract, and, if applicable, issuance of a notice to proceed, is in the Authority's best interest." RFP at 20 (emphasis added); *see also* Contracting Manual, § 9.6. The Protest is still pending because the protest process continues through the resolution of this request. The Contracting Manual specifically includes this review mechanism as part of the protest process, and notes that a decision is final only after the CEO, or the MWAA Board where applicable, issues a final decision. Contracting Manual, § 9.5. Therefore, the

---

[1] Ms. Hodges' Decision refers to a seven (7) **business** day deadline to submit this request. Out of an abundance of caution, PS submits its request within seven (7) calendar days as required by the Contracting Manual.

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

March 17, 2025
Page 3

Protest remains pending, and the Contract may not be awarded.  RFP at 20; *see also* Contracting

Manual, § 9.6.

     **c.**      **The Authority Should Complete PS's Records Request Before Continuing the
Protest or Procurement.**

     The Authority's piecemeal handling of the Protest has delayed and will continue to

prolong this protest process.  In order to save the Authority and PS's time and expense, the

Authority should immediately produce the materials PS requested in its records request under the

RFP's Freedom of Information Policy (the "FOIA Request") and provide PS its requested

debriefing before continuing with this protest process.

     On February 12, 2025, pursuant to the MWAA Freedom of Information Policy's

procedures, PS submitted a formal Freedom of Information request to the Authority requesting

nine (9) categories of documents and emails related to the procurement at issue.  *See* FOIA

Request.  PS reiterated its request in its Protest.  Those requests asked the Authority to provide

basic documents related to the Protest, such as evaluation documents, the acquisition and source

selection plans, proposals, and relevant communications.  *Id.*  Those documents are necessary to

PS's full understanding of the Authority's evaluation of the proposal responses.  Without these

basic proposal and evaluation documents, this process is unable to be completed in an efficient

and timely manner.  Despite those two timely and reasonable requests that were initially

submitted over a month ago, the Authority has not produced any documents.  The Decision

acknowledged that the Authority was in receipt of PS's requests and that the Authority's Freedom

of Information Officer would process that request accordingly, but did not give an expected date

of production.

     Similarly, the Authority has refused to conduct the debriefing PS requested pursuant to

Section 4.7 of the Contracting Manual.  On February 11, 2025, PS requested feedback from

**CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE**

March 17, 2025
Page 4

MWAA as to why its proposal was not selected, and PS followed up the next day clarifying that

its request was a formal request for debriefing. On February 13, 2025, MWAA acknowledged

that request and offered to provide a debriefing on February 18, 2025. But MWAA cancelled

that debriefing the same day PS filed its Protest and has not rescheduled it.[2]

The Authority's actions to cancel the debriefing and withhold requested documents only

serve to delay and extend this process. The Contracting Manual Section 9.2.2 and the RFP at 19

each require an offeror to file a protest within seven (7) days of the date it knew or should have

known of the basis for the protest. In the likely event that there are grounds for protest PS

discovers within the documents it requested or as a result of the debriefing, PS will have seven

(7) days to file another protest, and this protest and appeal process will restart. *See id*. Thus,

producing the relevant documents and providing PS the debriefing afforded to it by MWAA's

contracting rules would allow PS to consolidate its protest grounds into one document for

MWAA's consideration.

Furthermore, providing a debriefing based on a full document record is efficient, fair, and

widely practiced. Typical protest procedures at the Federal, State, and Local levels provide for a

post-award debriefing before a protest. *See, e.g.*, FAR 15.505, Preaward Debriefing Offerors;

FAR 15.506, Postaward Debriefing of Offerors; FAR 33.104(c)(1) ("When the agency receives

notice of a protest from the GAO within 10 days after contract award *or within 5 days after a*

*debriefing date offered to the protester for any debriefing that is required by 15.505 or 15.506*,

whichever is later, the contracting officer shall immediately suspend performance or terminate

the awarded contract…") (emphasis added). Similarly, typical protest procedures at the Federal,

---

[2] Inconsistently, the Authority wishes to issue a contract award "[s]ince the Airports Authority has denied this Protest," Decision at 7, but it has not restarted the debriefing process it cancelled "because of the Protest." Debriefing Cancellation Notice, Exhibit 1.

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

March 17, 2025
Page 5

State, and Local levels provide for the production of relevant documents before a protest. *See, e.g.*, 4 C.F.R. § 21.3(d) ("The report shall include … a copy of all relevant documents, or portions of documents, not previously produced, including, as appropriate: the bid or proposal submitted by the protester; the bid or proposal of the firm which is being considered for award, or whose bid or proposal is being protested; all evaluation documents; the solicitation, including the specifications; the abstract of bids or offers; and any other relevant documents."). These well-established protest procedures for public procurements seek to deal with protest issues efficiently and fairly by issuing a single decision on the full record, allowing for a transparent and fair protest process that is also expedient.

Conversely, failure to provide a debriefing represents a material process failure by MWAA, not only by staggering the production of procurement information, and thus staggering the protest process, but also wherein the Authority loses credibility—and the process becomes non-transparent—by failing to engage with bidders who are following the established protest procedure. Additionally, the Authority misses out on an opportunity for it to hear feedback and/or constructive criticism, which could impact current and future procurements, as well as the procurement and protest processes as a whole. Thus, the Authority's procedures are not only inefficient and ineffective, but they also undermine transparency. Respectfully, the CEO should direct the Authority to release the requested documents and conduct a debriefing before continuing this protest process.

## II.  PS's Protest Grounds Were and Are Timely.

Each of PS's protest arguments were and are timely, contrary to the Authority's finding in the Decision. PS timely submitted its Phase 1 proposal on or about September 15, 2023, and submitted its Phase 2 Proposal on or about October 7, 2024. *See* PS's Phase 1 Proposal; PS's

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

March 17, 2025
Page 6

Phase 2 Proposal.  On February 7, 2025, PS received a notice from Mr. Laffert at the Authority advising PS that the "Authority intend[ed] to award a contract to DAAI in the amount of $104,716,074.17 for the total Ground Rent and Minimum Annual Guarantee."  Notice of Award Email.  Accordingly, it was on February 7, 2025 that PS first learned of the bases for its Protest.  PS submitted its Protest on February 14, 2024, within seven (7) days of that email.

The Authority's contention that PS's protest arguments are untimely is incorrect.  First, the Authority claimed that PS's arguments regarding the extension of the Phase 2 deadline should have been brought within fourteen (14) days of Amendment No. 3.  Decision at 4; *see also* Contracting Manual 9.2.1.  However, PS's disputes about that extension were not related to the terms of the extension itself, but rather to the underlying facts about the ownership group that made up DAAI's offer—the identity of which would not be revealed until the Authority gave PS its notice of unsuccessful offer on February 7, 2025.  At the time the Authority issued Amendment 3, it had revealed nothing about DAAI's ownership structure, nor its proposal—the amendment says ***nothing*** other than to say the deadline was extended.  RFP Amendment 3.

The Authority's justifications for the Amendment, detailed in the Decision, that the offerors needed additional time to consider answers to questions submitted to the Authority and "to accommodate the TEC members' availability to evaluate proposals" are not supported by the record, and may even support PS's argument.  PS did not need additional time to answer questions and made no indication to the Authority that it did.  Therefore, if the Authority extended the deadline to give offerors extra time to consider responses, it did so with DAAI alone in mind.  Additionally, the Authority's second stated reason for issuing Amendment No. 3—that the TEC members needed more time to evaluate proposals—is nonsensical.  The RFP afforded the Authority 180 days to accept award, so delaying the submittal deadline would have

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

March 17, 2025
Page 7

minimal effect on the TEC's review process.  *See* RFP at 17.  PS could not have known about these rationales because the Amendment was silent on the reasons for an extension.  RFP Amendment No. 3.  The Authority wrongfully suggests that PS needed to bring its protest grounds about DAAI's ownership structure at an intermediate juncture, before PS even could have been aware and within fourteen (14) days of an Amendment that said nothing except that the due date had changed.  The Authority mistakes the point at which PS knew or should have known the basis for that protest ground, and therefore, PS's protest ground regarding Amendment No. 3 was timely.

Similarly, PS's arguments against DAAI's Phase 1 technical requirements were not time-bound by the May 8 site visit.  First, the Authority made an inappropriate assumption when it argued that "PS knew that [DAAI] was in the competitive range and the Airports Authority determined [DAAI] met the Phase 1 technical requirements" "[w]hen PS saw DAAI participating in the May 8, 2024, site visit."  Decision at 4.  The Authority's unrealistic assumption suggests that, at the time of that meeting, PS knew that DAAI, specifically, was present, and/or knew who employees from DAAE were and why they were at the meeting.  In reality, MWAA did not introduce PS to DAAI or indicate that the site visit necessarily indicated those in attendance were offerors who had passed Phase 1 and were selected to participate in Phase 2.  The fact that there were other, unknown individuals in attendance at the May 8 site visit did not put PS on notice that the Authority had made its ultimate Phase 1 determination that DAAI, specifically, was in the competitive range.

Second, RFP Amendment 2, which scheduled the site visit, contained several significant changes, chiefly including a change to the location of the lease.  RFP Amendment 2.  The Amendment did not include any indication that Phase 1 was complete or had been adjudicated.

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

March 17, 2025
Page 8

*See id.* Page 15 of the RFP stated, "[u]pon completion of Phase 1 technical evaluation, the

Authority will select and notify one or more qualified Offerors (competitive range) who it

determines submitted the most highly-rated technical proposals to participate in Phase II of the

procurement process." That did not happen. PS was never notified of the completion of Phase I.

Nor was PS required to investigate or infer that Phase 1 had, in fact, been completed.

The Contracting Manual indicates that:

> Protests that are based on the manner in which Offers were evaluated
> or on which a Contract was awarded may only be made by an
> Offeror who submitted an Offer and must be received no later than
> seven (7) Days after the Offeror knew or should have known of the
> basis for the protest.
>
> Protesters are deemed to know the basis for the protest on the earliest
> applicable date of the following:
>
> > (1) Public Bid opening;
> > (2) Communication was made regarding notice of
> > unsuccessful Offer;
> > (3) Contract was recommended for approval to the
> > Authority's Board; or
> > (4) Contract award was posted publicly.

Contracting Manual § 9.2.2. Here, at the time of the site visit, MWAA had not indicated the

status of its Phase 1 evaluations at all—there was no public bid opening, no communication

regarding notice of unsuccessful offer or award, no recommendation for approval, and no

contract award. PS could not have known the manner in which it or any other offeror was

evaluated because it was unaware even of the status of that evaluation, much less the detailed

substance comprising an evaluation. PS only knew, and only could have known, the results of

the evaluation after notice of award or after receiving results of an evaluation. Results of an

evaluation were never given to PS, *see also* Section I.C. *supra*, so it was limited to the notice of

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

March 17, 2025
Page 9

award.  PS filed its Protest within seven (7) days of that notice and, therefore, its Protest is

timely.

In sum, each of PS's Protest grounds remain timely and valid, and the Authority's

Decision dismissing those grounds should be overturned and those grounds substantively

addressed.

## III.    The RFP Contained a Latent Ambiguity—and the Authority's Failure to Distinguish between daa and daa International Represented Unequal Treatment of the Offerors.

The Decision indicated that the Authority allowed DAAI to use its parent company's

corporate experience, international network, and technical benefits to complete its proposal.  *See*

Decision at 3 ("nothing in the Solicitation expressly prohibited an Offeror from [referring to its

parent company]").  However, the RFP does not make clear that an offeror's parent company

experience, international marketing capabilities, and past performance can be utilized as part of

the offeror's experience.  *See generally* RFP.  The ambiguity of the definition of "offeror" was

first made known to PS when it received the Decision.  Had PS known that it could include its

parent company, it would have included in its proposal the international network, support, and

benefits offered by its international parent company, Group ADP.  By failing to make clear in the

RFP what entities were allowed to be relied on, and then allowing DAAI to use the experiences

of its parent company, other entities with whom it has a corporate relationship, and unnamed

subcontractors, but not PS, the Authority unfairly tilted the scales in favor of DAAI.

Furthermore, allowing DAAI's proposal to rely on the experience of additional entities but not

PS's proposal does a disservice to the Authority, who misses out on the chance to fully evaluate

the additional capabilities and benefits of PS when considering its relationship with Group ADP.

Solicitations must contain sufficient information to enable offerors to compete

intelligently and on a relatively equal basis.  *See Government & Military Certification Sys. Inc.*,

**CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE**

March 17, 2025
Page 10

B-411261, June 26, 2015, 2015 CPD ¶ 192 at 5; *Tennier Indus., Inc*., B-299624, July 12, 2007, 2007 CPD ¶ 129 at 2.  In this regard, an ambiguity in a solicitation exists where two or more reasonable interpretations of the solicitation are possible.  *See, e.g.*, *Colt Def., LLC*, B-406696, July 24, 2012, 2012 CPD ¶ 302 at 8.  An obvious, gross, or glaring error in a solicitation is a patent ambiguity, whereas a latent ambiguity is more subtle.  *Id.*  Where there is a latent ambiguity in the solicitation, both parties' interpretation of the provision may be reasonable, and the appropriate course of action is to clarify the requirement and afford offerors an opportunity to submit revised proposals based on the clarified requirement.  *Id*.; *Coastal Int'l Sec., Inc.*, B-411756, Oct. 19, 2015, 2015 CPD ¶ 340 at 4.

The RFP stated that the criterion under Phase 1 and 2 would be evaluated on the "***Offeror's***" financial position, past performance, proposed offering & marketing approach.  *See* PS's Phase 1 Proposal at 2-3 (emphasis added).  Importantly, the RFP clearly distinguished between "offeror" and "parent company," as it required the offeror to submit information about its parent company:

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

March 17, 2025
Page 11

**2     Parent Company and Identifying Data**

A.   A parent company, for the purpose of this provision, is one that owns or controls the activities and basic business policies of the Offeror. To own the Offeror's company means that the parent company must own at least 51% of the voting rights in that company. A company may control an Offeror as a parent company even though it does not meet the requirement for such ownership if the parent company is able to formulate, determine, or veto basic policy decisions of the Offeror through the use of dominant minority voting rights, use of proxy voting, or otherwise.

B.   The Offeror _____ (Company Name) [ ] is, [ ] is not (check applicable box) owned or controlled by a parent company.

C.   If the Offeror checked "is" in paragraph B. above, it shall provide the following information:

Name and Main Office Address of              Parent Company's Employer's
Parent Company (include zip code)            Identification Number

_____              _____
_____
_____
_____

D.   If the Offeror checked "is not" in paragraph B. above, it shall insert its own Employer's Identification Number on the following line:

_____

E.   The Offeror (or its parent company) [ ] is, [ ] is not (check applicable box) a publicly traded company.

F.   Principal(s), for the purposes of this certification, means officers; directors; owners; partners; and persons having primary management or supervisory responsibilities within a business entity (e.g., general manager; plant manager; head of a subsidiary, division, or business segment, and similar positions).

The Offeror shall insert the name(s) of its principal(s) on the following line:

_____

RFP at 6.  Throughout this section, the RFP distinguished between the "Offeror" and its parent company as separate entities.  The RFP and evaluation documents only used "offeror" and did not explicitly allow for the inclusion of the parent company's experience, financial capabilities, or marketing network to be used in the proposal.  The Authority's interpretation: that "offeror" and "parent company" are at once terms of art, and also interchangeable, is a peculiar interpretation that could not have been anticipated by PS.  Based on PS's more reasonable interpretation (that "offeror" had a singular meaning), PS submitted its proposal to the Authority and only included its own past performance, financial capability, and proposed offering & marketing approach.

**CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE**

March 17, 2025
Page 12

Yet, the ambiguity was made apparent to PS in the Decision, where the Authority interchangeably used "daa International" (the offeror), and "daa" (its parent company). *See generally* Decision. The following examples from the Decision highlight how the Authority evaluated DAAI and its parent company interchangeably:

> daa's parent company operates a commercialized U.S. preclearance facility at Dublin Airport, T2, which opened in 2011. daa's proposal explained that this T2 facility is considered U.S. soil and the maintenance of it is subject to CBP, TSA, and Federal Aviation Administration requirements. T2 includes a subcontractor-managed TSA screening area, which is required to meet U.S. security screening standards and TSA security screening training procedures. PS believes that daa has no experience complying with technical licensing requirements. Even though daa is not a United States-based company, which was not a requirement of the Solicitation, its proposal detailed experience working with the applicable United States governmental agencies. Moreover, the construction firm that daa proposed to lead project delivery has experience working at Dulles International and expertise in the permitting processes, having successfully delivered many projects within active airport operations.
>
> *  *  *
>
> daa's Phase 1 technical proposal included audited financial statements and a recent Annual Report, which described the scope and organization of its operations. daa also disclosed its ownership by daa Group PLC in its Representations and Certifications. Although the Protest stated that PS avoided referring to its parent company in its response, nothing in the Solicitation expressly prohibited an Offeror from doing so. Thus, daa's proposal demonstrated the requisite experience, and the TEC properly determined that daa's proposal complied with the Solicitation's requirements.

Decision at 3. The reliance on experience from DAAI's ownership group, as well as the undisclosed subcontractor that manages the TSA screening area, *see id.*, expand the experience the Authority considered well outside the bounds of the entity that bid on operating the remote VIP services at IAD.

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

March 17, 2025
Page 13

Such an expansive evaluation unfairly favors DAAI at PS's expense.  The Authority used

DAAI's parent company to repeatedly justify its evaluation of DAAI's proposal.  *See id.*  It

closed by claiming that "nothing in the Solicitation expressly prohibited an Offeror from doing

so."  *Id.*  However, it is axiomatic that the absence of an express prohibition does not

automatically grant permission to offerors to use their parent company in their proposal.  Rather,

interpretation of solicitation provisions is determined "by reading the solicitation as a whole and

in a manner that gives effect to all provisions; to be reasonable, and therefore valid, an

interpretation must be consistent with such a reading."  *Unico Mech. Corp.*, B-420355.6, Aug. 1,

2023, 2023 CPD ¶ 182 at 11.  Based on the RFP's language, which clearly differentiated offerors

from their parent companies, PS reasonably assumed by the language of both the RFP and the

evaluation criteria documents that the proposal should be based on an offeror's ***own resources***

***and capabilities.***  Because PS reasonably interpreted the RFP to exclude its parent and other

related entities while the Authority allowed DAAI to include its parent and other related entities,

the RFP contained a latent ambiguity and defect that should be addressed by the Authority.

The latent ambiguity and resultant unequal treatment significantly undermine the fairness

and validity of the award decision.  PS and DAAI submitted proposals operating under

drastically different assumptions about what relevant experiences, financial capabilities, and

marketing approaches they could include.  The Authority then evaluated the proposals under

DAAI's interpretation that its parent company's experience, financial capability, and

international reach could be counted as its own.  The ambiguity compromises the ***fairness of the***

***competition in the past performance evaluation, the financial capability evaluation, and the***

***market approach evaluation***.  Moreover, the Authority prejudices itself by failing to fairly

evaluate PS's full capability, including its relationship with Group ADP, because it loses the

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

March 17, 2025
Page 14

chance to evaluate two large, connected organizations and their full capacities. Therefore, the apples-and-oranges comparison of DAAI, including all related entities, and PS, without its corporate partners, robs not only PS of a fair evaluation, but also MWAA of a full comparative evaluation. The Authority should engage in corrective action, amend the RFP to clarify whether and how offerors are able to use parent companies, subsidiaries, affiliates, and subcontractors in the submission of proposals, and allow for the resubmission of proposals on a common basis. Because, where there is a latent ambiguity in the solicitation, and both parties' interpretation of the provision may be reasonable, the only appropriate course of action is to clarify the requirement and afford offerors an opportunity to submit revised proposals based on the clarified requirement. *Id.*; *Coastal Int'l Sec., Inc.*, B-411756, Oct. 19, 2015, 2015 CPD ¶ 340 at 4.

## IV. <u>The Authority Incorrectly Determined that DAAI Met the RFP's Technical Requirements.</u>

The Decision highlights many of the numerous ways in which DAAI failed to meet the technical requirements and the ways in which the Authority evaluated their proposal inappropriately. In short, the Authority failed to evaluate DAAI according to the terms of the RFP by indicating DAAI's insufficient and irrelevant experience, and inadequate references, satisfied the RFP. The Decision makes clear that DAAI's represented experience inadequately addresses the RFP requirements, and possibly that DAAI either misrepresented or grossly overstated their relevant experience based on the examples referenced in the Decision. "Where a solicitation requires the evaluation of offerors' past performance, an agency has the discretion to determine the scope of the offerors' performance histories to be considered, ***provided all proposals are evaluated on the same basis and consistent with the solicitation requirements***." *Sam Facility Mgmt., Inc.*, B-292237, July 22, 2003, 2003 CPD ¶ 147 at 2 (citations omitted) (emphasis added). Here, where the Decision purports to highlight how DAAI met the

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

March 17, 2025
Page 15

requirements, it instead demonstrates areas of DAAI's proposal that fail to meet the requirements

at all. In evaluating those representations favorably, the Authority erred, prejudicing PS's

compliant proposal, and necessitating a reevaluation of the proposals.

First, the Decision reveals how DAAI's proposed experience as providing "remote VIP

services" does not comply with the requirements of the RFP. The RFP sought:

> to develop, lease, and operate a **Remote** VIP Passenger Processing
> Service for Commercial Airline Flights at Washington Dulles
> International Airport (herein after referred to as "Remote VIP
> Services") to receive, screen, and transport passengers and their
> luggage to/from gated commercial aircraft, obtain and provide the
> necessary airport, airline, and federal approvals and contracts, such
> as those required by the FAA, Transportation Security
> Administration ("TSA"), and U.S. Customs and Border Protection
> ("CBP"), and to provide passenger lounge services and amenities.

RFP at 13 (emphasis added). In support of this stated purpose, the Phase 1 technical evaluation

criteria the RFP required offerors to include:

> include a minimum of one (1) representative contract within the last
> ten years whereby the Offeror provided **Remote** VIP Services,
> **including** TSA screening services **and** direct access to gated
> commercial aircraft, for a minimum of two consecutive years
>
> … [and] …
>
> one (1) professional reference, including a name, title, phone
> number, and email address for each reference, from each of the
> following categories:
>
> i.      An airport client for whom relevant services are currently or
> were provided within the past ten (10) years and can serve as a
> source of information regarding the Offeror's past performance.
>
> ii.     TSA or CBP representative with whom the Offeror has/had a
> relationship to provide relevant services (currently or within the past
> ten (10) years) and can serve as a source of information regarding
> the Offeror's past performance.
>
> iii.    An airline representative with whom the Offeror has/had a
> relationship to provide relevant services (currently or within the past

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

March 17, 2025
Page 16

> ten (10) years) and can serve as a source of information regarding
> the Offeror's past performance.

RFP at 3 (emphasis added). Those instructions in the RFP require offerors to submit their

relevant experience providing **remote** VIP services that **include** TSA screening services **and**

direct access to gated commercial aircraft, but according to the Decision, that is not what DAAI

submitted. According to the Decision, DAAI' proposed experience included that it:

> operates its Platinum Services **remote** VIP services, which include
> **a remote, private terminal separate from the main terminal** that is
> open 24/7 for luxury travelers with **valet parking** services; **remote
> security screening, separate from the primary processing area**;
> remote immigration and customs facilitation, separate from the
> primary customs hall; luxury reception, lounge, and concierge
> services; **baggage services on departure and return**; and private,
> luxury-vehicle transport **direct to and from the client's commercial
> gate**. Additionally, passengers have access to a **private car park**
> directly outside Platinum Services.

Decision at 3 (emphasis added). While the Decision seemed to slight PS for using "publicly

available information, rather than the information that DAAI provided in its technical proposal,"[3]

publicly available information demonstrates that this proposed experience fails to meet the RFP

requirements. First, Platinum Services in Dublin is simply **not** remote—rather, it is connected to

Terminal 1 of the Dublin Airport. *See* Platinum Services' Brochure, Exhibit 2 at 22-23. The

entrance to Platinum Services is immediately past the arrival doors in Terminal 1, next to a bus

stop, *see* image below,[4] and accessing it requires driving "in the lane marked 'Coach Park', [and

following] signs for Terminal 1 and the Short Term Car Park. *Id.* at 22-23. Such a location,

---

[3] Glossing over the fact that, as indicated in Section I(C) *supra*, the Authority failed to provide access to DAAI's proposal.

[4] https://www.google.com/maps/@53.4283304,-6.2444134,3a,75y,227.44h,83.13t/data=!3m7!1e1!3m5!1sfniVszLx17DCWjGdjveUdA!2e0!6shttps:%2F%2Fstreetviewpixels-pa.googleapis.com%2Fv1%2Fthumbnail%3Fcb_client%3Dmaps_sv.tactile%26w%3D900%26h%3D600%26pitch%3D6.874773471226078%26panoid%3DfniVszLx17DCWjGdjveUdA%26yaw%3D227.43661595288336!7i16384!8i8192?entry=ttu&g_ep=EgoyMDI1MDMxMi4wIKXMDSoASAFQAw%3D%3D

**CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE**

March 17, 2025
Page 17

connected to the terminal, and requiring access through the main bus lane is not "remote," as

required by the RFP, is not "a remote, private terminal separate from the main terminal," as

described in the Decision, at 3, and is not typical of the discretion and privacy VIP clientele

expect.



Relatedly, the "private car park" from DAAI's proposal, which was mentioned in the Decision as

meeting the evaluation criteria, is only for drop-off and pick-up, ***not*** for parking, as DAAI

requires patrons to park in the main garage.  *See* Platinum Services' Terms and Conditions,

Exhibit 3 at 2-4 ("We provide parking in a designated car park for users of the Service ***close to***

Platinum Services. . .", including "other users of our car park," and noting that parking charges

apply to the car park) (emphasis added).  Furthermore, given the location of Platinum Services

next to Terminal 1, the "private car park directly outside Platinum Services," Decision at 3, is

hardly private, much less remote or VIP.  In fact, the terms and conditions of Platinum Services

indicate a host of seemingly default luxury amenities that DAAI simply "never provides:"

> •      Any assurance that you will always get to your flight on
> time. …
> …

**CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE**

March 17, 2025
Page 18

• Protection from criminal activity that may damage or cause loss of parts or the entire of a Parked Vehicle or possessions or injury to individuals unless we are causing the criminal activity.

*** 

• Protection from other users of our car parks that cause damage to you, your travelling companions or to the Parked Vehicle.

• Travel arrangements for pets or any assurance concerning documentation associated with transportation of pets.

• Transport of any carry-on luggage or possessions between Platinum Services transport vehicle and the aircraft.

• Transport from the residence or hotel of a member of your Group to/from the Platinum Services Facility. We may make a booking on your behalf for these services but any agreement for the service is between you and the transport provider.

• We do not provide food and beverage to meet all dietary requirements. We may not have certain food types available at all times. A list of allergen book is available upon request.

• Luggage storage facilities.

Platinum Services' Terms and Conditions, Exhibit 3 at 2-3.

Moreover, Platinum Services **does not include** remote TSA screening services as required by the RFP—the Dublin screening services are operated as a standalone "commercialized U.S. preclearance facility" in Terminal 2 of the Dublin Airport that "is considered U.S. soil and the maintenance of it is subject to CBP, TSA, and Federal Aviation Administration requirements." Decision at 3. Those Terminal 2 TSA and CBP services are not remote, they are not managed by DAAI, and they are not exclusive as they are not limited to VIP travelers—all passengers, including the general public, transiting to the United States pass through the same TSA facility. *See* Platinum Services' Terms and Conditions, Exhibit 3 at 2. Additionally, while separate from the main terminal, immigration and passport control are not handled in Platinum Services' "remote" facility, but rather is handled at a desk in a corridor in Terminal 1 before entering the VIP area. *See id.* at 2. What is more, for passengers subject to U.S. TSA and CBP screening, passengers are not processed in the VIP area and then driven to their plane, as the Decision suggests. *See* Decision at 3 (claiming DAAI's proposal included "remote security screening,

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

March 17, 2025
Page 19

separate from the primary processing area; remote immigration and customs facilitation, separate from the primary customs hall; … and private, luxury-vehicle transport direct to and from the client's commercial gate"). Rather, those passengers are driven to the remote TSA facility for processing, a remote facility that is not operated or managed by Platinum Services. *See id.* at 2 ("In the case of US passengers we must bring you to US CBP and not directly to the aircraft. This is to allow US CBP to conduct their checks. You must then present yourself to the boarding gate."). As such, DAAI's experience, as indicated in the Decision, fails to meet the RFP requirements, and does so based on publicly available information, much less based on the information contained in the proposal, which the Authority so far refuses to produce. This means one of two things: either (1) DAAI misrepresented the Dublin Platinum Services experience in its proposal, embellishing or overstating its relevant experience to meet the RFP requirements, or (2) the Authority misevaluated DAAI's actual offerings, giving DAAI credit for services that were required by the RFP, but not proposed by DAAI.

The Decision also indicates that the Authority credited DAAI based on the experience of its parent company. Decision at 3. But the experience the Decision references and relies on is not relevant to the remote VIP services required by the RFP. *Compare* Decision at 3 *with* RFP, *generally*. While the Decision notes (i) DAAI's experience managing Dublin and Cork airports and regarding overseas airport operations in Saudi Arabia, the RFP seeks specific experience with remote VIP services, not full airport management; while the Decision notes (ii) DAAI's experience with airport retailing through Aer Rianta International, the RFP requests experience relevant to the provision of VIP services, not retail goods, and requests DAAI's experience, not the experience of a tangentially related subsidiary of DAAI's parent company, Aer Rianta International; while the Decision notes (iii) DAAI's experience in airport investments, airport

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

March 17, 2025
Page 20

investment is similarly not relevant at all to the provision of remote VIP services; and while the Decision notes (iv) DAAI's experience "delivering international aviation consulting services," international aviation consulting services are not part of this RFP, and are, again, not relevant to the provision of remote VIP services.  *Compare* Decision at 3 *with* RFP, *generally*.  The Decision indicates that DAAI's proposal submitted irrelevant experience not part of the RFP requirements and that the Authority then based its award on that experience.  Such an evaluation falls short of the Authority's own Contracting Manual rules, the RFP, and the basic tenets of procurement law.  *See e.g.*, *Sam Facility Mgmt., Inc.*, 2003 CPD ¶ 147; Contracting Manual § 3.5.3 ("The Solicitation shall clearly state the evaluation criteria, as selection will be made **only in accordance with the stated evaluation criteria.  Each separate criterion shall fully describe the necessary and relevant elements which will be evaluated**.") (emphasis added).

Lastly, the Decision also notes that "T2 includes a subcontractor-managed TSA screening area," but does not identify who that subcontractor is or whether or how that subcontractor relates to DAAI.  Accordingly, not only does the Decision explicitly note that the TSA facility is not included in DAAI's remote VIP services experience, as discussed above, but it also indicates that under DAAI's proposal, a crucial element of the RFP is run by a subcontractor in a separate area of the airport.  At a minimum, this revelation underscores the need for this Protest to evaluate the Authority's full evaluation and DAAI's proposal—*i.e.*, the Authority should provide the debriefing and requested protest documents to fully adjudicate this issue.  More holistically, the mention of the subcontractor calls into question DAAI's relevant, applicable experience and the Authority's evaluation of that experience.  Consistent with the foregoing examples of DAAI's apparent proposal shortfalls, the Authority should sustain PS's Protest in order to reevaluate the proposals in a manner consistent with the terms of the RFP.

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

March 17, 2025
Page 21

V.      **DAAI's Projected Profits of $5 Million a Year is Unachievable, and the Authority's Evaluation was Therefore Unreasonable.**

The Authority erred in evaluating DAAI's Phase 2 proposal as "Excellent," Decision at 6, because DAAI's projected revenue of an average of $5 million profit a year with a $49.9 million capital expenditure is an unachievable and overly ambitious projection. In the words of Mary Poppins: "That's a piecrust promise. Easily made, easily broken." *Mary Poppins* (Walt Disney Studios Motion Pictures 1964). To adequately estimate revenue, DAAI's proposal should have reasonably analyzed historical data, market research, and performed a thorough calculation of the expenses it can afford based on those data points, ultimately erring on the conservative side of the revenue projection. In reviewing DAAI's proposal without analyzing the context of the financial proposals each offeror submitted, the Authority failed to properly evaluate those proposals.

DAAI offered nonsensical numbers to the Authority with a promised $49.9 million capital expenditure, and figures boasting a $52 million revenue by year five. But by only reaching a profit of $4 million by year five, it would not be until year fourteen for DAAI to earn a cent in profit over their initial investment.[5] Alternatively, if DAAI were to invest $49.9 million into a High Yield Savings Account ("HYSA"), an incredibly low-risk investment account, it would yield a return of $111 million at the end of 20 years at a rate of 4.08% APY.[6] Such a high-

---

[5] DAAI has spent the last five (5) years diversifying its investment portfolio to international airports. Its strategy appears to rely on entering international markets and investing significantly in airport projects. The numbers DAAI chose for this project may seem generous on paper, but its decision is rooted in securing entry into the U.S. market. As such, the Authority should be wary of these flashy and generous-seeming numbers offered by DAAI and should consider its price realism. Awarding a contract to an offeror who tenders unrealistic promises and sets expectations higher than they can realize could lead to a massive risk to the Authority. This risk is not mirrored for DAAI because IAD is a minor and insignificant part of its overall initiative to diversify its portfolio of investments.
[6] Brendan Harkness; *Best High-Yield Business Savings Accounts for March 2025: Up to 4.08%*, Investopedia (Mar. 12, 2025), https://www.investopedia.com/the-best-high-yield-business-savings-accounts-8780948 (showing banks offering 4.08% APY for high-yield business savings accounts).

**CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE**

March 17, 2025
Page 22

risk capital investment by DAAI would negatively affect the Authority's ability to collect its

minimum annual guarantee rent from DAAI.

Utilizing only the numbers the Authority provided in the Decision and other publicly

available numbers, PS finds major challenges with DAAI's projections.  First, DAAI's projected

profits cannot adequately consider the market analysis and demand for private terminal services

at IAD.  Second, the only historical revenue DAAI can adequately rely on for its projected

revenue is based on services in an entirely different market than IAD and with a drastically

different service model.  Third, DAAI fails to explain how it intends to make the profit it alleges

after investing $49.9 million of capital expenditure into the terminal.  According to the Authority,

by year five, DAAI touts that it will reach $52 million in revenue, with a $4 million profit

retention.  Decision at 5.  Ultimately, DAAI runs on the hope that "everything is possible, even

the impossible," because only a belief in magic can adequately explain DAAI's financial

offerings.  *Mary Poppins* (Walt Disney Studios Motion Pictures 1964).

### a.  <u>DAAI's Market Analysis is Flawed</u>

The Authority erred in reviewing DAAI's proposal favorably because DAAI's revenue

projections rely on inaccurate market analysis and unproven marketing tactics.  In the Decision,

the Authority claims DAAI engaged with an "independent traffic advisor to validate its traffic

assumptions, and its revenue projections are supported by an extensive marketing campaign that

DAAI outlined in its proposal."  Decision at 5.  Additionally, DAAI allegedly "undertook a

comprehensive review of the pricing market domestically and overseas to determine the most

appropriate model for passengers."  *Id.*  However, the analysis DAAI performed could not have

adequately analyzed "the pricing market domestically" because PS is the only offeror of private

terminal services of the type requested by the RFP domestically and the prices DAAI proposed

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

March 17, 2025
Page 23

are unrealistic and unreasonable compared to PS's offerings and decades of actual experience and revenue receipts. Furthermore, its revenue projections hinges on the success of "an extensive marketing campaign" that is theoretical, but which has never been tried or successfully performed in the United States.

To adequately understand the market demand for Remote VIP Services at IAD, the Authority should have considered comparative services at other airports in the United States. The only comparable remote VIP services located in the United States are currently being operated by PS at both Los Angeles International Airport ("LAX") and Hartsfield-Jackson Atlanta International Airport ("ATL"). Based on the OAG rankings for 2024, ATL ranks as the busiest global airport of 2024 and LAX ranks as the fifth busiest airport in the United States.[7] In 2024, ATL saw 108.1 million passengers and LAX saw 76.5 million passengers. In comparison, IAD saw around 27.3 passengers. Furthermore, the DMV area has 5,732 Ultra-High Net Worth Individuals ("UHNWI") (>$50M) individuals with primary or secondary residences in Washington D.C., in comparison to 13,194 in Los Angeles, 3,420 in Atlanta.[8] *While the number of UHNWI's in the DMV area is substantial, the comparison between the DMV area with LAX and ATL shows a clear disparity in market potential.*

Using LAX as a benchmark for private terminal services in the United States, PS's sales and revenue performance are listed below from 2017-2022:

---

[7] OAG, https://www.oag.com/busiest-airports-world-2024 (last visited Mar. 16, 2025).
[8] Samanda Dorger, *The Cities Where the Most Ultra-Wealthy People Live*, TheStreet (Mar. 14, 2023 at 10:12 AM), https://www.thestreet.com/politics/cities-where-the-most-ultra-wealthy-live#gid=ci02b9a24e60002692&pid=new-york-manhattan-nyc-sh.

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

March 17, 2025
Page 24

**Sales and Revenue Performance (at LAX)**

Our sales have seen rapid growth over the past six years. 2020 and 2021 were difficult years for the aviation industry due to the COVID-19 pandemic, but since the lifting of air travel restrictions, we haven't looked back. The table below shows our growth at LAX.

| Year | Sales | Passengers | Revenues to LAWA |
|------|-------|------------|------------------|
| 2017 | $3,989,859 | 4,663 | $3,488,398 |
| 2018 | $13,427,671 | 16,984 | $3,637,181 |
| 2019 | $19,992,887 | 27,078 | $3,865,399 |
| 2020 | $10,098,174 | 9,389 | $3,909,181 |
| 2021 | $22,386,711 | 28,345 | $3,985,413 |
| 2022 | $43,286,268 | 48,503 | $4,182,531 |

INFORMATION MUST BE REDACTED IF THIS DOCUMENT IS SHARED EXTERNALLY

PS's Phase 2 Proposal at 5. Based on this data, IAD's private terminal services can predict, ***at most***, a passenger rate of roughly 17,000 passengers by year five.[9] IAD cannot reasonably expect to significantly surpass LAX's numbers based on the data points above of both the regional market analysis and the overall passenger volume at IAD. PS's projected revenue predictions are based on the ***current demand*** for private terminal services in the United States, as well as historical data showing the rate of demand for these services at major airports in the United States. As such, 17,000 passengers utilizing Remote VIP Services at IAD is a reasonable estimate for the passengers it accommodates each year. At an estimate of 17,000 passengers a year, DAAI's revenue projection of $52 million at year five is overly ambitious, when paired with its high initial investment and significantly cheaper services. Decision at 5.

DAAI's numbers likely come from one of two misunderstandings: 1) severely overestimating IAD's overall market opportunity for the private terminal services and/or being aggressively optimistic about its ability to capture the market, or 2) offering completely different services than true "VIP services" by lowering its prices so a larger share of the market can access the lounge. ***First***, if DAAI is overpromising on the amount of the market share it can capture for

---

[9] Calculated using the ratio of passenger volume at LAX in comparison to IAD, and historic usage rates for private terminal services at LAX. (76.5 million / 27.3 million = 2.80; 48.503 passengers utilizing private terminal services at LAX divided by 2.8 = 17,322 passengers)

March 17, 2025
Page 25

its services, then it will fail to recuperate its $49.9 million capital expenditure, and fail to turn a profit for the 20 years it is obligated to provide these services. The Authority should be wary of these flashy and deceptively generous numbers offered by DAAI and should consider its price realism. ***Awarding a contract to an offeror who tenders unrealistic promises and sets expectations higher than they can realize can lead to a massive risk to the Authority and longevity of the program.*** PS has invested in five high-traffic and busy airports with larger private terminals, and as can be seen, its capital expenditure has not surpassed $25 million:

**Locations**

We currently have two live Remote VIP Service operations, PS LAX and PS ATL. We also have two new sites, PS DFW and PS MIA and anticipate that these sites will be open in 2024 and 2025. We are also in the advanced stages of introducing our services at several other major airports across the USA; including JFK. The table below provides a summary of our contracts:

| Airport | Contract Duration | New Jobs | Capital Investment |
|---------|-------------------|----------|--------------------|
| LAX | 2016-2031 | 218 | $22,000,000 |
| ATL | 2023-2038 | 60 | $4,000,000 |
| MIA | 2024-2043 | 100 | $23,000,000 |
| DFW | 2024-2034 | 75 | $15,000,000 |
| JFK | TBC | 200 | $25,000,000 |

PS's Phase 2 Proposal at 3. A ***reasonable and fair*** capital investment will ensure that Dulles' remote VIP services terminal continues to operate and grow in a healthy and eventually profitable way, rather than on a gamble with double the capital investment upfront.

DAAI's high-risk capital investment and high revenue projections further highlight its lack of experience in building Remote VIP Services. DAAI has not invested in services like this before. Its international investment portfolio consists predominantly of investments in international airports such as Red Sea International Airport ("RSI"). DAAI's strategy of making large capital investments in airports is relatively safe because of the high market potential and generally safe return on investment.[10] However, the same investment strategy DAAI applies to

---

[10] Michael Burns, *The "new normal" for airport investment* 13 (2013), https://www.pwc.com/ee/et/publications/pub/new-normal-airport-investment.pdf ("Many investors see airports as

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

March 17, 2025
Page 26

airports cannot be applied to the requirements of the RFP because the market is much more exclusive and limited than the general public and its revenue projections are tied to the use and repeat use of its services by a specific clientele.

      **Second**, if DAAI is achieving their numbers by pricing their package for IAD's Remote VIP Services similarly to its Platinum Services at Dublin Airport, its services will miss the mark for the type of clientele IAD is hoping to attract—government officials, foreign dignitaries, c-suite executives, celebrities, and UHNWI (hereinafter, collectively, "clientele").  In that case, DAAI's services will be nothing more than a luxury lounge with a-la-carte add-on options.  The RFP is asking for more than just a luxury lounge, but rather a remote VIP terminal coveted by the clientele IAD hopes to attract.  DAAI itself admits to struggling to balance the "platinum" feel to their services while keeping prices so low at their Dublin Airport.[11]

      For example, Dublin Airports Platinum Services are marketed toward "honeymooning couples," and as "peachy gifts" to give friends and family or a "treat for a special occasion" because its services are "cheaper than business class flights."[12]  This kind of marketing will fall flat with the clientele with whom IAD hopes to establish itself as a premier airport—as exclusive clientele's primary motivation for purchasing private terminal services is ***not the price point but the privacy and exclusivity of the services***.  Charging significantly lower prices to expand the

---

[11] relatively safe assets.  That is because airports typically offer stable cash flows with the potential to realize significant capital gains on disposal.").

[11] Fora Staff, *Inside Dublin Airport's 'secret third terminal' - the one where selfies are banned*, The Journal (Nov. 11, 2018 at 1:01 am), https://www.thejournal.ie/dublin-airport-vip-terminal-services-2-4341786-Nov2018/ (reporting that Mr. Bolger, who manages Platinum Services, states that DAAI's biggest challenge is promoting the service without ruining the 'exclusive' feel).

[12] Pól Ó Conghaile, *Dublin Airport's VIP Terminal: Inside the 'Platinum Services' used by airport A-listers like Taylor Swift*, Irish Independent (Dec. 23, 2018 at 21:30), https://www.independent.ie/life/travel/ireland/dublin-airports-vip-terminal-inside-the-platinum-services-used-by-airport-a-listers-like-taylor-swift/37615940.html.

**CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE**

March 17, 2025
Page 27

market potential for luxury services is a kiss of death—prestige pricing and limiting supply conveys to clientele that the Remote VIP Services are truly VIP services.[13]

As shown above, DAAI's market predictions are significantly flawed. Its revenue projections are high-risk and more likely to fail than turn a profit for itself or the Authority. Furthermore, it stakes its financial offer on "marketing campaigns" and pricing strategies that are unproven, unreliable, and completely unpredictable. DAAI has not operated in the domestic market and has never run a marketing campaign in the United States.

Meanwhile, PS's prices are based on realistic models rooted in its experience servicing large airports such as ATL and LAX with the exact Remote VIP Services IAD seeks through the RFP. PS provides practical numbers that IAD can rely on based on the decades of experience it has running these services in high traffic, high volume airports servicing the unique clientele that IAD is hoping to attract. Additionally, PS's membership package already includes many UHNWI, government officials, and/or celebrities. PS's targeted campaigning has proven itself in the United States, and its grown exponentially in recent years with terminals set to open at JFK, MIA, and DFW. Overall, PS offers a balanced, reasonable, low-risk capital expenditure that can ensure profits for both PS and IAD. The Authority erred in relying on DAAI's misleading and overly optimistic projections that are based on misunderstandings of the remote VIP services market and by failing to adequately evaluate PS's experience-based and realistic projections.

**b.   DAAI's Financial Offer Relies on Markedly Different Historical Data**

DAAI's projected revenue relies on historical revenue data from their only comparable experience, Dublin Airport's "Platinum Services." The RFP states that the Airports Authority is seeking proposals to provide "Remote VIP Passenger Processing Service for Commercial Airline

---

[13] Indeed, *What is Prestige Pricing? Strategies, Advantages and Examples* (Aug. 15, 2024), https://www.indeed.com/career-advice/career-development/prestige-pricing.

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

March 17, 2025
Page 28

Flights" to "receive, screen, and transport passengers and their luggage to/from gated

commercial aircraft. . . ."  RFP at 13.  The only program for which DAAI arguably has

experience is its "Platinum Services" package at Dublin.  The most current rates for its Platinum

Services are reflected below:

| 2025 RATE CARD | | Dublin Airport \| PLATINUM SERVICES |
|---|---|---|
| | | Each Way Incl. VAT |
| **Departure or Arrival** | | |
| Price for one person | | €395 |
| Each additional person | | €275 |
| Price per child (2-16 yrs old) | | €275 |
| **Transfer (Transit).** This covers arrival & departure within a maximum of 3hrs. | | |
| Price for one person | | €520 |
| Each additional person | | €345 |
| **Additional Services** | | |
| Car Parking | On-site private car parking per day | €50 |
| Chauffeur Service | To or from your next destination, prices from | €145 |
| Luggage | Two checked pieces per person | Free of charge |
| | each additional piece of checked luggage | €10 |
| **Surcharges** | | |
| Late booking fee: | 20% of the booking value will be applied to bookings made less than 16hrs before the flight | |

Terms & Conditions apply. Rates subject to change. Amounts are rounded to the nearest Euro, decimal charge may apply.

See Dublin Airport, *Platinum Services* (last visited Mar. 16, 2025),

https://www.dublinairport.com/enhance-your-journey/platinum-services.

At the time of proposal submission in 2022, Platinum Services was charging an even

cheaper rate of only €295 per person, with further discounts for additional persons and

children.[14]  Furthermore, in 2018, despite their significantly low rates for services, only 30,000

people a year were using Dublin Airport's "Platinum Services."[15]  Platinum Services offers

---

[14] Barry O'Halloran, *Dublin Airport partly shuts Platinum Services*, The Irish Times (Jun. 08, 2022), https://www.irishtimes.com/business/2022/06/08/dublin-airport-shuts-platinum-service/.
[15] [15] Fora Staff, *Inside Dublin Airport's 'secret third terminal' - the one where selfies are banned*, The Journal (Nov. 11, 2018 at 1:01 am), https://www.thejournal.ie/dublin-airport-vip-terminal-services-2-4341786-Nov2018/ (highlighting that roughly 30,000 people used the services in 2018 and DAAI's rates were only €208 per person excluding additional discounts for packages, meaning they only netted a maximum revenue of around €6 million).

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

March 17, 2025
Page 29

services to a completely different market than the one IAD targets, and lacks enough historical

success based on a higher price point to base a projection of $105 million of revenue across 20

years at IAD.  Overall, Platinum Services varies in both types of services offered and its pricing

model and is the only experience that DAAI can remotely claim is similar to the services

contracted for in the RFP.   As such, the Authority misevaluated the proposals by taking DAAI's

proposal at face value, without analyzing the source of its projections, while failing to adequately

credit PS for its experience-based metrics.

Altogether, based on the information provided by the Authority in the Decision, DAAI

provided the Authority with an aggressively optimistic, deceptively generous but ultimately

unfounded financial offer.  The Authority should re-evaluate DAAI's financial offer for accuracy

and realism.

**V.    <u>The Authority Used Unstated Evaluation Criteria to Determine the Award.</u>**

The Authority's Decision makes clear that it considered factors that were not part of the

RFP in making its decision.  Respectfully, the Authority acted in an arbitrary and capricious

manner when it used such unstated evaluation criteria to evaluate offerors and make an award

decision.

It is well established that a solicitation must reasonably inform vendors of the basis for

the evaluation.  *See, e.g.*, *Securifense Inc.*, B-421818.2, Oct. 23, 2023, 2023 CPD ¶ 271 at 7

(citations omitted).  Indeed, "[a]n agency decision is also arbitrary and capricious if the decision

is a product of the agency's application of unstated evaluation criteria."  *Golden IT, LLC v.*

*United States*, 165 Fed. Cl. 676, 686 (2023), *aff'd*, No. 2023-1992, 2024 WL 4100253 (Fed. Cir.

Sept. 6, 2024).  Notably, the Authority's Contracting Manual requires as much:

> The Solicitation shall clearly state the evaluation criteria, as
> selection will be made ***only in accordance with the stated***

**CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE**

March 17, 2025
Page 30

> *evaluation criteria. **Each separate criterion shall fully describe the necessary and relevant elements which will be evaluated**. Evaluation criteria must not be designed to favor any specific Offeror. The use of sub-criteria must be approved by the Contracting Officer.*

Contracting Manual § 3.5.3 (emphasis added). The Contracting Manual also provides that:

> EC members shall evaluate each ***proposal against the evaluation criteria***. The EC Chair and the Contracting Officer shall assure that evaluation approaches used are consistent for all proposals. EC members' judgment ***must be based on facts as presented in the proposal***, performance evaluations on file with the Airports Authority or otherwise obtained as part of the procurement process, as well as first-hand knowledge from the panel members from execution of prior Contracts.
>
> <div align="center">***</div>
>
> (1)    Prior to the start of evaluation, the Contracting Officer shall ensure that the EC members have a common understanding of how the proposals are to be evaluated. ***Only the evaluation criteria included in the Solicitation shall be used for the evaluation.*** Also, the relative order of importance of the evaluation criteria cannot be changed from that in the Solicitation.
>
> (2)    Working independently, the EC members shall evaluate the proposals, make notes concerning the strengths and weaknesses of each proposal, and rate each proposal ***in an impartial and objective manner relative to each evaluation criterion***. EC members should ***carefully document any areas of noncompliance with the specific requirements stated in the RFP***.
>
> (3)    After each EC member has completed evaluation of all proposals, the EC will hold an organized discussion of the strengths and weaknesses of each proposal ***in terms of the evaluation criteria***. In the event of vague, conflicting, or missing language in a proposal, an evaluator may request the Contracting Officer to seek clarification from the Offeror (*see* Section 3.5.5).

*Id.* at § 3.5.7.3 (emphasis added).

> Here, the Phase 2 Evaluation Criteria indicated that:

> Phase 2 Technical Proposals will be evaluated based on the following Technical Evaluation Criteria:
>
> 1.    Revenue Projections

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

March 17, 2025
Page 31

> 2.    Initial Capital Investment and Mid-Term Refurbishment
> 3.    Sustainability Plan
> 4.    Plan to Meet Small Local Business Enterprise (SLBE) and
> Airport Concession Disadvantaged Business Enterprise (ACDBE)
> Participation Requirements/Goals Plan

RFP Phase 2 Requirements at 3.

However, in its Decision, the Authority explicitly noted that it relied on the offerors' proposed percentage rent as part of an overall calculation of "offered payment." Decision at 5 ("[PS's offered] payment to the Airports Authority is calculated as the sum of PS's proposed $151,493 ground rent, $675,305 MAG and PS's estimated $1.4 million in Percentage Rent. … *While Percentage Rent did not form the basis of evaluation of Financial Offers*, [DAAI]'s offer is clearly more advantageous to the Airports Authority than PS's.") (emphasis added). The Authority's claim that DAAI's proposal is "more advantageous" than PS's is wholly unjustified. That statement suggests that the Authority made its decision on the Phase 2 Evaluation Criteria on something other than the evaluation criteria that were stated in the RFP and around which the offerors addressed their proposals. We respectfully note that the Authority's assertion is also internally contradictory: it cannot in the first half of the sentence state that "Percentage Rent *did not form the basis of evaluation* for Financial Offers" but in the second half of the sentence state that the DAAI's "offer is clearly more advantageous" because of the proposed Percentage Rent. *Id.* The Authority therefore arbitrarily and capriciously applied unstated evaluation criteria to evaluate offerors on the combined category of "offered payment," rather than the stated evaluation criteria identified in the Phase 2 Evaluation Criteria. *See* RFP Phase 2 Requirements.

Similarly, the Decision suggests that PS received a lower rating than DAAI for its financial proposal because of the length of its revenue projections. Decision at 5-6. Nowhere did the RFP suggest that offerors would be rated higher based on the amount of financial

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

March 17, 2025
Page 32

documents that were provided. PS followed the rules of the RFP and was penalized for not adhering to a standard it did not know existed. Furthermore, if the Authority had questions regarding PS's financial projections, it could have asked. The Authority asked clarifying questions about PS's calculations on its financial proposal and could have asked any additional questions necessary to clarify the revenue projections. *See* Authority's Clarifying Questions, Exhibit 4.

Finally, the Decision indicates that the Authority granted significant credence to DAAI's representation that it "plans to work with its partners at BigBear.ai and Potomac to provide the latest technology in biometrics and passenger processing advances to ensure a smooth passenger service." Decision at 4. But nothing in the RFP indicated that biometrics or compatibility with "CBP's cloud-based facial recognition system" was required or was an evaluation metric. *Id.* at 3-4. Nor are those elements even necessarily desirable for this RFP, where the Authority seeks a remote, VIP service for high-end clientele to avoid the surveillance, scrutiny, and lack of privacy of a main airport terminal. *See generally*, RFP. The reference to providing biometric technology indicates that the Authority rewarded DAAI for an element of its proposal that was not required and does not align with the goals of the RFP.

In short, the Decision demonstrates that PS provided exactly what the Authority asked for in the Phase 2 evaluation criteria before then being evaluated on different metrics. Such an evaluation runs counter to well-established contracting practices and justifies the reevaluation and/or resolicitation of the RFP. *See Securifense Inc.*, B-421818.2, Oct. 23, 2023, 2023 CPD ¶ 271 at 5-6 (finding an Agency evaluated offerors unequally by assigning a weakness to offeror for failing to address audio and multimedia tasks, when no such requirement existed in the

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

March 17, 2025
Page 33

solicitation.)  The Decision shows that the Authority evaluated PS unfairly, and for that, the

award decision should be overturned and resolicited.

## VI.    **The Authority Failed to Conduct an Appropriate Best-Value Evaluation.**

The combination of each of the evaluation errors identified above caused the Authority,

necessarily, to conduct a flawed best-value evaluation.  In the RFP, the Authority proposed using

"a two-phase, competitively negotiated 'Best Value' procurement method … applicable to both

phases, hereinafter referred to as Phase I and Phase II."  RFP at 5.  Furthermore, the Contracting

Manual describes a best value procurement process as one in which "[a]ward of a Contract shall

be made to the responsible Offeror … whose proposal is determined to be the most advantageous

for and in the best interests of the Airports Authority."  Contracting Manual at 3.5.9.2.  In such a

procurement, the contracting officer may consider whether "a given price differential outweighs

the difference in technical merit."  *Id.* at 3.5.9.1.

As established herein, the Authority's evaluation of proposals demonstrates that the

Authority failed to properly evaluate which proposal was the most advantageous for and in the

best interest of the Authority, and therefore failed to conduct an appropriate best-value

evaluation.  Here, the Authority ignored a technically superior proposal in favor of a

(purportedly) better-priced, technically inferior option without adequate justification and by

using evaluation criteria that was wither not part of the RFP or within the RFP but latently

ambiguous.  Such an evaluation does not meet the standards of either the Contracting Manual or

the RFP itself.  The Authority's misapplied evaluation criteria cannot provide an adequate basis

for a properly executed best-value procurement.  As such, the Authority's decision should be

overturned, and the RFP should be resolicited and reevaluated under proper consideration.

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

March 17, 2025
Page 34

VII.    **The Authority's Unreasonable and Unlawful Acts Caused Substantial Prejudice to PS.**

As established herein, PS submitted an exceptionally strong proposal with its extensive experience in Remote VIP Services.  But for any and all of the Authority's errors described herein, PS—a highly qualified and highly rated U.S.-based offeror—would have received the Contract award.  Thus, for each of the reasons stated above, PS suffered undeniable prejudice as a result of the Authority's unequal and unreasonable evaluation.  *See*, *e.g.*, *Deloitte Consulting, et al.*, B-411884, *et al.*, Nov. 16, 2015, 2016 CPD ¶ 2 at 15 ("[B]ecause we find that certain areas of the agency's evaluation were not reasonable, and because the record does not show how a proper evaluation would have affected the ranking of vendors' quotations, we conclude that the protesters were prejudiced by the agency's evaluation."); *Solers, Inc.*, B-409079, Jan. 27, 2014, 2014 CPD ¶ 74 at 11 ("Because the record does not demonstrate that the agency reasonably considered the relative merits of the offerors' quotations, we have no basis to conclude whether this review would or would not have changed the agency's view of this competition."); *Celta Servs., Inc.*, B-411835, Nov. 2, 2015, 2015 CPD ¶ 362 at 10 ("[W]e resolve any doubts regarding prejudice in favor of a protester since a reasonable possibility of prejudice is a sufficient basis for sustaining a protest.").  Accordingly, PS's Protest should be sustained and the Authority's Decision should be overturned.

VIII.    **Request for Relief**

Based on the Foregoing, the Authority's Decision to deny the Protest, as well as its underlying evaluation of proposals and stated intention to award the Contract to DAAI, was unreasonable and unlawful in multiple material respects and has caused, and will continue to cause, undeniable prejudice to PS.  Accordingly, PS respectfully requests a ruling from MWAA's President and CEO that:

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

March 17, 2025
Page 35

1. Reverses in its entirety the VP-OSCM's Decision to Deny PS's Protest;

2. If applicable, cancels, stays, or rescinds any award of the Remote VIP Services contract;

3. Recommends that the Authority take corrective action, including but not limited to cancelling the intended award, revising the RFP, and reissuing the revised RFP for further competition;

4. Grants such other relief and remedies as the President and CEO determines to be just and equitable.

Respectfully submitted,

*/s/* Aron C. Beezley
Aron C. Beezley
Nathaniel J. Greeson
Charles F. Blanchard
Winni Zhang
*Counsel for PS*

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

# EXHIBIT 8

**Aron C. Beezley**
abeezley@bradley.com
202.719.8254 direct



April 17, 2025

**_VIA hand delivery to the Authority's Procurement & Contracts Department; certified mail, return receipt requested; and email._**

Ms. Felice Smith
Vice President and Secretary, Board of Directors
Metropolitan Washington Airports Authority
2733 Crystal Drive,
Arlington VA 22202

   **RE:**   **Solicitation No. RFP-23-21311**

   **SUBJ:**  **Review of Protest of The Private Suite IAD, LLC (dba PS)**

Dear Ms. Smith:

   The Private Suite IAD, LLC (dba PS) ("PS"), by and through the undersigned counsel, hereby respectfully files this timely Request for Review of the protest regarding the Metropolitan Washington Airports Authority's ("MWAA") evaluation of proposals under Solicitation No. RFP-23-21311 (the "RFP") and intended award of the Contract thereunder to daa International ("DAAI"). As discussed below, MWAA wrongfully conducted this procurement by failing to account for the RFP's latent defects, unreasonably evaluating DAAI's technical and price proposals, applying unstated evaluation criteria, and engaging in disparate treatment of the offerors, all of which contributed to an erroneous best-value procurement decision. By failing to adequately address each of these unreasonable and unlawful actions by the Authority, the various protest decisions regarding the RFP insufficiently address those procurement missteps.[1]

Accordingly, the MWAA Board of Directors (the "Board") should reverse the VP-OSCM, Julia.

---

[1] Although this Appeal does not rehash each issue under protest, PS incorporates by reference the entirety of each of its previous filings for context and appellate review by the MWAA Board of Directors.

**CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE**

Bradley Arant Boult Cummings LLP | 1615 L Street NW, Ste 1350 | Washington, DC 20036 | 202.393.7150 | bradley.com

Hodge's, March 10 decision denying the protest (the "Initial Denial"), the VP-OSCM's April 9 decision refusing to recognize PS's supplemental protest grounds (the "Supplemental Denial"), and the April 10 decision by MWAA President and Chief Executive Officer, John Potter, upholding Ms. Hodge's decisions (the "CEO Response").  PS files this final administrative appeal in order to exhaust its administrative remedies before exploring judicial options.

I.    **Threshold Matters**

    a.    **This Request for Review is Timely Filed.**

Pursuant to the CEO Response, Page 3, and Chapter 9.5 of MWAA's Contracting Manual, Revised Fifth Edition (5.2) ("Contracting Manual"), a protester may seek the Board of Directors' review of a protest within seven (7) days of the date of the CEO's response letter.  Here, the CEO dated his response letter to PS's protest appeal April 10, 2025 and delivered it to PS's counsel that day.  This request is submitted within seven days of that date and, therefore, is timely.[2] Similarly, although the Supplemental Decision was issued April 9, 2025, Ms. Hodge failed to provide PS the opportunity for review by the CEO.  Nevertheless, Mr. Potter addressed the Supplemental Decision in the April 10, 2025 CEO Response.  Thus, this appeal to the Board includes a timely response to both the Supplemental Denial and the CEO's review of that denial contained within the CEO Response.

    b.    **The Authority Must Not Award the Contract During the Pendency of this Request.**

Any actions to award the Remote VIP contract should be stayed.  Pursuant to Section 21 of the RFP, "[i]f a Contract has not been awarded at the time a protest is timely filed, the Contract may not be awarded while the protest is pending, unless the President and CEO

---

[2] Mr. Potter's Decision refers to a seven (7) **business** day deadline to submit this request.  Out of an abundance of caution, PS submits its request within seven (7) calendar days as suggested by the Contracting Manual.

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

determines that award of the Contract, and, if applicable, issuance of a notice to proceed, is in the Authority's best interest." RFP at 20; *see also* Cont. Manual, § 9.6. The Contracting Manual specifically includes this review mechanism as part of the protest process, and notes that a decision is final only after the CEO, or the MWAA Board where applicable, issues a decision. Cont. Manual, § 9.5. Here, a review by the MWAA Board is applicable. *See* CEO Response at 3. Therefore, the protest remains pending, and the Contract may not be awarded. Exhibit 1 at 20; *see also* Cont. Manual, § 9.6.

## II.    <u>Discussion</u>

### a.    <u>MWAA Conducted a Flawed Solicitation, and the Initial Decision Failed to Address Those Flaws.</u>

While the previous filings contain detailed analysis of the RFP and grounds for denial, this filing aims to provide a top-line identification of the flaws in the procurement process. As indicated in PS's initial protest filing, MWAA misevaluated both PS and DAAI's proposals, and in doing so, wrongfully credited DAAI where it fell short of the RFP requirements and wrongfully penalized PS where it excelled. The chart below identifies key differences between the respective proposals compared to the RFP requirements and the Authority's several evaluation errors related to those differences:

| Requirement | PS | DAAI | Notes |
|---|---|---|---|
| **1. Experience Operating Remote VIP Services with TSA Screening & Direct Aircraft Access** | ☑ Met – Cited LAX facility meeting all criteria. ATL operational at time of proposal, Miami & DFW awarded but not operational. | ✖ Did not meet as entity – DAAI lacked such experience; relied on parent company daa's experience at Dublin Airport. | In its debriefing, MWAA confirmed it evaluated DAAI's parent company experience, despite it being an unstated evaluation criterion. |
| **2. Experience Operating Remote VIP Services** | ☑ Met – LAX facility is located separate and apart from main terminal. | ✖ Did not meet – DAA's (not DAAI) Platinum Services is | |

| Requirement | PS | DAAI | Notes |
|---|---|---|---|
| | | located within the main terminal complex of Dublin Airport, connected to Terminal 1. | |
| **3. Secure Remote Parking** | ☑ Met – LAX facility contains secure, remote parking. | ✕ Did not meet – DAAI's Platinum Services vehicles are dropped off at Platinum Services but are then relocated to a nearby public parking lot. | |
| **4. Departing passenger screening within the facility in accordance with TSA requirements and then taken under escort by a driver and security detail via a waiting automobile to the terminal gate of the commercial aircraft.** | ☑ Met – PS does exactly this for all airlines at LAX and ATL and will do for DFW and MIA. | ✕ Did not meet – DAAI's Platinum Services has no TSA screening "within the facility" and cannot drive USA-destination passengers "direct to the terminal gate of the commercial aircraft. | |
| **5. Evaluation Limited to Offeror (Not Parent Company)** | ☑ Interpreted "Offeror" literally; did not include parent company. | ✕ Cited parent company experience (daa) and unnamed subcontractors. | MWAA admitted use of parent company experience, contradicting the stated criteria. |
| **6. Financial Capacity / Cash Flow** | ☑ Submitted reasonable and attainable financials for PS only. Financials based on actual performance of PS locations in US markets. | ✕ Submitted overestimated financials for daa (the parent company). Financials based on hypothetical projections and European market. | MWAA accepted parent company's financials, despite unclear guidance in RFP. |
| **7. Proposed Offering & Marketing Plan** | ☑ Provided a clear marketing and operations plan. | ☑ Included international marketing via parent. | DAAI credited with broader scope by |

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

| Requirement | PS | DAAI | Notes |
|---|---|---|---|
| | | | leveraging daa's international reach. |
| **8. Agreements with TSA, CBP, Airlines** | ☑ Existing agreements demonstrated; PS had TSA agreements already in place for LAX and ATL and has been working through the process with TSA for DFW and MIA.  It was PS who lobbied congress to create the Reimbursable Screening Services Program (RSSP).  It did not exist before PS.  PS has agreements in place with CBP for LAX, ATL, MIA, and DFW.  PS also has approvals for JFK and EWR. | ✕ Experience indirect—through daa's subcontractors only. | DAAI's CBP/TSA experience was overstated or misattributed—there is no TSA/CBP station located in Dublin's Platinum Services |
| **9. Evaluation of Past Performance** | ✕ MWAA only credited LAX experience; discounted ATL, DFW, MIA. | ☑ DAAI credited for daa's past airport ops experience. | MWAA rated PS only "Acceptable" despite superior direct experience. |
| **10. Equal Treatment of Offerors** | ✕ Treated inconsistently—held to narrower standard. | ☑ Treated favorably—allowed broader interpretation. | Key ground for protest (unequal evaluation & unstated criteria). |
| **11. Compliance with "Best Value" Procurement Method** | ✕ MWAA failed to follow best value by ignoring technical superiority. | ✕ DAAI's proposal contained unrealistic financials; technical proposal bolstered by non-offeror entities. | MWAA's flawed best-value assessment favored DAAI without justification. |

The takeaway is clear: PS met the terms of the RFP, while DAAI did not.  But while PS provided a technically superior proposal, MWAA gave both offerors a "Good" technical rating.  Conducting such an unreasonable procurement not only prejudiced PS, but also robbed MWAA of a superior product.  Purportedly, MWAA offset any discrepancy between the technical proposals by relying heavily on DAAI's proffered price.  But DAAI provided the Authority with

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

an aggressively optimistic, deceptively generous but ultimately unfounded financial offer. Accepting an offer based on questionable inputs surely represents a procurement evaluation flaw, but, more importantly, it represents an unacceptable risk to the financial health of MWAA. The Authority's reliance on unattainable financial projections could cause significant consequences regarding future financial planning.

Both the Initial Denial and the CEO's Response fail to adequately address the flaws within the procurement procedure and the flaws with DAAI's proposal. In doing so, those responses also fail to address the collateral consequences of such a flawed evaluation. The Board should review the Initial Denial and the CEO's response not only through the lens of whether MWAA conducted its procurement according to the terms of the RFP and the rules of the Contracting Manual (which it did not), but also with a view of the purpose behind those terms and rules—*i.e.*, with a consideration that the failures in process may lead to MWAA acquiring a worse contract.

**b.    Supplemental Denial.**

The Supplemental Denial, issued on April 9, 2025 and reviewed by the CEO in the April 10, 2025 CEO Response, gave short shrift to PS's additional protest grounds. Such treatment was improper. The Supplemental Denial made two overarching points: that there are no such things as "supplemental protests" based on the Contracting Manual, and that a debriefing could not, in any event, form the basis of additional grounds. These points are unsupported.

First, while the Contracting Manual does not specifically mention the term "supplemental protest" or a similar term, *see generally*, Cont. Manual, the Contracting Manual does not prohibit supplemental protests—in fact, it implicitly contemplates them. The Contracting Manual, § 9.2.2, states, "Protests that are based on the manner in which Offers were evaluated or on

which a Contract was awarded may only be made by an Offeror who submitted an Offer and must be received no later than seven (7) Days after the Offeror ***knew or should have known the basis*** for the protest." *Id.* (emphasis added). The Supplemental Denial suggests that this means PS "knew or should have known" the ***basis*** for its denial on February 7, 2025—*i.e.*, the date MWAA notified PS it was an unsuccessful offeror. Suppl. Den. at 1. But that notice contained nothing more than a notification that MWAA intended to award the RFP to DAAI. In its entirety, the notification contained only the following:



Initial Protest, Exhibit 4. Plainly, the notice contained nothing regarding the ***basis*** for why MWAA selected DAAI over PS. Therefore, PS did not know, nor should it have known, the basis for MWAA's decision until MWAA released further information. The Supplemental Denial's suggestion that PS was immediately on notice following the notice of unsuccessful offer of any and all potential bases for flaws in the evaluation runs counter to the plain language of the Contracting Manual and common sense.

**CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE**

PS learned additional grounds for protest during its March 26, 2025 debriefing.  It did not know those grounds before that date, and because MWAA had not shared those grounds previously, it could not, and should not, have known those grounds before that date.  As such, PS timely submitted an additional protest which highlighted the new information it recently learned.  The fact that MWAA's protest procedures allow for a debriefing or production of solicitation materials via a freedom of information request significantly later than the notice of unsuccessful offer represents a critical flaw in its procurement policies that will continue to present issues during future protests of MWAA procurements.  *See e.g.*, March 17, 2025 Protest Appeal at 3-5 (discussing flaws in MWAA's protest procedure).  But in relation to this protest, the flaws in that process do not change the stated guidance of the Contracting Manual, which allows protests after an offeror knew or should have known the basis for a protest.  Because PS did not know the basis for the supplemental protest grounds until its March 26, 2025 debriefing, MWAA was wrong to deny the protest and inadequately review those grounds.

Second, the Supplemental Denial suggests PS improperly used the debriefing to identify protest grounds.  *See* Suppl. Den. at 1-2.  MWAA correctly pointed out that the Contracting Manual identifies that debriefings will be "concentrated on the Offeror being debriefed."  Suppl. Den. at 2.  The Contracting Manual states:

> Concentration will be on the Offeror being debriefed, its submittal, and when appropriate, a general description of the basis for the Authority's selection decision.  The debriefing will address the strengths and weaknesses of the unsuccessful Offeror as related to the evaluation criteria in the Solicitation.

Cont. Manual, § 4.7.  But contrary to what the Supplemental Denial said, PS based its supplemental protest on those exact grounds.  *See* Suppl. Protest at 6 ("[D]espite MWAA's inability to discuss DAAI's proposal or the ongoing protest documents, its discussions ***about PS's proposal*** and ***how MWAA evaluated*** PS's proposal still shed light on elements of the

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

Protest….") (emphasis added).  PS's supplemental protest addressed how MWAA evaluated its proposal compared to the RFP.  The fact that those revelations also necessarily implicated how MWAA evaluated DAAI fail to make PS's protest grounds illegitimate.  Furthermore, the Contracting Manual states that debriefings "will **_concentrate_** on information that can be of benefit without revealing any sensitive or proprietary data regarding other Offerors."  Cont. Manual, § 4.7.  But the Contracting Manual does not state that information regarding other offerors is completely off-limits.  *See id*.  Any discussion of an unsuccessful offeror necessarily contains some reference to the successful offeror.  Therefore, MWAA was wrong to dismiss PS's supplemental protest based on the content of its debriefing.

Lastly, the CEO Response reviewed and endorsed these points in its April 10, 2025 response.  CEO Response at 2.  That analysis relies on the exact same legal reasoning and fails for the same reasons.  In sum, MWAA wrongly interpreted the Contracting Manual to deny effective review of PS's supplemental protest grounds.  The plain language of the Contracting Manual allows for protests within seven (7) days of the date the bases for protests were known or should have been known.  Attempts to limit that initiating event to the notice of unsuccessful offeror or to prevent the contents of a debriefing or records request from being included as a basis for a protest run counter to MWAA's own guidance, established public procurement law, and principles of basic fairness.  As such, the Board should review and consider PS's supplemental protest grounds as valid and timely.

    c.    **CEO's Response.**

The CEO Response, issued on April 10, 2025, failed to adequately address PS's valid protest grounds.  As indicated above, rather than re-hash each of the underlying protest grounds,

**CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE**

PS draws the Board's attention to the previous protest filings and highlights three crucial flaws in the underlying logic of the CEO Response.

First, the CEO Response highlights the provision in MWAA's Contracting Manual indicating that the Authority is not bound by the FAR, GAO caselaw, or other laws that govern federal procurement.  *See* Cont. Manual, § 1.7; CEO Response at 2.  But PS never suggested MWAA was bound by relevant FAR clauses or GAO caselaw.  Rather, PS highlighted similar, relevant public procurement law as examples to inform MWAA of typical protest and procurement procedures.  *See* Initial Protest at 18 ("While the Contract Manual indicates that it, and not federal procurement law, governs this MWAA bid protest, analogous federal law … inform[s] an analysis of the principles of fair competition in similar situations.").

Furthermore, while MWAA may not be bound by those laws, *per se*, MWAA's Enabling Act, 49 U.S.C. § 49101 *et seq.*, requires MWAA's governing lease to include certain provisions governing MWAA's operation of the airports, including a provision that states "[i]n acquiring by contract supplies or services for an amount estimated to be more than $200,000, or awarding concession contracts, the Airports Authority to the maximum extent practicable shall obtain complete and open competition through the use of published competitive procedures."  *Id.* § 49104(a)(4).  The Enabling Act further requires that MWAA's contracts be "awarded by procedures that follow sound Government contracting principles."  *See* 49 U.S.C. § 49106(g). This contract is a concession contract estimated to be more than $200,000, and therefore requires sound government contracting principles.  Those government contracting principles are necessarily informed by relevant other laws and decisions, including examples from the GAO caselaw and the FAR.  Therefore, those references can, and should, inform MWAA's procurement process and decisionmaking.

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

Second, MWAA was wrong to reduce the Best-Value decision to one based on price. Both the CEO Response and the Supplemental Denial identified that the evaluators awarded both DAAI and PS a "Good" rating for their overall technical proposals. CEO Response at 3. However, that reductive statement oversimplifies the comparative variance in quality between the proposals. *See*, Section II.a, supra; *see generally* Initial Protest. Characterizing both technical proposals as merely "Good," without considering the actual details within those proposals fails to provide a comprehensive review of the proposals, and dilutes the analysis made by the MWAA selection team regarding each offeror's technical proposal. Further, reducing both proposals to "Good" essentially turns a best-value procurement into an evaluation based wholly on price, ignoring the multifaceted reality of this procurement. *See e.g.*, *Cadre5, LLC*, B-422616, Aug. 28, 2024, 2024 CPD ¶ 204 at *8 ("[A]gencies may not base their selection decisions on adjectival ratings alone, as such ratings serve only as guides to intelligent decision-making; source selection officials are required to consider the underlying bases for ratings, including the advantages and disadvantages associated with the specific content of competing quotations."); *Mil-Mar Century Corp. v. United States*, 111 Fed. Cl. 508, 553 (2013) ("When assessing differences between proposals, the SSA should take into consideration not only the proposals' adjectival ratings but also information on advantages and disadvantages of the proposals. Looking beyond the adjectival ratings is necessary because proposals with the same adjectival ratings are not necessarily of equal quality."). Therefore, limiting the solicitation evaluation to price alone ignores the required "best-value" element of this proposal, and risks a procurement decision based entirely on price instead of substance.

Lastly, the CEO Response notes that PS included a reference to its parent company, Groupe ADP, as part of its financial proposal. CEO Response at 2. PS did include that

reference, but only in the context of demonstrating PS's robust financial support.  What PS did not do, and what was the subject of PS's protest grounds, was use Groupe ADP's experience as its own when submitting its technical proposal as examples of its own experience and capabilities, as DAAI did with its parent and affiliated companies.  *See e.g.*, Protest Appeal at 9-14 (highlighting the consequences and unfairness of DAAI's proposal including its parent company and tangentially related subcontractors).  MWAA's attempt to equivocate a limited reference to PS's corporate structure with DAAI's wholesale adoption of the experience of its parent company and other related entities mischaracterizes PS's protest grounds and seeks to ignore the substantive issues and latent defects within the RFP and MWAA's evaluation thereof.

In conclusion, the CEO Response failed to adequately address PS's protest grounds and wrongfully relied on easily rebuttable legal principles to do so.  The Board should consider the full scope of PS's protest grounds, and its legal justification, during its review of the protest filings.

## III.    Conclusion

Based on the foregoing, the Authority's Decision to deny the Protest, deny the Supplemental Protest, and the CEO's Response upholding those decisions, as well as MWAA's underlying evaluation of proposals and stated intention to award the Contract to DAAI, was unreasonable and unlawful in multiple material respects and has caused, and will continue to cause, undeniable prejudice to PS.  Accordingly, PS respectfully requests a ruling from the Board that:

1. Reverses in its entirety the VP-OSCM's Decision to Deny PS's Protest, Supplemental Protest, and the CEO Response;

2. If applicable, cancels, stays, or rescinds any award of the Remote VIP Services contract;

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

3.  Recommends that the Authority take corrective action, including but not limited to cancelling the intended award, revising the RFP, and reissuing the revised RFP for further competition;

4.  Grants such other relief and remedies as the Board determines to be just and equitable.

Respectfully submitted,

*/s/ Aron C. Beezley*

Aron C. Beezley
Nathaniel J. Greeson
Charles F. Blanchard
Winni Zhang

*Counsel for The Private Suite IAD, LLC (dba PS)*

CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE

# EXHIBIT 9



Metropolitan Washington
Airports Authority
1 Aviation Circle
Washington, DC 20001-6000

June 13, 2025

Aron C. Beezley
Bradley Arant Boult Cummings, LLP
1900 K Street, NW, Suite 800
Washington, D.C. 20006
Sent via email: abeezley@bradley.com

Re: Decision in Protest of Solicitation No. RFP-23-21311

Dear Mr. Beezley:

This letter is in response to your request that the Metropolitan Washington Airports
Authority ("Airports Authority") Board of Directors review your protest in the above matter
and reverse the Vice President, Office of Supply Chain Management's decisions, dated
March 10, 2025 and April 9, 2025, as well as the President and Chief Executive Officer's
decision dated April 10, 2025.

The Airports Authority has canceled the solicitation and rescinded its selection of DAA
International as the apparent successful offeror. Furthermore, the Airports Authority will
be issuing a new solicitation for Remote VIP Services.

Because the above actions provide Private Suites IAD, LLC (PS) with the relief it has
requested, the Board hereby dismisses PS's appeal and underlying protests as moot.

On behalf of the Board of Directors,

*Thorn Pozen*

Thorn Pozen
Chairperson

cc:    John Potter
       Chryssa Westerlund
       Ashley Carvalho
       Julia Hodge



**Dulles International | Reagan National | Dulles Toll Road**
mwaa.com

# EXHIBIT 10

**ATTACHMENT 01**
**EVALUATION CRITERIA AND TECHNICAL PROPOSAL SUBMISSION REQUIREMENTS**

## 01     EVALUATION CRITERIA

A.     Information submitted in proposals will be evaluated using only the criteria listed below. As used herein, the term "proposal" is synonymous with the term "Offer." Each criterion consists of all elements listed in the paragraph under each criterion. Please note that the elements listed in each of these paragraphs are not considered sub-criteria and will be evaluated collectively, not individually. In other words, when evaluating how well a Technical Proposal (which is the portion of the Offer described in 05 – Technical Proposal Submission Instructions) meets a particular criterion, the Authority will consider all the elements of that criterion together as a single criterion, not as separate sub-criteria. The Authority will base its evaluation on information provided by the Offeror in its proposal.

B.     The Authority reserves the right to (1) award the Contract without Discussions (2) to establish a competitive range of Offerors based upon its initial evaluation of the Technical Proposals (the technical evaluation) and at subsequent points during the evaluation process, (3). to conduct oral interviews with only the Offerors in the competitive range and to include the results of the interviews in its evaluation and to consider only these firms for a contract award, and (4) request Best and Final Offers (BAFO) if in the best interest of the Authority. If BAFOs are desired, the Contracting Officer will issue a Solicitation amendment containing the BAFO request. This amendment will be issued to all Offerors still within the competitive range and will state a deadline for receipt of the BAFOs. Offerors are not required to change their Technical Proposal or Financial Offer (defined below) in response to the BAFO request but must acknowledge the BAFO amendment even if they do not change their proposals. Contract award will be made to the Offeror whose offer is deemed to be technically acceptable, with the highest total Financial Offer for the Term and that the Airports Authority deems responsible in accordance with the Airports Authority Contracting Manual.

C.     Capitalized terms used in this document are defined herein or in Section V of the Solicitation.

**Definitions for Technical Evaluation**

Technical Proposals will be evaluated by their strengths, weaknesses and deficiencies against the evaluation  criteria and these attributes will be communicated to the Offerors for follow-up action as appropriate.

<u>**Definitions:**</u>

**Clarifications**:     Communications with an Offeror for the sole purpose of eliminating minor irregularities, informalities, or apparent clerical mistakes in the proposal. Unlike Discussions, Clarifications do not give the Offeror an opportunity to revise or modify its proposal, except to the extent that correction of apparent clerical mistake results in revisions.

**Discussions:**     Oral or written communications, including negotiations, between the Authority and an Offeror (other than Clarifications) that involve information essential for determining the acceptability of the proposal or to cure identified Deficiencies in the proposal.

**Deficiencies:**     Defects in the proposal which preclude acceptance and involve any part of the Offeror's proposal which would not satisfy the Authority's minimum requirements established in the Solicitation, including failures to meet specifications, submit

information, or questionable technical or management approaches. Deficiencies disclosed during Discussions are evaluated in two categories: (1) Material - basis for rejection of the proposal because further Discussions would be meaningless; or (2) Curable – the Offeror may correct the deficiencies through Discussions and the proposal may be brought into the competitive range.

**02    EVALUATION**

A.    **Technical Proposal Evaluation Ratings**

An adjectival rating will be given depicting how well the Offeror's Technical Proposal meets or exceeds the stated evaluation criteria, as follows:

**Unacceptable**    The proposal fails to meet the evaluation standard and the Deficiency is uncorrectable. The proposal would have to undergo a major revision to become Acceptable. The proposal has a demonstrated lack of understanding of the Authority's requirements or omissions of major areas.

**Marginal**    The proposal lacks essential information to support a rating of Unacceptable or Acceptable. Deficiencies found are not Material and are Curable through Discussions. These communications are not intended as a re-write of the proposal. Marginal is not intended as a final rating but used as a placeholder.

**Acceptable**    The proposal meets the evaluation standard. Any weaknesses the proposal has are correctable. The proposal has no Deficiencies.

Technical Proposals will be evaluated based on the following Technical Evaluation Criteria:

1. Ability to Meet the Authority's Requirements (Technical Approach)
2. Past Performance (Experience)
3. VIP Facility Construction

B.    **Financial Offer Evaluation**

The Airports Authority will evaluate financial offers for reasonableness, completeness, and realism as appropriate.

**03    TECHNICAL EVALUATION CRITERIA**

**Criterion 1:  Ability to Meet the Authority's Requirements (Technical Approach)**

This criterion will be evaluated based on the Offeror's approach to develop, operate and maintain a Remote VIP Services facility, including security screening, processing, and transfer of VIP passengers and their baggage to and from commercial aircraft in accordance with government guidelines, airline check-in arrangements, and the sale of goods and services commonly available in a commercial airport terminal or VIP airport lounge. Offerors will be evaluated on their approach to: (1) managing airport security in conjunction with government entities; (2) providing passenger check-in and related services with major airline carriers; (3) operating on the Air Operations Area (AOA); and (4) incorporating an airport's security plan and procedures into the Offeror's security plan and operations.

**Criterion 2:  Past Performance (Experience)**

This criterion will be evaluated based on: (1) the Offeror's previous experience in the development and operation of a similar VIP passenger services facility or provision of airport passenger-related services of comparable scope and complexity at an airport similarly sized to IAD and (2) the Offeror's detailed description of passenger services and amenities provided at the identified airport.

**Criterion 3:  VIP Facility Construction**

This criterion will be evaluated based on the Offeror's ability to construct the facility within thirty (30) months after award of the Lease, including whether the design and construction schedule is realistic/feasible/achievable.

**04     TECHNICAL PROPOSAL SUBMISSION REQUIREMENTS**

To facilitate evaluation of the technical evaluation criteria identified in 03 above, the Offeror shall submit the following information as part of its Technical Proposal:

**Criterion 1:  Ability to Meet the Authority's Requirements (Technical Approach)**

The Offeror shall demonstrate an understanding of the requirements of the Airports Authority, specifically the ability to operate and maintain a Remote VIP Passenger Services facility at the Airport.

Offeror shall provide the following:

> A detailed description of Offeror's approach to develop, operate, and maintain a Remote VIP Services facility, including security screening, processing, and transfer of VIP passengers and their baggage to and from commercial aircraft in accordance with government guidelines, airline check-in arrangements, and the sale of goods and services commonly available in a commercial airport terminal or VIP airport lounge.

> A detailed description of Offeror's approach to managing airport security in conjunction with government entities.

> A detailed description of Offeror's approach to providing passenger check-in and related services with major airline carriers.

> A detailed description of Offeror's approach to operating on the AOA, specifically addressing Offeror's knowledge of commercial aviation safety and security protocols and procedures for vehicle movements on the AOA.

> A detailed description of Offeror's approach to incorporating an airport's security plan and procedures into the Offeror's security plan and operations.

**Criterion 2:  Past Performance (Experience)**

The Offeror shall provide details of Offeror's previous experience in the development and operation of a VIP passenger services facility or airport passenger-related services of comparable scope and complexity.

Offeror shall provide the following:

At least one domestic or foreign airport of comparable size to IAD where Offeror has experience in the development and operation of a similar VIP passenger services facility or Offeror has provided airport passenger-related services of comparable scope and complexity.

A detailed description of passenger services and amenities Offeror provided at the airport identified above.

**Criterion 3:  VIP Facility Construction**

The Offeror shall demonstrate its ability to construct the facility within thirty (30) months after award of the Lease.

Offeror shall provide the following:

A design and construction schedule demonstrating the Offeror's ability to construct the facility in accordance with the applicable requirements, including the design and construction requirements at IAD, within the required timeframe.

Conceptual designs, including interior and exterior renderings, and conceptual site plans of the facility that the Offeror plans to construct.

Identification of the contractor who will construct the facility.

**05    TECHNICAL PROPOSAL SUBMISSION INSTRUCTIONS**

The Technical Proposal must demonstrate the Offeror's ability to meet all requirements in this Solicitation.

Submit complete Technical Proposal:

a.   As single PDF file, with the following contents, in the following order, not to exceed fifteen (15), single sided pages:
   - Cover/Title Sheet
   - Table of Contents
   - Section 1: Ability to Meet the Authority's Requirements (Technical Approach)
   - Section 2: Past Performance (Experience)
   - Section 3: VIP Facility Construction
b.   Without reference to MAG or Ground Rent.
c.   Using a minimum of 11-point font, with all pages numbered; provided however, that the 11-point font requirement does not apply to charts or tables where Offerors may use smaller fonts as may be reasonably necessary to convey information in an 8 ½ by 11-inch page format.

# EXHIBIT 11

**METROPOLITAN WASHINGTON AIRPORTS AUTHORITY**

PROCUREMENT AND CONTRACTS DEPARTMENT
1 AVIATION CIRCLE | WASHINGTON, DC 20001-6000 | (703) 417-8660 | WWW.MWAA.COM

# AMENDMENT OF SOLICITATION

## SOLICITATION AND AMENDMENT INFORMATION

| | |
|---|---|
| Solicitation Number | RFP-25-24520 |
| Solicitation Date | September 26, 2025 |
| Amendment Number | 2 |
| Effective Date | November 12, 2025 |

## DESCRIPTION OF AMENDMENT

Metropolitan Washington Airports Authority Solicitation **RFP-25-24520** entitled, "Remote VIP Services Facility, IAD" is amended as follows:

1. Attachment 3 draft Land and Concession Lease and Development Agreement (draft Lease) is amended to revise Section 6.02 as set forth on the attached Revised Section 6.02.

2. The ACDBE Goal is removed from Section 13 of the Solicitation and Sections 9.03. 9.04, and 9.05 are deleted from the draft Lease. Section 9.06 only applies to the SLBE Requirement. Offerors are not required to provide and small business documentation regarding ACDBEs.

3. In response to the Question regarding height limitations for the building site, the Authority has provided a diagram as supplemental information.

4. Attachment 1 Evaluation Criteria and Proposal Submission Requirements is amended to delete Section 02 B. Financial Offer Evaluation and add "The Airports Authority will evaluate the completeness of a financial offer by determining whether it is complete and responsive to the requirements set forth in the Solicitation."

5. The Airports Authority will hold a site visit to the Premises only (landside not airside) on Friday, November 21, 2025 at 10:00 AM. Offerors wishing to attend the site visit should contact the contracting officer by email at donald.laffert@mwaa.com

6. The time for submission of proposals is extended to December 5, 2025 at 2:00 PM.

Except as provided herein, all terms and conditions of the referenced Solicitation remain unchanged and in full force and effect.

## SUBMISSION DEADLINE

Date and/or time specified for submission of Quotes or Offers is extended.

## ACKNOWLEDGEMENT

Quoters and Offerors are required to acknowledge receipt of this Amendment of Solicitation on the Solicitation Offer and Award (SOA) Form prior to the submission deadline.  Failure to acknowledge Amendments may cause the Quote or Offer to be considered non-responsive to the Solicitation and rejected.

# EXHIBIT 12

**Aron C. Beezley**
abeezley@bradley.com
202.719.8254 direct



February 12, 2025

_**Via Email**_ – FOI@mwaa.com

Freedom of Information Officer
Office of the Secretary
Metropolitan Washington Airports Authority,
1 Aviation Circle, Washington, DC, 20001-6000

> RE:    **Freedom of Information Request**
>
> _**Solicitation No.:**_    _**RFP-23-21311 - Remote VIP Passenger Processing Service Concession, IAD**_
> _**On Behalf Of:**_    _**The Private Suite IAD, LLC (dba PS)**_

Dear Freedom of Information Officer:

Pursuant to the Metropolitan Washington Airports Authority's ("MWAA") Freedom of Information Policy ("FOIP"), MWAA's Contracting Manual, Revised Fifth Edition (5.2) ("Manual"), and Section V, Paragraph 22 of Solicitation No. RFP-23-21311 ("RFP"), this firm, on behalf of The Private Suite IAD, LLC (dba PS), hereby requests that the MWAA provide access to and an opportunity to copy the following documents related to the award of the above-referenced contract.

## DEFINITIONS

For the purpose of this request, the following definitions apply:

"Document" or "documents" as used herein refers to all written or graphic matter, however produced or reproduced, of every kind and description in the actual or constructive possession, custody, care or control of MWAA or any of its representatives, agents or employees including, but not limited to, papers, books, letters, e-mails, photographs, maps, geotechnical reports, objects, tangible things, correspondence, telegrams, memoranda, interoffice communications, reports, studies, surveys, contracts, licenses, agreements, drafts, working papers, statistical records, desk calendars, appointment books, diaries, daily reports, timesheets, log sheets, engineers logs, lists of conversation, notations, plans, schematic drawings, models, change orders, computer printouts, punch cards, magnetic tapes, magnetic discs, pleadings, depositions, notes or sound recordings of any conversations, notes of meetings or conferences and minutes of any meetings.

"Communication(s)" means and includes any transmission or exchange of information between two or more persons, whether orally or in writing, including, without limitation, any discussion or information carried on or transmitted by means of letter, note, memorandum, interoffice correspondence, telephone, telegraph, telex, telecopy, e-mail, text message, instant message, cable, or some other electronic or other medium.

1

The term "relate" or "relating" shall mean and include contain or containing, constitute or constituting, describe or describing, discuss or discussing, refer or referring, state or stating, assess or assessing, and record or recording.

"RFP" and "Solicitation" shall mean and include all facts and matters relating to Solicitation No. RFP-23-21311 - Remote VIP Passenger Processing Service Concession, IAD.

"Award" shall mean the award of the RFP made on or about February 7, 2025, to DAA International in the amount of $104,716,074.17 for the total Ground Rent and Minimum Annual Guarantee.

"Awardee" means and includes DAA International, and all employees, officials, agents, and/or representatives of DAA International, including any and all joint ventures, owners, parent companies, subsidiaries, partners, and/or teaming arrangements.

"EC" means and includes all current or former MWAA Evaluation Committee agents, members, representatives, and/or employees with knowledge of facts and matters relating to the RFP and Award.

"DAA International's Proposal" shall mean and include all facts and matters relating to DAA International's bid submittal provided in response to the Solicitation, including without limitation all **pricing, technical**, or other information submitted by DAA International in response to Phase I and Phase II of the RFP.

"P/S's Proposal" shall mean and include all facts and matters relating to the bid submittal provided in response to the Solicitation by The Private Suite IAD, LLC (dba PS) (or "P/S"), including without limitation all **pricing, technical**, or other information submitted by P/S in response to Phase I and Phase II of the RFP.

"RFP's Freedom of Information Policy" means Section V, Paragraph 22 of Solicitation No. RFP-23-21311, which states:

> Except as otherwise noted, all related documents submitted to the Authority in response to this Solicitation, including, but not limited to, quotes, Offers, Proposals, Bids, statements of work, and/or specifications, will be open to the inspection of any citizen, or any interested person, firm, or corporation, in accordance with the Authority's Freedom of Information Policy. Trade secrets or confidential information submitted as part of an Offer will not be subject to public disclosure if exempted by the Authority's Freedom of Information Policy; however, the Offeror must invoke the protections of this section prior to or upon submission of its Offer and must identify the specific data or other materials to be protected and state the reasons why protection is necessary. The Offeror may not request that its Offer in its entirety be treated as a trade secret or confidential information, nor may an Offeror request that its pricing be treated as a trade secret or confidential information.

"Public Release of Information Chapter" means Chapter 4.8 of the MWAA Contracting Manual - Revised Fifth Edition (5.2), effective January 1, 2025, and includes the following

2

provisions that govern the release of records pursuant to requests under the Freedom of Information Policy that have been prepared during, in conjunction with, or as a result of, an Authority procurement, including:

(1) Offers or Bids submitted by Offerors are exempt from release, except that, after Contract award, portions of the winning Offer or Bid that have been incorporated into the Contract and that do not contain confidential business information of the Contractor, will be released;

(2) Price or financial Offers and price schedules submitted by Offerors, and Abstracts of Offers created by the Authority are exempt from release, except that, following the date of Contract award or the date written notice of award is sent to unsuccessful Offerors, whichever occurs first, an abstract containing the names of unsuccessful Offerors and each total price Offer (other than unit prices) will be released. If the Solicitation sought prices for multiple Contract years, the abstract will include the total price Offer for each Contract year. With respect to Solicitations conducted under IFB procedures, Bids, price schedules, and Abstracts of Offers containing information read aloud at Bid opening pursuant to Section 3.4.2 will be released after Bid opening;

\*\*\*

(4) Evaluations conducted by the EC or its members and the rationales of an EC are exempt from release, except that an EC's final evaluation, including its evaluation for each Offeror relative to each evaluation criterion as well as the EC's rationales for each such evaluation except to the extent they contain proposal information that an Offeror has claimed to be confidential or proprietary business information, will be released after the date of Contract award, or the date written notice of award is sent to unsuccessful Offerors, whichever occurs first, but with the names and other identifiers of EC members and unsuccessful Offerors redacted.

## **DOCUMENTS REQUESTED**

Subject to the provisions of the RFP's Freedom of Information Policy, the Public Release of Information Chapter of the MWAA Contracting Manual, and the FOIP, we hereby request the following documents:

1.  A complete copy of the Solicitation, including any appendices, questions and answers, and attachments, and copies of all amendments thereto;

2.  The acquisition plan and source selection plan for the subject Project;

3.  All instructions, guides, checklists, or templates provided to evaluators;

4.  A complete copy of DAA International's Proposal and/or the Awardees' proposal, and any revisions thereto, including all information submitted in response to Phase I and Phase II of the RFP;

3

5.      All documents referring to, discussing, or reflecting the MWAA's evaluation of DAA International's Proposal and P/S's Proposal, including, but not limited to, the EC's final evaluation, including its evaluation for each Offeror relative to each evaluation criterion as well as the EC's rationales for each such evaluation, including, but not limited to, Phase I and Phase II of the RFP;

6.      Any and all evaluation documents pertaining to the MWAA's and the EC's evaluation of P/S's Proposal and the DAA International's Proposal, including both Phase I and Phase II;

7.      An unredacted copy of the MWAA's and/or the EC's source selection decision and best value tradeoff documents; and

8.      Any and all communications pertaining to the decision to extend the time to submit Phase 2 offers to October 7, 2024.

9.      Any and all communications between MWAA and the awardee regarding the Solicitation, evaluation, and/or award.

At this time, we are willing to pay up to $500 for this request.  If the fee for this request will exceed $500, please contact us for payment authorization.

If you deny all or any part of this request, please cite each specific exemption that you believe justifies your refusal to release the requested information and notify me of appeal procedures available under the law.

If you have any questions about handling this request, please contact me by phone at (202) 719-8254 or by e-mail at abeezley@bradley.com.  Thank you in advance for your prompt written acknowledgment of your receipt of this request and your substantive response to this inquiry within two weeks of the date of this letter.

Respectfully submitted,

*/s/ Aron C. Beezley*
Aron C. Beezley

4

# EXHIBIT 13

Metropolitan Washington
Airports Authority
1 Aviation Circle
Washington, DC 20001-6000



June 12, 2025


Aron C. Beezley
Bradley Arant Boult Cummings LLP
1900 K Street, NW, Ste 800
Washington, D.C. 20006
Sent via e-mail:  abeezley@bradley.com

Re:    Appeal of Decision of Freedom of Information Officer

Dear Mr. Beezley:

As co-chairs of the Risk Management Committee, we are responding to your May 8, 2025, appeal of the Metropolitan Washington Airports Authority ("Airports Authority") Freedom of Information ("FOI") Officer's May 1, 2025, decision to withhold from disclosure certain records or portions of records you requested on February 12, 2025. After considering your appeal, we have determined to grant your appeal in part and deny your appeal in part as further discussed in this letter.

## BACKGROUND

Your February 12 request sought nine categories of records related to RFP-23-21311, Remote VIP Passenger Processing Service Concession, IAD ("RFP"), which are described in your request as follows:

(1)  A complete copy of the solicitation, including any appendices, questions, and answers, and attachments, and copies of all amendments thereto;

(2)  The acquisition plan and source selection plan for the subject project;

(3)  All instructions, guides, checklists, or templates provided to evaluators;

(4)  A complete copy of DAA International's proposal and/or the awardee's proposal, and any revisions thereto, including all information submitted in response to Phase 1 and Phase II of the RFP;

(5)  All documents referring to, discussing, or reflecting the Airports Authority's evaluation of DAA International's proposal and PS's [The Private Suite IAD, LLC dba PS] proposal, including but not limited to, the evaluation committee's ("EC") final evaluation, including its evaluation

Aron C. Beezley
June 12, 2025
Page 2

for each offeror relative to each evaluation criteria as well as the EC's rationales for each such evaluation, including but not limited to Phase 1 and Phase II of the RFP;

(6) Any and all evaluation documents pertaining to the Airports Authority's and the EC's evaluation of PS's proposal and DAA International's proposal, including both Phase I and Phase II;

(7) An unredacted copy of the Airports Authority's and/or the EC's source selection decision and best value tradeoff documents;

(8) Any and all communications between the Airports Authority and the awardee regarding the solicitation, evaluation, and award; and

(9) Any and all communications between the Airports Authority and the awardee regarding the solicitation, evaluation and/or award.

By letter dated May 1, 2025, the FOI Officer determined to release in their entirety records responsive to category 1 and determined there were no records responsive to categories 8 and 9. For categories 2-5, the FOI Officer released the source selection plans for Phase 1 and Phase 2, with redactions based on Section VII.B(1) of Part 3 of the Airports Authority's FOI Policy, which exempts from disclosure the Airports Authority's confidential business information, and Section VII.B(3) of Part 3 of the FOI Policy, which exempts from disclosure confidential procurement records specifically addressed in the Airports Authority's Contracting Manual. The FOI Officer determined that Sections 4.8(3) and (4) of the Airports Authority's Contracting Manual addressed the redactions in the source selection plans.

In response to category 4, the FOI Officer withheld in its entirety DAA International's proposal in response to the RFP pursuant to Section VII.B(3) of Part 3 of the FOI Policy and Section 4.8(1) of the Contracting Manual which exempts from disclosure procurement records, such as proposals and offers, until after contract award. For records falling within category 7, the FOI Officer released the Technical Evaluation Committee (TEC) Memorandum with redactions under Section VII.B(3) of Part 3 of the FOI Policy and Sections 4.8(3) and (4) of the Contracting Manual. The FOI Officer also redacted information from the records responsive to categories 2, 3, 6, and 7 based on Section VII.A of Part 3 of the FOI Policy, which exempts personal privacy information from disclosure.

Your appeal does not contest any redactions based on Section VII.A of Part 3 of the FOI Policy, which exempts personal privacy information from disclosure. Your

Aron C. Beezley
June 12, 2025
Page 3

appeal challenges the FOI Officer's redactions pursuant to Sections VII.B(1) and (3) of Part 3 of the FOI Policy because you believe these redactions are in excess of what is necessary to comply with the Airports Authority's "applicable rules and contract terms". You also believe the FOI Officer was "overbroad in the application of the rules for excluding records". Your letter further argues that the Airports Authority's redactions did not comply with the Contracting Manual, which requires that certain information be released upon the earlier of contract award or written notice of award is sent to unsuccessful offerors. Finally, you object to the FOI Officer's determination that there are no records responsive to categories 7 and 8.

For the reasons described herein, we grant your appeal in part and deny it in part.

## DISCUSSION

In analyzing appeals under the FOI Policy, we employ a "de novo" standard of review of the FOI Officer's decision. This allows us to consider the facts and arguments presented in the appeal, examine any relevant information, and ensure a fully considered decision is made.

**Redaction of Information Responsive to Categories 2 and 3:  acquisition plan and source selection plan, and all instructions, guides, checklists, or templates provided to evaluators.**

In response to categories 2 and 3, the FOI Officer provided the source selection plans for Phase 1 and Phase 2 with redactions pursuant to Sections VII.B(1) and (3) of Part 3 of the FOI Policy. The FOI Officer also provided a link to the pre-solicitation terms for Architectural and Engineering Design Improvements at Washington Dulles International Airport that were presented to the Business Administration Committee of the Board of Directors.

Your appeal letter recognizes that there are portions of the source selection plans which fall within Section VII.B(1) of Part 3 of the FOI Policy, which exempts from disclosure Airports Authority confidential business information. Nevertheless, you believe that the FOI Officer overapplied this exemption. You suggest that "the bulk of a source selection document necessarily details why the [Airports] Authority requests the contract, how the RFP would be postured, and how it would be evaluated" and that these "general procurement considerations do not fall within [the Airports Authority's] confidential commercial, financial, or proprietary business information." For these reasons, you conclude that no exception under the FOI Policy applies to the pre-proposal submission evaluation criteria that may be included within the source selection plans. Your letter also notes that the link to the pre-solicitation terms provided in the FOI Officer's response was irrelevant to your

Aron C. Beezley
June 12, 2025
Page 4

request. Finally, you question the applicability of Section 4.8(4) of the Contracting Manual to any of the redactions to the source selection plans, as Section 4.8(4) exempts from disclosure the EC and individual EC members' evaluations of the proposals, not the evaluation criteria used for such evaluations.

We concur in this aspect of your appeal to the extent that FOI Officer redacted the publicly available pre-proposal submission criteria. We also agree that the source selection plans do not include the EC evaluations and rationales, and therefore, Section 4.8(4) should not have been identified by the FOI Officer as a basis for redaction of information in these documents. Therefore, enclosed are the updated source selection plans for Phase 1 and Phase 2 with redactions consistent with our decision in this letter. You also correctly note that the link to the pre-solicitation terms provided in the initial response was incorrect. The pre-solicitation terms presented to the Business Administration Committee for Remote Very Important Person (VIP) Passenger Processing Services for Commercial Airline Flights at Washington Dulles International Airport may be found at the link for Tab 16 in the Board of Directors Schedules and Agendas for Wednesday, May 17, 2023, available on the Airports Authority's website at: https://www.mwaa.com/event/may-17-2023-board-and-committee-meetings.

While we grant your appeal of some of the redactions to the source selection plans, we uphold the FOI Officer's decision to redact certain information from these plans pursuant to Sections VII.B(1) and (3) of Part 3 of the FOI Policy. Section VII.B(1) of the FOI Policy exempts from disclosure the Airports Authority's confidential commercial, financial, or proprietary information which, if disclosed, could harm the Airports Authority's competitive or negotiating position. The redacted information is comprised of instructions to the EC members for applying the evaluation criteria and specific characteristics of proposals that demonstrate and distinguish "Acceptable", "Good", and "Excellent" ratings under the evaluation criteria. Disclosure of this information would allow offerors to tailor their proposals to this evaluation criteria in a manner that would undermine the competitive nature the RFP process which, in turn, harms the Airports Authority's competitive or negotiating position. For this reason, the Airports Authority requires strict confidentiality of source selection information, as stated in the source selection plans. We also uphold the FOI Officer's determination to withhold the names of the individual EC members, in accordance with Section VII.B(3) of Part 3 of the FOI Policy and Section 4.8(3) of the Contracting Manual.

Aron C. Beezley
June 12, 2025
Page 5

**Withholding of Records Responsive to Category 4: DAA International's proposal in response to the RFP.**

The FOI Officer withheld DAA International's proposal in its entirety pursuant to Section VII.B(3) of Part 3 of the FOI Policy and Section 4.8(1) of the Contracting Manual. Section 4.8(1) of the Contracting Manual makes offers exempt from release under the FOI Policy until after contract award.

Your appeal letter acknowledges that the proposal was properly withheld under the FOI Policy; however, you argue that portions of the proposal related to pricing should have been released because Section 4.8(2) of the Contracting Manual requires disclosure of "the total price offer for each contract year" upon the earlier of the date of contract award or the date written notice of award is sent to unsuccessful offerors. You also point to language in the RFP informing prospective offerors that all documents submitted to the Airports Authority in response to the RFP will be "open to the inspection of any citizen . . . in accordance with the [FOI] Policy", unless the offeror indicates that certain information is a trade secret of otherwise confidential.

We deny this aspect of your appeal and uphold the FOI Officer's decision to withhold DAA International's proposal in its entirety under Section VII.B(3) of Part 3 of the FOI Policy and Section 4.8(1) of the Contracting Manual. No contract has been awarded in response to the RFP and unsuccessful offerors have not been provided written notice of award. The communication provided to PS on February 7, 2025, was notice that it was an unsuccessful offeror, as required under Section 4.7 of the Contracting Manual. This notice is not the "written notice of award" described in Section 4.8. For contracts that require approval of the Board of Directors, like that which would have been awarded in response to the RFP, "written notice of award" is not provided until the recommendation for contract award appears on the published agenda for the Board of Directors' meeting at which the contract award will be made. That has not occurred. Therefore, the requirements in Section 4.8 of the Contracting Manual related to disclosure of certain information after the date of contract award or written notice of award is sent to unsuccessful offers do not apply. In addition, pursuant to Section 4.7 of the Contracting Manual, communications with unsuccessful offerors "should be limited to the total price offer", not the price for each contract year. The communication provided to PS on February 7, 2025, included the total price offer. Accordingly, DAA International's proposal must be withheld in its entirety under Section VII.B(3) of Part 3 of the FOI Policy and Section 4.8(1) of the Contracting Manual.

**Redaction of Information Responsive to Categories 5, 6 and 7:  All documents reflecting the Airports Authority's evaluation of DAA International's proposal**

Aron C. Beezley
June 12, 2025
Page 6

**and PS's proposal, including the EC's evaluation, and the source selection decision and best value tradeoff documents.**

In response to your request for documents reflecting the Airports Authority's evaluation of the proposals submitted in connection with the RFP, the FOI Officer provided you with the Technical Evaluation Committee (TEC) Memorandum, with redactions pursuant to Sections VII.A and B(3) of the FOI Policy. The redactions under Section VII.B(3) of Part 3 of the FOI Policy were based on Sections 4.8(3) and (4) of the Contracting Manual.

In your appeal, you do not challenge the redactions under Section VII.A of Part 3 of the FOI Policy. With regard to the redactions under Section VII.B(3), however, your letter suggests that the FOI Officer inconsistently applied this FOI exemption because some rating descriptions were released, while those for the "Good" and "Excellent" rating were withheld. You also argue that the rating criteria are not an offeror's proposal information or the Airports Authority's evaluation of proposals. Additionally, you note that Section 4.8(4) of the Contracting Manual requires disclosure of the TEC Memorandum after the date of contract award or written notice of award is sent to unsuccessful offerors.

Upon consideration of your arguments, we are upholding the FOI Officer's decision to redact information under Section 4.8(4) of the Contracting Manual, and we find that FOI Officer also should have relied on Section VII.B(1) of Part 3 of the FOI Policy. In reaching this decision, we note that the FOI Officer's redactions of the rating descriptions from the TEC Memorandum were consistent. The rating descriptions for "Unacceptable", "Marginal", and "Acceptable" for each of the Criterion were identical to the Evaluation Criteria published in the RFP and, thus, were already publicly disclosed. The rating descriptions for "Good" and "Excellent", however, contained Airports Authority confidential information derived from the source selection plans. As previously discussed on page 4, this information is exempt from disclosure under Section VII.B(1) of Part 3 of the FOI Policy and the FOI Officer's redaction of this information from the TEC Memorandum was appropriate.

In addition, the FOI Officer properly withheld portions of the TEC Memorandum that reflect the EC's final evaluation. The EC's final evaluation is exempt from disclosure under the FOI Policy, as specified in Section 4.8(4) of the Contracting Manual, until the date of contract award or the date written notice of award is sent to unsuccessful offerors. As previously explained on page 5, neither contract award nor written notice of award to unsuccessful offerors has occurred. Thus, withholding this information was appropriate. In addition, the evaluations of individual EC members were also properly withheld pursuant to Section VII.B(3) of the FOI Policy and Section 4.8(3) of the Contracting Manual.

Aron C. Beezley
June 12, 2025
Page 7

While we are generally upholding the FOI Officer's determination to redact certain information from the TEC Memorandum, we find that some of the information, such as the identity of the other bidder (DAA International) and general descriptions of the evaluation criteria were already publicly available and, therefore, should not have been redacted from the TEC Memorandum. This information is provided with this letter in updated responsive documents.

**No Records Determination in response to Categories 8 and 9.**

With respect to your request for "all communications pertaining to the decision to extend the time to submit Phase 2 offers to October 7" (category 8), the FOI Officer determined that there were no records responsive to this request. In your appeal, you surmise that because the Airports Authority articulated a reason to extend the time period, there must have communications regarding that decision. However, this is not a sufficient basis to challenge the FOI Officer's determination. See e.g., S. Envtl. Law Center v. Tenn. Valley Auth., 2025 WL 1037248 (E.D. Tenn. Mar. 26, 2025) (noting, under the federal Freedom of information Act, "[t]he law does not deem a search inadequate because a requester believes other documents exist."). The FOI Officer searched the Airports Authority's Office of Supply Chain Management, the Office which extended the period of time, and determined that there were no responsive records. We uphold the FOI Officer's determination.

In the FOI Officer's response to your request for communications between the Airports Authority and the "awardee" (category 9), the FOI Officer concluded that the Airports Authority has no responsive records "as the contract has not been awarded." Your initial request, however, defined "awardee" to mean DAA International, without regard to whether a contract has been awarded. Therefore, we grant your appeal of the FOI Officer's determination on category 9. We are remanding this aspect of your request to the FOI Officer to search for any communications with DAA International described in category 9 that may exist.

## CONCLUSION

As explained in this letter, we grant your appeal in part and deny your appeal in part. Enclosed with this letter are the updated source selection plans for Phase 1 and 2 and the TEC Memorandum. These records retain redactions that are consistent with our decision on your appeal.

Under Section VI.B of the FOI Policy, if you are dissatisfied with this response, you may file a notice of appeal to the Airports Authority's FOI Review

Aron C. Beezley
June 12, 2025
Page 8


Panel. The notice of appeal must be received by the Airports Authority within five (5) business days of the date of this decision and addressed to:

> Vice President and Secretary
> Metropolitan Washington Airports Authority
> 1 Aviation Circle
> Washington, D.C. 20001

If you do not file a notice of appeal, this decision will be final and not subject to further review.

Sincerely,

/s/ Timothy Poole

Timothy Poole
Co-Chair, Risk Management Committee


/s/ Alex Vogel

Alex Vogel
Co-Chair, Risk Management Committee

Enclosures

cc:     Felice Smith, Vice President and Secretary