Aron Beezley
Partner
abeezley@bradley.com
(202) 719-8254 direct



December 15, 2025

**VIA HAND DELIVERY**

Mr. John E. Potter
President and Chief Executive Officer
Metropolitan Washington Airports Authority
1 Aviation Circle
Washington, DC 20001

Mr. John E. Potter
President and Chief Executive Officer
Metropolitan Washington Airports Authority
2733 Crystal Drive
Arlington, VA 22202

      **RE:**    Solicitation No. RFP-25-24520

      **SUBJ: Request for Review Regarding the Protest of The Private Suite IAD, LLC (dba PS)**

Dear Mr. Potter:

      The Private Suite IAD, LLC (dba PS) ("PS"), through the undersigned counsel, hereby respectfully files this timely Request for Review of Vice President, Office of Supply Chain Management ("VP-OSCM") Julia T. Hodge's December 8, 2025 decision (the "Decision") to deny PS's protest (the "Protest") of the Metropolitan Washington Airports Authority's ("MWAA" or the "Authority") Solicitation No. RFP-25-24520 (the "RFP" of the "Solicitation").

      As explained below, the Authority's Decision to dismiss the Protest in part and deny it in part rests on fundamental legal error. The Authority failed to evaluate the Protest as what it plainly is—a challenge to the terms of the Solicitation—and failed to apply the governing law and bedrock principles of sound government contracting. Rather than meaningfully engaging with the Protest's substantive arguments, the Decision substitutes conclusory assertions that do not grapple with the Protest's actual challenges. In doing so, the Authority not only precipitates this Appeal, but also forfeits a critical opportunity to demonstrate its adherence to sound government contracting principles. Accordingly, and for the reasons set forth in greater detail below, the President and CEO should reverse the VP-OSCM's Decision, sustain the Protest, and direct that the RFP be resolicited after its defects are remedied.

**CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE**

Bradley Arant Boult Cummings LLP | 1900 K Street NW | Suite 800 | Washington, DC 20036 | 202.393.7150 | bradley.com

Mr. John E. Potter
December 15, 2025
Page 2

I.  **Threshold Matters**

  a.  **This Request for Review is Timely Filed.**

Pursuant to the Decision, Page 3, and Chapter 9.5 of MWAA's Contracting Manual, Revised Fifth Edition (5.2) ("Contracting Manual"), a protester may seek the CEO's review of a protest decision by the VP-OSCM within seven (7) days of the date of the VP-OSCM's response letter. Here, the VP-OSCM dated her response letter to PS's Protest, the Decision, March 10, 2025, and delivered it to PS's counsel that day. This request is submitted within seven (7) days of that date and, therefore, is timely.

  b.  **The Authority Must Not Award the Contract During the Pendency of This Request.**

Any actions to award the Remote VIP contract must be stayed, and any actions to initiate or process award of the Remote VIP contract during the pendency of this Protest process would be inappropriate. Pursuant to Section 19 of the RFP, "[i]f a Contract has not been awarded at the time a protest is timely filed, the Contract may not be awarded while the protest is pending, unless the President and CEO determines that award of the Contract, and, if applicable, issuance of a notice to proceed, is in the Authority's best interest." RFP at 20 (emphasis added); *see also* Contracting Manual, § 9.6. The Protest is still pending because the protest process continues through the resolution of this request. The Contracting Manual specifically includes this review mechanism as part of the protest process, and notes that a decision is final only after the CEO, or the MWAA Board where applicable, issues a final decision. Contracting Manual, § 9.5. Therefore, the Protest remains pending, and the Contract may not be awarded. RFP at 20; see also Contracting Manual, § 9.6.

  c.  **The Authority Should Complete PS's Records Request before Continuing the Protest or Procurement.**

The piecemeal handling of the Protest delays and will continue to prolong this protest process. In order to save the Authority and PS's time and expense, the Authority should immediately produce the materials PS requested in its records request under the RFP's Freedom of Information Policy (the "FOIA Request"), submitted contemporaneously and attached hereto as **Exhibit A**.

On November 25, 2025, PS submitted its initial Protest in this matter. PS included in that Protest a records request to the Authority requesting seven (7) categories of documents related to the Protest. In the Decision, the Authority summarily denied PS's document request because the request was not made through the Authority's formal Freedom of Information Officer. Decision at 3; *see also* Airports Authority, *Freedom of Information Policy*, https://www.mwaa.com/sites/mwaa.com/files/legacyfiles/freedom_of_information_policy.pdf at 3. In response, PS submitted a formal request for records to the Authority's Freedom of Information Officer on the same day it submitted this Appeal.

**CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE**

Mr. John E. Potter
December 15, 2025
Page 3

Notwithstanding that the initial request was not made through MWAA's separate formal channel, those documents are necessary to PS's full understanding of the Authority's development of the Solicitation and rationale for the Amendment at issue in its Protest. MWAA should produce those documents as soon as practicable because, without these basic proposal documents, the protest process is unable to unable to be completed in an efficient and timely manner. In the event that there are grounds for protest PS discovers within the documents it requested, PS will have seven (7) days to file another protest, and this protest and appeal process will restart. *See* Contracting Manual § 9.2.2; RFP at 19. Thus, producing the relevant documents would allow PS to consolidate its protest grounds into one document for MWAA's consideration.

Furthermore, evaluating a protest based on a full document record is efficient, fair, and widely practiced. Typical protest procedures at the Federal, State, and Local levels provide for the production of relevant documents before a protest. *See, e.g.*, 4 C.F.R. § 21.3(d) ("The report shall include … a copy of all relevant documents, or portions of documents, not previously produced, including, as appropriate: the bid or proposal submitted by the protester; the bid or proposal of the firm which is being considered for award, or whose bid or proposal is being protested; all evaluation documents; the solicitation, including the specifications; the abstract of bids or offers; and any other relevant documents."). These well-established protest procedures for public procurements seek to deal with protest issues efficiently and fairly by issuing a single decision on the full record, allowing for a transparent and fair protest process that is also expedient.

Conversely, failure to provide relevant documents represents a material process failure by MWAA, not only by staggering the production of procurement information—and thus staggering the protest process—but also wherein the Authority loses credibility—and the process becomes non-transparent—by failing to engage with bidders who are eager to do business with the Authority. Relatedly, the Authority is forced to issue a decision based on an incomplete record and incomplete arguments, leading to missed opportunities for it to hear feedback and/or constructive criticism, which could impact current and future procurements, as well as the procurement and protest processes as a whole. Thus, the Authority's procedures are not only inefficient and ineffective, but they also undermine transparency. Respectfully, the CEO should direct the Authority to release the requested documents before continuing this protest process.

II.     **PS's Protest Raised Valid Protest Grounds.**

In its Decision, MWAA completely misreads the Protest to avoid or ignore PS's allegations that the Authority's decision to amend the Solicitation as described in Amendment 2 was arbitrary and capricious and/or unreasonable. The term[1] "arbitrary and capricious" is a widely used standard for administrative actions. *See e.g.*, FTA C 4220.1F, Ch. VI, para. 2.a (as cited in the Contracting Manual) (prohibiting "[t]aking any arbitrary action in the procurement process"); 5 U.S.C.A. § 706(2)(A) (review under the "Administrative Procedure Act").

---

[1] Or "terms"—whether viewed as two separate terms or one term, the point remains the same.

**CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE**

Mr. John E. Potter
December 15, 2025
Page 4

The Decision misconstrues the Protest's explanations of *why* the Authority's action was arbitrary and capricious for independent bases of fault. The Decision suggests that PS protests the Authority on the basis that Amendment 2 "eliminates one of MWAA's important risk evaluation tools," leads to "uneconomically high-priced proposals," and creates a "risk that a successful offeror who overpromises on its bid suddenly must underperform on its services to provide MWAA with the promised rent." Decision at 2, citing Protest at 11-13. But the Decision misses an obvious and important distinction: the basis for the Protest was that the Authority's removal, via Amendment 2, of the common-sense requirement that cost proposals be "reasonable," was arbitrary, capricious, and unreasonable.

For example, the Protest states that Amendment 2 "eliminates one of MWAA's important risk evaluation tools" and describe why it does so. Protest at 11-12; *see also* Decision at 2. However, the Protest both explicitly summarizes that the practical effects are indications of why the decision is arbitrary and capricious, Protest at 13 ("[t]he practical impacts make clear that this change to the Solicitation in RFP Amendment 2 represents an arbitrary and capricious decision that must be reconsidered"), and makes clear that the allegation of arbitrary and capricious conduct was separate from the policy determination of which procurement method is most advantageous to the Authority. *Id*. at 11 ("Such a change is not only ill-advised, but also unnecessary, arbitrary, and capricious.").

Furthermore, the Decision suggests that PS's Protest is based on its disagreement with the Authority's decision to pursue a High Price, Technically Acceptable (HPTA) procurement. *See* Decision at 2. To be clear, PS *does* disagree with the Authority's selected procurement method, *see* Protest at 8, fn 4, but PS did not base its Protest on that disagreement. *See* Protest at 11 ("As identified above, MWAA has already changed this procurement from a best-value procurement to a HPTA procurement, with the effect of making price the principal factor."); *id*. ("The shift from a best value procurement under the previous RFP to a HPTA procurement here already placed a premium on price…"). PS did not challenge the terms of the Solicitation as originally issued on September 25, 2025, and, indeed, PS submitted a proposal in compliance with the terms of the Solicitation, including Amendment 2, on the due date for proposal submissions on December 5, 2025. *See* Amendment 2 at 1, #6.

Rather, the Protest challenges a single, narrow change, made in one of six listed changes in Amendment 2, as unreasonable, arbitrary, and capricious—"[e]specially in the context of an HPTA evaluation." Protest at 12; s*ee also e.g.*, *id*. at 11 ("MWAA Should Not Have Removed and Replaced the Language in Criteria and Requirements § 02, B."). The Decision misses that clear, obvious—and discrete—objection, and, in doing so, mischaracterizes PS's arguments. PS does not challenge the Authority's decision to engage in a HPTA procurement. It challenges the Authority's decision to replace a single requirement—that financial proposals be reasonable, complete, and realistic—with another—that financial proposals be only complete and responsive.

In that regard, the Authority's decision to alter the language *was* arbitrary and capricious. It is the Authority's general procurement policy for procurements to be, *inter alia*, "designed and conducted to achieve meaningful competition;" "funded and approved at the appropriate level;" made "to Contractors selected in accordance with the stated evaluation criteria included in the

**CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE**

Mr. John E. Potter
December 15, 2025
Page 5

Solicitation;" and "made only to responsible Contractors." Contracting Manual at § 1.2. For the reasons described in the Protest, removing requirements that price proposals be reasonable and realistic does not meet these general policies. There can be no "meaningful competition" with unreasonable and unrealistic offers; by definition, unrealistic and unreasonable offers cannot be funded and approved at the appropriate level; and unrealistic and unreasonable offers are indicative of non-responsible contractors. Furthermore, the requirement for an award to be fair and reasonable is another basic tenant of general procurement law. *See e.g.*, Contracting Manual at 3.3.5 (for simplified acquisitions, requiring a determination that "the quoted price is fair and reasonable"); *id*. at § 3.4.4 (requiring a Contracting Officer to reject any bid for which the price is unreasonable); *id*. at §3.5.7.4 ("The Contracting Officer is responsible for evaluating the proposed price and may appoint a separate evaluation panel or advisor to assist in evaluating the price and determining its reasonableness."); *id*. at 3.7 (requiring fair and reasonable price in other than full and open competitions); FAR 15.404-1(a) ("The objective of proposal analysis is to ensure that the final agreed-to price is fair and reasonable."); *see also* FAR 14.404-1(d)(cost realism involves "reviewing and evaluating specific elements of each offeror's proposed cost estimate to determine whether the estimated proposed cost elements are realistic for the work to be performed; reflect a clear understanding of the requirements; and are consistent with the unique methods of performance and materials described in the offeror's technical proposal."). Without a requirement for prices to be realistic and reasonable, the Solicitation fails to meet the Authority's most basic contracting goals.

### III. The Changes to Criteria and Requirements § 02, B, in Amendment 02, Do Not Comply With Applicable Law or Sound Government Contracting Principles.

The Decision incorrectly concludes that HPTA procurements are somehow immune from the requirements that MWAA follow "sound Government contracting principles," as identified in 49 U.S.C.A. § 49106(g), and "complete and open competition," as identified in 49 U.S.C.A. § 49104(a)(4). Again, the Decision mischaracterizes the Protest's invocation of FAR part 15. Where the Protest states (accurately) that "analogous federal law, including the Federal Acquisition Regulation ('FAR') and bid protest decisions issued by the U.S. Government Accountability Office ('GAO') and the U.S. Court of Federal Claims ('COFC'), informs any analysis of what constitutes "sound government contracting principles" and "complete and open competition" in similar situations," Protest at 14 (citing 49 U.S.C.A. § 49104(a)(4) and applicable caselaw), the Decision misconstrues the statement to suggest that FAR part 15 and not the Contracting Manual governs. *See* Decision at 2-3. The Decision goes on to suggest that, because FAR Part 15 does not include the term "HPTA," the FAR cannot be applicable. Decision at 3.

But, again, the Decision gives short shrift to the actual substance of the Protest and the FAR clauses it references. FAR 15.404-1 is entitled "Proposal analysis techniques." 48 C.F.R. § 15.401-1. That section describes the overarching way a contracting officer must analyze proposals, and describes numerous scenarios and types of procurements, not just for Lowest-Priced-Technically-Acceptable (or any other) proposals. *Id.*; *see also* FAR 15-402 (similarly agnostically entitled "Pricing policy"). And that FAR provision includes multiple references and requirements to root proposal analysis in reasonableness. *See* Protest at 14. Notably, the

**CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE**

Mr. John E. Potter
December 15, 2025
Page 6

Decision does not refute these general principles. Decision at 2-3. Instead, the Decision merely restates the Contracting Manual definition of HPTA, declares that the CO complied with the definition, and concludes that, therefore, the Authority was reasonable. As stated above, PS does not dispute that the Authority generally has the discretion to choose HPTA for this procurement or that Amendment 2 fits within the Contracting Manual definition for HPTA. *See generally*, Protest. Rather, PS protests that the change to the financial proposal requirements enacted through Amendment 2 violated other elements of the Contracting Manual and sound government contracting law—namely, that proposal prices be reasonable and realistic. The Decision's conclusion appears to be that, if the Solicitation and Amendment 2 do not violate the HPTA definition, they necessarily reflect "sound government contracting principles." *See* Decision at 2-3. But that flawed conclusion conveniently ignores the rest of the Contracting Manual and the rest of generally accepted sound government contracting principles, from the FAR or any other source. To make the point, the definition of HPTA does not also include requirements that an award be free from Organizational Conflicts of Interest or illegal activities, but a hypothetical Solicitation that allowed for bribery would nonetheless violate such an HPTA procurement, even if it tracked the definition included in the Contracting Manual.

Lastly, the Decision disingenuously states that, FAR part 15 does not address, and therefore does not set forth any "sound Government contracting principles" applicable to the Airports Authority's selected HPTA evaluation method. *Id*. at 3. First, as described above, that statement ignores generally applicable government contracting principles that are applicable to numerous types of procurements, including the principle that prices be reasonable and realistic. Second, FAR part 15 explicitly details procedures and principles applicable for "lowest-price-technically-acceptable" ("LPTA") procurements. *See e.g.*, FAR 15.101-2 ("Lowest price technically acceptable source selection process"). LPTA procurements offer the same principles as HPTA—minimum technical acceptability for the best possible price. *Id*. at (a). Indeed, the Contracting Manual does not even define HPTA and LPTA separately, as they are functionally equivalent methods:

> 3.5.2.1 Lowest Price Technically Acceptable (LPTA) / Highest Price Technically Acceptable (HPTA)
>
> The LPTA method is appropriate when selection of the technically acceptable proposal with the lowest offered price is preferred. The HPTA method is appropriate when selection of the technically acceptable proposal with the highest offered price is preferred (e.g., concessions Contracts). The evaluation factors that establish the requirements of acceptability shall be set forth in the Solicitation, and Solicitations shall specify that award will be made on the basis of the lowest (or highest) price proposals meeting or exceeding the acceptability standards. Proposals are evaluated for acceptability only, and trade-off is not permitted.

Contracting Manual at § 3.5.2.1.

Indeed, the language cited in the Decision to describe and define HPTA merely excises the references to "lowest." *Compare* Decision at 2-3 (that award "be made on the basis of the . .

**CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE**

Mr. John E. Potter
December 15, 2025
Page 7

. highest . . . price proposals meeting or exceeding the applicability standards." (citing Contracting Manual at § 3.5.2.1)) *with* Contracting Manual at § 3.5.2.1 ("be made on the basis of the ***lowest*** (***or*** highest) price proposals meeting or exceeding the acceptability standards") (emphasis added).  A deliberately myopic reading of the Contracting Manual that avoids any reference to LPTA—lest it acknowledge similar procurements in other areas of law—disingenuously disregards the reality that the Authority is not insulated from conducting HPTA procurements in accordance with generally accepted, sound government contracting principles.  As such, the Authority's decision should be overturned, and the RFP should be amended to include the previous requirements regarding financial proposals and resolicited under proper consideration.

### IV.    The Authority's Unreasonable and Unlawful Acts Caused Substantial Prejudice to PS.

The Agency's unreasonable and arbitrary decision to modify the terms of the Solicitation and remove the requirement that financial offers be reasonable and realistic directly prejudices PS.  As described above, PS does not protest the Authority's decision to issue this procurement as an HPTA award (although it does disagree with that decision).  Rather, PS is prejudiced because the changes to the financial proposal requirements made in Amendment 2 risk turning a competition based on technical acceptability and price into an unreasonable game of "who can name the highest number."  Without the common-sense and generally applicable principle that offers be reasonable and realistic, PS must submit its proposal based on unpredictable and unimaginable numbers, rather than based on actual market dynamics and sound economic projections.  Rather than provide MWAA a truly meaningful proposal, PS—and all other offerors—must provide MWAA with a proposal controlled for the injection of unreasonable and unrealistic competing proposals.  Such a procedure is not rational and clearly prejudices PS.

### V.    Request for Relief.

Based on the Foregoing, the Authority's Decision to deny the Protest was arbitrary, unreasonable, and unlawful in multiple material respects and has caused, and will continue to cause, undeniable prejudice to PS.  Accordingly, PS respectfully requests a ruling from MWAA's President and CEO that:

1. Reverses in its entirety the VP-OSCM's Decision to Deny PS's Protest;

2. If applicable, cancels, stays, or rescinds any evaluation and/or award of the Remote VIP Services contract;

3. Recommends that the Authority take corrective action, including but not limited to revising the RFP, and reissuing the revised RFP for further competition;

4. Grants such other relief and remedies as the President and CEO determines to be just and equitable.

**CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE**

Mr. John E. Potter
December 15, 2025
Page 8

                                                Respectfully submitted,

*/s/ Aron C. Beezley*
Aron C. Beezley
Nathaniel J. Greeson
Charles F. Blanchard

*Counsel for PS*

**CONTAINS PROTESTER'S PROPRIETARY INFORMATION – NOT FOR PUBLIC RELEASE**