IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| The Private Suite IAD, LLC, )<br>)<br>*Plaintiff,* )<br>)<br>v. )<br>)<br>Metropolitan Washington Airports )<br>Authority, )<br>)<br>*Defendant.* ) | Civil Case No. 1:26-cv-349 |

**MEMORANDUM IN SUPPORT OF MOTION TO DISQUALIFY
SEYFARTH SHAW LLP AS COUNSEL FOR DEFENDANT**

The Private Suite IAD, LLC ("PS IAD") respectfully moves this Court to disqualify Seyfarth Shaw LLP ("Seyfarth") from its present representation of the Metropolitan Washington Airports Authority ("MWAA") in this litigation. Seyfarth represents PS IAD's parent company (and another similar affiliate) in no less than seven active matters and regularly interfaces with PS IAD's general counsel on a number of issues. Incredibly, though, Seyfarth has refused PS IAD's request that Seyfarth withdraw from this matter, leaving PS IAD no choice but to petition this Court for that relief.

**FACTUAL AND PROCEDURAL BACKGROUND**

This case is a bid protest by PS IAD against MWAA arising out of MWAA's solicitation of proposals for a new luxury private terminal ("the Project") at Dulles International Airport ("Dulles"). PS IAD is a single-member limited liability company that was created to submit a proposal to MWAA for the design and operation of the private terminal at Dulles. If PS IAD ultimately prevails in this litigation and is awarded a contract from MWAA, PS IAD will be the entity that performs the work and operates the terminal at Dulles.

4923-7742-4782.4

**A. PS IAD shares leadership, resources, and counsel with its parent company.**

PS IAD is a limited liability company with a single parent member: PS Extime, LLC ("Extime"). Extime is the single member of a number of limited liability companies like PS IAD. They include identical entities at airports where PS currently operates luxury terminals like Los Angeles (The Private Suite LAX, LLC) and Atlanta (The Private Suite ATL, LLC), as well as at airports where PS is building or would like to build private terminals (such as The Private Suite DFW, LLC and The Private Suite Miami, LLC). Every one of these entities, including PS IAD, shares identical leadership with their parent Extime. They share the same president, chief financial officer, the same development team, the same executive committee, the same finance department, the same human resources department, and the same payroll provider. And, critically, they rely on the same general counsel, Drew Lincoln, and inhouse legal team in all legal matters affecting Extime and its subsidiaries. All of this support comes from a shared office in El Segundo, California.

**B. PS IAD sues MWAA, and MWAA hires a firm that represents both PS IAD's parent and another PS entity in numerous matters.**

On February 5, 2026, PS sued MWAA in this Court claiming that MWAA's solicitation of offers for the private terminal at Dulles was rife with arbitrary and capricious decisions that evinced an unrelenting (and illegal) effort by MWAA to award a contract to PS IAD's competitor, daa International ("DAAI"). ECF No. 1. Contemporaneously with its complaint, PS IAD filed a motion for temporary injunctive relief seeking to prohibit MWAA from awarding a contract to PS IAD's competitor pending the outcome of the bid protest. ECF No. 2. Pursuant to the Federal Rules of Civil Procedure and this Court's Local Rules, PS IAD promptly sent the complaint, motion for temporary injunctive relief, and a memorandum in support of the motion to MWAA personnel.

4923-7742-4782.4

This Court then ordered, in a minute entry, that the parties confer regarding a briefing schedule on the motion by February 6, 2026, at 12 PM EST.

At 10:45 AM EST on February 6, 2026, counsel for PS IAD was contacted by Edward "Teddie" Arnold and Ken Kanzawa of Seyfarth. Mr. Arnold and Mr. Kanzawa informed counsel for PS IAD that Seyfarth represented MWAA in this matter and agreed to a briefing schedule on its behalf, which PS IAD submitted to the Court. ECF No. 7. Shortly thereafter, counsel for PS IAD updated their client on the status of the proceedings and the proposed briefing schedule. At that time, PS IAD informed the undersigned that Seyfarth represented both its parent Extime and its affiliate PS LAX, LLC under a single engagement letter in numerous pending matters in other jurisdictions. Many of the matters are employment matters, but one is a collective bargaining agreement matter that exposed Seyfarth to sensitive information including compensation data, personnel files, operational know-how, and many of the policies and procedures that Extime and its subsidiaries like PS IAD use at airports.

Counsel for PS IAD suggested that the shared general counsel for PS IAD, Extime, and PS LAX LLC—Drew Lincoln—contact Seyfarth and attempt to work out the conflict without resort to this Court. Those efforts failed. Seyfarth insisted that because it represented affiliates of PS IAD rather than PS IAD itself, there was no conflict and that it was proceeding with its representation of MWAA in this matter despite PS IAD's intense concerns about Seyfarth's ability to simultaneously represent its parent company and MWAA. PS IAD moves to disqualify Seyfarth.

## ARGUMENT

Seyfarth's continued representation of MWAA in this matter contravenes the District of Columbia's Rules of Professional Conduct and is, bluntly, untenable. The Court should disqualify Seyfarth and require MWAA to obtain other counsel.

4923-7742-4782.4

**I.      This Court disqualifies counsel where their representation of a client violates the Rules of Professional Conduct and compromises their ability to advocate zealously for the client.**

"[T]he district court bears responsibility for supervising the members of its bar and its exercise of this supervisory duty is discretionary." *Paul v. Jud. Watch, Inc.*, 571 F. Supp. 2d 17, 20 (D.D.C. 2008) (quoting *Groper v. Taff,* 717 F.2d 1415, 1418 (D.C. Cir. 1983)). "The court has authority to disqualify an attorney from participating in a case before it if there is a conflict of interest or if the attorney has committed ethical violations." *Konarski v. Donovan*, 763 F. Supp. 2d 128, 135 (D.D.C. 2011). "For the very reasons that the ethics rules forbid lawyers to enter into representations that create conflicts of interest or the appearance thereof, a district court must promptly address allegations of conflict." *Grimes v. D.C.*, 794 F.3d 83, 90 (D.C. Cir. 2015). "Once a party moves to disqualify an adverse party's counsel, the district court may not entertain a dispositive motion filed by the very counsel alleged to be conflicted until the court has first determined whether that counsel is disqualified." *Id.*

"[M]otions to disqualify are governed by two sources of authority. First, attorneys are bound by the local rules of the court in which they appear. Federal district courts usually adopt the Rules of Professional Conduct of the states where they are situated. Second, because motions to disqualify counsel in federal proceedings are substantive motions affecting the rights of the parties, they are decided by applying standards developed under federal law." *Paul*, 571 F. Supp. 2d at 20 (quoting *Cole v. Ruidoso Mun. Schools*, 43 F.3d 1373, 1383 (10th Cir. 1994)). Here, "[t]he District of Columbia Rules of Professional Conduct are the applicable rules." *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 965 F. Supp. 2d 104, 110 (D.D.C. 2013); *see also* L.R. 83.15.

"When considering a motion to disqualify, the Court 'must consider two questions in turn: first, whether a violation of an applicable Rule of Professional Conduct has occurred or is

4

occurring, and if so, whether such violation provides sufficient grounds for disqualification.' " *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 965 F. Supp. 2d at 110 (quoting *Paul*, 571 F. Supp. 2d at 20). "If the Court finds that a violation of the D.C. Rules has occurred, disqualification is appropriate if the Court is convinced that the lawyer's 'ability to act as a zealous and effective advocate for the client' is compromised, or if the representation poses 'a substantial possibility of an unfair advantage to the current client because of counsel's prior representation of the opposing party.'" *Id.* (quoting *Koller v. Richardson-Merrell, Inc.*, 737 F.2d 1038, 1056 (D.C. Cir. 1984), *vacated on other grounds*, 472 U.S. 424 (1985)).

II. **Rule 1.7 of the District of Columbia Rules of Professional Conduct prohibits concurrent representation of a parent and its subsidiary where they're alter egos of one another.**

As noted, the District of Columbia Rules of Professional Conduct ("the D.C. Rules") govern the Court's inquiry. Relevant here is Rule 1.7. That Rule provides that "a lawyer shall not represent a client with respect to a matter if . . . [s]uch representation will be or is likely to be adversely affected by representation of another client" or if "[r]epresentation of another client will be or is likely to be adversely affected by such representation." D.C. Rules R. 1.7(b)(3), (4). Here, Seyfarth's representation of MWAA runs afoul of these rules.

The comments to Rule 1.7—which this Court has regularly relied upon—emphasize that counsel for a company (especially a parent company) cannot proceed in an adverse posture against an affiliate where that counsel has obtained information "that could be used to the disadvantage of . . . [the] affiliate." D.C. Rules R. 1.7, cmt. 22. More importantly, the comments make it clear that "the propriety of representation adverse to an affiliate or constituent of [an] organization client must be tested by attempting to determine whether the adverse party is in substance the 'alter ego' of the organization client." D.C. Rules 1.7. cmt. 23; *see, e.g.*, *In re Rail Freight Fuel Surcharge*

5

*Antitrust Litig.*, 965 F. Supp. 2d at 113 (relying on comments). As the comment explains, "[t]he alter ego case is one in which there is likely to be a reasonable expectation by the constituents or affiliates of an organization that each has an individual as well as a collective client-lawyer relationship with the lawyer, a likelihood that a result adverse to the constituent would also be adverse to the existing organization client, and a risk that both the new and the old representation would be so adversely affected that the conflict would not be 'consentable.'" *Id.*[1]

Comment 23 to Rule 1.7 lay out several factors that are helpful in determining whether an "alter ego case" exists for disqualification. As is relevant here in the "parent-subsidiary context," a court should ask "whether (i) the parent directly or indirectly owns all or substantially all of the voting stock of the subsidiary, (ii) the two companies have common directors, officers, office premises, or business activities, or (iii) a single legal department retains, supervises and pays outside lawyers for both the parent and the subsidiary. If all or most of those factors are present, for conflict of interest purposes those two entities normally would be considered alter egos of one another and the lawyer for one of them should refrain from engaging in representation adverse to the other." *Id.*

Though this Court does not appear to have addressed the issue, "[m]any courts have reached the conclusion that the bar to concurrent representation applies if a firm's representation adverse to a client's corporate affiliate 'reasonably diminishes the level of confidence and trust in counsel held by the client.'" *See GSI Com. Sols., Inc. v. BabyCenter, L.L.C.*, 618 F.3d 204, 210 (2d Cir. 2010) (quotation marks, citations, and brackets omitted); *see also Dr. Falk Pharma GmbH*

---

[1] It must be emphasized that this "alter ego" test is something less than what would be required to prove "alter ego" in the context of corporate veil piercing. That, of course, would require a showing of "[either] use of the corporate form to perpetrate fraud or wrong, or other considerations of justice and equity justify it." *TAC-Critical Sys., Inc. v. Integrated Facility Sys., Inc.*, 808 F. Supp. 2d 60, 67 (D.D.C. 2011). This is plainly not such a case.

4923-7742-4782.4

*v. GeneriCo, LLC*, 916 F.3d 975, 985 (Fed. Cir. 2019) (same).[2] "Put another way, these courts focus on the reasonableness of the client's belief that counsel cannot maintain the duty of undivided loyalty it owes a client in one matter while simultaneously opposing that client's corporate affiliate in another." *Id.* Some have even found, standing alone, "that an affiliate's status as a wholly-owned subsidiary of the client may suffice to establish a corporate affiliate conflict. *Id.* (citing *Carlyle Towers Condo. Ass'n, Inc. v. Crossland Sav., FSB*, 944 F. Supp. 341, 346 (D. N.J. 1996)).

In general, though—and like the factors set out in Comment 23—courts look at the "(i) the degree of operational commonality between affiliated entities, and (ii) the extent to which one depends financially on the other." *Id.* Among other things, "courts have considered the extent to which entities rely on a common infrastructure" and "the extent to which the affiliated entities rely on or otherwise share common personnel such as managers, officers, and directors." *Id.* Specifically, other jurisdictions "have emphasized the extent to which affiliated entities share responsibility for both the provision and management of legal services"—"reflect[ing] the view that neither management nor in-house legal counsel should, without their consent, have to place their trust in outside counsel in one matter while opposing the same counsel in another." *Id.*

### III. Seyfarth must be disqualified from its representation of MWAA in this case.

#### a. Seyfarth's representation of MWAA violates Rule 1.7 and provides sufficient grounds for disqualification.

Seyfarth's representation of MWAA in this case violates Rule 1.7 and Comment 23 because Seyfarth's representation of MWAA "adversely affects" Seyfarth's existing representation of PS

---

[2] Though *GSI* is a Second Circuit decision, it should be persuasive here because it applied the American Bar Association Model Rules. *See* 618 F.3d at 210. As this Court has noted, "the D.C. Rules were not intended to lead to significantly different results in actual cases from the results that would be achieved under the ABA's model rules." *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 965 F. Supp. 2d at 116 n.8 (quotation marks, citation, and brackets omitted).

IAD's parent Extime (and its affiliate PS LAX, LLC) and destroys PS IAD's "confidence and trust in" Seyfarth's representation of its business. *See GSI Com. Sols.*, 618 F.3d at 210. Look no further than the concerns laid out in Comment 23 and the caselaw, all of which are implicated in this case.

*First*, Extime "directly . . . owns all . . . of the voting stock of" PS IAD, satisfying the first factor of the test to its absolute utmost. *See* D.C. Rules R. 1.7, cmt. 23; *see* Lincoln Dec., at ¶ 5. Again, some courts have found that this factor *standing alone* is enough to prove a violation of ethical rules and merit disqualification. *See Carlyle Towers Condo. Ass'n, Inc.*, 944 F. Supp. at 346. As a matter of law, Seyfarth simply cannot be allowed to represent MWAA here given its frequent representation of PS IAD's lone parent.

The Court need not decide if Extime's complete ownership of PS IAD alone suffices to show an alter ego, though, because PS IAD also handily satisfies the *second* factor of the test: Extime and PS IAD share "common directors, officers, office premises, [and] business activities." D.C. Rules R. 1.7, cmt. 23; Lincoln Dec., at ¶ 12. Again, Extime and PS IAD feature the same CEO and CFO, executive committee, and other key leadership offices. The companies share a business address at 212 Eucalyptus Dr, El Segundo, CA 90245. *Id.* ¶ 11. Their leadership and employees use the same "computer network" and "email system." *GSI*, 618 F.3d at 211 (citing *Discotrade Ltd. v. Wyeth-Ayerst Int'l, Inc.*, 200 F. Supp. 2d 355, 358–59 (S.D.N.Y. 2002)). And Extime is the holding company for the individual companies (like PS IAD and PS LAX) that own and/or operate private terminals at each airport where Extime has a terminal or is planning to have one, *i.e.*, these are not disparate entities in an unrelated web of businesses owned by some distant parent company. PS IAD was created solely to bid on this contract and currently has no employees or officers that reside in the entity, as they all reside in Extime. Extime and its affiliated entities are effectively a singular corporate enterprise, with the same officers and personnel, working in

concert in the same line of work, as evidenced by the immense, near identical overlap in personnel and policy and procedure elucidated above. Simply put: PS IAD *is* Extime operationally.

*Third*, "a single legal department retains, supervises and pays outside lawyers for both the parent and the subsidiary." D.C. Rules R. 1.7, cmt. 23; Lincoln Dec., at ¶¶ 14–15. Again, Drew Lincoln is the general counsel for the entire Private Suite enterprise: Extime, PS LAX, and PS IAD. Seyfarth communicates with Mr. Lincoln as it relates to all matters in which it represents Extime and PS LAX—not to mention Seyfarth's communications with Mr. Lincoln regarding the instant conflict. It is beyond the pale that Mr. Lincoln and his inhouse team might be required to "place their trust" in Seyfarth in some seven other matters "while opposing" Seyfarth in the instant matter. *GSI*, 618 F.3d at 211.

Because PS IAD satisfies each of these factors (and then some), Seyfarth had (and continues to have) an ethical obligation to "refrain from engaging in representation adverse" to PS IAD, including in this matter. *See* D.C. Rules R. 1.7, cmt. 23. Indeed, the relationship between the two entities is so "exceedingly close" under Comment 23 and the caselaw that analysis of the relatedness of Seyfarth's other matters for Extime and PS LAX is unnecessary. *See GSI*, 618 F.3d at 212 & n.1. But should the Court desire additional support for disqualification, it finds that support in the extensive information Seyfarth possesses about Extime's (and therefore PS IAD)'s business due to Seyfarth's representation of Extime in the collective bargaining matter outlined above. *See supra* at 3. Even if PS IAD had not ably proved the elements for a violation of Comment 23 to Rule 1.7, Seyfarth's representation of Extime in the collective bargaining matter provides yet another reason for disqualification of Seyfarth in this matter. *See* D.C. Rules R. 1.7, cmt. 22.

Because of the closeness between Extime and PS IAD and Seyfarth's extensive representation of PS IAD's affiliates in other matters, there can be little doubt that Seyfarth's

"ability to act as a zealous and effective advocate for the client is compromised" *and* that Seyfarth's "representation poses a substantial possibility of an unfair advantage to [MWAA]" because of Seyfarth's extensive knowledge of PS IAD and Extime's business. *See In re Rail Freight Fuel Surcharge Antitrust Litig.*, 965 F. Supp. 2d at 110 (quotation marks and citation omitted). The Court must disqualify Seyfarth from its representation of MWAA in this matter.

      **b. The generic waiver in Seyfarth's engagement letter does not absolve Seyfarth of its ethical conflict in this case.**

It cannot be seriously disputed that neither PS IAD, Extime, nor PS LAX, LLC have agreed to waive this conflict with Seyfarth. However, to the extent that Seyfarth relies on generic language in its engagement letter with PS IAD's affiliates stating that Seyfarth does not represent "affiliates" of Extime or PS LAX, the Court should reject Seyfarth's entreaty. For one, Seyfarth undertook representation of PS LAX without having Extime's general counsel execute a separate engagement letter for PS LAX, demonstrating that both Seyfarth and Extime believed that Seyfarth's representation extended to Extime's subsidiaries. But more importantly, such blanket waiver provisions "raise a serious ethical problem" and courts should be leery of "straining to work a broad waiver into language that simply is not plain enough or clear enough to support it." *GSI*, 618 F.3d at 214. Seyfarth's representation of PS IAD's closely related parent and affiliate is too extensive and wide-ranging to allow Seyfarth to sidestep the serious ethical issues that its representation of MWAA present in this matter with the invocation of generic engagement letter language.

## CONCLUSION

PS IAD does not lightly petition this Court for the relief it seeks in this motion. Indeed, it tried multiple times to avoid it. And were it not for the extensive, current representation of its interests by Seyfarth, PS IAD may have been able to look past this obvious conflict. But it cannot.

10

Because Seyfarth's representation of MWAA in this matter violates the Rules of Professional Conduct and has not been waived by PS IAD, PS IAD requests that the Court disqualify Seyfarth and issue all relief to which PS IAD may be entitled.

**RESPECTFULLY SUBMITTED** this the 9th day of February, 2026.

**THE PRIVATE SUITE IAD, LLC**

/s/ *Andrew J. Narod*
Andrew J. Narod (D.C. Bar No. 1006083)
Erik M. Coon (D.C. Bar No. 1656075)
Bradley Arant Boult Cummings LLP
1900 K Street, NW
Suite 800
Washington, D.C. 20006
P: 202.719.8271
F: 202.719.8371
anarod@bradley.com
ecoon@bradley.com

R. Sumner Fortenberry (MS Bar No. 106292)
*Pro Hac Vice Application Forthcoming*
Bradley Arant Boult Cummings LLP
188 E. Capitol St., Suite 1000
Jackson, MS 39202
Tel: (601) 592-9922
Email: sfortenberry@bradley.com

*Attorneys for The Private Suite IAD, LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that I have electronically filed the foregoing with the Clerk of the Court using CM/ECF system which will send notification of such filing on all counsel of record on the date set out above.

/s/ *Andrew J. Narod*
Andrew J. Narod

12

4923-7742-4782.4