IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

THE PRIVATE SUITE IAD, LLC,

                Plaintiff,

      v.

METROPOLITAN WASHINGTON
AIRPORTS AUTHORITY,

                Defendant.

Civil Action No. 1:26-cv-00349

**DEFENDANT METROPOLITAN WASHINGTON AIRPORTS AUTHORITY'S
COMBINED OPPOSITION TO PLAINTIFF'S EMERGENCY MOTION FOR
TEMPORARY INJUNCTIVE RELIEF AND MOTION TO DISQUALIFY
SEYFARTH SHAW LLP AS COUNSEL FOR DEFENDANT**

## TABLE OF CONTENTS

**Page**

**DEFENDANT METROPOLITAN WASHINGTON AIRPORTS AUTHORITY'S OPPOSITION TO PLAINTIFF'S EMERGENCY MOTION FOR TEMPORARY INJUNCTIVE RELIEF**

I.    INTRODUCTION ............................................................................... 1

II.   FACTUAL BACKGROUND ................................................................ 2

    A.    The Airports Authority Is an Independent Entity, Not a Federal Agency ............ 2

    B.    The Original Best-Value RFP, PS IAD's Protest, Cancellation, and Reissuance Under an HPTA Framework ................................................ 3

        1.    The Original RFP Was a Concessions Solicitation Using a Best Value Method ............................................................................. 3

        2.    PS IAD Protested the Intended Award and the Airports Authority Subsequently Cancelled the Original RFP ................................... 4

        3.    The Airports Authority Reissued a Substantially Similar Concessions Solicitation Using HPTA to Align Evaluation with Revenue-Maximization for Concessions ..................................... 4

    C.    PS IAD's Second Protest Challenging Amendment 2, Administrative Exhaustion, and the TRO Filing ................................................... 6

        1.    Amendment 2 Revised the Financial-Offer Evaluation Description; PS IAD Protested the Change ................................................... 6

III.  LEGAL STANDARD ......................................................................... 8

IV.   ARGUMENT ................................................................................... 8

    A.    PS IAD CANNOT SHOW IRREPARABLE HARM .......................... 8

        1.    Any Asserted Injury Is Speculative Because PS IAD Remains Eligible and No Award Has Been Made ................................... 9

        2.    PS IAD's Alleged Harm Is Self-Inflicted and Does Not Warrant Emergency Relief ............................................................... 10

        3.    The Absence of Monetary Damages Does Not Transform Speculative Economic Injury Into Irreparable Harm .................. 11

4.   "Loss of Opportunity to Compete" Is Not Enough Here Where PS IAD Is Still Competing ........................................................................ 12

B.   PLAINTIFF IS UNLIKELY TO SUCCEED ON THE MERITS ...................... 13

1.   PS IAD Lacks Standing Because There Is No Redressable Injury.......... 14

2.   This Court Lacks Jurisdiction Over PS IAD's Claimed "Enabling Act" Violation and PS IAD's Arbitrary and Capricious Cause of Action.................................................................................................... 15

3.   PS IAD Otherwise Fails to State a Plausible Claim for Relief ............... 17

4.   The Airports Authority's Selection of HPTA for a Revenue Generating Contract and Issuance of Amendment 2 Are Reasonable Acts of Discretion ................................................................ 18

5.   The Airports Authority's Selection of HPTA, and Corresponding Issuance of Amendment 2, Was Consistent with the Contracting Manual and a Rational Exercise of Discretion ....................................... 19

6.   PS IAD's "No Explanation" and "Pretext" Narrative Is Speculative and Contrary to the Record .................................................................... 21

C.   THE BALANCE OF EQUITIES WEIGHS DECISIVELY AGAINST INJUNCTIVE RELIEF.............................................................................. 22

1.   Enjoining the Competition Would Impose Concrete Operational and Administrative Burdens on the Airports Authority.......................... 22

2.   PS IAD's Continued Participation in the Solicitation Undermines Its Request for Equitable Relief ............................................................. 23

3.   PS IAD's Requested Relief Is Disproportionate to Its Alleged Harm ..................................................................................................... 23

D.   THE PUBLIC INTEREST STRONGLY COUNSELS AGAINST A TRO ....... 23

1.   The Public Interest Favors Allowing the Airports Authority to Administer Competitions Under Its Governing Framework .................. 24

2.   Emergency Relief Is Not a Tool for Judicial Supervision of Competition Policy Choices ................................................................... 24

3.   The Public Interest in Efficient Airport Operations and Revenue Generation Weighs Against Delay.......................................................... 25

V.   CONCLUSION.................................................................................................... 25

**DEFENDANT METROPOLITAN WASHINGTON AIRPORTS AUTHORITY'S
OPPOSITION TO PLAINTIFF'S MOTION TO DISQUALIFY SEYFARTH
SHAW LLP AS COUNSEL FOR DEFENDANT**

I.      INTRODUCTION ........................................................................................................ 26

II.     BACKGROUND .......................................................................................................... 27

III.    DISCUSSION ............................................................................................................... 28

        A.      Legal Standard .................................................................................................. 28

        B.      PS IAD Does Not Have Standing to Move to Disqualify .................................. 29

        C.      Seyfarth Shaw Does Not Represent PS IAD, So There Is No Conflict .............. 29

        D.      Seyfarth Shaw Possesses No Relevant Confidential Information, and Its
                Representation Here Poses No Threat to the Integrity of the Proceedings .......... 35

IV.     CONCLUSION ............................................................................................................. 36

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AirBoss Def. Grp., LLC v. United States*,
  172 Fed. Cl. 219 (2024) ................................................................................................9

*AIU N. America, Inc.*,
  B-283743.2, Feb. 16, 2000, 2000 CPD ¶ 39 ...........................................................18

*Ark. Dairy Co-op Ass'n, Inc. v. USDA*,
  573 F.3d 815 (D.C. Cir. 2009) ....................................................................................13

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)....................................................................................................18

*Chaplaincy of Full Gospel Churches v. England*,
  454 F.3d 290 (D.C. Cir. 2006) ......................................................................................8

*Clevinger v. Advocacy Holdings, Inc.*,
  134 F.4th 1230 (D.C. Cir. 2025) ...................................................................................8

*ConverDyn v. Moniz*,
  68 F. Supp. 3d 34 (D.D.C. 2014) (Walton, J.) ...........................................................11

*E.B. v. U.S. Dep't of State*,
  422 F. Supp. 3d 81 (D.D.C. 2019) ..............................................................................12

*Elec. Priv. Info. Ctr. v. DOJ*,
  15 F. Supp. 3d 32 (D.D.C. 2014) .........................................................................22, 23

*Exxon Corp. v. Fed. Trade Comm'n*,
  589 F.2d 582 (D.C. Cir. 1978) .................................................................................9, 12

*Feinerman v. Bernardi*,
  558 F. Supp. 2d 36 (D.D.C. 2008) (Walton, J.) .........................................................11

*Figg Bridge Eng'rs, Inc. v. FHWA*,
  No. CV 20-2188, 2020 WL 4784722 (D.D.C. Aug. 17, 2020).................................11

*FirstLine Transp. Sec., Inc. v. United States*,
  107 Fed. Cl. 189 (2012) .............................................................................................14

*Food & Water Watch, Inc. v. Vilsack*,
  79 F. Supp. 3d 174 (D.D.C. 2015), *aff'd*, 808 F.3d 905 (D.C. Cir. 2015).........................14, 15

*Guam Indus. Servs., Inc. v. Rumsfeld*,
   383 F. Supp. 2d 112 (D.D.C. 2005) ...................................................................................11

*Hanson v. D.C.*,
   120 F.4th 223 (D.C. Cir. 2024) .........................................................................................24

*Heart 6 Ranch, LLC*,
   285 F. Supp. 3d at 144; *see also Comprehensive Health Servs., LLC*, 151 Fed.
   Cl. 200 (2020) ...................................................................................................................13

*IAP Worldwide Servs., Inc. v. United States*,
   159 Fed. Cl. 265 (2022) ....................................................................................................12

*Int'l Graphics, Div. of Moore Bus. Forms, Inc. v. United State*s,
   4 Cl. Ct. 515 (1984) ..........................................................................................................12

*Kerpen v. Metro. Washington Airports Auth.*,
   907 F.3d 152 (4th Cir. 2018) ............................................................................................16

*LTMC/Dragonfly, Inc. v. Metropolitan Washington Airports Authority*,
   699 F. Supp. 2d 281 (D.D.C. 2010) ............................................................................15, 18

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) ...........................................................................................................14

*Mktg. & Mgmt. Info., Inc. v. United States*,
   57 Fed. Cl. 665 (2003) .......................................................................................................18

*MWAA v. Pan*,
   106 F.4th 355 (4th Cir. 2024) .............................................................................................2

*Nat'l Min. Ass'n v. Jackson*,
   768 F. Supp. 2d 34 (D.D.C. 2011) (Walton, J.) ................................................................11

*Nken v. Holder*,
   556 U.S. 418 (2009) .............................................................................................................8

*Safari Club Int'l v. Salazar*,
   852 F. Supp. 2d 102 (D.D.C. 2012) ..................................................................................10

*Sampson v. Murray*,
   415 U.S. 61 (1974) ...............................................................................................................8

*San Jose Constr. Grp., Inc. v. MWAA*,
   415 F. Supp. 2d 643 ...........................................................................................................17

*Saratoga Dev. Corp. v. United States*,
   21 F.3d 445 (D.C. Cir. 1994) ............................................................................................18

*Singh v. Berger*,
    56 F.4th 88 (D.C. Cir. 2022) ............................................................................24

*State v. Musk*,
    769 F. Supp. 3d 1 (D.D.C. 2025) .......................................................................9

*ViroPharma, Inc. v. Hamburg*,
    898 F. Supp. 2d 1 (D.D.C. 2012) ......................................................................12

*Washington-Dulles Transp., Ltd. v. MWAA*,
    263 F.3d 371 (4th Cir. 2001) ............................................................................15

*Washington-Dulles Transp. Ltd. v. MWAA*,
    87 F. App'x 843 (4th Cir. 2004) (unpublished) ...........................................15, 16

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) .................................................................................... *passim*

*Woodstream Corp. v. Jackson*,
    No. CIV.A. 11-867 JEB, 2011 WL 8883395 (D.D.C. June 3, 2011) .....................11

**Statutes**

49 U.S.C. § 49104 ..............................................................................7, 15, 16, 18

49 U.S.C. § 49106 ...........................................................................................7, 16

Administrative Procedure Act ..................................................................1, 11, 16

Enabling Act .......................................................................................... *passim*

Transfer Act .......................................................................................................2

**Other Authorities**

4th Cir. Local R. 32.1 .......................................................................................17

FAR 2.101 .........................................................................................................18

FAR Part 15 ......................................................................................................19

**DEFENDANT METROPOLITAN WASHINGTON AIRPORTS AUTHORITY'S**
**OPPOSITION TO PLAINTIFF'S EMERGENCY**
**MOTION FOR TEMPORARY INJUNCTIVE RELIEF**

Defendant METROPOLITAN WASHINGTON AIRPORTS AUTHORITY ("Airports Authority"), respectfully submits this Opposition to Plaintiff THE PRIVATE SUITE IAD, LLC's ("PS IAD") Emergency Motion for Temporary Injunctive Relief (the "Motion"). For the reasons set forth below, PS IAD's request for extraordinary emergency relief should be denied.

## I.    INTRODUCTION

PS IAD asks this Court to issue extraordinary emergency relief halting an ongoing Airports Authority concessions competition—not because PS IAD faces imminent or irreparable harm, but because it disagrees with the Airports Authority's chosen evaluation methodology. That is not a proper basis for a temporary restraining order, and PS IAD's motion should be denied. Because there has not been any contract award, this case is not ripe for judicial action of any sort.

PS IAD cannot satisfy the threshold requirements for injunctive relief. Most fundamentally, PS IAD cannot show irreparable harm. It submitted a proposal under the challenged solicitation and remains an eligible offeror competing on equal terms. Any asserted injury rests on speculation about how the Airports Authority might evaluate proposals and whether PS IAD might lose to a competitor offering a higher price in a concessions competition. Courts do not grant emergency relief based on predictions, expectations, or disagreement with the rules of the competition.

Nor is PS IAD likely to succeed on the merits. The Airports Authority is not a federal agency and is not subject to the Federal Acquisition Regulation ("FAR") or Administrative Procedure Act ("APA")-style review. The challenged solicitation implements a Highest Price Technically Acceptable framework that the Airports Authority's Contracting Manual expressly

authorizes—and, in the concessions context, prefers. PS IAD identifies no violation of the Airports Authority's governing solicitation framework, no departure from published competitive procedures, and no cognizable prejudice. Instead, PS IAD asks the Court to impose federal procurement concepts that do not apply and to judicially redesign a revenue-generating airport concession.

Finally, the balance of equities and the public interest weigh decisively against injunctive relief. Enjoining this competition would disrupt the Airports Authority's planning and management of passenger services, divert public resources, delay implementation of a revenue-generating concession, and invite judicial supervision of solicitation policy choices Congress entrusted to the Airports Authority. The extraordinary remedy PS IAD seeks would impose significant costs on the Airports Authority, where no harm has yet occurred.

Because PS IAD cannot show irreparable harm, likelihood of success, or that the equities and public interest favor intervention, its Emergency Motion for Temporary Injunctive Relief should be denied.

## II.    FACTUAL BACKGROUND

### A.    The Airports Authority Is an Independent Entity, Not a Federal Agency

The Airports Authority is an independent regional entity created by the Commonwealth of Virginia and the District of Columbia and authorized by Congress to lease and operate Washington Dulles International Airport ("IAD") and Ronald Reagan Washington National Airport. The Enabling Act[1] requires the Airports Authority, when "acquiring by contract supplies or services" over $200,000 or "awarding concession contracts," to obtain "complete and open competition through the use of published competitive procedures" to the maximum extent

---

[1] This Act is also referred to as the "Transfer Act." *See, e.g.*, *MWAA v. Pan*, 106 F.4th 355, 359 n.2 (4th Cir. 2024).

practicable.  The Enabling Act also provides that federal district courts have jurisdiction to compel the Airports Authority to comply with the Lease's terms.

The Airports Authority implements its statutory and Lease obligations through a Board-adopted Contracting Manual that sets forth the Authority's contracting policies and procedures, including for concessions.  The Contracting Manual expressly confirms that the Airports Authority is not a federal agency and "is not subject to the … FAR."  Pl.'s Ex 3, ECF No. 2-4, at § 1.7 (Contracting Manual).  The Manual also states that neither its provisions nor any deviation from them is intended to create rights in third parties (including offerors), except as expressly provided.  Pl.'s Ex 3, ECF No. 2-4, at § 1.1 (Contracting Manual).

The Contracting Manual assigns to the Airports Authority contracting officials discretion to select the procurement method "most advantageous to the Authority," taking into account competition, pricing, and efficiency.  Pl.'s Ex 3, ECF No. 2-4, at § 3.1 (Contracting Manual).  For competitive proposals, the Manual expressly authorizes multiple evaluation methods, including Highest Price Technically Acceptable ("HPTA"), and explains that HPTA is appropriate "when selection of the technically acceptable proposal with the highest offered price is preferred (*e.g.*, concessions Contracts)." Pl.'s Ex 3, ECF No. 2-4, at § 3.5.2.1 (Contracting Manual).

### B.    The Original Best-Value RFP, PS IAD's Protest, Cancellation, and Reissuance Under an HPTA Framework

#### 1.    The Original RFP Was a Concessions Solicitation Using a Best Value Method

On June 26, 2023, the Airports Authority issued Solicitation No. RFP-23-21311 for "Remote VIP Passenger Processing Services for Commercial Airline Flights at Washington Dulles International Airport" (the "Original RFP").  *See generally* Pl.'s Ex. 2, ECF No. 2-3.  The Original RFP expressly contemplated award of a concessions contract, including contractor

payment of ground rent, a Minimum Annual Guarantee ("MAG"), and a percentage of revenue remitted to the Airports Authority.  Pl.'s Ex. 2, ECF No. 2-3, at 14.  The Original RFP further described a two-phase, competitively negotiated Best Value selection process.  *E.g.*, Pl.'s Ex. 2, ECF No. 2-3, at 66.  PS IAD and one other offeror (daa International, "DAAI," partnering with Potomac Holdings, LLC) submitted proposals.  PS IAD alleges that the Airports Authority notified it on February 7, 2025, that it intended to award to DAAI based on the "highest price" in total ground rent and MAG.

### 2.    PS IAD Protested the Intended Award and the Airports Authority Subsequently Cancelled the Original RFP

On February 14, 2025, pursuant to the protest procedures in the Airports Authority's Contracting Manual, PS IAD filed a series of protest actions challenging the Airports Authority's evaluation of proposals and intended award to DAAI.  The essence of PS IAD's protest was that the Airports Authority's Best Value selection process was flawed because it undervalued the technical merit of PS IAD's proposal and overvalued the technical merits and revenue projections in DAAI's proposal.  Ultimately, the Airports Authority decided to cancel the Original RFP.

### 3.    The Airports Authority Reissued a Substantially Similar Concessions Solicitation Using HPTA to Align Evaluation with Revenue-Maximization for Concessions

On September 25, 2025, the Airports Authority issued Solicitation No. RFP-25-24520, "Remote VIP Passenger Services at IAD" (the "New RFP").  *See generally* Pl.'s Ex. 8, ECF No. 2-9.  Like the Original RFP, the New RFP also concerns a revenue-generating concession opportunity at IAD.  Laffert Decl. ¶ 6.[2]  The Airports Authority selected the HPTA evaluation method for the New RFP—an award method the Airports Authority's Contracting Manual

---

[2] Attached as Exhibit A.

expressly identifies as appropriate "(*e.g.*, concessions Contracts)" where tradeoffs are not permitted and award is based on the highest price among technically acceptable offers. Laffert Decl. ¶¶ 6-7. In fact, the Airports Authority's Contracting Manual states that this award methodology is preferred for the award of concessions contracts. Pl.'s Ex 3, ECF No. 2-4, at § 3.5.2.1 (Contracting Manual). In other words, the move to HPTA reflects a rational alignment of the solicitation's evaluation method with the basic structure of a concessions arrangement—where the Airports Authority's objective is to maximize revenue while ensuring that only proposals meeting defined technical acceptability requirements are eligible for award. Laffert Decl. ¶ 7-8. Thus, PS IAD's effort to characterize the matter as a conventional government "procurement" obscures the nature of the transaction: the Airports Authority is not purchasing goods or services with appropriated funds. Rather, the Airports Authority is selecting a concessionaire for an airport passenger-service concession under a revenue-sharing/ground rent structure, with award based on the highest return among technically acceptable proposals. Laffert Decl. ¶ 27 .

      Even under HPTA, the Airports Authority's solicitation framework does not provide for "automatic award" to the highest number. And the solicitation language emphasizes that apparent success does not automatically result in award and that the Airports Authority must consider conformity and responsibility. Pl.'s Ex. 2, ECF No. 2-3, at 19; Laffert Decl. ¶¶ 12, 15. The Airports Authority's competition framework further requires award only to responsible contractors, including those with financial resources or ability to obtain them. Laffert Decl. ¶ 2; Pl.'s Ex 3, ECF No. 2-4, at § 3.5.2.1 (Contracting Manual). The solicitation package also includes a performance-security mechanism, including a Performance Guarantee provision

reflecting a guarantee equal to 100% of the Minimum Annual Guarantee, subject to claim upon default/failure to perform.  Pl.'s Ex. 2, ECF No. 2-3, at 29; Laffert Decl. ¶ 14.

### C.    PS IAD's Second Protest Challenging Amendment 2, Administrative Exhaustion, and the TRO Filing

#### 1.    Amendment 2 Revised the Financial-Offer Evaluation Description; PS IAD Protested the Change

On September 26, 2025, the Airports Authority issued Amendment 2 to the New RFP. As relevant, Amendment 2 revised the evaluation criteria to replace previous language contemplating evaluation of financial offers for "reasonableness, completeness, and realism as appropriate,"  Pl.'s Ex. 9, ECF No. 2-10, at 2; Laffert Decl. ¶ 9, with an evaluation of each financial offer to "determin[e] whether it is complete and responsive to the requirements set forth in the Solicitation," Pl.'s Ex. 11, ECF No. 2-12, at 1; Laffert Decl. ¶ 10.

On November 25, 2025, PS IAD protested Amendment 2, pursuant to the procedures in the Airports Authority's Contracting Manual.  PS IAD challenged Amendment 2 as arbitrary and capricious and contrary to the Enabling Act's requirements to "obtain complete and open competition" and to use "sound Government contracting principles."  Pl.'s Ex. 12, ECF No. 2-13, at 14.  The Vice President, Office of Supply Chain Management ("VP OSCM") (i) dismissed PS IAD's protest in part, because part of PS IAD's protest expressed disagreement with the Airports Authority's selected competition method and thus failed to identify a violation of the manual or applicable law, required for a valid basis for protest under the Airports Authority's procedures; and (ii) denied PS IAD's protest in part, because PS IAD relied on inapplicable provisions from the Federal Acquisition Regulation on Best Value solicitations.

Following the VP OSCM's denial of that protest, PS IAD appealed to the CEO and then to the Board; each denied PS IAD's protest, for largely similar reasons.  The Airports Authority's final decision, from the Board of Directors, explained that—despite PS IAD's

citation to the parts of the Enabling Act that require the Airports Authority to follow "sound Government contracting principles," 49 U.S.C. § 49106(g), and to obtain "complete and open competition," 49 U.S.C. § 49104(a)(4)—PS IAD identified no violations of those laws. The Airports Authority complies with those provisions by conducting competitions for concessions contracts in accordance with its Contracting Manual, which embodies sound government contracting principles that are tailored to the Airports Authority's statutory framework. Laffert Decl. ¶ 11. The Airports Authority's final decision explained that various sections of the FAR, and GAO regulations, which PS IAD had cited, did not apply to the Airports Authority. And the Airports Authority explained both why its HPTA contracting method to evaluate financial offers for completeness, rather than for reasonableness and realism, complied with its Contracting Manual, and why, given other measures in the New RFP, evaluating financial offers for completeness was neither arbitrary nor capricious. *Id.* ¶¶ 10-12.

In sum, PS IAD contends that the Airports Authority's issuance of Amendment 2 allegedly failed to follow procedures that adhere to "sound Government contracting principles" under 49 U.S.C. § 49106(g) and related lease provisions. PS IAD alleges the Airports Authority removed language about evaluating proposals for "reasonableness" and "realism," and argues that this change disadvantages PS IAD because (it claims) competitors can propose "unrealistic" financial terms. However, PS IAD also admits the central fact that defeats emergency relief— PS IAD submitted a proposal under the solicitation and the Airports Authority has made no award. Laffert Decl. ¶ 3. Against this background, PS IAD cannot satisfy the demanding requirements for emergency injunctive relief under *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) and its progeny.

## III.    LEGAL STANDARD

A TRO is "an extraordinary remedy never awarded as of right," *Winter*, 555 U.S. at 24. A movant must make a "clear showing" that it is entitled to relief, including: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm absent relief; (3) that the balance of equities tips in its favor; and (4) that an injunction is in the public interest. *Id.* at 20-24; *Nken v. Holder*, 556 U.S. 418, 434 (2009). Failure on any element is grounds to deny relief. *Winter*, 555 U.S. at 22. Nonetheless, the "basis of injunctive relief in the federal courts has always been irreparable harm." *Sampson v. Murray*, 415 U.S. 61, 88 (1974).

## IV.    ARGUMENT

### A.    PS IAD CANNOT SHOW IRREPARABLE HARM

A movant's failure to show irreparable harm is alone a basis to refuse preliminary injunctive relief. *Clevinger v. Advocacy Holdings, Inc.*, 134 F.4th 1230, 1236 (D.C. Cir. 2025). Irreparable harm must be actual and imminent, not speculative or contingent on future events. *Winter*, 555 U.S. at 22. In the D.C. Circuit, this is a "high standard": The injury "must be both certain and great; it must be actual and not theoretical." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).

PS IAD cannot meet this high standard. PS IAD's alleged harm is speculative and contingent, not certain and actual, given it remains eligible for consideration and award of the remote VIP contract under equal terms as any other offeror. Additionally, assuming *arguendo* PS IAD has sustained any harm, that harm is self-inflicted, because PS IAD is complaining about its own bidding decisions, not the Airports Authority's actions. Finally, PS IAD's non-existent injury is not transformed into irreparable harm because of the absence of monetary relief.

### 1. Any Asserted Injury Is Speculative Because PS IAD Remains Eligible and No Award Has Been Made

PS IAD seeks to stop the Airports Authority from making an "inevitable" award to a competitor.  TRO Mot., ECF No. 2-1, at 1.  Yet, PS IAD admits that "[the Airports Authority] has not made an award of the Contract," and because PS IAD submitted a proposal it remains in competition for the award.  *Id.* at 5; *see* Laffert Decl. ¶¶ 3, 11.  PS IAD is litigating on a hunch, a "possibility" of some hypothetical injury caused by a future award to a competitor.  *See Winter*, 555 U.S. at 22.  But preliminary injunctions cannot be issued on "feared" future events.  *Exxon Corp. v. Fed. Trade Comm'n,* 589 F.2d 582, 594 (D.C. Cir. 1978); *State v. Musk*, 769 F. Supp. 3d 1, 6 (D.D.C. 2025) ("[T]he 'possibility' that Defendants *may* take actions that irreparably harm Plaintiffs 'is not enough.'" (italics original)).  And courts routinely reject irreparable injury claims, such as PS IAD's, where the plaintiff's alleged injury is dissatisfaction with the rules of the competition rather than exclusion from it.  *See, e.g.*, *AirBoss Def. Grp., LLC v. United States*, 172 Fed. Cl. 219, 231 (2024).  PS IAD, therefore, alleges no real irreparable harm, so the Court should deny PS IAD's motion.

PS IAD's claimed injury rests on a chain of contingencies, none of which is certain to occur. To suffer the harm PS IAD asserts, the Airports Authority would have to: (1) complete its evaluations; (2) identify an apparent successful offeror; (3) determine that offeror to be responsible; and (4) decide to make an award.  At each step, the Airports Authority retains discretion, and nothing in the record establishes that an award to a particular competitor is inevitable.  Speculative harm that "may occur at some indefinite time in the future" does not satisfy the irreparable-harm standard.  *Winter*, 555 U.S. at 22.

PS IAD's theory further presumes that the Airports Authority will disregard the safeguards embedded in the solicitation and governing competition framework.  *See* TRO Mot.,

ECF No. 2-1, at 15.  But the RFP expressly provides that identification of an apparent successful offeror "does not automatically result in Contract award" and that the Airports Authority must evaluate both conformity with the solicitation and the offeror's responsibility.  Pl.'s Ex. 2, ECF No. 2-3, at 19.  The Contracting Manual independently requires that any award be made only to a responsible contractor, including one with adequate financial resources or the ability to obtain them.  Pl.'s Ex. 3, ECF No. 2-4, at § 4.5.1 (Contracting Manual).  In addition, the solicitation mandates a Performance Guarantee equal to 100% of the Minimum Annual Guarantee, providing further protection against non-performance.  Pl.'s Ex. 2, ECF No. 2-3, at 29.  PS IAD's irreparable-harm claim thus rests on speculation that the Airports Authority will ignore its own rules and contractual protections—an assumption courts do not accept as a basis for emergency relief.  *Winter*, 555 U.S. at 22.

### 2. PS IAD's Alleged Harm Is Self-Inflicted and Does Not Warrant Emergency Relief

Assuming *arguendo* PS IAD can demonstrate any irreparable harm, that harm is self-inflicted. "[A] preliminary injunction movant does not satisfy the irreparable harm criterion when the alleged harm is self-inflicted."  *Safari Club Int'l v. Salazar*, 852 F. Supp. 2d 102, 123 (D.D.C. 2012).  PS IAD complains that it is harmed by Amendment 2 because it cannot "ethically" offer the highest price because it believes higher amounts would be unrealistic.  TRO Mot., ECF No. 2-1, at 10, 16.  But the competitive disadvantage PS IAD claims is self-created. So, PS IAD points its finger in the wrong direction: offerors select their own business terms and assume the commercial risk of their offers.  If PS IAD chooses not to submit a higher price in a competition where price is the determining factor for award among technically acceptable offers, that is simply a business judgment—not irreparable harm inflicted by the Airports Authority.

### 3.    The Absence of Monetary Damages Does Not Transform Speculative Economic Injury Into Irreparable Harm

PS IAD argues it is irreparably harmed because it cannot recover monetary damages under the Enabling Act.  TRO Mot., ECF No. 2-1, at 16-17 (relying upon *Feinerman v. Bernardi*, 558 F. Supp. 2d 36, 51 (D.D.C. 2008) (Walton, J.)).[3]  But "[i]n the D.C. Circuit, 'economic loss does not, in and of itself, constitute irreparable harm.'" *Guam Indus. Servs., Inc. v. Rumsfeld*, 383 F. Supp. 2d 112, 121 (D.D.C. 2005) ((quoting *Wisconsin Gas Co. v. Fed. Energy Regulatory Comm.,* 758 F.2d 669, 674 (D.C. Cir. 1985)).  Moreover, "the mere fact that economic losses may be unrecoverable does not, in and of itself, compel a finding of irreparable harm."  *Nat'l Min. Ass'n v. Jackson*, 768 F. Supp. 2d 34, 53 (D.D.C. 2011) (Walton, J.) (footnote omitted); *see also Woodstream Corp. v. Jackson*, No. CIV.A. 11-867 JEB, 2011 WL 8883395, at *8 (D.D.C. June 3, 2011). Thus, PS IAD's inability to recover monetary damages is not an irreparable injury requiring relief.

PS IAD's reliance on *Feinerman* is particularly misplaced, because the Court has expressly recanted its characterization that economic damages unrecoverable due to sovereign immunity are "irreparable *per se*."  *ConverDyn v. Moniz*, 68 F. Supp. 3d 34, 49 (D.D.C. 2014) (Walton, J.) ("While this Court previously characterized economic damages that are unrecoverable due to sovereign immunity as 'irreparable *per se*,' … that characterization goes too far …" (citing *Feinerman*)).  And the Court recently found that *Feinerman*'s *per se* rule "is not the law of this Circuit" and would "effectively eliminate the irreparable harm requirement." *Figg Bridge Eng'rs, Inc. v. FHWA*, No. CV 20-2188, 2020 WL 4784722, at *8 (D.D.C. Aug. 17, 2020).

---

[3] *Feinerman* is an APA monetary relief decision.  The APA, as discussed *infra* at in Part IV.B.2, does not apply to the Airports Authority. *Feinerman* is thus inapposite.

PS IAD's argument wrongly conflates remedial limits with irreparable injury. PS IAD's burden to show a likelihood of imminent, non-speculative harm does not disappear in the absence of a damages remedy. *Winter*, 555 U.S. at 22-24; *see ViroPharma, Inc. v. Hamburg*, 898 F. Supp. 2d 1, 26 (D.D.C. 2012) ("[I]rreparability aside, it remains incumbent on plaintiffs to demonstrate, first, that they are threatened with serious *injury*." (emphasis in original)); *see also IAP Worldwide Servs., Inc. v. United States*, 159 Fed. Cl. 265, 326 (2022) ("[D]ecisions in this court have *not* indicated that lost profits *necessarily* constitute irreparable harm." (cleaned up and emphasis in original)). Courts ultimately require a showing that the alleged injury cannot be undone and is likely to occur absent immediate judicial intervention. *Exxon Corp.*, 589 F.2d at 594. That PS cannot recover monetary damages fails that standard.

### 4.    "Loss of Opportunity to Compete" Is Not Enough Here Where PS IAD Is Still Competing

PS IAD's "lost opportunity" narrative is factually inapt. PS IAD has not been excluded. PS IAD is not prevented from competing. And PS IAD has already competed by submitting a proposal. Laffert Decl. ¶¶ 5. In sum, PS IAD is "not losing out on a unique opportunity" that would cause irreparable damage, so a TRO is unjustified. *E.B. v. U.S. Dep't of State*, 422 F. Supp. 3d 81, 91 (D.D.C. 2019) (finding a lost opportunity only occurs when plaintiff has been eliminated from award consideration altogether or when a plaintiff "should have been awarded [the contract] in the first place.").

To the extent PS IAD reframes its injury as "competitive harm" because it believes competitors can propose higher prices, that is not an irreparable harm because no information was "improperly withheld" from PS IAD or any other party on how the competition was to be implemented. *E.g.*, *Int'l Graphics, Div. of Moore Bus. Forms, Inc. v. United States*, 4 Cl. Ct. 515, 522 (1984). "But even if true, this deprivation has already occurred," because competitive

dynamics are inherent in an HPTA concession where offerors decide how much revenue and rent they are willing to commit to the Authority. *Heart 6 Ranch, LLC v. Zinke*, 285 F. Supp. 3d 135, 144 (D.D.C. 2018); *see* Laffert Decl. ¶¶ 7-8. Any award based on a competitor's proposed higher prices, therefore, "can be remedied if [PS IAD] is successful in this litigation." *Heart 6 Ranch, LLC*, 285 F. Supp. 3d at 144; *see also Comprehensive Health Servs.*, *LLC*, 151 Fed. Cl. 200, 207 (2020) (explaining that a temporary restraining order is unnecessary of the irreparable harm will not occur "before a decision can be rendered on the merits.").

Granting a TRO on that basis would invite courts to halt competitive solicitations whenever an offeror asserts that a solicitation reflects poor judgment or an unwise policy choice. That would transform irreparable harm into a mechanism for judicial supervision of contracting policy, contrary to *Winter* and the limited role of courts in pre-award disputes. 555 U.S. at 22.

Because PS IAD has not shown a likelihood of actual, imminent, irreparable harm—as opposed to a desire to pause the solicitation process while it litigates—its Motion fails at the threshold.

### B.    PLAINTIFF IS UNLIKELY TO SUCCEED ON THE MERITS

PS IAD must show it has a "substantial likelihood" of success on the merits to obtain a TRO. *Ark. Dairy Co-op Ass'n, Inc. v. USDA*, 573 F.3d 815, 821 (D.C. Cir. 2009). PS IAD cannot do so for six reasons. *First*, PS IAD fails to show the requisite injury needed to show Article III standing (for this Court to even have jurisdiction over PS IAD's complaint) and to show prejudice (needed for PS IAD to prevail on the merits). *Second*, PS IAD's claimed "Enabling Act" violation and arbitrary and capricious cause of action fall outside this Court's jurisdiction. *Third*, PS IAD fails to meet FRCP 8 pleading standards. *Fourth*, to the extent PS IAD is likely to overcome its jurisdictional and pleading hurdles, the Airports Authority complied with the Enabling Act's competition requirement through use of its published

competitive procedures.  *Fifth*, the Airports Authority's Contracting Manual expressly authorizes the selection method that the Airports Authority has chosen and the Airports Authority's Amendment 2 rationally aligned the financial offer evaluation with the HPTA approach.  *Sixth*, PS IAD's assertions of "no explanation" and "pretext," used in support of its claim of arbitrary and capricious action, are speculative and contradicted by the record.

### 1.   PS IAD Lacks Standing Because There Is No Redressable Injury

Just as PS IAD has shown no irreparable injury, PS IAD has suffered no injury in fact. PS IAD therefore fails to carry its burden to show a substantial likelihood of Article III standing, which is a threshold requirement for this Court to have jurisdiction and among "the 'merits' on which plaintiff must show a likelihood of success."  *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015).

To establish standing under Article III, a claimant must show each of the following. *First*, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'"  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  *Second*, there must be a causal connection between the injury and the conduct complained of: the injury must be "fairly … trace[able] to the challenged action of the defendant and not … th[e] result [of] the independent action of some third party not before the court."  *Id*.  *Third*, the injury must be "likely," not merely "speculative[ly]," redressable by a favorable decision. *Id.* at 561.

PS IAD has failed to allege an injury in fact.  Because it remains eligible under Amendment 2 to compete for the award on equal terms as other offerors, PS IAD's claimed harm from Amendment 2 is therefore merely conjectural or hypothetical.  And, because Amendment 2 applies equally to PS IAD as it does to any other offeror, PS IAD has alleged no particularized harm, meaning PS IAD shows no redressable competitive injury.

PS IAD also fails to show the requisite causal connection between its asserted injury and any action of the Airports Authority.  PS IAD's claimed loss of a competitive opportunity arises not from the Airports Authority's Amendment 2, but from PS IAD's own bidding strategy.  This lack of traceability to action by the Airports Authority is a separate reason that PS IAD's allegation of injury fails.  *Food & Water Watch, Inc. v. Vilsack*, 79 F. Supp. 3d 174, 195-96 (D.D.C. 2015), ("It is clear beyond cavil that a plaintiff cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." (internal quotation marks omitted)), *aff'd*, 808 F.3d 905 (D.C. Cir. 2015).

> ## 2. This Court Lacks Jurisdiction Over PS IAD's Claimed "Enabling Act" Violation and PS IAD's Arbitrary and Capricious Cause of Action

PS IAD also fails to show likelihood of success on the merits because it raises arguments that fall outside this Court's jurisdiction.  There is no generalized right of action for an aggrieved party to enforce any and all parts of the Enabling Act.  Rather, the Enabling Act provides for a limited cause of action, specifically to enforce the terms of the Airports Authority's Lease.  In particular, Section 49104 states, "[T]he district courts of the United States have jurisdiction to compel the Airports Authority and its officers and employees *to comply with the terms of the [L]ease*. … [A]n aggrieved party may bring an action on behalf of the Government." 49 U.S.C. § 49104(c) (italics added); *see LTMC/Dragonfly, Inc. v. Metropolitan Washington Airports Authority,* 699 F. Supp. 2d 281, 295 (D.D.C. 2010); *Washington-Dulles Transp., Ltd. v. MWAA*, 263 F.3d 371, 376-79 (4th Cir. 2001) [hereinafter *WDT I*].

The consequence of that limited cause of action is significant:  Aggrieved parties may bring an action to enforce the Lease term that requires the Airports Authority to "obtain full and open competition through the use of published competitive procedures," *see LTMC/Dragonfly*, 699 F. Supp. at 290; *WDT I*, 263 F.3d at 376, because that is a term of the Lease, Pl.'s Ex. 1,

ECF No. 2-2, at 13. However, aggrieved parties have no right of action to ensure that the

Airports Authority applies "sound Government contracting principles," because that is ***not*** a

requirement of the Lease.[4]  *See generally* Pl.'s Ex. 1, ECF No. 2-2, at 32-35.  Indeed, the

Enabling Act does not require such a Lease provision.  *See* 49 U.S.C. § 49104(a) (outlining

required Lease provisions).  Rather, the Enabling Act's reference to "sound Government

contracting principles" appears in a subsection of the statute addressing the Comptroller

General's right of review.  49 U.S.C. § 49106(g).  Accordingly, PS IAD's allegation that the

Airports Authority has violated the Enabling Act, based on its failure to "follow[] sound

Government contracting principles," Complaint, ECF No. 1, ¶¶ 110, 111, falls outside this

Court's jurisdiction.  PS IAD therefore fails to state a plausible claim for relief.

Additionally, the right of an aggrieved party to enforce the terms of the Lease does not

extend so far as to grant a general "arbitrary and capricious" cause of action., because the

Airports Authority is not a federal agency and is not subject to the APA.[5]  *Kerpen v. Metro.*

*Washington Airports Auth.*, 907 F.3d 152, 160 (4th Cir. 2018) ("Appellants' failure to meet the

---

[4] Although in *WDT I* the Fourth Circuit stated that "the Enabling Act subjects [the Airports Authority] contracts to [Comptroller General] review to ensure the contracts 'were awarded by procedures that follow sound Government contracting principles,' *see* 49 U.S.C.A. § 49106(g), and the Lease provides for such a review as well," 263 F.3d at 374, the Fourth Circuit misstated what the Lease actually requires.  Article 25 of the Lease provides the Comptroller General with audit authority "in accordance with generally accepted management principles and under such rules and regulations as may be prescribed by the Comptroller General."  Pl.'s Ex. 1, ECF No. 2-2, at 35.  The Lease does **not** address a review for application of "sound Government contracting principles."

[5] In *Washington-Dulles Transp. Ltd. v. MWAA*, 87 F. App'x 843 (4th Cir. 2004) (unpublished) [hereinafter *WDT II*], during review of the Airports Authority's decision to award a concessions contract, the Fourth Circuit erroneously applied an APA standard of review.  87 F. App'x at 849 (citing *Newport News Shipbldg. & Dry Dock Co. v. Gen. Dynamics Corp.*, 960 F.2d 386, 392 (4th Cir. 1992)).  But this case is inessential because *WDT II* decision has no precedential value even within the Fourth Circuit, *see* 4th Cir. Local R. 32.1, nor is binding on this Court.  This Court should disregard *WDT II*'s reasoning as a result.

threshold of establishing [the Airports Authority] as a federal entity is fatal to their claims under the Appointments Clause and the Administrative Procedures Act. Both these provisions apply to federal entities."); *San Jose Constr. Grp., Inc. v. MWAA*, 415 F. Supp. 2d 643, 646 ("[The Airports Authority] is independent of the federal government"). For this reason, too, PS IAD fails to state a plausible claim for relief; the Court does not have jurisdiction over PS IAD's complaint of "arbitrary and capricious" action. *See* Complaint, ECF No. 1, ¶ 93.

### 3.    PS IAD Otherwise Fails to State a Plausible Claim for Relief

Even assuming *arguendo* that the Lease provision requiring "full and open competition through the use of published competitive procedures" includes a requirement to employ "sound Government contracting principles"—a point that the Airports Authority does not in any way concede— PS IAD still fails to state a plausible claim for relief, because PS IAD does not identify with any specificity the "sound Government contracting principles" that the Airports Authority violated.

Specifically, PS IAD both fails to identify any price "reasonableness and realism" principles that apply here and fails to explain why such principles would apply in a competition for an HPTA concessions contract, or to what elements of offerors' pricing these principles should be applied. *See* Complaint, ECF No. 1, ¶ 109.

Assuming gratuitously that these "sound Government contracting principles" are the same Federal Acquisition Regulation ("FAR") provisions that PS IAD identified in its protests before the Airports Authority, *see*, *e.g.*, Pl's Ex. 12, ECF No. 2-13, at 14, these FAR provisions are inapplicable because the Airports Authority "is not subject to the … FAR or the various statutes that generally govern federal procurement." Pl.'s Ex. 3, ECF No. 2-4, at § 1.7 (Contracting Manual). But even if the FAR generally were applicable to the Airports Authority, the FAR would not apply to the type of contract here because the FAR applies to "acquisitions"

-17-

by the Federal Government with appropriated funds, not to revenue-generating concessions contracts. *Saratoga Dev. Corp. v. United States*, 21 F.3d 445, 452-53 (D.C. Cir. 1994). Absent the expenditure of appropriated funds, a contract does not constitute an "acquisition" subject to the FAR. *Mktg. & Mgmt. Info., Inc. v. United States*, 57 Fed. Cl. 665, 674 (2003); FAR 2.101; *AIU N. America, Inc.*, B-283743.2, Feb. 16, 2000, 2000 CPD ¶ 39 at 7 n.12 ("The [FAR] does not apply to this procurement, since contract revenues are provided by DOS contractors rather than from DOS's appropriated funds."). Even ignoring all the above, the FAR says nothing about evaluating reasonableness or realism of prices under the HPTA method.

PS IAD has failed to state a plausible claim for relief. By neglecting to plead its allegations with requisite specificity, PS IAD has not crossed "the line from conceivable to plausible," thus failing to meet Rule 8's pleading standard. *Ashcroft v. Iqbal*, 556 U.S. 662, 680 (2009).

### 4. The Airports Authority's Selection of HPTA for a Revenue Generating Contract and Issuance of Amendment 2 Are Reasonable Acts of Discretion

PS IAD invokes the Enabling Act's requirement that, for large contracts and concession contracts, the Airports Authority "to the maximum extent practicable shall obtain complete and open competition through the use of published competitive procedures." 49 U.S.C. § 49104(a)(4); *see generally* PS IAD's Complaint, ECF No. 1; TRO Mot., ECF No. 2-1. But PS IAD's filings and exhibits confirm that the Airports Authority proceeded in accordance with its Contracting Manual, *see LTMC/Dragonfly*, 699 F. Supp. 2d at 284 (explaining that the Airports Authority adopted the Manual in response to the requirement to use published competitive procedures), and the Airports Authority issued solicitations and amendments, received proposals, and provided a structured protest process, *see generally* Pl.'s Exs. 2, 8, 11-17, ECF Nos. 2-3, 2-9, 2-12-2-18 (PS IAD's description of those documents.)

PS IAD attempts to transform the statutory phrase "published competitive procedures" into a requirement that the Airports Authority adopt a particular evaluation technique, (*e.g.*, FAR Part 15 cost realism), or a particular method of contracting (best value rather than HPTA). The statute does not say that; instead, it requires competition through published procedures—*i.e.*, transparent solicitation and evaluation rules applied to all offerors. PS IAD identifies no specific term in the Lease or Enabling Act that forbids the Airports Authority from using HPTA for concessions, or that mandates the precise evaluation language PS IAD prefers. Ironically, PS IAD's own exhibits show the solicitation materials include express caution that an "apparent successful offer does not automatically result in Contract award," and that the Airports Authority must consider conformity and responsibility. Pl.'s Ex. 2, ECF 2-3, at 18-19 (award language).

> **5.** **The Airports Authority's Selection of HPTA, and Corresponding Issuance of Amendment 2, Was Consistent with the Contracting Manual and a Rational Exercise of Discretion**

PS IAD's motion portrays the Airports Authority's use of Highest Price Technically Acceptable ("HPTA") as irrational or "pretextual." But the Airports Authority's Contracting Manual expressly authorizes HPTA and states it is appropriate when selection of the technically acceptable proposal with the highest offered price is preferred, "*e.g.*, concessions Contracts." Pl.'s Ex. 3, ECF No 2-4, at § 3.5.2.1 (Contracting Manual). The Manual further provides that Contracting Officers "shall determine which procurement method is most advantageous to the Authority," considering competition, pricing, and efficiency. Pl.'s Ex. 3, ECF No 2-4, at § 3.1 (Contracting Manual). That delegation undermines PS IAD's theory that the Airports Authority was required to retain a best-value method or that changing methods is inherently unlawful.

This process is particularly applicable here because the competition is for a revenue-generating concession, Pl.'s Ex. 2, ECF No. 2-3, at 14, and the Contracting Manual expressly

recognizes HPTA for concessions reflects a rational policy choice to maximize revenue among technically acceptable proposals.  Pl.'s Ex. 3, ECF No 2-4, at § 3.5.2.1 (Contracting Manual). PS IAD's disagreement with the Airports Authority's policy judgment is not a legal violation.  A plaintiff cannot establish likelihood of success by re-labeling its disagreement as "arbitrary" where the governing solicitation rules expressly permit the chosen method.

As to Amendment 2 in particular, PS IAD's principal substantive complaint involves the change in the financial-offer evaluation description—removing the phrase "reasonableness, completeness, and realism" and replacing it with language focusing on whether the financial offer is "complete and responsive to the requirements set forth in the Solicitation."  Pl.'s Ex. 11, ECF No. 2-12, at 1.  That change is consistent with HPTA.  Under HPTA, the Airports Authority must define acceptability standards, evaluate whether proposals meet those standards, and then identify the highest offered price among technically acceptable proposals.  Pl.'s Ex. 3, ECF No 2-4, at § 3.5.2.1 (Contracting Manual).  It is therefore rational for the financial-offer evaluation description in an HPTA solicitation to focus on completeness and responsiveness—*i.e.*, whether the offer conforms to the solicitation requirements and can be compared and enforced.  Laffert Decl. ¶¶ 7-8.

Amendment 2 did not, as PS IAD contends, render the Airports Authority "powerless." PS IAD's own exhibits confirm that multiple safeguards remain under the solicitation.  The solicitation expressly warns that identification of an apparent successful offeror does not automatically result in contract award and that the Airports Authority must evaluate both conformity with the solicitation and the offeror's responsibility.  Pl.'s Ex. 2, ECF No. 2-3, at 19. Consistent with that framework, the Contracting Manual independently requires that any award be made only to a responsible contractor, defining responsibility to include adequate financial

resources or the ability to obtain them.  Pl.'s Ex. 3, ECF No 2-4, at § 4.5.1 (Contracting Manual).

In addition, the solicitation requires a Performance Guarantee equal to 100% of the Minimum

Annual Guarantee, which is subject to claim in the event of default or failure to perform. Pl.'s

Ex. 2, ECF No. 2-3, at 29; Laffert Decl. ¶ 14.  These provisions directly undermine PS IAD's

assertion that the removal of a single phrase from the financial-offer evaluation description

stripped the Airports Authority of discretion or inevitably resulted in an irrational or unlawful

competitive process.

### 6.    PS IAD's "No Explanation" and "Pretext" Narrative Is Speculative and Contrary to the Record

PS IAD repeatedly asserts that the Airports Authority offered "no explanation" for the

shift in approach and Amendment 2.  But PS IAD's own exhibit bundle includes the Airports

Authority's protest decisions at multiple levels—VP, CEO, and Board—each addressing PS

IAD's arguments and concluding that the Airports Authority's approach complied with the

Airports Authority's Contracting Manual and applicable law.  *See generally* Pl.'s Ex. 13, ECF

No. 2-14; Pl.'s Ex. 15, ECF No. 2-16; Pl.'s Ex. 16, ECF No. 2-17.  Those decisions constitute

explanations and reflect that the Airports Authority evaluated PS IAD's legal objections and

rejected them under the Airports Authority's governing rules.

PS IAD also relies on timing and inference—*e.g.*, a congressional letter, *see generally*

Pl.'s Ex. 10, ECF No. 2-11, and the proximity of Amendment 2—to claim pretext and

favoritism.  But timing alone does not establish unlawful motive, and PS IAD pleads no

nonconclusory facts showing that the Airports Authority applied unstated criteria, treated

offerors unequally, or departed from published procedures.  What PS IAD offers is conjecture,

and conjecture cannot satisfy the "clear showing" required for emergency relief.  *Winter*, 555

U.S. at 22.

### C.    THE BALANCE OF EQUITIES WEIGHS DECISIVELY AGAINST INJUNCTIVE RELIEF

"When 'balanc[ing] the competing claims of injury,' the Court must 'consider the effect on each party of the granting or withholding of the requested relief.'"  *Elec. Priv. Info. Ctr. v. DOJ*, 15 F. Supp. 3d 32, 47 (D.D.C. 2014) (quoting *Winter*, 555 U.S. at 24).  Particularly, the Court should consider  "the public consequences" of an injunction.  *Id.*

PS IAD asks the Court to halt an ongoing competitive contracting process not because it faces imminent harm, but because it disagrees with the Airports Authority's chosen evaluation methodology and wishes to halt the process while it litigates.  Against that speculative interest stand the Airports Authority's concrete institutional, operational, and administrative burdens associated with stopping a mission-critical airport concession process.  Laffert Decl. ¶¶ 16-18. The equities overwhelmingly favor the Airports Authority.

#### 1.    Enjoining the Competition Would Impose Concrete Operational and Administrative Burdens on the Airports Authority

The solicitation at issue concerns Remote VIP Passenger Services at Washington Dulles International Airport, a major international transportation hub.  Even before award, the Airports Authority must coordinate across operational, security, legal, financial, and planning functions to manage contracting timelines and prepare for integration of future services.  Laffert Decl. ¶¶ 16-18.  A court-ordered halt would disrupt those efforts, divert staff resources, and undermine the Airports Authority's ability to plan for airport operations and passenger services.  *Id.*  Unlike PS IAD's asserted harms—which are contingent and speculative—these burdens are real, immediate, and significant: An injunction would force the Airports Authority to manage a pause with no defined endpoint, impairing efficient airport administration and delaying critical airport operations and services.  *Id.*

**2.      PS IAD's Continued Participation in the Solicitation Undermines Its Request for Equitable Relief**

Equity also disfavors PS IAD because it chose to submit a proposal under the challenged solicitation. Laffert Decl. ¶ 5. PS IAD remains an active offeror; it has not been excluded or denied an opportunity to compete in this competition. Having elected to participate, PS IAD cannot plausibly claim that it is inequitable to allow the competition to proceed under the very rules it accepted when bidding. Worse, the Court would be rewarding PS IAD's strategic behavior—by allowing PS IAD to compete while simultaneously seeking to halt the process when the evaluation criteria that does not align with its preferred business model. Equity does not support that result.

**3.      PS IAD's Requested Relief Is Disproportionate to Its Alleged Harm**

The relief PS IAD seeks—freezing the entire competition—is wholly disproportionate to its alleged injury. PS IAD does not allege exclusion, unequal treatment, or violation of published procedures. Instead, it challenges the Airports Authority's policy choice to use HPTA for a concessions contract. Enjoining an entire competition based on that disagreement would impose significant costs on the Airports Authority and the public while addressing, at most, a speculative competitive concern. Laffert Decl. ¶¶ 16-18. Equity does not support such an outcome.

**D.      THE PUBLIC INTEREST STRONGLY COUNSELS AGAINST A TRO**

The public interest independently compels denial of PS IAD's Motion. Granting a TRO here would interfere with the Airports Authority's ability to manage a major airport concession under its statutorily authorized framework and would invite judicial supervision of competition policy decisions that Congress entrusted to the Airports Authority. *Elec. Priv. Info. Ctr.*, 15 F. Supp. 3d at 47 ("'[C]ourts of equity should [have] particular regard for the public consequences in employing the extraordinary remedy of injunction.'" (quoting *Winter*, 555 U.S. at 24)). These

"unequal consequences [should] carry material weight in the equitable preliminary-injunction calculus," and decisively favor denying PS IAD's Motion. *Hanson v. D.C.*, 120 F.4th 223, 247 (D.C. Cir. 2024); *see also Singh v. Berger*, 56 F.4th 88, 96-97 (D.C. Cir. 2022) ("Properly understood, the public consequences [of] employing the extraordinary remedy of injunction, necessarily include the risk that the relief requested will cause unusual disruption if granted in error, for example by disturbing the status quo in a way that cannot readily be undone." (cleaned up)).

### 1. The Public Interest Favors Allowing the Airports Authority to Administer Competitions Under Its Governing Framework

Congress authorized the Airports Authority, an independent authority, to operate and manage the region's major airports and, through the Lease, required it to conduct competitions through published competitive procedures, which the Airports Authority implemented via its Contracting Manual. That Manual reflects the Airports Authority's Board-approved judgment about how best to balance competition, integrity, efficiency, and revenue generation—particularly in the context of concessions. The public expects that the Airports Authority can apply those rules consistently and predictably. Judicial intervention, by either rewriting solicitation terms or mandating certain evaluation methodology, would undermine those expectations, and introduce uncertainty in future competitions.

### 2. Emergency Relief Is Not a Tool for Judicial Supervision of Competition Policy Choices

PS IAD's Motion asks the Court to decide—on an emergency basis—whether HPTA is an appropriate method for a concessions competition and whether the Airports Authority should have retained "reasonableness" or "realism" review. Those are policy judgments entrusted to the Airports Authority under its governing statutes and competition framework, not matters

warranting emergency judicial intervention.  The public interest is not served by turning federal courts into solicitation design boards, particularly at the TRO stage and on a limited record.

### 3. The Public Interest in Efficient Airport Operations and Revenue Generation Weighs Against Delay

The solicitation at issue concerns a revenue-generating concession at a major international airport.  Revenues from such concessions support airport operations, infrastructure, and services for the traveling public.  Delaying or disrupting these competitions imposes real public costs.  Laffert Decl. ¶¶ 16-18.  A TRO would not enhance fairness or transparency.  It would merely delay the Airports Authority's ability to implement a concessions program designed to generate revenue while meeting defined technical requirements.  Laffert Decl. ¶¶ 16-18.  The public interest favors allowing the Airports Authority to proceed with its competition consistent with its rules.

## V. CONCLUSION

For the foregoing reasons, Defendant the Airports Authority respectfully requests that the Court deny Plaintiff's Emergency Motion for Temporary Injunctive Relief.

**DEFENDANT METROPOLITAN WASHINGTON AIRPORTS AUTHORITY'S
OPPOSITION TO PLAINTIFF'S MOTION TO DISQUALIFY
SEYFARTH SHAW LLP AS COUNSEL FOR DEFENDANT**

Defendant METROPOLITAN WASHINGTON AIRPORTS AUTHORITY ("Airports Authority"), respectfully submits this Opposition to Plaintiff THE PRIVATE SUITE IAD, LLC's ("PS IAD") Motion to Disqualify Seyfarth Shaw LLP as Counsel for Defendant (the "Motion"). For the reasons set forth below, PS IAD's request for disqualification should be denied.

## I.    INTRODUCTION

There is no conflict here, and the Court should deny PS IAD's motion to disqualify. Seyfarth Shaw has never represented PS IAD, and the lawyers here have no confidential information from PS IAD or any of its affiliates that is relevant to this case. Seyfarth Shaw *does* represent PS IAD's parent, Extime, in employment matters unrelated to this litigation. But in hiring Seyfarth Shaw, Extime expressly agreed that Seyfarth Shaw would "represent Extime only, and not any other person or entity, including . . . subsidiaries, or affiliated entities of Extime" except as the parties agree. *See* Retention Letter at 1 (Exhibit B). The parties never agreed that Seyfarth Shaw would represent PS IAD, and Seyfarth Shaw has done no work for PS IAD. For avoidance of doubt, Seyfarth Shaw has also walled off the lawyers working for Extime from the lawyers working on this bid protest, so there is no question that there could be no taint to the present proceeding. Courts in this District strongly disfavor motions to disqualify and are highly suspicious of their improper tactical use. PS IAD's effort to deprive MWAA of its chosen counsel would needlessly and improperly disrupt this proceeding, and the Court should deny the motion.

## II.    BACKGROUND

MWAA hired Seyfarth Shaw in October 2015, and has relied on the firm as its primary

outside law firm for much of the time since then.[6]  MWAA has over the years retained the firm

for matters involving a number of disciplines.  As particularly relevant here, MWAA first asked

Seyfarth in April 2025 to assist with reviewing a bid protest that PS IAD lodged against the

award of a contract related to Washington Dulles airport that preceded the bid at issue in this

litigation.  In the follow-on bidding process, which is at issue here, MWAA again relied on

Seyfarth for advice and counsel.  MWAA does not have other counsel that it uses for this type of

work, and relies on Seyfarth's detailed knowledge of the company and its processes to advance

its interests most effectively.  The lawyers that are doing this work for MWAA are located in the

law firm's Washington, D.C. office.

Four months ago, in November 2025, Extime also hired different Seyfarth Shaw lawyers

to assist it with employment matters largely arising out of Extime's work at Los Angeles

International Airport.  The lawyers that Extime hired work primarily out of Seyfarth Shaw's

New York, San Francisco, and Los Angeles offices.  On November 4, 2025, Extime signed a

related retention letter with Seyfarth Shaw.  That letter provided in its second paragraph, under

the heading "Client and Scope of Engagement," that Seyfarth Shaw would "represent Extime

only, and not any other person or entity, including . . . subsidiaries, or affiliated entities of

Extime." Ex. B at 1.  The letter explained that this would be the case "unless we reach an

explicit understanding to the contrary," and all references in the letter to Seyfarth's client are

expressly to "Extime." *Id.*  Nothing in the letter otherwise suggests that Seyfarth Shaw would

_____

[6] Seyfarth Shaw represents to the Court the accuracy of the facts described in this section.  To the extent the Court would like Seyfarth Shaw to submit declarations or other materials in support of these facts, Seyfarth Shaw stands ready to do so.

represent any Extime affiliates.  The individual who signed the retention letter was Extime's Vice President of Legal, a lawyer who has been in practice at various law firms and companies for 17 years.[7]  Extime does not dispute that its sophisticated in-house counsel was informed about the contents and import of the retention letter he signed with Seyfarth Shaw.

Seyfarth then proceeded to work for Extime on a number of individual employment complaints related to Los Angeles International Airport.  Starting in mid-November 2025, Extime also asked Seyfarth to work on a labor dispute matter in which employees named "The Private Suite LAX" as the defendant.  Seyfarth agreed to do the work.  In no case did Extime ask Seyfarth to do any work for PS IAD, and none of the employment work that Seyfarth has done has had any relationship to PS IAD or Washington Dulles Airport.

PS IAD filed the present lawsuit and request for temporary restraining order on Thursday, February 5, 2026.  Extime is not a party to these proceedings.  Seyfarth Shaw identified itself as counsel for MWAA in this matter on Friday, February 6, 2026, and PS IAD moved to disqualify Seyfarth Shaw from representing MWAA on Monday, February 9, 2026.  Because there is no basis for the motion to disqualify, we now oppose.

## III.    DISCUSSION

Seyfarth Shaw has no conflict here because it does not represent PS IAD, and possesses no relevant confidential information from PS IAD or any of its affiliates.  The Court should deny the motion.

### A.    Legal Standard

Disqualification "is a drastic measure that is disfavored," and "disqualification motions should be subject to particularly strict scrutiny."  *Konarski v. Donovan*, 763 F. Supp. 2d 128, 135

---

[7] *See* https://www.linkedin.com/in/andrew-lincoln-0b1b472b/.

(D.D.C. 2011) (quotations omitted).  Consistent with that principle, the moving party bears an

"extraordinarily high burden" of establishing the need for disqualification.  *Steinbuch v. Cutler*,

463 F. Supp. 2d 4, 7 (D.D.C. 2006).  Accordingly, motions to disqualify should be denied

"[e]xcept in cases of truly egregious misconduct likely to infect future proceedings."  *Koller v.

Richardson-Merrell*, 737 F.2d 1038, 1056 (1984), *vacated on other grounds*, 472 U.S. 424

(1985).  Court should be particularly wary of disqualification motions used as "'procedural

weapons' to advance purely tactical purposes."  *Paul v. Judicial Watch, Inc.*, 571 F. Supp. 2d 17,

20 (D.D.C. 2008).

> **B.**    **PS IAD Does Not Have Standing to Move to Disqualify**

As a threshold matter, the Court should deny the motion to disqualify because PS IAD

does not have standing to move to disqualify Seyfarth Shaw here.  PS IAD is not and has never

been Seyfarth Shaw's client.  Extime is Seyfarth Shaw's client and claims harm here, but Extime

is not a party to this case and is not moving to disqualify; PS IAD is.  Without an attorney-client

relationship, PS IAD lacks standing here to move to disqualify, and for that reason alone the

motion should be denied.  *See, e.g., Ambush v. Engelberg*, 282 F. Supp. 3d 58, 65 (D.D.C. 2017)

(denying motion to disqualify for lack of standing where movant did not have attorney-client

relationship with lawyers).

> **C.**    **Seyfarth Shaw Does Not Represent PS IAD, So There Is No Conflict**

Even if PS IAD had standing here, its arguments are without merit. To argue that

Seyfarth Shaw has a conflict here and should therefore be disqualified, PS IAD relies on D.C.

Rule of Professional Conduct 1.7, which governs concurrent client conflicts.  That rule says in

pertinent part:

> Except as permitted by paragraph (c) below [which governs how a client consents to a
> conflict], a lawyer shall not represent a client with respect to a matter if:

    (i)    That matter involves

        a specific party or parties and

        a position to be taken by that client in that matter is adverse to a position taken or to be taken by another client in the same matter

        even though that [other] client is unrepresented or represented by a different lawyer . . .

D.C. Rule Prof'l Cond. 1.7 (formatting added for ease of reading).  That rule means that, absent a waiver, a lawyer generally violates this rule by representing one client adverse to a second client in litigation, even if the only work the lawyer does for that second client has nothing to do with the relevant litigation.  The rule also says that, absent a waiver, a lawyer also shall not represent a client if "[r]epresentation of another client will be or is likely to be adversely affected by such representation."  *Id.*

    The comments to Rule 1.7, however, provide that "[o]rdinarily [a] client's affiliates (parents and subsidiaries) . . . are not considered to be clients of the lawyer."  D.C. Rule Prof'l Cond. 1.7, cmt. 21.  The comments explain that it therefore follows that, "the lawyer for an organization normally should not be precluded from representing an unrelated client whose interests are adverse to the interests of an affiliate (e.g., parent or subsidiary) . . . in a matter that is separate from and not substantially related to the matter on which the lawyer represents the organization."  *Id.*  So while a lawyer cannot be adverse to a current client in litigation absent a waiver, the default rule is that a lawyer *can* be adverse to *an affiliate* of a client in litigation, waiver or no waiver.

    Here, that rule has straightforward application.  Seyfarth represents Extime in unrelated matters, and Extime has agreed that Seyfarth does not represent its affiliates except if the parties specifically agree to that.  Because the parties never agreed that Seyfarth would represent PS IAD, Seyfarth *doesn't* represent PS IAD.  Under the plain language of the rule and its comments,

Seyfarth can represent another client adverse to PS IAD without any conflict, and without being subject to disqualification.

PS IAD nevertheless relies on comment 23 to Rule 1.7 to try to argue otherwise. Comment 23 provides that when the "adverse party is in substance the 'alter ego' of the organization client," then a lawyer may be precluded from being adverse to that party. The comment provides a number of considerations to weigh to determine when that is the case, and PS IAD asserts that it and Extime satisfy the test. It therefore argues that the entities are "alter egos" of each other, and since Seyfarth could not be adverse to Extime in this litigation, it also can't be adverse to PS IAD in this litigation. *See generally* Disqualification Mot., ECF No. 8, at 5-7.

The problem with that argument is that the alter ego test only applies when there is ambiguity as to whom the lawyer represents. As the American Bar Association Committee on Ethics and Professional Responsibility explained when it addressed the alter ego test in an opinion in 1995, "the best solution to the problems that may arise by reason of clients' corporate affiliations is to have a clear understanding between lawyer and client, at the very start of the representation, as to which entity or entities in the corporate family are to be the lawyer's clients, or are to be so treated for conflicts purposes." ABA Prof. Resp. Op. 95-390 at 2.[8] That ABA opinion on the alter ego test is therefore "principally addressed to those circumstances where there are not such clear governing terms to the engagement." *Id.* The same is true for comment 23. Here, the parties agreed through sophisticated counsel that *only* Extime would be Seyfarth's client, and that no other entities would be clients unless the parties agreed to it. That is a

---

[8] Available online at https://www.americanbar.org/content/dam/aba/administrative/ professional_responsibility/ethics-opinions/95-390.pdf.

straightforward matter of contract, and it resolves the issue without considering any of the factors that PS IAD addresses at length in its motion, including the entities' shared personnel or operations.

PS IAD's lead case, *GSI Commerce Sols., Inc. v. BabyCenter, L.L.C.*, 618 F.3d 204, 206 (2d Cir. 2010) ("*GSI II*"), makes this point clear.  *See* Disqualification Mot., ECF No. 8, at 6, 7, 10.  *GSI II* applied New York's version of Rule 1.7 and ABA Opinion 95-390 to find that a corporate affiliate *was* a client for conflicts purposes.  But consistent with ABA Opinion 95-390, the court first applied "[t]he rules of contract construction" to determine the meaning of the parties' retention letter.  *GSI II* at 214 (quotation and citation omitted).  The court found that, although the retention letter in one place purported to limit the law firm's representation to a corporate parent, other provisions of the retention letter contemplated waiving conflicts where the law firm was adverse to "any of [the parent's] affiliates, subsidiaries or divisions."  *Id.* at 213.  The court concluded that construing the retention letter to restrict representation to only the parent "would strip the remainder of the Engagement Agreement of any meaning," and "violate[] basic canons of construction of contract law."  *Id.*  The court therefore concluded that the parties' agreement contemplated the representation of the relevant affiliate as well as the parent.  *Id.* Indeed, the law firm there had *in fact* represented the affiliate in question in other matters.  *GSI Commerce Sols., Inc. v. BabyCenter, L.L.C.*, 644 F. Supp. 2d 333, 335 (S.D.N.Y. 2009) ("*GSI I*").  So the court found that the affiliate was a client, and disqualified the law firm.  *See also Falk Pharma GMBH v. Generico, LLC,* 916 F.3d 975, 982 (Fed. Cir. 2019) (also relied on by Extime, and concluding law firm represented affiliate where one affiliate was identified as a client in the parties' retention letter and client's outside counsel guidelines expressly applied to "subsidiaries and affiliates").

By focusing on the parties' retention letter, *GSI II* highlights that in cases like this one, where the parties' agreement reflects no ambiguity about whom the lawyer represents, the contract resolves the issue definitively. Thus, for the same reason that the law firm was disqualified in *GSI II*, there is no basis to disqualify here: the contract controls whom the client is.

Other courts analyzing the rule and *GSI II* have reached the same conclusion. In *Jefferson St. Holdings, LLC v. Otter Prods., LLC*, No. 1:23-cv-01514, 2023 U.S. Dist. LEXIS 203961, at *48-49 (D. Colo. Nov. 14, 2023), for example, the court faced a similar issue on a motion to disqualify, and concluded that "when the engagement letter is clear on [the] issue, [client identity] is governed solely by the terms of the engagement letter." Thus, rather than apply the test described in ABA Opinion 390 to determine if the affiliate at issue was a law firm's client, the court concluded that, "engagement letter terms that define the client take precedence over all of these [attorney ethics] rules and therefore remove the subject from the rules' purview." *Id.* at * 51. The same is true here, where the contract controls and there is no occasion to apply the alter ego test.

*Jefferson St. Holdings* includes additional analysis that applies here as well, because the court there also evaluated out of abundance of caution (without concluding it was necessary) whether the client there gave informed consent to the limitation of representation. *Id.* The Court then found that the retention letter itself provided sufficient information to properly inform the client and obtain consent. *Id.* Although there is nothing suggesting informed consent is necessary to limit Seyfarth's representation to just Extime, there is also no question here that the Extime, represented by sophisticated in-house counsel, gave informed consent to that limitation.

The decision in *Keefe Commissary Network v. Beazley Ins. Co.*, No. 4:20-cv-00176, 2020 U.S. Dist. LEXIS 144706, at *11-12 (E.D. Mo. Aug. 12, 2020) likewise tracks *Jefferson Holdings* and ABA Opinion 390, and similarly found that the parties' unambiguous retention letter controlled whom the relevant lawyers represented, regardless of any corporate affiliate test. The court there concluded that it "need not weigh in on the applicability of the corporate affiliate conflicts doctrine because the parties' contract controls under the Model Rules," and found no conflict because the relevant affiliate was not a client of the law firm. *Id.* Again, the same is true here. *See also SLF Holdings, LLC v. Uniti Fiber Holdings, Inc.*, No. 1:19-cv-00333, 2019 U.S. Dist. LEXIS 147950, at *12 (S.D. Ala. Aug. 30, 2019) (rejecting *GSI II*'s test and finding affiliate was not "alter ego" of parent corporation).

Extime nevertheless asserts that "Seyfarth undertook representation of PS LAX without having Extime's general counsel execute a separate engagement letter for PS LAX," and claims that this overrides the parties' clear agreement about whom Seyfarth represents. But that is in fact consistent with the parties' retention letter, which allowed for affiliates to be added as clients by party agreement. When that work arose, Seyfarth and Extime agreed they would do work for that entity. Moreover, even if it were otherwise, PS IAD was unambiguously never a client here. *Compare Keefe Commissary Network*, 2020 U.S. Dist. LEXIS 144706, at *13-14 (denying motion to disqualify after concluding that retention letter was ambiguous as to whether it covered one affiliate, but unambiguous that affiliate at issue in case was not a client). Seyfarth and Extime—both highly sophisticated entities—entered into a contract as to precisely whom Seyfarth represented, and agreed that Seyfarth doesn't represent PS IAD. Nothing then changed that, and there is therefore no conflict here.

-34-

**D.    Seyfarth Shaw Possesses No Relevant Confidential Information, and Its Representation Here Poses No Threat to the Integrity of the Proceedings**

As Extime points out, even when there is a conflict under Rule 1.7—and there is none here—courts nevertheless still consider the harm to the proceeding before depriving a party of their chosen counsel.  *See* Disqualification Mot., ECF No. 8, at 5 (citing *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 965 F. Supp. 2d 104, 110 (D.D.C. 2013) (denying motion to disqualify)).  Here, Seyfarth's representation of MWAA poses no conceivable harm to the integrity of the proceedings.  First, none of the work that any Seyfarth lawyer has done for Extime has any bearing on the present bid protest.  Seyfarth's work was on employment and labor matters; this proceeding relates to the propriety of how MWAA is conducting its bidding process and evaluating bids.  There is no overlap, and Seyfarth possesses no information from Extime that would unfairly advance MWAA's position here.  PS IAD nevertheless asserts that Seyfarth possesses "extensive information" about "Extime's (and therefore PS IAD)'s business due to Seyfarth's representation of Extime in the collective bargaining matter."  Disqualification Mot., ECF No. 8, at 9.  But PS IAD identifies neither what that information would be nor how it would bear in any way on this proceeding.  There is for this reason alone no risk of taint.

Second, even assuming the counterfactual that some Seyfarth Shaw lawyer had learned something relevant from Extime about PS IAD's challenge, Seyfarth Shaw has walled all of the lawyers working for Extime off from the present litigation, and vice versa.  No Seyfarth Shaw lawyer working on this matter ever worked for Extime, and no lawyer working on this matter has access to any confidential information about Extime from any of the lawyers who did.  For that reason, too, there is no risk of taint to this proceeding.

Finally, Extime complains that it is "beyond the pale" that Extime's general counsel may have to both trust the Seyfarth lawyers whom Extime has hired while also facing Seyfarth

lawyers in the present litigation.  Disqualification Mot., ECF No. 8, at 9 (citing *GSI II*).  To be clear, however, the lawyers assigned to these matters have no overlap with each other, work in different practice groups, and work in entirely different offices.  There is therefore no reason for Extime to doubt the fidelity of any of its lawyers.  Nevertheless, as Opinion 390 explains, when there is no actual adversity, as is the case here, the "client's only recourse is to fire the lawyer who undertakes a matter that displeases the client."  ABA Op. 390 at 12.  There is no reason for that here, but there is even more plainly no basis in the law to disqualify Seyfarth Shaw.

## IV.    CONCLUSION

There is no basis to find any conflict here, and the Court should deny the motion to disqualify.

DATED:  February 11, 2026                Respectfully submitted,

                                         SEYFARTH SHAW LLP


                                         By:  */s/ Edward V. Arnold*
                                              Edward V. Arnold (D.C. Bar No.
                                              1010273)
                                              earnold@seyfarth.com
                                              Ken M. Kanzawa (D.C. Bar No. 219076)
                                              *Pro hac vice forthcoming*
                                              kkanzawa@seyfarth.com


SEYFARTH SHAW LLP
975 F Street, N.W.
Washington, DC  20004-1454
Telephone:  (202) 463-2400
Facsimile:  (202) 828-5393

*Attorneys for Defendant*
*Metropolitan Washington Airports Authority*

DATED:  February 11, 2026                Respectfully submitted,

                                         HWG LLP


                                         By:  */s/ Thomas B. Mason*
                                              Thomas B. Mason (D.C. Bar No. 413345)
                                              tmason@hwglaw.com
                                              Jared P. Marx (D.C. Bar No. 1008934)
                                              jmarx@hwglaw.com


HWG LLP
1919 M Street Northwest
Washington, DC  20036
Telephone:  (202) 730-1300
*Attorneys for Seyfarth Shaw LLP Appearing*
*only with respect to Motion to Disqualify*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 11, 2026, I presented the foregoing COMBINED

OPPOSITION TO PLAINTIFF'S EMERGENCY MOTION FOR TEMPORARY INJUNCTIVE

RELIEF AND OPPOSITION TO MOTION TO DISQUALIFY SEYFARTH SHAW LLP AS

COUNSEL FOR DEFENDANT with the Clerk of the Court using the CM/ECF system, which

will send notification of such filing to all counsel of record.


*/s/ Edward V. Arnold*
Edward V. Arnold