**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **The Private Suite IAD, LLC,** | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| **v.** | ) | **Civil Case No. 1:26-cv-349** |
| | ) | |
| **Metropolitan Washington Airports** | ) | |
| **Authority,** | ) | |
| | ) | |
| *Defendant.* | ) | |

---

### REPLY IN FURTHER SUPPORT OF MOTION FOR TEMPORARY INJUNCTIVE RELIEF AND MOTION TO DISQUALIFY SEYFARTH SHAW LLP

---

The Private Suite IAD, LLC ("PS IAD") filed this bid protest action because Defendant Metropolitan Washington Airports Authority ("MWAA") conducted a procurement so rife with arbitrary decisions that any disinterested observer would be forced to conclude that MWAA was intent on awarding the contract to PS IAD's competitor, despite statutory proscriptions aimed at preventing that very behavior. Now, MWAA reveals that it retained Seyfarth Shaw LLP ("Seyfarth") to advise on these very matters *ten months ago*. Shockingly, Seyfarth never mentioned any of this to PS IAD's general counsel *three months ago*, when Seyfarth undertook representation of both PS IAD's parent Extime PS, LLC and its affiliate PS LAX, LLC—two entities with the same general counsel, the same leadership, and effectively the same business as PS IAD.

MWAA tells the Court that none of this matters. It is wrong. Seyfarth's representation of MWAA, which must be addressed first, flies in the face of the rules of professional conduct and demands disqualification. *See Grimes v. D.C.*, 794 F.3d 83, 90 (D.C. Cir. 2015). And even if Seyfarth is allowed to continue representing MWAA, none of its merits arguments on MWAA's behalf convince. The Court should disqualify Seyfarth and grant injunctive relief to PS IAD.

## REPLY ARGUMENT

**I.    Seyfarth cannot avoid Rule 1.7 with invocation of boilerplate engagement letter language.**

Last Friday, PS IAD began drawing up a motion to disqualify Seyfarth within hours of learning that Seyfarth represented MWAA in these proceedings. PS IAD moved to disqualify Seyfarth for a simple reason: It has been advising both PS IAD's parent company Extime PS, LLC f/k/a Private Suite Holdings, LLC ("Extime") and its sister company, PS LAX, LLC since November 2025 in some seven matters—including on a sensitive collective bargaining matter that exposed Seyfarth to the intimate details of how Extime and all of its subsidiaries, including PS LAX and PS IAD, handle their private terminal business. Extime shares its business, its leadership, office space, financials, legal counsel—everything—with its subsidiaries.

Now, in its effort to maintain Seyfarth as its counsel, MWAA has revealed that, in fact, Seyfarth has been advising MWAA since April 2025 *on this very matter*. ECF No. 10 at 34–35. That means that Seyfarth began advising MWAA shortly after PS IAD first protested MWAA's proposed award to PS IAD's competitor daa International ("DAAI"), and it means that Seyfarth has been privy to PS IAD's extensive proposal to MWAA—which clearly identify both Extime (under its predecessor name, Private Suite Holdings, LLC) and PS IAD's affiliated sister companies, including PS LAX. It also means that Seyfarth has likely advised MWAA on its entire strategy of cancelling its original solicitation and reissuing a new one with a different evaluation methodology that favors DAAI—not to mention the infamous addition of Amendment 2.

Seyfarth never told PS IAD's general counsel about any of this when it entered into an engagement with Extime in November 2025 on multiple litigation matters. Nor did Seyfarth tell PS IAD's general counsel about that representation when Seyfarth began representing PS LAX in the collective bargaining matter without executing a separate engagement letter for that subsidiary.

Nonetheless, MWAA now tells the Court that Seyfarth's engagement letter with Extime—and that engagement letter alone—precludes the Court from finding that Extime, PS LAX, and PS IAD are alter-ego companies for purposes of a conflicts analysis under the District of Columbia Rules of Professional Conduct ("D.C. Rules"). Because any "objective observer" would have more than a "reasonable doubt" about the propriety of Seyfarth's conduct in this matter, the Court should reject MWAA's argument and disqualify Seyfarth.

### a. PS IAD has standing to seek disqualification.

MWAA's first argument is a remarkable one: It says that PS IAD has no standing to seek disqualification of Seyfarth because "PS IAD has never been Seyfarth Shaw's client." ECF No. 10 at 36. But that puts the cart before the horse—this Court must obviously decide whether the interrelated nature of Extime and its subsidiaries, including PS IAD, merits a finding of concurrent representation. *See GSI Com. Sols., Inc. v. BabyCenter, L.L.C.*, 618 F.3d 204, 210 (2d Cir. 2010) ("representation adverse to a client's affiliate can, in certain circumstances, conflict with the lawyer's duty of loyalty owed to a client.").

MWAA's lone authority for this proposition is also inapposite. *See Ambush v. Engelberg*, 282 F. Supp. 3d 58, 64–65 (D.D.C. 2017). Not only does the case have nothing to do with a "corporate affiliate conflicts," but it involved an instance of a plaintiff attempting to police alleged conflicts between opposing counsel and clients with no connection to the plaintiff. *See id.* This is obviously not such a case; this is a case where PS IAD is arguing that Seyfarth's representation of its corporate family amounted to a representation of it, too. And, in any event, any alleged "lack of standing is moot, since the court should exercise its 'inherent power to preserve the integrity of the adversary process' when possible conflicts arise." *Cohen v. Strouch*, No. 10 CIV. 7828 DLC, 2011

WL 1143067, at *4 (S.D.N.Y. Mar. 24, 2011) (quoting *Hempstead Video, Inc. v. Incorporated Village of Valley Stream*, 409 F.3d 127, 132 (2d Cir. 2005)).

> **b.  Seyfarth cannot evade its ethical obligations by invoking boilerplate language in the Extime engagement letter.**

MWAA's entire argument can be boiled down to this: Because Extime signed a boilerplate engagement letter that stated Seyfarth did not represent Extime's subsidiaries (such as PS LAX or PS IAD), this Court has no obligation—indeed, no right—to conduct an analysis of whether the relationship between Extime, PS LAX, and PS IAD rendered Seyfarth's representation of one entity an effective representation of the other for purposes of D.C. Rule 1.7. MWAA's argument is wrong.

As MWAA concedes, the comments to Rule 1.7 set out a straightforward test to determine whether a corporate affiliate should be treated as the same client as an affiliate for conflict purposes. MWAA does not even attempt to dispute that PS IAD has handily satisfied every factor of this test. Nor could it—for purposes of Rule 1.7, the overlap between Extime and its subsidiaries is complete and total. Nonetheless, MWAA tells this Court to ignore that overlap because of language in Seyfarth's engagement letter saying that Seyfarth did not represent Extime's subsidiaries.

But nowhere do those comments say—anywhere—that an engagement letter means a court should ignore a corporate affiliate conflict. Nor does the Second Circuit's seminal *GSI* decision, despite MWAA's best efforts to make that case about an "ambiguous" engagement letter. *See* 618 F.3d at 210. MWAA's incredible claim that the Second Circuit "first applied" rules of "contract construction" in that case is flatly belied by MWAA's citation to the *last page of the opinion*, which was preceded by no less than three pages of analysis in which the Second Circuit considered whether (and found that) a parent and a subsidiary should be treated as alter egos for purposes of

Rule 1.7. *Compare* ECF No. 10 at 39, *with GSI*, 618 F.3d at 209–12.  Only after that analysis did the Court analyze the engagement letter, which, like the one at issue here, said that the law firm "represent[ed] only the named client and not unnamed affiliates, subsidiaries, partners, joint venturers, employees, directors, officers, shareholders, members, owners, agencies, departments, or divisions." *Id.* at 214. Then, the Second Circuit noted that "[c]onstrued as a waiver of all corporate affiliate conflicts involving the entities listed therein, this clause would raise a serious ethical problem." *Id.* After that, the court held, unambiguously, that the law firm there was "straining to work a broad waiver into language that simply is not plain enough or clear enough to support it." *Id.* at 214. Though the Court separately analyzed other portions of the engagement letter, *id.* at 213, *GSI* does not remotely stand for the proposition that a court need not consider a corporate affiliate conflict just because a client signs a boilerplate engagement letter disavowing representation of other subsidiaries.

Even if the Court took the engagement letter at its word, the conduct of lawyer and client in this case evinced that both parties conceived of their relationship as extending to subsidiaries. Shortly after the engagement letter was signed, Seyfarth began work on a collective bargaining issue for PS LAX—which, like PS IAD, is a wholly owned subsidiary that relies entirely on the centralized financial, operational, and legal services of its parent, Extime. But Seyfarth never sought "a modification of its original agreement with [Extime]." *Lennar Mare Island, LLC v. Steadfast Ins. Co.*, 105 F. Supp. 3d 1100, 1114 (E.D. Cal. 2015). It just did the work, continuing to coordinate with all the same decision-makers on those PS LAX matters as it did on the Extime matters.

So, even accepting MWAA's contention that its relationship with the Private Suite Enterprise began "with the parent company alone," its "later representation" of PS LAX confirms

client leadership's "expectation that [Seyfarth] owed the corporate family a duty of fidelity." *Id.*
(analyzing identical language in engagement letter with parent company and concluding (1) that
firm *currently* represented both the parent and its subsidiaries, and (2) that firm's "ethical wall
[could] not cure" this "concurrent conflict"). Put differently, even assuming Seyfarth could rely on
the engagement letter's boilerplate language, the clear "'mission creep' in the attorney-client
relationship" here shows "all parties impliedly kn[e]w that affiliates ha[d] become part of the
representation." *Jefferson St. Holdings, LLC v. Otter Prods., LLC*, No. 1:23-cv-01514-RMR-SBP,
2023 WL 7551560, at *19 (D. Colo. Nov. 14, 2023) (quoting *Keefe Commissary Network, LLC. v.
Beazley Ins. Co., Inc.*, No. 4:20-CV-00176-SNLJ, 2020 WL 4673782, at *6 (E.D. Mo. Aug. 12,
2020)).[1]

    But regardless of how the Court reads these cases, the revelations contained within
MWAA's responsive briefing cut to the heart of Rule 1.7. That Rule rests on two fundamentals:
(1) every client "is entitled to wholehearted and zealous representation of its interests," and (2)
both lawyer and client "must have the opportunity to judge and be satisfied that such representation
can be provided." D.C. Rules R. 1.7 cmt. 7. "The underlying premise is that *disclosure* and
*informed consent* are required before assuming a representation if there is any reason to doubt the
lawyer's ability to provide wholehearted and zealous representation of a client . . . . Although the
lawyer must be satisfied that the representation can be wholeheartedly and zealously undertaken,
if an *objective observer* would have *any reasonable doubt* on that issue, the client has a right to

---

[1] This "mission creep" problem alone dooms MWAA's efforts to rely on *Jefferson Street* and *Keefe
Commissary*, both of which acknowledged that problem. But those cases have other problems. *Jefferson
Street*, for instance, was a Rule 1.9 "former-client conflict"—but "[t]he rule against concurrent conflicts is
less forgiving" than that Rule. *Lennar*, 105 F. Supp. 3d at 1108–09. And *Jefferson Street*, like *SLF Holdings,
LLC v. Uniti Fiber Holdings, Inc.*, 2019 WL 4143296 (S.D. Ala. Aug. 30, 2019) arose after an entity was
acquired by a new company, creating an alleged conflict that didn't exist at the time the relevant attorney-
client relationship was created. These cases don't change the outcome.

disclosure of all relevant considerations and the opportunity to be the judge of its own interests." *Id.* (emphasis added); *see also id.* cmt. 27 ("Disclosure and informed consent are not mere formalities. Adequate disclosure requires such disclosure of the parties and their interests and positions as to enable each potential client to make a fully informed decision as to whether to proceed with the contemplated representation.").

MWAA's arguments collapse under the weight of these principles. At the time Seyfarth entered the Extime engagement, it was already advising MWAA on a bid protest filed by Extime's wholly owned subsidiary, PS IAD. Thus, the Court must ask whether Seyfarth or an "objective observer" could "foresee that an issue" might exist regarding this arrangement, such that Seyfarth owed Extime full disclosure of its work for MWAA. D.C. R. 1.7 cmt. 7, 9. The answer is "yes."

For one, Seyfarth was plainly privy to reams of information regarding PS IAD and its corporate structure the day that MWAA retained it for advice regarding PS IAD's bid protest. PS IAD's original bid protest provided contact information for PS IAD's Vice President of Airport Development, Steven Gargaro, who shared an identical email domain (@reserveps.com) with every other person working in the Extime family of entities—including their general counsel, Drew Lincoln. Furthermore, PS IAD's original proposal materials emphasized, over and over again, that Extime—then known as The Private Suite Holdings, LLC—was indistinguishable from its affiliates. It provided consolidated financial disclosures, a summary of its corporate organization, and an audit of Extime and its subsidiaries in which they were collectively, referred to as "The Company."[2] Yet in November 2025, without so much as a heads-up about its relationship with MWAA, Seyfarth began representing Extime in multiple matters.

---

[2] This proposal contains the sensitive financial data of Extime and its affiliates. Should the Court require the proposal for review, PS IAD requests the opportunity to move for leave to file it under seal.

The upshot: Seyfarth knew as early as November 2025 that an "objective observer" might question its ability to represent Extime and one of its subsidiaries in numerous matters under the terms of a single, boilerplate engagement letter with Extime—all while simultaneously working to deprive another Extime subsidiary of a nine-figure contract award. Yet Seyfarth failed to give client leadership the "opportunity to judge and be satisfied" that this arrangement was acceptable. D.C. Rules R 1.7 cmt. 7. That is wholly unacceptable.

The fact that Seyfarth represents Extime and PS on different matters with different lawyers does nothing to allay these concerns. Ethical walls and screens "do nothing to mitigate conflict arising from concurrent adverse client relationships, since the purpose of the prohibition against such relationships is to preserve the attorney's duty of loyalty, not confidentiality, to his client." *Concat LP v. Univlever, PLC*, 350 F. Supp. 2d 796, 822 (N.D. Cal. 2004) (citing cases). Moreover, "[w]here a concurrent representation is found, it will 'not suffice to show that the two matters upon which an attorney represents existing clients are unrelated.'" *First NBC Bank*, 259 F. Supp. 3d at 57 (quoting *GSI*, 618 F.3d at 209). As the Second Circuit bluntly put it, "[t]he lawyer who would sue his own client, asserting in justification the lack of 'substantial relationship' between the litigation and the work he has undertaken to perform for that client, is leaning on a slender reed indeed." *GSI*, 618 F.3d at 209 (quoting *Cinema 5, Ltd. v. Cinerama, Inc.*, 528 F.2d 1384, 1386 (2d Cir. 1976)). And to MWAA's final point—which boils down to Extime can simply "fire them and find someone else"—ignores the massive prejudice of forcing Extime and PS LAX to onboard entirely new counsel in several active matters merely to accommodate a conflict that Seyfarth could have and should have disclosed from the start.

A final note. MWAA's brief is replete with intimations that PS IAD filed its motion to disqualify Seyfarth to obtain some sort of "tactical advantage" against MWAA. Those suggestions

don't survive the barest scrutiny. For one, PS IAD and its leadership had no idea that Seyfarth represented MWAA in this matter until *yesterday*, so it had no knowledge of Seyfarth's work for MWAA until after it filed its motion to disqualify. And, more to the point, PS IAD's decision to move to disqualify will only slow its ability to obtain the temporary relief it sought in its TRO, as this Court must first resolve the disqualification issues and would likely give MWAA time to obtain replacement counsel. *See Grimes v. D.C.*, 794 F.3d 83, 90 (D.C. Cir. 2015). PS IAD did not move to disqualify Seyfarth for tactical reasons; it did so because its counsel should not be made to place its "trust in outside counsel in one matter while opposing the same counsel in another." *GSI*, 618 F.3d at 211.

For all these reasons, Seyfarth must be disqualified.

## II.    PS IAD has demonstrated entitlement to temporary relief.

PS IAD moved this Court for temporary injunctive relief because it has a right under this Court's caselaw to a "legally valid procurement process" with MWAA that is presently under siege as MWAA proceeds with the procurement despite its taint. *See LTMC/Dragonfly, Inc. v. Metro. Washington Airports Auth.*, 699 F. Supp. 2d 281, 291 (D.D.C. 2010) (quoting *Nat'l Maritime Union of Am. v. Commander, Military Sealift Command*, 824 F.2d 1228, 1237 (D.C. Cir. 1987)). Because PS IAD satisfies each element for temporary injunctive relief, the Court should enjoin MWAA's procurement pending the outcome of this dispute.

### a.    PS IAD has ably proven irreparable harm—a reality confirmed by MWAA's prior representations to this Court in *LTMC/Dragonfly*.

MWAA starts its analysis of the TRO factors by focusing on the second factor—irreparable harm—so PS IAD will, too. PS IAD ably showed that it suffers irreparable harm because it is presently being forced to undergo a procurement that unlevelled the playing field between PS IAD

and its lone competitor, and it can't sue MWAA for any damages to recover its losses. MWAA says that's not enough for several reasons, but they all fall flat.

***First***, MWAA says that PS IAD can't show irreparable harm because no award has been made[3] and PS IAD won't suffer any injury unless and until MWAA awards the contract to PS IAD's lone competitor, daa International ("DAAI"). ECF No. 10 at 16–17. MWAA misapprehends the injury. As noted, PS IAD has been denied its right to a legally valid procurement process and is suffering through an unfair, arbitrary procurement caused by MWAA. And "a 'lost opportunity to compete in a fair competitive bidding process for a contract has been found sufficient to prove irreparable harm.' " *IgniteAction JV, LLC v. United States*, 174 Fed. Cl. 62, 72 (2024) (quoting *Overstreet Elec. Co. v. United States*, 47 Fed. Cl. 728, 744 (2000)) (brackets omitted); *Anders Constr., Inc. v. United States*, 171 Fed. Cl. 300, 313 (2024) (it has been "repeatedly held that a protester suffers irreparable harm if it is deprived of the opportunity to compete fairly for a contract.") (citation and brackets omitted). So, PS IAD has suffered a recognized irreparable harm.

***Second***, MWAA claims PS IAD's harm is "self-inflicted" because PS IAD has stated that it cannot ethically submit a price unmoored from reality. ECF No. 10 at 17. MWAA again misstates the injury and thus mis-frames the inquiry. PS IAD is forced to compete in a procurement tainted by MWAA's arbitrary and capricious decisions (discussed in more detail below), including MWAA's unexplained and baseless decision to delete a requirement that MWAA review proposals

---

[3] MWAA also suggests this case is not "ripe" because no contract award has been made. MWAA misapprehends the law. Pre-award protests are deemed ripe when a patent error in a solicitation is challenged before the closing date for proposal submissions, as established in *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1315 (Fed. Cir. 2007). Failure to raise such pre-award objections early constitutes a waiver of the claim. MWAA's assertion that this case is not yet ripe because the award has not yet been made ignores the clear distinction between pre-award and post-award bid protest law and the Federal Circuit's requirement. "To accept the Government's argument that a pre-award bid protest is not ripe until an agency makes a final award would be to eviscerate the Court's jurisdiction over pre-award protests." *Ideogenics, LLC v. U.S.*, 146 Fed. Cl. 482 (2019).

for "realism" and "reasonableness." These now-deleted safeguards spoke directly to PS IAD's concern that its competitor has been allowed to compete in a procurement unconstrained by reality, whereas PS IAD must necessarily be so constrained because of the data it's accumulated actually operating private terminals. PS IAD's inability to compete ethically in this procurement is not a problem of PS IAD's making; it's a problem created by MWAA's illegal procurement. The alternative, if one to believe MWAA's suggestion, would be only to compete based on an unethical bid. That cannot possibly be the standard.

*Third*, MWAA faults PS IAD for relying on cases from this Court suggesting that an inability to recover monetary damages establishes irreparable harm. ECF No. 10 at 18–19; *see, e.g.*, *Feinerman v. Bernardi*, 558 F. Supp. 2d 36, 50–51 (D.D.C. 2008); *Nalco Co. v. U.S. E.P.A.*, 786 F. Supp. 2d 177, 188 (D.D.C. 2011). This Court has suggested as much as recently as last year. *See Jenner & Block LLP v. U.S. Dep't of Just.*, 784 F. Supp. 3d 76, 114 (D.D.C. 2025) (noting that " 'significant' economic loss unrecoverable due to sovereign immunity can be irreparable."). At minimum, the cases "demonstrate that recoverability of monetary losses can, and should, have some influence on the irreparable harm calculus." *Nat'l Min. Ass'n v. Jackson*, 768 F. Supp. 2d 34, 53 (D.D.C. 2011). That is especially so when those losses are combined with injury to a bidder's established right to a fair procurement in a contract worth over nine figures. *LTMC/Dragonfly*, 699 F. Supp. 2d at 291; *IgniteAction*, 174 Fed. Cl. at 72–73. MWAA's evaluation of proposals, which is currently underway, is part and parcel of an illegal procurement that threatens PS IAD's ability to generate over a hundred million dollars in revenue. That's irreparable.

*Finally*, MWAA repackages its refrain that PS IAD is not damaged because PS IAD is still participating in the procurement and has therefore not lost the opportunity to compete. ECF No. 10 at 19–20. Yet again, MWAA misses the mark. PS IAD had a right to a fair procurement process,

which necessarily entails a fair evaluation process. *See LTMC/Dragonfly*, 699 F. Supp. 2d at 291. MWAA made these processes unfair by cancelling its original solicitation without a legally required explanation, then repeatedly modifying its new solicitation without explanation to make it favor DAAI and disfavor PS IAD (more on that below). Those modifications rendered the procurement unfair to PS IAD, such that it is "deprived of the opportunity to compete fairly for a contract." *Anders Constr.*, 171 Fed. Cl. at 313 (quotation marks and citation omitted).

A final note: It takes a special hubris for MWAA to tell this Court that PS IAD will not suffer irreparable harm if the solicitation is not paused when MWAA once implied to this Court that it "lacks authority to enjoin MWAA to re-conduct a fair contracting process." *See LTMC/Dragonfly*, 699 F. Supp. 2d at 292. By its own suggestion, MWAA should be halted from proceeding with this procurement until this dispute is resolved.

### b. MWAA's merits arguments contradict holdings from every federal court to consider them, confirming PS IAD's substantial likelihood of success.

PS IAD also needed to show that it had a substantial likelihood of success on the merits of its claims against MWAA. PS IAD had little trouble doing that. All it had to do was marry MWAA's baldly noncompetitive actions to the blueprint set out by Judge Kollar-Kotelly's decision in *LTMC/Dragonfly* and in the two decisions from the Fourth Circuit recognizing the very causes of actions that PS IAD alleges here. Tellingly, though, MWAA barely engages with *LTMC/Dragonfly* and tells this Court that the Fourth Circuit got it wrong and should be ignored. And it's clear why: these cases foreclose nearly every argument that MWAA makes.

### i. PS IAD has standing.

MWAA's argument that PS IAD lacks standing because it "remains eligible under Amendment 2 to compete for the award on equal terms as other offerors" and because it "fails to show the requisite causal connection between its asserted injury and any action of the Airports

Authority" is plainly misplaced. ECF No. 10 at 21–22. As noted, this Court has made it abundantly clear that a jilted bidder has standing to "claim injury to its right to a legally valid procurement process." *LTMC/Dragonfly*, 699 F. Supp. 2d at 291 (quoting *Nat'l Maritime Union of Am.*, 824 F.2d at 1237). "Thus, 'injury to a bidder's right to a fair procurement is obviously an injury both traceable to the alleged illegality in a procurement and redressable by any remedy that eliminates the alleged illegality.' " *Id.* (again quoting *Nat'l Maritime Union of Am.*, 824 F.2d at 1237–38). That is precisely the injury that PS IAD claims: It has alleged that MWAA conducted a legally flawed procurement replete with arbitrary decisions that ran afoul of MWAA's statutory and contractual obligation "to follow open and competitive contracting procedures." *Id.* That harm is not speculative—it's already occurred, and it's still tainting the procurement now. It is beyond dispute that PS IAD has standing.

### ii. This Court has jurisdiction.

MWAA advances an equally remarkable claim that this Court lacks jurisdiction over MWAA's claims because (1) MWAA doesn't have to follow sound government contracting principles and (2) MWAA can't be held liable for arbitrary and capricious decisions it makes. ECF No. 22–24. As to the former claim, MWAA unsuccessfully advanced the same argument in *LTMC/Dragonfly* and was rebuffed by the Court, which noted that "[t]he Enabling Act also requires that MWAA's contracts be 'awarded by procedures that follow sound Government contracting principles.' " *Compare* MWAA Rep. Br., 2009 WL 5114211, at n.4 (D.D.C.), *with LTMC/Dragonfly*, 699 F. Supp. 2d at 284 (quoting 49 U.S.C. § 49106(g)). The Fourth Circuit said so, too. *See Washington-Dulles Transp., Ltd. v. Metro. Washington Airports Auth.*, 263 F.3d 371, 374 (4th Cir. 2001) ("*WDT I*") (quoting 49 U.S.C. § 49106(g)) ("the Enabling Act subjects MWAA's contracts to review to ensure the contracts "were awarded by procedures that follow

sound Government contracting principles," and the Lease provides for such a review as well."). And, in an extensive report on MWAA's various competitive failings, the Government Accountability Office similarly reminded MWAA that its "congressional mandate required the Authority to conduct its procurements, to the maximum extent practicable, in a manner consistent with the well-established principles underlying full and open competition." Ex. 1, 2002 GAO Report. PS IAD has a well-established right to challenge MWAA's failure to do so.

For similar reasons, MWAA's latter point fares no better. Though MWAA boldly claims that its decisions are immune from review for their arbitrariness or capriciousness, the caselaw tells a different story. *See Washington-Dulles Transp. Ltd. V. Metro. Washington Airports Auth.*, 87 F. App'x 843, 849 (4th Cir. 2004) ("*WDT II*"). Begin with *WDT II*, in which a panel of the Fourth Circuit held that a jilted bidder could prevail against MWAA if it proved "an arbitrary or irrational decision of the procurement official on matters primarily committed to his discretion." *Id.* (quoting *Newport News Shipbuilding & Dry Dock Co. v. General Dynamics Corp.*, 960 F.2d 386, 392 (4th Cir. 1992)). And though MWAA faults that court for "erroneously appl[ying] an APA standard of review," ECF No. 16 at n.5, this Court has noted "the Enabling Act is similar to the Administrative Procedure Act" and held that it has the "authority to enjoin MWAA to re-conduct a fair contracting process." *LTMC/Dragonfly*, 699 F. Supp. 2d at 291–92. MWAA's status as a quasi-independent government entity does not mean it can act arbitrarily and capriciously in making procurement decisions.

At bottom, MWAA asks this Court to find its only obligation under the Enabling Act and Lease is to pay lip service to its Manual. The consequences of that position are stark. Under MWAA's view of the world, it could take any action it was empowered to take under its Manual— even if the stated purpose for doing so was to advantage a specific bidder. But MWAA's

obligations under the Enabling Act and the Lease must be read in their statutory context, which plainly envisions a regime in which MWAA undertakes procurements in accordance with principles applicable to similarly situated agencies within the federal government. Otherwise, the Enabling Act's strictures "would be a hollow and toothless promise," indeed. *See WDT I*, 263 F.3d at 376.

### iii.   When viewed in context, MWAA's decisions are patently arbitrary.

Though MWAA insists its arbitrary actions aren't susceptible to this Court's reproach, it devotes a significant portion of its brief to arguing that (1) it acted reasonably in switching gears and selecting the Highest Price Technically Acceptable ("HPTA") method of evaluation for proposals and (2) it was entitled to delete the New RFP's requirement that MWAA evaluate proposals for "realism" and "reasonableness." *See* ECF No. 10 at 25–28. As its various procurement officials did below, MWAA again fails to provide a rational, reasoned decision about its decisions in this procurement.

Start with MWAA's abrupt cancellation of its original solicitation ("Original RFP") and intended award to PS IAD's competitor DAAI back on June 13, 2025. ECF No. 2-8. To remind, the Original RFP called for a "best-value procurement" that required MWAA to look both at the technical suitability of an offeror's proposal and the proposal's financial offering. PS IAD protested the intended award to DAAI because the latter's proposal was both technically inferior *and* featured an unrealistic price unsupported by any data. Clearly concerned that PS IAD was right, MWAA cancelled the original solicitation and award—*with no explanation whatsoever*—and then reissued a new solicitation ("New RFP") that allowed MWAA to select the proposal featured the highest price and was minimally technically acceptable.

Predictably, MWAA says in retort that it was entitled to select whatever proposal evaluation method it wanted to use, and since it followed the HPTA requirements set out in its Manual, it's done nothing wrong or actionable. ECF No. 10 at 25–26. And normally, MWAA might be right—but it's wrong here.[4] MWAA did not select the HPTA method in a vacuum; it did so after PS IAD rightly called into question the propriety of MWAA's award to the *only other offeror* by pointing out that DAAI's proposal did not satisfy the best-value procurement method that *MWAA originally selected*. Only then did MWAA change course, cancel the Original RFP, and issue a new one with HPTA as the method.

MWAA's course change violated the law. For one, MWAA's reasonless cancellation ran afoul of its Manual's requirement that "[t]he reason for determination to cancel the Solicitation shall be documented and made part of the file." ECF No. 2-4 at 46 § 4.2.3. As the Fourth Circuit chided MWAA in *WDT I*, MWAA has an obligation "to *use* published competitive procedures, not merely put them on paper." 263 F.3d at 376. MWAA violated that obligation when it failed to explain its cancellation, then as now. But MWAA's failure to give a reason for the cancellation was not just a violation of the Manual's express requirements—it was also doubly arbitrary under this Court's cases. First, MWAA's unexplained cancellation was an action that was "contrary to its own regulations." *Pol'y & Rsch., LLC v. United States Dep't of Health & Hum. Servs.*, 313 F. Supp. 3d 62, 72 (D.D.C. 2018) (Jackson, J.) (citing *Nat'l Envtl. Dev. Ass'n's Clean Air Project v. EPA*, 752 F.3d 999, 1009 (D.C. Cir. 2014)). Second, it was an action "accompanied by 'no explanation'" and was therefore "the epitome of 'arbitrary and capricious' decision-making." *Id.* (quoting *Commc'ns & Control, Inc. v. FCC*, 374 F.3d 1329, 1335–36 (D.C. Cir. 2004)).

---

[4] MWAA's selection of an evaluation method usually reserved for "concessions" (like taxi services) for a project involving the design and operation of a private terminal, complete with TSA security, at one of the nation's most prominent airports, is downright shocking—and also capricious.

MWAA's decision to swap to the HPTA evaluation method also came with no explanation. Though MWAA now extols the virtues of the HPTA method, ECF No. 10 at 26–27, it was more than content to use the best-value method until PS IAD pointed out that DAAI's proposal failed that method. Only then did MWAA switch gears, cancel the Original RFP, and select the HPTA method—all without explanation. Perhaps if MWAA had originally selected the HPTA method, or if it hadn't come on the heels of PS IAD protesting an award *to its only competitor*, then a factfinder could credit MWAA's *ex post facto* justifications for its swap. But that context renders MWAA's excuses hollow and its decisions arbitrary and capricious.

So was MWAA's unexplained (and inexplicable) decision to delete the "reality failsafe" with its adoption of Amendment 2 just days after it received a letter in support of DAAI from five Democratic congressmen. As before, MWAA has no meaningful explanation for this change. Instead, MWAA trots out a familiar "explanation": it was "consistent" for MWAA to replace the requirement that it evaluate proposals for "reasonableness, completeness, and realism" with a requirement that it ensure proposals are "complete and responsive to the requirements." *See* ECF No. 10 at 27. Read that again. MWAA deleted a provision that provided for three things (reasonableness, completeness, and realism) and replaced it with a provision that only provided for one of those things (completeness), and contained the "requirement" that a proposal meet "the requirements of the Solicitation"—which MWAA then immediately admits in the next paragraph was *already something the Solicitation required it to consider*. *See* ECF No. 2-3 at 19 ("Factors, including conformity of the Offer to the Solicitation . . . must be considered."). So, MWAA admits that this change was a one-way ratchet: It deleted a critical failsafe and added nothing. MWAA has

given no reasonable explanation for this change whatsoever. The deletion of Amendment Two is a textbook example of an arbitrary decision.[5]

Taken together, MWAA's decisions also flout sound government contracting principles. *See* 49 U.S.C. § 49106(g). Though MWAA argues that it isn't subject to the Federal Acquisition Regulations ("FAR"), it ignores that the principles those rules embody—that good government means proposed government contracts should be reviewed for "reasonableness" or "realism"—apply with equal force to MWAA, no matter its statutory genesis and no matter what type of contract MWAA chooses to use. Again, MWAA deleted its obligation to review proposals with those concerns in mind without explanation. Under what government contracting principles could that decision be sound?

PS IAD's response to MWAA can be summed up with one phrase: Context matters. If the Court isolated MWAA's actions and viewed them individually in a vacuum, perhaps they could survive judicial scrutiny. But viewed together, MWAA's actions evince one goal: an award of the contract to PS IAD's competitor. That goal is not a legitimate aim for a public entity; it violates the Lease and the Enabling Act; and it is patently arbitrary and capricious.

PS IAD has shown a substantial likelihood of success on the merits.

> **c.  Nonspecific invocation of "administrative burdens" doesn't trump the public's interest in MWAA following the law.**

PS IAD also had to show that the equities favored it rather than MWAA by balancing the harms to both parties. As PS IAD pointed out, this third factor of the TRO-test collapses with the fourth factor, as the alleged harm to MWAA and "the public-interest factor are 'one and the same'

---

[5] For similar reasons, MWAA's citation to various other "safeguards" in the New RFP fails to diminish the arbitrariness of MWAA's decision to delete Amendment 2. ECF No. 20–21. Again, those are excuses—they're not explanations for the change itself. So, they are arbitrary.

because the government is the non-movant and because 'the government's interest *is* the public interest.' " *Chef Time 1520 LLC v. Small Bus. Admin.*, 646 F. Supp. 3d 101, 116 (D.D.C. 2022) (quoting *Pursuing America's Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016)). So, the Court weighs the harm to PS IAD with the harm to the public interest.

The harm to PS IAD is obvious—it's being forced to undergo yet another procurement tainted by MWAA's arbitrary and capricious decision-making despite "its right to a legally valid procurement process." *LTMC/Dragonfly, Inc.*, 699 F. Supp. 2d at 291 (quotation marks and citation omitted). Further, this Court has made clear that there's harm to the public here, too. After all, "the public interest [is] served by ensuring that the government obtains the most advantageous contracts *by complying with the procedures which Congress and applicable regulations have provided*." *Eco Tour Adventures, Inc. v. Zinke*, 249 F. Supp. 3d 360, 386 (D.D.C. 2017) (citation omitted) (emphasis added); *Abel Converting, Inc. v. United States*, 679 F. Supp. 1133, 1142 (D.D.C. 1988) ("the public interest strongly favors maximizing competition in all federal government procurements."). These cases are not anomalies, either. *See, e.g.*, *IgniteAction*, 174 Fed. Cl. at 72–73 (quotation marks and citations omitted) ("It is well settled that the public has a strong interest in ensuring that the government procurement process is fair. This involves requiring the government to follow its procurement regulations."). Thus, the harms to PS IAD and the public interest *both* support injunctive relief.

MWAA grapples with none of this law. Instead, MWAA blandly complains it will be forced to "manage a pause with no defined endpoint" and that the public will suffer because, eventually, a private terminal will be built will generate money to be spent on "airport operations, infrastructure, and services for the travelling public." ECF No. 10 at 29, 32. As to the first gripe, this Court has said before that an agency "will suffer no cognizable injury from a delay in the

award of contracts," when the status quo is maintained, as it would be here because no contract has been awarded. *Abel Converting, Inc.*, 679 F. Supp at 1142. That conclusion is not shaken by MWAA's warning that pausing the procurement risks "impairing efficient airport administration and delaying critical airport operations and services." ECF No. 10 at 29. While addition of a private terminal will no doubt benefit MWAA, it's a stretch to describe the project as "critical."

As to MWAA's second complaint, the public's judicially established interests in (1) governmental entities like MWAA following procedures established by law and regulation and (2) maximizing competition in their procurements trump the daisy chain of events required before the "public" benefits from this procurement—*i.e.*, MWAA's award of this contract, then the construction of the terminal, then the operation of the terminal, then MWAA's receipt of revenue generated from the terminal, then MWAA's procurement of new contracts for the provision of whatever undefined benefits the public will supposedly receive from these monies. If MWAA had wanted the public to benefit from this terminal more immediately, it would not have cancelled the Original RFP and reissued the New RFP with a different evaluation methodology designed to favor DAAI. It would have awarded the contract to the offeror whose proposal offered MWAA the best value—PS IAD.

The public's established interests in MWAA's compliance with the law and maximization of competitive bidding also undermine MWAA's other argument: That "judicial intervention" into MWAA's solicitation would "undermine" the public's "expectations" that MWAA apply its "rules consistently and predictably." ECF No. 10 at 31. Again, PS IAD's entire argument is that MWAA has *not* done so here—beginning with its reasonless cancellation of the Original RFP and ending in its arbitrary and capricious decision to delete Amendment 2's failsafe. The public's interest is served by this Court scrutinizing MWAA's actions, not ignoring them because MWAA says so.

20

Finally, MWAA makes the argument, in multiple places, that PS IAD's decision to participate in this procurement means that it has not been denied an opportunity to compete, and therefore, it has suffered no harm. That rejoinder remains an empty one. Again, PS IAD has a right under this Court's jurisprudence to a legally valid procurement. *LTMC/Dragonfly, Inc.*, 699 F. Supp. 2d at 291. It was denied that right because of MWAA's actions, including MWAA's decision to delete Amendment 2 and force PS IAD to compete in a procurement centered on submission of the "highest price" offer with a competitor that has no data to support its financial proposal, and which has demonstrated a willingness to propose grossly unrealistic pricing. Though MWAA attempts to minimize PS IAD's complaint as a choice related to PS IAD's "preferred business model," PS IAD has explained that it cannot ethically submit bids unmoored from the years of experience and hard data that PS IAD has accumulated. In any event, though, PS IAD has a right to participate in the procurement (if for no other reason than to avoid MWAA's inevitable argument that PS IAD lacked standing because it didn't participate) while simultaneously protesting that it was not being conducted fairly.

## CONCLUSION

PS IAD did not want to move to disqualify Seyfarth, and it did not want to be forced to take this bid protest to a judicial forum. MWAA has forced its hand on both fronts. The Court should disqualify Seyfarth, grant temporary injunctive relief to PS IAD, and allow this case to proceed expeditiously on the merits.

**RESPECTFULLY SUBMITTED** this the 12th day of February, 2026.

**THE PRIVATE SUITE IAD, LLC**

*/s/ Andrew J. Narod*
Andrew J. Narod (D.C. Bar No. 1006083)

Erik M. Coon (D.C. Bar No. 1656075)
Bradley Arant Boult Cummings LLP
1900 K Street, NW
Suite 800
Washington, D.C. 20006
P: 202.719.8271
F: 202.719.8371
anarod@bradley.com
ecoon@bradley.com

R. Sumner Fortenberry (MS Bar No. 106292)
*Admitted Pro Hac Vice*
Bradley Arant Boult Cummings LLP
188 E. Capitol St., Suite 1000
Jackson, MS 39202
Tel: (601) 592-9922
Email: sfortenberry@bradley.com

*Attorneys for The Private Suite IAD, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that I have electronically filed the foregoing with the Clerk of the Court using CM/ECF system which will send notification of such filing on all counsel of record on the date set out above.

/s/ *Andrew J. Narod*
Andrew J. Narod