**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| PRIVATE SUITE IAD, LLC, <br><br> Plaintiff, <br><br> v. <br><br> METROPOLITAN WASHINGTON AIRPORTS AUTHORITY, <br><br> Defendant. | Civil Action No. 26-cv-349 (BAH) <br><br> Judge Beryl A. Howell |

<u>**MEMORANDUM OPINION**</u>

Plaintiff Private Suite IAD, LLC initiated this lawsuit seeking an order enjoining defendant Metropolitan Washington Airports Authority ("MWAA" or "Airports Authority"), for an unspecified period of time, from making a final selection of a competitive nine-figure procurement contract to construct a luxury private terminal at Washington-Dulles International Airport ("Dulles"), and also declaring that MWAA's modifications to its procurement evaluation method are "arbitrary, capricious, and contrary to law under the Enabling Act[, 49 U.S.C. §§ 49101-49112]." Verified Compl. for Declaratory Relief ("Compl.") at pg. 18, ECF No. 1 (Prayer for Relief). This effort to pause the bidding process for MWAA's new construction project was first addressed, in February 2026, when plaintiff's motion for a temporary restraining order was denied. *See Priv. Suite IAD, LLC v. Metro. Wash. Airports Auth.*, No. 26-cv-349 (BAH), 2026 WL 1520714, at *1 (D.D.C. Feb. 14, 2026).

Pending before the Court now are two motions. First, MWAA moves to dismiss this suit for lack of subject matter jurisdiction under the Enabling Act and for failure to state a claim, pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), respectively, which motion plaintiff opposes. Def.'s Mot. to Dismiss for Lack of Subject Matter Jurisdiction & Failure to

State a Claim ("Def.'s Mot."), Att. 1, Def.'s Mem. in Supp. of Mot. to Dismiss for Lack of Subject

Matter Jurisdiction & Failure to State a Claim ("Def.'s Mem.") at 2, ECF No. 15-1; *see* Pl.'s Resp.

in Opp'n to Mot. to Dismiss ("Pl.'s Opp'n"), ECF No. 16.  After this motion became ripe, "MWAA

[] announced its intent to award the nine-figure contract at the center of this procurement dispute

to [plaintiff]'s competitor, daa International," prompting plaintiff to seek leave to amend the

complaint, which motion MWAA opposes.  Pl.'s Mot. for Leave to Amend Compl. ("Pl.'s Mot."),

ECF No. 18; Def.'s Opp'n to Pl.'s Mot. for Leave to Amend Its Compl. ("Def.'s Opp'n"), ECF

No. 19.

For the reasons explained more fully below, MWAA's motion to dismiss the complaint is

granted and plaintiff's motion for leave to file an amended complaint is denied as futile.

## I.    BACKGROUND

Set out below is an overview of the relevant statutory and contractual framework for

resolving the pending motions, followed by the factual and procedural background for this case.

### A.    Statutory Background

In 1985, "[b]efore Congress enacted legislation authorizing the Secretary of Transportation

to transfer control of Dulles and Reagan National airports, the Commonwealth of Virginia and the

District of Columbia, acting pursuant to an interstate compact, jointly created MWAA for the sole

purpose of leasing Dulles and Reagan National airports from the federal government."  *Wash-*

*Dulles Transp., Ltd. v. Metro. Wash. Airports Auth.*, 263 F.3d 371, 373 (4th Cir. 2001) (citations

omitted).  In October 1986, Congress enacted the Metropolitan Washington Airports Act (the

"Enabling Act") "authoriz[ing] the transfer of the control and operation of these airports to MWAA

via a 50–year lease (the "Lease") between the Secretary of Transportation and MWAA."  *Id.* (citing

The Metropolitan Washington Airports Act of 1986, Pub. L. No. 99-591, §§ 6001-6012, 100 Stat.

3341-376 (codified as amended at 49 U.S.C. §§ 49101-49112)).  Congress explained that "the

2

United States Government has a continuing but limited interest in the operation of the 2 federally owned airports, which serve the travel and cargo needs of the entire Metropolitan Washington region as well as the District of Columbia as the national seat of government," observing that "all other major air carrier airports in the United States are operated by public entities at the State, regional, or local level," and thus concluding that "the Federal interest in these airports can be provided through a lease mechanism which provides for local control and operation."  49 U.S.C. § 49101.  Pertinent parts of MWAA's underlying statutory, contractual and regulatory provisions are highlighted next.

### 1. Enabling Act

Under the Enabling Act, MWAA is governed by a board of directors composed of seventeen members appointed, in various numbers, by the Governor of Virginia, the Mayor of the District of Columbia, the Governor of Maryland, and the U.S. President, with the advice and consent of the Senate.  *Id.* § 49106(c)(1).[1]  These board members serve without compensation and "may not hold elective or appointive political office."  *Id.* § 49106(c)(4).  The Enabling Act prohibits certain conflicts of interest, stating that "[m]embers of the board and their immediate families may not be employed by or otherwise hold a substantial financial interest in any enterprise that has or is seeking a contract or agreement with the Airports Authority or is an aeronautical, aviation services, or airport services enterprise that otherwise has interests that can be directly affected by the Airports Authority," but "[t]he official appointing a member may make an exception if the financial interest is completely disclosed when the member is appointed and the member does not participate in board decisions that directly affect the interest."  *Id.* § 49106(d).

---

[1] The members of the MWAA Board are appointed as follows: "(A) 7 members appointed by the Governor of Virginia; (B) 4 members appointed by the Mayor of the District of Columbia; (C) 3 members appointed by the Governor of Maryland; and (D) 3 members appointed by the President with the advice and consent of the Senate."  49 U.S.C. § 49106(c)(1).

The Enabling Act imposes certain requirements on the Lease, including that MWAA "shall operate, maintain, protect, promote, and develop the Metropolitan Washington Airports as a unit and as primary airports serving the Metropolitan Washington area." *Id.* § 49104(a)(1). As relevant to this case, MWAA is also statutorily directed, "[i]n acquiring by contract supplies or services for an amount estimated to be more than $200,000, or awarding concession contracts, . . . to the maximum extent practicable shall obtain complete and open competition through the use of published competitive procedures." *Id.* § 49104(a)(4). Additionally, the Lease must provide that MWAA "shall develop a code of ethics and financial disclosure to ensure the integrity of all decisions made by its board of directors and employees" and this "code shall include standards by which members of the board will decide, for purposes of section 49106(d) of this title, what constitutes a substantial financial interest and the circumstances under which an exception to the conflict of interest prohibition may be granted." *Id.* § 49104(a)(8).

The Enabling Act ensures compliance with the Lease through at least two means. First, the Lease is required to provide that "[t]he Comptroller General may conduct periodic audits of the activities and transactions of the Airports Authority in accordance with generally accepted management principles, and under regulations the Comptroller General may prescribe." *Id.* § 49104(a)(7). Further, the Comptroller General is authorized to "review contracts of the Airports Authority to decide whether the contracts were awarded by procedures that follow sound Government contracting principles and comply with section 49104(a)(4) of this title," and required to "submit periodic reports of the conclusions reached as a result of the review to the Committee on Transportation and Infrastructure of the House of Representatives and the Committee on Commerce, Science, and Transportation of the Senate." *Id.* § 49106(g). Second, compliance can may be ensured through legal action, with the Enabling Act providing that "[t]he district courts of

the United States have jurisdiction to compel the Airports Authority and its officers and employees to comply with the terms of the lease" and "[t]he Attorney General or an aggrieved party may bring an action on behalf of the Government." *Id.* § 49104(c).

### 2.      MWAA Lease

With respect to the procurement process, the terms of the Lease largely mirror those required under the Enabling Act.  For example, the Lease states that, "[i]n acquiring by contract supplies or services for an amount estimated to be in excess of $200,000, or awarding concession contracts, the Airports Authority shall obtain, to the maximum extent practicable, full and open competition through the use of published competitive procedures," with "exceptions to the requirements of this paragraph" permitted "[b]y a vote of seven members" of MWAA.  Pl.'s Mot. for Temporary Injunctive Relief ("Pl.'s TRO Mot."), Ex. 1, Lease of the Metro. Wash. Airports ("MWAA Lease") art. 11.D, ECF No. 2-2.  Similarly, as to the Enabling Act's conflicts of interest prohibition, the Lease states that "[t]he Airports Authority shall develop a code of ethics and financial disclosure in order to assure the integrity of all decisions made by its Board of Directors, Board of Review, and employees" and that "[a]t a minimum, the code shall provide that members of the boards and their immediate families may not be employed by or otherwise hold a substantial financial interest in any enterprise that has or is seeking a contract or agreement with the Airports Authority or is an aeronautical, aviation services, or airport services enterprise that otherwise has interests that can be directly affected by the Airports Authority." *Id.* art. 14.C.

The Lease adopts the methods of compliance prescribed in the Enabling Act.  First, legal recourse is assured as the Lease provides that "the district courts of the United States shall have jurisdiction to compel the Airports Authority and its officers and employees to comply with the terms of this lease," that "[a]n action may be brought on behalf of the United States by the Attorney

General, or by any aggrieved party," and that "[a]n action to enforce the terms and conditions of this lease may also be brought on behalf of the Airports Authority in a district court of the United States." *Id.* art. 24.A. Second, the audit procedure specifies that "[t]he Comptroller General of the United States, or a duly authorized representative from the General Accounting Office, may conduct periodic audits of the activities and transactions of the Airports Authority in accordance with generally accepted management principles and under such rules and regulations as may be prescribed by the Comptroller General." *Id.* art. 25.

### 3.    MWAA's Contracting Manual

MWAA's Contracting Manual operationalizes the requirements in the Lease and "sets forth the contracting policies governing the procurement of goods and services, including concessions and construction, for Ronald Reagan Washington National Airport, Washington Dulles International Airport (Airports), the Dulles Toll Road, and until completed, the Metrorail Silver Line extension." Pl.'s TRO Mot., Ex. 3, MWAA, Contracting Manual (Rev. 5th ed. 2025) ("Contracting Manual") at pg. 1 (Forward), ECF No. 2-4. This Manual lists several published competitive procedures and directs contracting officers to select from this list the "method [that] prioritizes efficiency and economics for both Airports Authority staff and participating businesses." *Id.* § 3.5.2. Regardless of which procedure is used, "[t]he Solicitation shall clearly state the evaluation criteria, as selection will be made only in accordance with the stated evaluation criteria" and the "[e]valuation criteria must not be designed to favor any specific Offeror." *Id.* § 3.5.3.

Two published competitive procedures on the list are relevant here. First, the Highest Price Technically Acceptable ("HPTA") method "is appropriate when selection of the technically acceptable proposal with the highest offered price is preferred (e.g., concessions Contracts)." *Id.*

§ 3.5.2.1. When this method is used, "[t]he evaluation factors that establish the requirements of acceptability shall be set forth in the Solicitation, and Solicitations shall specify that award will be made on the basis of the . . . highest[] price proposals meeting or exceeding the acceptability standards," *id.*, such that "[p]roposals are evaluated for acceptability only, and trade-off is not permitted," *id.*

Second, the Best Value with Trade-Off Procurement Method is used when "technical factors and price" are "separately evaluated," such that "[o]nce the technical evaluation is complete, the Contracting Officer will consider both the technical evaluation and the price proposed by each Offeror and determine which Offer provides the best value to the Airports Authority." *Id.* § 3.5.2.2. In this Best Value method, the "comparison involves a trade-off between price and non-price factors," and "[t]he relative importance of price and non-price factors varies based on the specific goods and services that are being procured." *Id.* Further, "with respect to revenue Contracts, if it is determined that the additional technical merit offered is worth the decrease in revenue in relation to other proposals received, the Authority may select other than the highest priced Offer." *Id.*

The Contracting Manual contains a general section, entitled "Standards of Conduct," requiring "all employees and members of its Board to act in the best interests of the Authority at all times and to not engage in conduct that is illegal, dishonest, or brings discredit upon the Authority, or participate in any matter as to which the employee or Board member has a conflict of interest." *Id.* § 1.6. For procurements, a subsection, entitled "Prohibited Conduct and Procurement Integrity," lists five "examples of conduct that is strictly prohibited:" (1) "[t]he Offer or the provision of anything of value . . . to an Authority employee or a member of the Board with the intent to influence an action or decision to be made by the employee or Board member, or with

the intent to compensate or recognize the employee or member for an action or decision that the employee or member has made"; (2) "[t]he disclosure by an Authority employee, Board member or Offeror . . . of Bid or proposal information or source selection information prior to Contract award . . . .; (3) the "[u]se of procurement information by an Authority employee or Board member for personal gain, including in negotiation for future employment outside of the Authority"; (4) the "[a]cceptance of kickbacks, bribes, gratuities, or other similar monetary payments by anyone"; and (5) the "[p]articipation in a particular matter by those Contracting personnel having a conflict of interest regarding the matter." *Id.* § 1.6.3.

B.      **Factual Background**

"Plaintiff is a limited liability company that 'design[s], build[s], and operat[es] one-of-a-kind luxury private terminals in commercial airports.'" *Priv. Suite*, 2026 WL 1520714, at *1 (quoting Compl. ¶ 29).  In June 2023, MWAA issued a request for proposal ("RFP") to "establish a private luxury terminal at Dulles" in response to which only plaintiff and its competitor daa International ("DAAI") submitted proposals. *Id.* at *1-2 (quoting Compl. ¶ 16).  "The Original RFP called for submissions in two phases: a technical phase and a financial phase," with the technical submission intended "to determine whether an offeror could provide MWAA the level of service and technical expertise to develop, lease, and operate a luxury private terminal at Dulles" and "[t]he financial phase was to determine whether an offeror could provide MWAA the optimal return on its investment."  Pl.'s Mot., Ex. B, First Am. Compl. for Declaratory Relief ("Proposed Am. Compl.") ¶¶ 20-22, ECF No. 18-2.  The original RFP used the "negotiated Best-Value procurement method," under which "MWAA evaluates technical factors and price separately, then considers them together and determines which proposal offers the best value for the airport." *Id.* ¶¶ 23-24.

"In response to the RFP, only plaintiff and DAAI submitted proposals," and "[i]n February 2025, MWAA informed plaintiff that DAAI would win the contract 'for the 'highest price' of some $104,716,074.17 in total Ground Rent and Minimum Annual Guarantee.'" *Priv. Suite*, 2026 WL 1520714, *2 (quoting Compl. ¶ 45). Believing "this 'amount was wildly in excess of a realistic potential ground rent for a private terminal,'" plaintiff filed a protest with MWAA and then "followed up with a supplemental protest and escalation 'to MWAA's CEO and, eventually, to MWAA's Board of Directors,'" *id.* (quoting Compl. ¶¶ 46, 49). "The solicitation was cancelled in June 2025." *Id.*

"Several months later, in September 2025, MWAA issued a new RFP, entitled 'Remote VIP Passenger Services at IAD,' that used a different methodology than that set out in the original RFP to evaluate proposals." *Id.* (quoting Compl. ¶¶ 55, 57). "Under this different 'Highest Price Technically Acceptable' methodology, the proposals would be evaluated for 'reasonableness, completeness, and realism as appropriate,' and MWAA 'will accept the proposal that offers MWAA the highest projected revenue,' so long as the technical submission is 'minimally acceptable.'" *Id.* (quoting Compl. ¶¶ 58, 61). "In November 2025, MWAA issued Amendment 2 to the RFP that, among other things, replaced the 'reasonableness, completeness, and realism' language with 'responsive[ness] to the [RFP] requirements.'" *Id.* (quoting Compl. ¶¶ 66-68 (alterations in original)). "In plaintiff's view, this amendment was made because 'on November 3, 2025, a group of Democratic congresspeople wrote a letter to MWAA regarding Potomac Holdings, LLC's bid for the new VIP Terminal at Washington Dulles International Airport' that, plaintiff characterizes, 'read like a billboard for [plaintiff]'s competitor.'" *Id.* (alteration in original and internal quotation marks omitted) (quoting Compl. ¶¶ 63-64). Plaintiff, again, filed a protest, challenging Amendment 2 on the basis that the alteration of the RFP language was "arbitrary and

9

capricious," but this protest was unsuccessful, at all levels of MWAA: on December 8, 2025, the protest was denied by MWAA's vice president, on December 20, 2025, denied by MWAA's CEO, and finally denied by MWAA's board of directors. *Id.* at *3 (quoting Compl. ¶ 73). "Plaintiff ultimately submitted a proposal." *Id.*

"On May 22, 2026, MWAA announced its intent to award a $125,000,000.00 contract to DAAI." Proposed Am. Compl. ¶ 92. Plaintiff again filed a protest, which was denied, and on July 15, 2026, the award of the contract to DAAI became final. *See* Joint Notice, ECF No. 24.

### C.    Procedural Background

Plaintiff filed the instant suit on February 5, 2026, *see* Compl., and simultaneously moved for a temporary restraining order, *see* Pl.'s TRO Mot. While expedited briefing on this motion was underway, plaintiff moved to disqualify MWAA's counsel, Pl.'s Mot. to Disqualify Counsel, ECF No. 8, which was also put on an expedited schedule so that briefing on both motions was complete by February 12, 2026. *See* Minute Orders (Feb. 6, 2026, and Feb. 9, 2026). Both of plaintiff's motions were denied on February 14, 2026. *See Priv. Suite*, 2026 WL 1520714, at *1. The TRO was denied because "plaintiff is still in the running to win the contract targeted by the requested emergency injunctive relief and thus has suffered no injury, let alone an imminent or irreparable injury sufficient to entitle plaintiff to the relief sought," *id.*, and because plaintiff could not establish a likelihood of success on the merits as "no matter the merits of plaintiff's disagreements with and critiques of MWAA's chosen and authorized methodology to evaluate bid proposals and award the contract, such disagreement does not constitute injury at all, let alone sufficient to receive a temporary restraining order[,]" *id.* Plaintiff's motion to disqualify was denied because the counsel in question "ha[d] never represented plaintiff," and thus no conflict existed. *Id.* at *7 n.9.

10

On February 26, 2026, MWAA filed a motion to dismiss, *see* Def.'s Mot., which became ripe in late-March 2026, *see* Def.'s Reply in Supp. of Its Mot. to Dismiss for Lack of Subject Matter Jurisdiction & for Failure to State a Claim ("Def.'s Reply"), ECF No. 17.  Two months later, plaintiff moved for leave to amend the complaint, noting that "MWAA has announced its intent to award the nine-figure contract at the center of this procurement dispute to [plaintiff]'s competitor, daa International."  Pl.'s Mot. at 1.  The proposed amended complaint only adds three factual allegations and a handful of other immaterial, minor changes, regarding MWAA's announced intent to award the contract to DAAI.  *See* Proposed Am. Compl. (adding ¶ 92 ("On May 22, 2026, MWAA announced its intent to award a $125,000,000.00 contract to DAAI."), ¶ 102 ("That has now come to pass with MWAA's award of the Contract to DAAI."), and ¶ 112 ("PS IAD suffered further injury to its rights when MWAA confirmed its intent to award the Contract to DAAI on May 22, 2026.")).  Thus, save a few revised words, the claim asserted in the proposed amended complaint is essentially identical to that in the original complaint.

Both motions are now ripe for resolution.

## II.     APPLICABLE LEGAL STANDARDS

Set out below are the separate legal standards applicable to MWAA's motion to dismiss and plaintiff's motion for leave to amend the complaint.

### A.     Federal Rule of Civil Procedure 12(b)(1)

To survive a motion to dismiss for "lack of subject-matter jurisdiction," under Federal Rule of Civil Procedure 12(b)(1), "[t]he plaintiff bears the burden of invoking the court's subject matter jurisdiction." *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)).  When considering jurisdictional questions, the court accepts as true all uncontroverted material factual allegations contained in the complaint and "construe[s] the complaint liberally, granting plaintiff[s] the benefit of all inferences that can be derived from the

facts alleged." *Hemp Indus. Ass'n v. DEA*, 36 F.4th 278, 281 (D.C. Cir. 2022) (second alteration in original) (quoting *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011)). Additionally, "where necessary, the court may consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Coal. for Underground Expansion v. Mineta*, 333 F.3d 193, 198 (D.C. Cir. 2003) (quoting *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992)).

### B.      Federal Rule of Civil Procedure 12(b)(6)

Federal Rule of Civil Procedure 12(b)(6) permits dismissal for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when the plaintiff pleads factual content that is more than "'merely consistent with' a defendant's liability" and "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Twombly*, 550 U.S. at 556-57). "Factual allegations, although assumed to be true, must still 'be enough to raise a right to relief above the speculative level.'" *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012) (per curiam) (quoting *Twombly*, 550 U.S. at 555). Courts "do not assume the truth of legal conclusions, nor do [courts] 'accept inferences that are unsupported by the facts set out in the complaint.'" *Arpaio*, 797 F.3d at 19 (citing *Iqbal*, 556 U.S. at 678, and quoting *Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 732 (D.C. Cir. 2007)). In determining whether a complaint fails to state a claim, a court may consider only the facts alleged in the complaint and "any documents either attached to or incorporated in the complaint and matters of which the court may take judicial notice." *N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1249 (D.C. Cir. 2020) (alterations in original accepted and citation omitted).

12

### C.   Federal Rule of Civil Procedure 15(a)

"Leave to amend a complaint under Rule 15(a) 'shall be freely given when justice so requires.'" *Firestone v. Firestone*, 76 F.3d 1205, 1208 (D.C. Cir. 1996) (per curiam) (quoting FED. R. CIV. P. 15(a)).  "If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits." *Foman v. Davis*, 371 U.S. 178, 182 (1962).  Thus, "a district court should grant leave to amend a complaint '[i]n the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.'" *Atchinson v. District of Columbia*, 73 F.3d 418, 425-26 (D.C. Cir. 1996) (quoting *Foman*, 371 U.S. at 182).  The D.C. Circuit has recognized that "the grant of leave to amend a complaint might often occasion some degree of delay and additional expense, but leave still should be 'freely given' unless prejudice or delay is 'undue.'" *Barkley v. U.S. Marshals Serv. ex rel. Hylton*, 766 F.3d 25, 39 (D.C. Cir. 2014) (quoting *Foman*, 371 U.S. at 182).  The party opposing the amendment bears the burden to show why leave should not be granted.  *See Gudavich v. District of Columbia*, 22 F. App'x. 17, 18 (D.C. Cir. 2001) (per curiam) (affirming order granting leave to amend because non-movant "failed to show prejudice from the district court's action in allowing the [movant's] motion to amend").

## III.   DISCUSSION

Given the procedural posture of this case and the fact that the single claim asserted in both the operative and proposed amended complaints are virtually identical, MWAA's arguments for dismissal and in opposition to granting leave to amend the complaint are evaluated against plaintiff's proposed amended complaint.  To the extent those arguments are found persuasive to defeat amendment, they are also used as the basis for dismissal.  *See Howard v. Fed. Express*

13

*Corp.*, 280 F. Supp. 3d 26, 29 (D.D.C. 2017) (APM); *see also Bethel v. Rodriguez*, No. 20-cv-1940, 2021 WL 1340961, at *1 n.2 (D.D.C. Apr. 9, 2021) (RC) (stating similar analytical framework).  MWAA's jurisdictional challenge is considered first, followed by consideration of whether the proposed amended complaint states a plausible claim for relief.[2]

### A.      Statutory Jurisdiction Is Assumed

As noted, the Enabling Act provides that "[t]he district courts of the United States have jurisdiction to compel the Airports Authority and its officers and employees to comply with the terms of the lease." 49 U.S.C. § 49104(c).  Since the Lease requires the use of competitive bidding through published competitive procedures, the Enabling Act thus "provides jurisdiction for a disappointed bidder to challenge MWAA's application of competitive bidding procedures." *LTMC/Dragonfly, Inc. v. Metro. Wash. Airports Auth.*, 699 F. Supp. 2d 281, 289-90 (D.D.C. 2010) (CKK).  As the Fourth Circuit has observed, "[i]ndeed, if the provision requiring full and open competition in competitive bidding is not enforceable in federal court, then this requirement in the Lease mandated by an Act of Congress would be a hollow and toothless promise." *Wash-Dulles Transp.*, 263 F.3d at 376.  The parties do not dispute these basic principles, but MWAA nonetheless contends that jurisdiction is lacking because plaintiff's "one-count Complaint, which alleges 'Arbitrary and Capricious Violations of the Lease/Enabling Act,' raises claims beyond this Court's limited jurisdiction under the Enabling Act." Def.'s Mem. at 8 (quoting Compl. at pg. 15).  As MWAA correctly points out, "the Complaint does not identify any Lease provision the Airports

---

[2]      MWAA's final award of the contract to plaintiff's competitor makes moot two of MWAA's arguments—namely, that plaintiff lacks standing because the complaint "alleges only a hypothetical future injury based on the possibility that [MWAA] might later select another offeror," which "conjecture is insufficient to establish the concrete and imminent injury-in-fact demanded by Article III," Def.'s Mem. at 2; Def.'s Opp'n at 5-6 ("alleged injury remains hypothetical and unripe" because "the Airports Authority has still not made an award of the contract"); and that plaintiff has not exhausted administrative remedies by filing a protest through "a secondary and a tertiary review by the Airports Authority's CEO and Board," Def.'s Opp'n at 7.  The last argument fails for the additional reason that the Enabling Act does not require administrative exhaustion as a necessary predicate for a suit.  *See* 49 U.S.C. § 49104(c).

14

Authority allegedly violated." Def.'s Reply at 1. In MWAA's view, "the supposed 'violations' that [plaintiff] alleges are not actually matters of compliance with the Lease, which, again, is the extent of this Court's jurisdiction." Def.'s Mot. at 9. These same identified flaws in plaintiff's claim underlie MWAA's arguments for both lack of jurisdiction and failure to state a claim.

Plaintiff's single claim in the proposed amended complaint is replete with negative critiques of its competitor's bid, *see, e.g.*, Proposed Am. Compl. ¶ 102 ("blatant deficiencies"); *id.* ¶ 103 ("technical inferiorities and unrealistic price proposal"); *id.* ¶ 104 ("technical inferiority" and "unrealistic price"); *id.* ¶ 105 ("unrealistic price"); along with pejorative descriptions of MWAA's decision-making process, *see, e.g.*, *id.* ¶ 106 ("its behavior . . . was based on inappropriate considerations . . . relentless desire to award this contract to DAAI."); *id.* ¶ 110 ("MWAA's actions trample sound principles of Government contracting"); *id.* ¶ 114 ("MWAA's baseless and unexplained decision . . ."); *id.* ¶¶ 113, 114 (calling MWAA's decisions "arbitrary, capricious, irrational"). Sorting through this verbiage to distill precisely what plaintiff claims MWAA got wrong in the bidding process to establish statutory jurisdiction under the Enabling Act is a challenge, which may be avoided here by assuming that such jurisdiction is present to address the merits of plaintiff's claim. The D.C. Circuit has been clear that "[t]he law of our circuit allows a court to assume hypothetical *statutory* jurisdiction even if we cannot assume Article III jurisdiction." *Am. Hosp. Ass'n v. Azar*, 964 F.3d 1230, 1246 (D.C. Cir. 2020) (emphasis in original); *see also Khadr v. United States*, 67 F.4th 413, 425 (D.C. Cir. 2023) (Randolph, J., concurring) ("[W]e have often bypassed statutory jurisdiction to decide merits issues."); *Dib v. Shea*, No. 25-cv-4167 (JEB), 2026 WL 1578859, at *8 (D.D.C. June 2, 2026) ("Indeed, when a question of statutory jurisdiction is hard but 'relief will unquestionably be denied' on the merits, the Circuit often prefers to dispose of the claim on the easy merits grounds and thereby 'avoid a

15

doubtful issue of statutory jurisdiction.'" (quoting *Young v. EPA*, 106 F.4th 56, 61 n.5 (D.C. Cir. 2024), and *Kramer v. Gates*, 481 F.3d 788, 791 (D.C. Cir. 2007))).  Thus, statutory jurisdiction is assumed here to proceed to consideration of the merits of plaintiff's claim.

### B.     Plaintiff Fails to State a Claim

Plaintiff alleges that "[r]ather than evaluate the proposals for the best value to MWAA, MWAA arbitrarily switched evaluation methodologies to pursue a 'Highest Price Technically Acceptable' ('HPTA') method of evaluating the proposals," and then "amend[ed] the New RFP to delete the provision requiring MWAA to evaluate proposals for reasonableness, completeness, and realism."  Proposed Am. Compl. ¶¶ 57, 101.  These actions, plaintiff claims, violated plaintiff's "right to a legally valid and fair procurement that promoted open competition and followed sound Government contracting principles."  *Id.* ¶ 111.  Plaintiff's diffused contentions can be ordered into three basic arguments: first, that the procedures MWAA employed for the RFP contravene sound government contracting principles; second, that a November 2025 letter from members of Congress somehow contributed to MWAA favoring DAAI; and third, that plaintiff's vague allusions to ethical issues motivating MWAA's decision-making process, coupled with plaintiff's negative critiques about the quality of DAAI's bid, suffice to establish that MWAA could have only picked DAAI if MWAA were biased against plaintiff.  None of these arguments state a plausible claim for relief.

First, rather than showing a failure to follow published competitive procedures, as plaintiff alleges, MWAA's change in methodologies reflects action in conformity with those procedures. In fact, the Contracting Manual states that "[t]he HPTA method is appropriate when selection of the technically acceptable proposal with the highest offered price is preferred (e.g., concessions Contracts)."  Contracting Manual § 3.5.2.1.  As the RFP at issue is a concessions contract, the HPTA method is the preferred methodology.  *See also Priv. Suite*, 2026 WL 1520714, at *2 n.2

16

("MWAA points out that the applicable Airports Authority's Contracting Manual states that this award methodology, the 'Highest Price Technically Acceptable' method, 'is preferred for the award of concessions contracts' because it allows MWAA 'to maximize revenue while ensuring that only proposals meeting defined technical acceptability requirements are eligible for award.'" (quoting Def.'s Opp'n to Pl.'s Emergency Mot. for Temporary Injunctive Relief at 5, ECF No. 10)).

Plaintiff also does not state a claim with respect to Amendment 2. This amendment altered the "Financial Offer Evaluation" criteria in the RFP by replacing a single sentence. Specifically, the original sentence, stating, "[t]he Airports Authority will evaluate financial offers for reasonableness, completeness, and realism as appropriate," Pl.'s TRO Mot., Ex. 9, RFP-25-24520, Attach. 01, Evaluation Criteria and Technical Proposal Submission Requirements, at 02(B), ECF No. 2-10, was replaced with the following sentence: "[t]he Airports Authority will evaluate the completeness of a financial offer by determining whether it is complete and responsive to the requirements set forth in the Solicitation," *id.*, Ex. 11, RFP-25-24520, Amendment of Solicitation, ECF No. 2-12. In plaintiff's view, Amendment 2 renders MWAA "powerless to evaluate the highest price proposal it receives for 'reasonableness' or 'realism,'" Proposed Am. Compl. ¶ 71, but this argument is contravened by language from the revised RFP itself, which expressly states that "[t]he fact that an Offeror demonstrates alignment with Authority policies or submits the highest Financial Offer does not automatically result in Contract award. Factors, including conformity of the Offer to the Solicitation, the Offeror's responsibility, and any change in the Authority's requirements must be considered," Pl.'s TRO Mot., Ex. 8, RFP-25-24520, at § 5.18, ECF No. 2-9. In any event, importantly, plaintiff nowhere explains how, acting transparently, Amendment 2 would contravene the terms of either the Lease or Contracting Manual. *See*

17

*generally* Pl.'s Opp'n; Pl.'s Mot.; Pl.'s Reply in Supp. of Mot. for Leave to Amend Compl. ("Pl.'s Reply"), ECF No. 20.  In short, this argument falls far short of stating a claim for violation of any part of the Lease or Enabling Act.

As to plaintiff's second argument, the proposed amended complaint alludes to procurement-related decisions made by MWAA as being based on non-public or "unknown" reasons, suggesting ethical breaches, without any clear underlying factual allegations in support. *See, e.g.*, Proposed Am. Compl. ¶ 44 ("Despite DAAI's complete lack of relevant expertise, it quickly became apparent that MWAA wanted to award the contract to DAAI, not PS, for reasons that are unknown to PS."); *id.* ¶¶ 63-65 (references to congressional letter); *id.* ¶ 102 ("When viewed in the context of PS's protests and MWAA's conduct throughout this procurement, the only reasonable interpretation of MWAA's actions is that MWAA is determined to award the Contract to DAAI despite the blatant deficiencies in its proposal.").  In particular, plaintiff points to a letter sent in November 2025, to MWAA by "a group of Democratic congresspeople," that, according to plaintiff, reads "like a billboard for PS's competitor in the New RFP," citing, "[a]mong other things," that plaintiff's "competitor had been awarded the Contract under the Original RFP; featured members that were from Virginia; and had, in the authors' estimation, enough experience to handle the job."  *Id.* ¶¶ 63-65.  While this positive congressional letter regarding plaintiff's competitor is not "unknown to PS," *id.* ¶ 44, and likely did not hurt the competitor's bid proposal, to the extent plaintiff implies this letter was the reason for the competitor winning the proposal is a leap too far into thin air.  Indeed, the only concrete fact alleged to support this assertion is that MWAA issued Amendment 2 "[j]ust 9 days" after receipt of this letter.  Proposed Am. Compl. ¶¶ 63, 66.  This fact, however, does not explain why MWAA intended to award the original RFP to plaintiff's competitor months before the letter was sent, nor

18

is this coincidental timing otherwise sufficient to sustain a claim that MWAA is acting in contravention of any ethical duties.

Third, to the extent plaintiff intended to allege that the procurement process suffered flawed decision-making due to ethical lapses, the proposed amended complaint fails to identify precisely the ethical requirements breached or any conflicts of interest compromised. In contrast, a case relied upon by plaintiff, *LTMC/Dragonfly, Inc. v. MWAA*, *see, e.g.*, Pl.'s Reply at 5, demonstrates how a viable claim may be brought under the Standards of Conduct provision of the Contracting Manual. The complaint in that case, brought by a disappointed bidder for a taxicab concession contract, details that the winning bidder had informed "others that he was assured of being selected as one of the winning bidders, attributing his certainty to information he had received from the lobbyist he had hired to advocate his bid." LTMC/Dragonfly, Inc.'s Compl. ¶ 54, *LTMC/Dragonfly, Inc. v. Metro. Wash. Airports Auth.*, 699 F. Supp. 2d 281 (D.D.C. 2010), ECF No. 1. This lobbyist, who was at the time "serving as a Virginia State Delegate," hired a fundraising consultant "in order to advance his interests in campaigning for the office of Governor of Lieutenant Governor of Virginia." *Id.* ¶¶ 56, 59. That fundraising consultant happened to be "the Chair[woman] of the Board of Directors for the MWAA." *Id.* ¶ 60. Additionally, the lobbyist's brother served as "a member of the MWAA's Board of Directors." *Id.* In these circumstances, plaintiff alleged that the chairwoman "had a personal, professional, political, and financial interest in seeing the contract award go to" her own client's client, and thus her "participation in the evaluation process and in the vote on the contract award violated the terms of the Enabling Act, the Lease, and all applicable Codes of Ethics and other relevant provisions and proximately caused the contract award competition to be other than fair and open." *Id.* ¶¶ 61-63.

19

In stark relief to the specific allegations made in *LTMC/Dragonfly*, plaintiff here makes no accusation of a conflict of interest, or any other verboten conduct such as receipt of a bribe or improper sharing of information.  Instead, the claim boils down to asserting the legal conclusion that MWAA improperly favors DAAI, but without providing any plausible, let alone specified, basis for finding any impropriety.  While plaintiff plainly believes its own bid was superior to that of DAAI, the obvious bias in this perspective also undermines plaintiff's conclusion that "the only reasonable interpretation of MWAA's actions is that MWAA is determined to award the Contract to DAAI despite the blatant deficiencies in its proposal."  Proposed Am. Compl. ¶ 102.  This assertion, too, is insufficient to support a plausible claim for relief.

In sum, plaintiff has not stated a plausible claim that the published competitive procedure violated the terms of the Lease, that the letter from members of Congress contributed to an undisclosed bias in MWAA, or that unidentified ethical breaches resulted in the award of the contract to plaintiff's competitor.  Consequently, without a viable claim, plaintiff's complaint must be dismissed, and leave to file the proposed amended complaint, which does not cure this fatal defect, must be denied.

## IV.    CONCLUSION

For the foregoing reasons, MWAA's motion to dismiss the complaint is granted, pursuant to Federal Rule of Civil Procedure 12(b)(6), because plaintiff has failed to state a cognizable claim, and plaintiff's motion to amend the complaint is denied as futile.  An order consistent with this Memorandum Opinion will be entered contemporaneously.

Date:  August 9, 2026

_____
**BERYL A. HOWELL**
United States District Judge

20